ACCEPTED
06-15-00061-cv
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
12/18/2015 11:05:02 AM
DEBBIE AUTREY
CLERK

230 S.W.3d 723

Court of Appeals of Texas,
Houston (14th Dist.).

Eugene Morris **HARTIS** Jr., Appellant

v.

**CENTURY FURNITURE
INDUSTRIES**, INC., Appellee.

No. 14–05–01099–CV.  |  June 28, 2007.

## Synopsis

**Background: Furniture** company brought action against showroom representative for sworn account, quantum meruit, breach of contract, fraud, and conversion based on missing consigned **furniture**, and representative asserted counterclaim for breach of contract. The 55th District Court, Harris County, Jeff Brown, J., entered judgment for company and awarded attorney's fees, and representative appealed.

**Holdings:** The Court of Appeals, Eva M. Guzman, J., held that:

[1] representative had burden to prove the existence and terms of agreement with company concerning goods company picked up from showrooms;

[2] exchange of e-mails between company and representative did not satisfy statute of frauds;

[3] e-mails and attached inventory files did not constitute an enforceable new contract;

[4] evidence was sufficient to support findings that company and representative agreed to credit representative's account for the market value of third-party goods transferred to company and that the market value of the goods was 40% of the price listed on inventory file;

[5] testimony of company's controller as to market price for third-party **furniture** was admissible as the factual testimony of a lay witness;

[6] representative was estopped from arguing on appeal that he was entitled to a new trial based on financing agreement which allegedly failed to comply with North Carolina law; and

[7] court was not bound by stipulation that company's attorney's fees would be $18,000 through date of trial.

Affirmed.

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
12/18/2015 11:05:02 AM
DEBBIE AUTREY
Clerk

West Headnotes (12)

[1]  **Account, Action On**
 Evidence

**Furniture** showroom representative had burden to prove the existence and terms of agreement with **furniture** company concerning goods company picked up from showrooms, where representative pleaded payment as an affirmative defense to company's suit on sworn account, and also pleaded breach of contract as a counterclaim. Vernon's Ann.Texas Rules Civ.Proc., Rules 94, 95.

Cases that cite this headnote

[2]  **Frauds, Statute Of**
 Modification of Contract

Exchange of e-mails between **furniture** company and **furniture** showroom representative did not constitute a writing satisfying the requirements of the statute of frauds, where, under existing agreement, representative had already pledged his present and future inventory as collateral securing note and agreed to perfect company's lien on the inventory, representative had defaulted on note at the time **furniture** was transferred, and nothing in the exchanged e-mails indicated the parties intended to modify their agreement or execute a new and separate contract, particularly since the transfer of goods to company in the event of default was already encompassed within the existing agreement. V.T.C.A., Bus. & C. § 2.201.

Cases that cite this headnote

[3]  **Frauds, Statute Of**

◇━ Modification of Contract

E-mails and attached inventory files did not constitute an enforceable new contract between **furniture** company and **furniture** showroom representative regarding ownership of **furniture**, in light of existing consignment agreement; existing agreement already required monthly inventories, company already owned the majority of the products included in the inventory list, and existing agreement required a quarterly review of the percentage of showroom space occupied by company's **furniture**. V.T.C.A., Bus. & C. § 2.202.

Cases that cite this headnote

[4]     **Account, Action On**
◇━ Evidence

Evidence was legally and factually sufficient to support findings that **furniture** company and **furniture** showroom representative agreed to credit representative's account for the market value of third-party goods transferred to company and that the market value of the goods was 40% of the price listed on inventory file; representative agreed at trial that company offered to apply a credit against his debt in the amount of the market value of the third-party **furniture**, company's controller testified that the market value of the **furniture** was equal to 40% of the price listed in the inventory file, and there was no evidence or testimony that representative offered the **furniture** to company or any other entity at the full price listed in the file.

Cases that cite this headnote

[5]     **Account, Action On**
◇━ Evidence

**Evidence**
◇━ Value

Testimony of **furniture** company's controller as to market price for third-party **furniture** was admissible as the factual testimony of a lay witness in company's sworn account action against **furniture** showroom representative; testimony was rationally based on his perceptions and helpful to a clear understanding

of his testimony, and expert testimony was not necessary to prove reasonable price or actual damages. Rules of Evid., Rule 701.

1 Cases that cite this headnote

[6]     **Appeal and Error**
◇━ Particular cases

Any error in admitting testimony of **furniture** company's controller as to market price for third-party **furniture**, based on lack of expert qualification, was harmless error in company's sworn account action against **furniture** showroom representative, as testimony was cumulative of evidence previously admitted without objection. Rules of Evid., Rule 701.

Cases that cite this headnote

[7]     **Appeal and Error**
◇━ Exclusion of evidence

**Furniture** showroom representative was estopped from raising issue on appeal in **furniture** company's sworn account action that he was entitled to a new trial based on financing agreement which allegedly failed to comply with North Carolina law preventing a secured party from recovering a deficiency, where representative objected to the reopening of the evidence to admit the document and asked the trial court to exclude the document as untimely and as a discovery sanction against **furniture** company, and court granted that relief.

Cases that cite this headnote

[8]     **Appeal and Error**
◇━ Waiver by failure to argue or present to court

**Furniture** showroom representative made no argument based on North Carolina law in his motion for new trial, and thus waived argument on appeal that he was entitled to new trial on **furniture** company's action for sworn account and other claims because financing agreement contained a provision that required it to be interpreted under North Carolina law and that **furniture** company failed to comply with North

Carolina statutes that prevent a secured party from recovering a deficiency unless that party proves notice of planned disposition complying with the statute and commercially reasonable disposition of the collateral. Rules App.Proc., Rule 33.1.

Cases that cite this headnote

[9] **Appeal and Error**
⬚ Exclusion of evidence

**Furniture** showroom representative, who successfully argued for exclusion of UCC financing document from evidence in **furniture** company's action for sworn account and other claims, was estopped on appeal from arguing that the trial court should have held that company's failure to sell third-party goods in a manner complying with the UCC disqualified it from recovering a deficiency from representative, as any error was invited.

Cases that cite this headnote

[10] **Costs**
⬚ Stipulations and agreements
**Evidence**
⬚ Weights, measures, and values

Trial court was not bound by stipulation that defendant's attorney's fees would be $18,000 through date of trial, but rather could take judicial notice of the usual and customary fees for additional work and the efforts of the attorneys and add a reasonable sum to the previously stipulated amount and award $20,000 in fees. V.T.C.A., Civil Practice & Remedies Code § 38.004(1).

Cases that cite this headnote

[11] **Appeal and Error**
⬚ Attorney fees
**Costs**
⬚ Items and amount; hours; rate

Ordinarily, the amount of attorneys' fees awarded rests within the sound discretion of the trial court and will not be reversed absent a showing of abuse of that discretion.

Cases that cite this headnote

[12] **Costs**
⬚ Stipulations and agreements
**Costs**
⬚ Evidence as to items

The trial court is not bound by stipulations or uncontroverted evidence regarding attorneys' fees.

Cases that cite this headnote

**Attorneys and Law Firms**

*725 Joseph A. McDermott III, Houston, for Appellant.

Charlene Cantrell Koonce, Dallas, Patrick Joseph Schurr, Frisco, for Appellee.

Panel consists of Chief Justice HEDGES and Justices HUDSON and GUZMAN.

**OPINION**

EVA M. GUZMAN, Justice.

Appellant Eugene Morris **Hartis**, Jr. sold **furniture** on consignment for appellee, **Century Furniture Industries, Inc.** After **Hartis** repeatedly failed to remit payment to **Century**, the parties agreed that **Century** would pick up its consigned **furniture** and also **furniture** manufactured by third parties from **Hartis's** Houston warehouses and credit the value of the **furniture** to **Hartis's** outstanding indebtedness. After retrieving and reselling the **furniture**, **Century** brought suit on a sworn account, alleging that, after applying the credit to **Hartis's** account, an outstanding balance remained. As an affirmative defense and counterclaim, **Hartis** alleged that the transfer was performed subject to a new *726 contract under which **Century** agreed to pay the full price stated by **Hartis** for each item. The main dispute on appeal involves **Hartis's** contention that **Century** agreed to purchase each item of third-party **furniture** for the price stated by **Hartis** in a written document detailing his Houston inventory. After a trial to the bench, the trial court ruled in favor of **Century**. We affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### April 2002–February 2003

Appellant Eugene Hartis, Jr. was a manufacturer's representative for **Century Furniture Industries, Inc.** ("**Century**"). His company, **Century** Showrooms ("Showroom") maintained an open account with **Century**. **Century** consigned **furniture** to Showroom, and Showroom paid **Century** for the **furniture** after it was sold.[1]

**Century's** controller, Brandon Hucks, inventoried Showroom's three warehouses in April 2002 and discovered that, although **Century** had consigned **furniture** with a wholesale value of $454,930.89 to Showroom, Showroom had only $229,724.25 in consigned **furniture** in its possession. **Hartis** admitted that he had sold the missing **furniture** and had not remitted any of the proceeds to **Century**.[2]

In an effort to address the missing payments, **Hartis** executed a "Key Points of Agreement" ("Key Agreement") with **Century** on April 29, 2002. Under this Agreement, **Hartis** assumed personal responsibility for Showroom's debt (the "Note") and agreed to execute required forms perfecting **Century's** lien on "the existing inventory and inventory acquired in the future" as collateral securing the Note. He also agreed that, effective January 1, 2003, he would devote 85% of Showroom's net usable space to **Century** products. **Century** agreed to reduce the debt arising from the missing **furniture** from $225,206.64 to $150,000, and the parties established a payment plan. **Hartis** agreed to pay **Century** $50,000 of this debt on May 15, 2002 and to pay the remainder in four quarterly installments of $25,000 each, beginning on August 1, 2002. **Hartis** made the first two payments totaling $75,000, but failed to make payments due on November 1, 2002 and February 1, 2003.

By February 2003, **Hartis** had reported additional sales of **Century's** consigned **furniture** with a wholesale value of $135,173.25.[3] After deducting these reported sales from **Hartis's** April 2002 inventory, **Century** expected that in February 2003, **Hartis** possessed **Century furniture** with a wholesale value of $94,551.00. **Hartis** also incurred additional debts to **Century** during this time. As a result of sales on other accounts and sales of floor samples, **Hartis's** total debt to **Century** in February 2003, including payments due under the Key Agreement, totaled $256,432.03.

### February 12, 2003–March 17, 2003

Hucks testified that **Hartis** offered to pay his outstanding debt by turning over merchandise listed in three inventory spreadsheets that **Hartis** emailed to Hucks on February 12, 2003. One spreadsheet listed merchandise stored in Dallas and identified with the Durango Trading Company (the "Durango Inventory File"); another listed imported goods stored in a warehouse in High Point (the "High Point Inventory File").[4] The third spreadsheet **\*727** was identified as "**Century** 2003 Reconciliation, Item Listing, February 12, 2003" (the "Houston Inventory File"). The Houston Inventory File contains six columns with the headings, "Item," "Description," "Quantity on Hand," "Cost," "Ext Cost," and "Preferred Vendor." On the last page of this spreadsheet, the sum of the entries in the column marked "Ext Cost" is listed as $386,503.54.

On February 17, 2003, **Hartis** emailed **Century** two files labeled "CSR Inventory Reconciliation021803" and "Durango Inventory021803." The body of the email contains no text, but the stated subject is "Updated Inventory."

On February 18, 2003, Hucks wrote to **Hartis** as follows:

> Gene, I haven't had an opportunity to review the detail of your files below, but the CSR file seems high. When I took you're [sic] Dec. Inventory less January Sales, I came up with 296,529.20. (excluding Durango and High Point). That seemed reasonable based on the January sales figures that we discussed (approximately $150K to $160K with little to no margin). Your file below states 366,887.09. Any ideas?

On February 20, 2003, **Hartis** responded:

> I was trying to get a picture of the **Century** inventory and left the subtotal in the figures. I think that the **Century** inventory was added in twice. I am forwarding a corrected copy that subtotals the **Century** inventory and then backs out the **Century** goods.... Also attached is a listing of the **Century** items

cleared in Jan./Feb. The merchandise at Ampac in High Point does not belong to [Showroom].... There is also additional merchandise at Ampac from the Chinese company that came in with the goods designated for me. We do not own any of it, however.

Sometime between February 20 and March 17, 2003, Century picked up five truckloads of consigned and third-party furniture from Hartis's warehouses.

### Transfer of Consigned Furniture

The parties do not dispute their mutual understanding that some of the transferred furniture was held on consignment, or that, after retrieving the consigned furniture, Century removed it from the list of consigned items held in trust, effectively giving Hartis a "dollar-for-dollar" credit for these items. The initial wholesale cost of these goods, and thus the credit applied to Hartis's debt upon their return, totals $64,784.75.[5] With the exception of items that were simply misidentified on the party's lists—and Hartis testified at trial that these constitute an insignificant amount—the shortfall is the result of missing inventory. When asked at trial if he sold an additional $30,000 of consigned Century furniture and again failed to pay Century, Hartis responded, "Possibly."

### Transfer of Third–Party Furniture

The remainder of the furniture transferred to Century consisted of furniture manufactured by third parties. The third-party furniture was not in its original packaging and had previously been displayed; Hartis was unsure of its age. Century sold this furniture to its sister company, Boulevard, for an amount Century identified as market value.

On March 17, 2003, Hucks emailed Hartis as follows:

Gene, Please see the attached file per our conversation. The *first* tab contains a recap of your liability. The *second* tab *728 contains a "summary" of the inventory picked up. The *third* tab contains the "detail" of the inventory picked up. The *fourth* tab contains the remaining consignment inventory prior to the pick-up. Per our

conversation, let's discuss further on Friday.

One or more of the files attached to the email contained the information that, as a result of the transfer of the third-party goods, Century had applied a credit of $68,911.00 to Hartis's outstanding debt. This amount represented 40% of the price Hartis listed for the items in the Houston Inventory File attached to his email of February 12, 2003; according to the evidence presented at trial, this is also the amount for which Century sold the property to Boulevard. Century credited this amount to Hartis's debt, leaving an outstanding balance of $105,013.27. Hartis made no further payments, and there is no evidence of any further written communications.

### The Trial

Century brought suit on a sworn account against Hartis, adding claims for quantum meruit, breach of contract, fraud, and conversion. Hartis asserted a counterclaim for breach of contract, and the case was tried to the bench on June 16, 2005.

At trial, Hucks testified that he and Hartis had agreed that the market price for the third-party goods would be applied to Hartis's outstanding debt (i.e., the debt that Hartis owed Century under the Key Agreement and the debt that his company owed Century for consigned goods). Hucks further testified that in North Carolina, where Century is headquartered, liquidation prices are 40–50% of the wholesale price, and when sold through a retailer, the market value for furniture is 50–60% of the wholesale price.[6] These prices apply to goods out of the box on the showroom floor. Here, the transferred goods were wrapped in blankets, and Hartis admitted that the goods were out of the box and had been on display.

Hartis admitted that he did not comply with the terms in the Key Agreement requiring him to give Century liens on the existing and future inventory. Initially, he also testified that he never had any discussions with Century concerning discounts to the price he identified for the third-party goods. Although he subsequently testified that Century offered to take the goods at market price, Hartis stated that he refused the offer.

According to Hartis, he instructed Century to examine the goods in Houston and accept only those that it considered salable. He admitted that he knew Century would sell the goods to its sister company, but testified that he could

have liquidated the third-party goods for a 33–40% profit. In contrast, **Century** produced evidence that in November 2002, **Hartis's** company was selling **furniture** at a 50–80% reduction from retail prices. Most of the items listed in **Hartis's** inventory of February 12, 2003 would have been among those items offered for sale at reduced prices in November 2002.

During closing argument, **Hartis** argued that the case was governed by Article 2 of the Uniform Commercial Code. After the trial court requested post-trial briefing on the issue, **Century** objected on the grounds that "the UCC argument is not made in the pleading." The trial court suggested that **Century** address this objection in its post-trial brief.

On June 21, 2005, **Century** moved to reopen the evidence in order to introduce a *729 security agreement, a UCC financing statement, and evidence regarding the date on which **Century** sold the third-party **furniture** to Boulevard. **Hartis** opposed the motion, and the trial court denied it. On June 22, 2005, **Hartis** moved "for a trial amendment to incorporate Article 2 into his contract pleadings." This motion also was denied.

On July 22, 2005, the trial court entered its final judgment in favor of **Century** and ordered **Hartis** to pay the principal sum of $105,103.27 plus prejudgment and postjudgment interest and reasonable attorneys' fees.[7] **Hartis** requested findings of fact and conclusions of law, and after he filed a notice that they were past due, the trial court issued its findings and conclusions on October 4, 2005. In pertinent part, the trial court wrote as follows:

> **Century** pleaded and proved a sworn account by which **Hartis** had acquired from **Century** **furniture** to be sold in his retail **furniture** store. **Century** proved that the amount due, owing and unpaid on that account was $30,013.27.

> The court's holding on **Century's** sworn-account claim mooted **Century's** *quantum meruit* claim. **Century** either abandoned or failed to bear its burden to prove **Hartis'[s]** liability for fraud and conversion.

> The agreement at issue in **Century's** breach-of-contract claim was the Key Points of Agreement signed by **Hartis** and **Century** on April 29, 2002. As one of the terms of that agreement, **Hartis** agreed to pay—and **Century** agreed to accept—$150,000 for "sold" inventory that had been worth $225,000. By paying only half of the $150,000 he had agreed to pay, **Hartis** breached the agreement.... The court holds that **Hartis** is liable for the $75,000 he failed to pay, but that the $75,000 "discount" does not constitute damages arising out of a breach of the contract. Accordingly, **Century's** recovery on its breach-of-contract claim is limited to $75,000.

> **Hartis'[s]** counterclaim for breach of contract fails both because he failed to bear his burden to prove the existence of a valid agreement and because any such agreement would have been unenforceable under the Statute of Frauds—TEX. BUS. & COM. CODE ANN. § 2.201—which **Century** asserted and proved as an affirmative defense.

The trial court denied **Hartis's** motions for additional findings and for a new trial, and this appeal ensued.

## II. ISSUES PRESENTED

**Hartis** presents eleven issues for our review. In his first issue, **Hartis** contends the trial court improperly required him to prove the existence and terms of an agreement between the parties concerning the third-party goods transferred to **Century** in February 2003. He next argues that the trial court should have found, as a matter of law, that there was an agreement between the parties to credit **Hartis** for the third-party goods that **Century** obtained from him in February 2003; alternatively, he contends that the trial court's failure to make such a finding is against the great weight and preponderance of the evidence. **Hartis** argues in his third issue that the trial court should have found, as a matter of law, that the agreed price for each third-party item was the price listed in the Houston Inventory File he emailed to **Century** on February 12, 2003; alternatively, **Hartis** contends that the trial *730 court's failure to make such a finding is against the great weight and preponderance of the evidence.

**Hartis** raises additional sufficiency challenges in his fourth, fifth and sixth issues. In his fourth issue **Hartis** asserts that there is legally and factually insufficient evidence to support the trial court's implied finding that the parties agreed **Century** would credit **Hartis** for the market price of the third-party goods. **Hartis** argues in his fifth issue that the evidence is legally and factually insufficient to support the trial court's implied finding that the market price for these goods was forty percent of the price listed in the Houston Inventory File. In his sixth issue, **Hartis** contends the trial court should have found, as a matter of law, that the market price for the third-

party goods was the price listed in the Houston Inventory File; alternatively, he argues that the failure to make such a finding was against the great weight and preponderance of the evidence.

Hartis asserts in his seventh issue that the trial court should have excluded the testimony of Brandon Hucks concerning the market price for the goods transferred to Century in February 2003 because Hucks was not designated as an expert. In his eighth issue, Hartis challenges the trial court's holding that his counterclaim was barred by the statute of frauds. Hartis contends in his ninth issue that the trial court should have conducted a new trial because Century failed to produce a controlling document in discovery. In his tenth issue, Hartis argues that the trial court should have held Century's failure to sell the goods in a manner complying with Article 9 of the Uniform Commercial Code disqualified Century from recovering a deficiency from him. Finally, in his eleventh issue, Hartis challenges the trial court's award of attorneys' fees.

## III. ANALYSIS

### A. Burden of Proof

[1]    Hartis asserts in his first issue that the trial court improperly placed the burden on him to prove the existence and terms of an agreement between the parties concerning the goods picked up by Century in February 2003. We disagree. Hartis pleaded payment as an affirmative defense to Century's suit on a sworn account; thus, he bore the burden to prove this defense. *See* TEX. R. CIV. P. 94, 95; *Sw. Fire & Cas. Co. v. Larue,* 367 S.W.2d 162, 163 (Tex.1963). Moreover, not only is his assertion of payment a matter in avoidance, but Hartis also pleaded breach of contract as a counterclaim, and bears the burden of proof on his own claims.

In support of his argument that the trial court improperly shifted the burden of proof, Hartis relies on *Willis v. Jenkins,* 472 S.W.2d 600, 602 (Tex.Civ.App.-Tyler 1971, no writ). In *Willis,* the Twelfth Court of Appeals observed the unexceptional rule that a defendant bears the burden of proof on his counterclaim. *Id.* Thus, it undermines rather than supports Hartis's argument. He also relies on *Olney Savings & Loan Association v. Farmers Market of Odessa, Inc.* 764 S.W.2d 869, 871 (Tex.App.-El Paso 1989, writ denied). There, the Eighth Court of Appeals held that in a suit by a lender for a deficiency judgment from loan guarantors

after a non-judicial foreclosure sale, the lender, by alleging that it sold the property for a "fair and reasonable" value, assumed the burden of proof on that issue. *Id.* But *Olney* does not purport to apply outside of the real property context. [8]

*731 Finding no support for Hartis's arguments, we conclude the trial court properly placed the burden of proof; thus, we overrule his first issue.

### B. The Transfer as a Separate Agreement

In his second, third, and eighth issues, Hartis essentially complains of the following conclusion of law:

> Hartis'[s] counterclaim for breach of contract fails both because he failed to bear his burden to prove the existence of a valid agreement and because any such agreement would be unenforceable under the Statute of Frauds—TEX. BUS. & COM. CODE ANN. § 2.201—which Century asserted and proved as an affirmative defense.

We begin our analysis with Section 2.201 of the Business and Commerce Code, which provides as follows:

(a) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more *is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought* or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

(b) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of Subsection (a) against such party *unless written notice of objection to its contents is given within ten days after it is received.*

(c) A contract which does not satisfy the requirements of Subsection (a) but which is valid in other respects is enforceable ...

...

(2) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

(3) with respect to goods for which payment has been made and accepted or which have been received and accepted (Section 2.606).

TEX. BUS. & COM. CODE ANN. § 2.201 (Vernon 1994) (emphasis added).

[2] Contrary to **Hartis's** contentions, the exchange of emails in February and March 2003 does not constitute a writing satisfying the requirements described in section 2.201(a) of the Business and Commerce Code. It is undisputed that, under the terms of the Key Agreement, **Hartis** had already pledged his present and future inventory as collateral securing the Note and agreed to perfect **Century's** lien on the inventory. It is also undisputed that, at **\*732** the time the **furniture** was transferred, **Hartis** had defaulted on the Note. Nothing in the exchanged emails indicates the parties intended to modify their agreement or execute a new and separate contract, particularly since the transfer of these goods to **Century** in the event of **Hartis's** default was already encompassed within the Key Agreement. Moreover, none of the writings contain an offer or agreement that **Century** would pay **Hartis** the amount listed in the Houston Inventory File for each third-party item or credit that amount against **Hartis's** outstanding debt.

[3] **Hartis** also contends that, taken individually or collectively, the Houston Inventory File, the February 18, 2003 email from Hucks to **Hartis**, and a file entitled "Houston Inventory, 3rd Party Inventory Picked–Up" constitute a "confirmatory memoranda." He then relies on section 2.202 of the Business and Commerce Code to argue that parol evidence can be used to explain variances in the quantities of transferred goods, but not to vary the price from that stated in the Houston Inventory File.

The statute at issue provides in pertinent part:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing *intended by the parties as a final expression of their agreement* with respect to such terms as are included

therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(1) by course of performance, course of dealing, or usage of trade (Section 1.303); and

(2) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

TEX. BUS. & COM. CODE ANN. § 2.202 (Vernon Supp.2006) (emphasis added).

Examining the writings at issue, a reasonable factfinder could conclude that **Hartis** failed to show the series of emails and attachments were intended as a final expression of the parties' agreement.[9] First, **Hartis's** email of February 12, 2003 is not sufficiently specific to constitute an offer. Although it attached the Houston Inventory File, the Key Agreement already required inventories to be performed monthly.[10] Moreover, the email and attachment could not be reasonably construed as an offer for sale because **Century** already owned the majority of **Century** products included on the list. Most of the **Century furniture** was held on consignment, and although **Century** had the right to retrieve these goods at any time if the terms of the Key Agreement were not satisfied, **Hartis's** email and attachment did not treat these items differently from the third-party goods owned by **Hartis** or Showroom. Finally, we note that the Key Agreement **\*733** required **Hartis** to maintain a volume of **Century** goods constituting "no less than 85% of the net usable space by January 1, 2003" and that his progress toward that target was to be reviewed quarterly. On its face, the Houston Inventory file and the inventory reconciliations appear to respond to this requirement. Similarly, Hucks's email to **Hartis** on February 18, 2003 and **Hartis's** response on February 20, 2003 can reasonably be characterized as a discussion concerning **Hartis's** compliance with the Key Points of Agreement, both by accurately reporting sales and by maintaining **Century's** inventory prominence.

In sum, there is no evidence that the communications on which **Hartis** relies confirm a new contract, rather than addressing an offset to a preexisting debt; thus, sections 2.201(b), 2.201(c)(2), and 2.203 of the Uniform Commercial Code are inapplicable. *See id.* §§ 2.201(b), (c)(2), 2.202. For similar reasons, there is no evidence of an agreement that is "valid in other respects," and thus section 2.201(c)(3) does not

apply. *See id.* § 2.201(c)(3). We therefore overrule **Hartis's** second, third, and eighth issues.

### C. Implicit Finding that the Parties Agreed to Apply a Credit Against Hartis's Debt in the Amount of the Market Price for the Third–Party Furniture

[4] **Hartis's** fourth and fifth issues concern the legal and factual sufficiency of the evidence supporting the trial court's implied findings. [11] In his fourth issue, **Hartis** challenges the implied finding that the "parties' agreement was that the price to be paid, or credited against what **Hartis** owed **Century**, for the goods picked up by **Century** from **Hartis'**[s] warehouse in February[ ] 2003 was to be market price, in that such finding was supported by no evidence, or alternatively, by insufficient evidence." In his fifth issue, **Hartis** argues that the "trial court should not have implicitly found that the market price for the goods picked up by **Century** from **Hartis'**[s] warehouse in February[ ] 2003 was 40% of **Hartis'**[s] stated price, in that such finding was supported by no evidence, or alternatively, by insufficient evidence." **Hartis's** sixth issue also concerns the market price for the transferred goods. There, he argues that the trial court should have found, as a matter of law, that "the market price for the goods was the price specified" in the Houston Inventory File, or alternatively, the failure to make such a finding was against the great weight and preponderance of the evidence.

Each of these issues requires us to review the entire record using the same standards of legal and factual sufficiency applicable to a jury's answers. *See Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994). In evaluating legal sufficiency, we credit evidence that supports the judgment if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). A party *734 attacking the legal sufficiency of an adverse finding on an issue on which he had the burden of proof must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001). If a party attacks the legal sufficiency of the evidence supporting an adverse finding on an issue on which it did not have the burden of proof, the party must demonstrate on appeal that no evidence supports the adverse finding. *Arrellano v. State Farm Fire & Cas. Co.,* 191 S.W.3d 852, 855–56 (Tex.App.-Houston [14th Dist.] 2006, no pet.). When a party attacks the factual sufficiency of a finding, we set it aside only if it is so contrary to the overwhelming weight and preponderance of the evidence that

it is clearly wrong and manifestly unjust. *Haas v. Ashford Hollow Cmty. Improvement Ass'n, Inc.,* 209 S.W.3d 875, 887 (Tex.App.-Houston [14th Dist.] 2006, no pet.).

We conclude that, under the applicable standards of review, the implied findings **Hartis** challenges are supported by the record evidence. At trial, **Hartis** agreed that **Century** offered to apply a credit against his debt in the amount of the market value of the third-party **furniture**. Although **Hartis** contends that he rejected the proposal, the trial court could have reasonably disbelieved that contention. A finding that the market value of the third-party **furniture** was equal to forty percent of the price listed in the Houston Inventory File was supported by testimony from Brandon Hucks regarding both valuation and actual sales price.

On the other hand, there is no evidence in the record that **Hartis** offered these goods to **Century**, to the public, or to any other potential purchaser at the prices listed in the Houston Inventory File. Regarding the prices on this list, **Hartis** testified as follows:

> Q: Okay. And where did you get the cost prices that are listed on Exhibit Number 1 [i.e., the Houston Inventory File]?
>
> A: *These were the prices that are entered into our system when we receive the merchandise.*
>
> Q: So there would be invoices when you received it-when you received the merchandise that would support these dollar figures, correct?
>
> A: That's correct.
>
> Q: And who has those documents?
>
> A: I'm not sure. [12]

Thus, **Hartis** testified regarding the time when the figures were entered, but offered no evidence explaining what the figures represent.

In a bench trial, the trial court is the sole judge of the credibility of the witnesses and may take into consideration all the facts and surrounding circumstances in connection with the testimony of each witness and accept or reject all or any part of that testimony. *Nelson v. Najm,* 127 S.W.3d 170, 174 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). Thus, the trial court could have found **Hartis's** testimony less than credible and may not have inferred from his testimony that

the amounts he listed in the Houston Inventory File accurately represented the original wholesale price of the third-party goods.

In sum, the record is legally and factually sufficient to support the trial court's findings that the parties agreed to credit **Hartis's** account for the market value of the transferred third-party goods, and the market value of these goods was forty *735 percent of the price listed on the Houston Inventory File. We therefore overrule **Hartis's** fourth, fifth, and sixth issues.

### D. Testimony of Brandon Hucks

[5] **Hartis** next contends that, because **Century** failed to timely designate Brandon Hucks as an expert, the trial court erred in admitting his testimony concerning the market price for third-party goods because **Century** did not show that its failure to designate Hucks as an expert was excused for good cause, or that the failure did not unfairly surprise or prejudice **Hartis**. *See* TEX. R. CIV. P. 193.6. **Hartis** further contends that, in the absence of Hucks's expert testimony concerning the market price of the third-party goods, there is no evidence to support such a finding. We review the trial court's decision to allow Hucks's testimony for an abuse of discretion. *See Tamez v. State,* 205 S.W.3d 32, 43 (Tex.App.-Tyler 2006, no pet.).

We begin our review by placing **Hartis's** objection in context. Hucks initially testified that **Century** was typically able to resell its own product for "40 to 50 cents on the wholesale dollar" when the product is out of the box and has been displayed in a showroom; moreover, he has personally had experience reselling such furniture. He further testified that when the product is still in the box, **Century** can sell it to liquidators for "50 to 60 cents on the wholesale dollar." Hucks also testified that he had made such a sale the day before trial with a Houston retailer or liquidator.

**Hartis** did not object to any of this testimony on the grounds that Hucks was an undesignated expert. He raised this objection only when Hucks was subsequently asked "how did you arrive at 40 percent as a discount for this third-party merchandise?" Hucks responded:

> The decision points [sic] to credit Mr. **Hartis** 40 percent of the listed price of his inventory was based on the prior experience that I have in selling items of first quality in the box—

slow turning, in the box, for 50 to 60 cents on the wholesale dollar, in my experience. And my experience of selling our showroom samples, that I assume would be in similar condition to what Mr. **Hartis** had on his floor, at 40 to 50 cents on the wholesale dollar out of the box. So the 40 cent basis came from basically drawing on, this is the type expectation that we get for our goods in similar condition.

Hucks further testified that **Century** actually sold the furniture for this price to its sister company, Boulevard.

**Hartis** argues that "[t]estimony concerning market price of trade goods must come from an expert," and in support of this contention, relies on *Cass v. Stephens,* 156 S.W.3d 38, 64–65 (Tex.App.-El Paso 2004, pet. denied). But *Cass* involves the competency of an accounting expert to testify regarding (a) whether operators followed correct accounting procedures, (b) the market value of converted oil and gas equipment, and (c) whether defendants acted with malice in converting the equipment. It does not concern trade goods or the necessity for expert testimony.

**Hartis** next relies on *50–Off Stores, Inc. v. Banques Paribas (Suisse), S.A.,* for the proposition that "[a] sale at other than arms length is no evidence of a fair market transaction." 180 F.3d 247, 255 (5th Cir.1999). But, in that case, the Fifth Circuit Court of Appeals held that if a buyer never intended to pay the price he negotiated for stock, then his offer is not a useful indication of fair market value, because it only shows the price the seller would accept and not the price an arms-length purchaser would pay. *Id.* Here, however, Hucks *736 testified without objection regarding the price an arms-length purchaser would pay.

Finally, **Hartis** contends that the trial court was required to accept the figures included in the Houston Inventory File as the market value or the agreed value of the third-party goods. Specifically, **Hartis** argues that "[w]hile the fact finder is ordinarily free to disbelieve even uncontroverted testimony, in a proper case such testimony, even that of an interested witness, establishes the matter testified to as a matter of law." In support of this argument, **Hartis** relies on *Schwartz v. Pinnacle Communications,* 944 S.W.2d 427 (Tex.App.-Houston [14th Dist.] 1997, no writ).

In *Schwartz,* we held:

> [W]hile the fact finder is charged with the duty of deciding issues raised by conflicting evidence, *when the evidence is not conflicting,* the fact finder may not disregard uncontradicted testimony in order to decide an issue in accordance with its own wishes. This exception applies even when the testimony comes from an interested witness if certain circumstances exist to ensure its reliability. If *the interested witness'[s] testimony is clear, direct, and positive, as well as free from contradiction, inaccuracies, and suspicious circumstances,* it is taken as true, as a matter of law.

*Id.* at 434 (citations omitted, emphasis added). The italicized circumstances are not present here.

[6] On appeal, Century persuasively argues that Hucks's testimony is admissible as the factual testimony of a lay witness under Texas Rule of Evidence 701 because Hucks's statements were rationally based on his perceptions and helpful to a clear understanding of his testimony. *See* TEX. R. EVID. 701 (restricting the opinion testimony of a lay witness to "those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue"). Century further argues that expert testimony is not required to prove reasonable price or actual damages. *See Laprade v. Laprade,* 784 S.W.2d 490, 492 (Tex.App.-Fort Worth 1990, pet. denied) (stating that "it is largely discretionary with the judge as to whether a witness is qualified to testify as to market value" and holding that the trial court did not err in admitting lay witness testimony concerning the value of a business where the witness had knowledge of the business's accounts receivable, had run the business for five years, knew what was paid for each of the business's trucks, and knew the value of other, smaller businesses for sale). We agree with both contentions. Moreover, the testimony to which Hartis objected is cumulative of evidence previously admitted without objection, and thus error, if any, is harmless.

We hold the trial court did not abuse its discretion by admitting the challenged testimony, and we overrule Hartis's seventh issue.

## E. UCC Financing Statement

[7] In his ninth issue, Hartis contends that the trial court should have granted a new trial because Century failed to produce a controlling document in discovery. Specifically, Hartis complains that Century did not produce a requested UCC financing agreement until after trial. Although Century moved to reopen the evidence to admit the document, *Hartis objected.* Hartis now argues that the document contains a provision that requires it to be interpreted under North Carolina law, and that Century failed to comply with North Carolina statutes that prevent a secured party from recovering a deficiency unless that party proves (a) notice of planned disposition complying with the statute and (b) commercially reasonable disposition of the collateral. Hartis contends that no *737 evidence of a notice of disposition was offered, and, if we exclude Hucks's testimony regarding market value, no evidence of commercial reasonableness is in the record.

[8] First, in his motion for new trial, Hartis made no argument based on North Carolina law. Thus, these arguments are waived. TEX. R. APP. P. 33.1. Second, inasmuch as Hartis objected to the reopening of the evidence and asked the trial court to exclude the document as untimely and as a discovery sanction, Hartis has already been granted the relief he sought, and the court's error, if any, was invited. Hartis is therefore estopped from raising this issue on appeal. *See Tittizer v. Union Gas Corp.,* 171 S.W.3d 857, 861 (Tex.2005) (per curiam). For each of these reasons, we overrule Hartis's ninth issue.

## F. Compliance with Article Nine of the Uniform Commercial Code

[9] In a related argument, Hartis contends that the trial court should have held that Century's failure to sell the third-party goods in a manner complying with Article Nine of the Uniform Commercial Code disqualified it from recovering a deficiency from Hartis. This argument depends on the admission of the security agreement, and Hartis successfully argued for its exclusion. Here, too, the court's error, if any, was invited; thus Hartis is estopped from raising this issue on appeal. *See id.* Accordingly, we overrule Hartis's tenth issue.

## G. Attorneys' Fees

**[10]** Finally, **Hartis** argues that the attorneys' fee award should be vacated because the damage award must be reversed. For the reasons discussed above, this argument is without merit. In the alternative, he asks us to reform the judgment because the trial court awarded fees exceeding the amount stipulated. [13] Specifically, at the close of **Century's** case-in-chief, **Century's** attorney, Patrick J. Schurr, recited the parties' stipulation that **Century's** "attorneys' fees will be $18,000 through the date of trial" and that the fees for **Hartis's** attorney, Joseph A. McDermott, III, were $16,000. He added, "And then, appellate fees of $2,500 for Motions for New Trial, Court of Appeals, et cetera." McDermott then added that the parties stipulated "to an amount, not entitlement...." The trial court accepted the stipulation, but after the close of evidence, requested post-trial briefing on the application of the Uniform Commercial Code.

**[11]** **[12]** Ordinarily, the amount of attorneys' fees awarded rests within the sound discretion of the trial court and will not be reversed absent a showing of abuse of that discretion. *Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 881 (Tex.1990) (per curiam). Here, no such abuse of discretion has been demonstrated. When a contract case is tried without a jury, the trial court may take judicial notice of (1) the contents of the file to estimate the work involved; and (2) the customary fee for the claim involved, which is presumed to be reasonable. TEX. CIV. PRAC. & REM. CODE ANN.. § 38.004(1) (Vernon 1997); *Lee v. Perez,* 120 S.W.3d 463, 469 (Tex.App.-Houston [14th Dist.] 2003, no pet.); Hon. Scott A. Brister, *Proof of* *738 *Attorney's Fees in Texas,* 24 ST. MARY'S L.J. 313, 333 (1993). The trial court is not bound by stipulations or uncontroverted evidence regarding attorneys' fees. *See Jackson v. Barrera,* 740 S.W.2d 67, 68–69 (Tex.App.-San Antonio 1987, no writ) (holding that a

stipulation is "some evidence" of attorneys' fees); *Nat'l Mar-Kit, Inc. v. Forrest,* 687 S.W.2d 457, 460 (Tex.App.-Houston [14th Dist.] 1985, no writ) (affirming award of attorneys' fees that differed from the uncontroverted evidence). We therefore assume that, after requesting post-trial briefing, the trial court took judicial notice of the usual and customary fees for the additional work and the efforts of the attorneys, and added a reasonable sum to the previously stipulated amount. *See Lacy v. First Nat'l Bank of Livingston, Tex.,* 809 S.W.2d 362, 367 (Tex.App.-Beaumont 1991, no writ) (noting that the trial court is presumed to have taken judicial notice of reasonable and customary attorneys' fees). We overrule **Hartis's** eleventh issue.

## IV. CONCLUSION

We hold the trial court properly placed the burden on **Hartis** to prove the elements of his counterclaim and affirmative defenses, and the evidence supports the trial court's express or implied findings of fact and conclusions of law. We further hold the trial court did not abuse its discretion in admitting the testimony of Brandon Hucks. Finally, we presume that in awarding attorneys' fees, the trial court considered the parties' stipulations and took judicial notice of the reasonable and customary fees in the area for the work performed. We overrule **Hartis's** remaining issues under the doctrines of invited error and waiver, and affirm the judgment of the trial court.

**All Citations**

230 S.W.3d 723, 63 UCC Rep.Serv.2d 282

Footnotes

1    **Century** also sold **furniture** directly to Showroom.
2    The wholesale value of the missing **furniture** was $225,206.64.
3    **Century** did not insist on payment of the full amount, but instead agreed to accept $89,527.75 in full satisfaction for these sales.
4    Neither file is in the record.
5    This amount is approximately $29,766.25 less than the value of the consigned goods reported by **Hartis** in his earlier email.
6    Hucks also testified that on the day before trial, he completed a transaction with a retailer that conducts operations in Florida and Houston. According to Hucks, the **furniture** sold in this transaction was valued at "50 cents on the dollar."
7    The attorneys' fee award consisted of $20,000 incurred in obtaining the judgment, $2,000 if **Century** should successfully defend an attack on the judgment prior to appeal, $2,000 if **Century** succeeded in an appeal to the court of appeals, and $2,000 if **Century** succeeded in an appeal to the Texas Supreme Court.

8 Moreover, this court does not follow *Olney*, but has instead stated that "[c]ommercial reasonableness is a defense which must be pled by the debtor, not an element of the lender's cause of action. Only after the affirmative defense of commercial reasonableness is asserted, does the lender have the burden to offer proof that the sale was commercially reasonable." *McDonald v. Foster Mortgage Corp.*, 834 S.W.2d 573, 576 (Tex.App.-Houston [14th Dist.] 1992, writ denied) (citation omitted); *see also* TEX. PROP. CODE ANN.. § 51.003 (Vernon 2007); *Sowell v. Resolution Trust Corp.*, No. 14–92–00320–CV, —— S.W.3d ——, ——, 1996 WL 233727, at *3 (Tex.App.-Houston [14th Dist.] May 9, 1996, no pet.) (recognizing that the sale of real property need not be reasonable, thus, the lender's receiver is not required to prove a foreclosure sale was reasonable to recover a deficiency from the guarantor). Other courts do not recognize such a defense at all. *See Pentad Joint Venture v. First Nat'l Bank of La Grange*, 797 S.W.2d 92, 95–97 (Tex.App.-Austin 1990, writ denied).

9 In the alternative, **Century** argues that, by failing to object (as required by section 2.201(b) of the Code) to its "confirmatory" email stating that it would credit 40% of the value stated by **Hartis** to his debt, **Hartis** entered an enforceable agreement under section 2.207. *See* TEX. BUS. & COM. CODE ANN. §§ 2.201(b), 2.207 (Vernon 1994). This argument, however, is contrary to the trial court's finding that **Hartis** failed to prove the existence of a valid agreement and that any such agreement would have been unenforceable under section 2.201. *See id.* § 2.201(a) ("Except as otherwise provided in this section...."). **Century** also relies on section 2.305(d) to argue that the parties never intended to contract in the absence of an agreement on price, and thus, the law implies a reasonable price. *See id.* § 2.305(d). We do not reach this argument.

10 **Hartis** later disclosed that this inventory was current only as of December 31, 2002.

11 We note that **Hartis** asked the trial court to memorialize these implied findings in additional findings of fact, and that the trial court refused his request. **Hartis** does not challenge the trial court's refusal to make his requested additional findings, and neither party contends that this refusal precludes us from treating these findings as implied. *See Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 253 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) (suggesting that a finding of fact that was expressly refused by the trial court cannot be supplied by implication on appeal). We therefore presume the parties agree that the requested additional findings were "disposed of directly or indirectly by the original findings, and the failure to make additional findings was not prejudicial to the appellant." *See Levine v. Maverick County Water Control & Improvement Dist. No. 1*, 884 S.W.2d 790, 796 (Tex.App.-San Antonio 1994, writ denied).

12 **Hartis** further testified that he owns 100% of the stock in Showroom, and that the company filed for bankruptcy. However, **Hartis** did not produce the invoices to the bankruptcy trustee, although the invoices would list the wholesale value of these goods.

13 **Hartis** does not challenge Schurr's qualifications or the award of attorneys' fees generally. He also does not allege that the attorneys' fees stipulated or awarded include payment for legal work performed solely in connection with **Century's** fraud and conversion claims. Rather, his entire argument for reformation of the attorneys' fee award consists of the single sentence, "Alternatively, the award of fees is greater than the parties' stipulation and should be reformed to that amount."

---

End of Document                                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by    Allen v. Devon Energy Holdings, L.L.C.,
Tex.App.-Hous. (1 Dist.),    March 9, 2012

### 953 S.W.2d 370
### Court of Appeals of Texas,
### Texarkana.

Sam **FISHER**, Edith **Fisher** d/b/a **Fisher's**
Truck World, Bill McNatt, Connie Matika,
and Gale **Fisher** Huggins, Appellants,

v.

Jim **YATES** and FirstBank of Texarkana, Appellees.

No. 06–96–00098–CV.   |   Submitted
June 3, 1997.   |   Decided July 18, 1997.   |
Opinion Overruling Rehearing Oct. 10, 1997.

Customers, who were also former minority shareholders of bank, and other former shareholders sued bank and its director, chairman, and vice president for fraudulent representations, fraudulent concealment, statutory fraud, and civil conspiracy in connection with director's purchase of bank's stock prior to bank's sale. The 102nd Judicial District Court, Bowie County, John F. Miller, Jr., J., granted summary judgment in favor of defendants, and plaintiffs appealed. The Court of Appeals, Cornelius, C.J., held that: (1) court had jurisdiction over appeal; (2) genuine issues of material fact remained as to customers' fraud and conspiracy allegations against director; (3) conspiracy claims of other former shareholders against director were barred by two-year statute of limitations; (4) bank was not entitled to summary judgment as to customers' fraud and conspiracy claims; (5) bank was entitled to summary judgment on other former shareholders' conspiracy claim; and (6) plaintiffs failed to raise fact issues concerning fraud or conspiracy claims against chairman and vice president.

Affirmed in part, reversed in part, and remanded.

West Headnotes (42)

**[1]**     **Appeal and Error**
         Necessity of final determination
    Texas appellate courts have jurisdiction only
    over final judgments.

Cases that cite this headnote

**[2]**     **Appeal and Error**
         Final Judgments or Decrees
    For purposes of appellate jurisdiction, there can
    be only one final judgment. Vernon's Ann.Texas
    Rules Civ.Proc., Rule 301.

Cases that cite this headnote

**[3]**     **Appeal and Error**
         Final Judgments or Decrees
    Judgment is "final" for purposes of appellate
    jurisdiction if it disposes of all issues and parties
    in case and no further action is required to
    determine the controversy.

1 Cases that cite this headnote

**[4]**     **Appeal and Error**
         Nature and Scope of Decision
    If summary judgment order appears to be final
    and disposes of all claims or parties, judgment
    should be treated as final for purposes of appeal.

3 Cases that cite this headnote

**[5]**     **Appeal and Error**
         On motion for judgment
    **Appeal and Error**
         Finality as to All Parties
    Trial court's order, granting summary judgment
    as to two defendants but denying it as to a third,
    was interlocutory, but became final for appeal
    purposes when second judgment was entered
    disposing of remaining defendants.

6 Cases that cite this headnote

**[6]**     **Appeal and Error**
         Nature and Scope of Decision
    **Appeal and Error**
         Finality as to All Parties
    Where language of second trial court judgment
    purported to be final and disposed of all

remaining issues and parties in action, it operated as final and appealable judgment.

1 Cases that cite this headnote

**[7] Judgment**
 Evidence in General

Response to summary judgment motion is a pleading and does not, standing alone, constitute competent summary judgment evidence.

2 Cases that cite this headnote

**[8] Judgment**
 Weight and sufficiency

Defendant's summary judgment motion, to be sufficient, must conclusively negate at least one element of each of plaintiff's alleged causes of action.

Cases that cite this headnote

**[9] Conspiracy**
 Nature and Elements in General
**Fraud**
 Nature of fraud

Fraud and civil conspiracy are separate torts.

1 Cases that cite this headnote

**[10] Fraud**
 Elements of Actual Fraud

To establish fraud, plaintiff must prove that defendant made material representation that was false, that defendant knew it was false or recklessly made representation without knowledge of truth and as positive assertion, that defendant made statement with intention that it be acted upon by plaintiff, that plaintiff did act in reliance on it, and that plaintiff suffered injury as result of the representation.

Cases that cite this headnote

**[11] Conspiracy**
 Nature and Elements in General

Elements of civil conspiracy are two or more persons, object to be accomplished, meeting of the minds on the object or course of action, one or more unlawful acts, and damages as proximate result.

1 Cases that cite this headnote

**[12] Judgment**
 Documentary evidence or official record

Interrogatories are proper summary judgment evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c, f).

Cases that cite this headnote

**[13] Judgment**
 Documentary evidence or official record

Deposition excerpts are proper summary judgment evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

**[14] Appeal and Error**
 Judgment

In reviewing grant of summary judgment, Court of Appeals is required to take as true all evidence favorable to nonmovant and indulge all reasonable inferences and resolve all doubts in nonmovant's favor, and court cannot consider evidence favoring movant unless is it uncontradicted. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

1 Cases that cite this headnote

**[15] Judgment**
 Banks, cases involving

Genuine issues of material fact remained precluding summary judgment as to fraud and conspiracy allegations against bank director in customers' and former shareholders' action against bank and its officials arising from director's stock purchase prior to bank's sale.

Cases that cite this headnote

**[16]    Fraud**
  ⟳ Materiality of matter represented or concealed

In fraud context, representation is "material" if it induces party to act.

Cases that cite this headnote

**[17]    Fraud**
  ⟳ Materiality of matter represented or concealed

Courts use "but for" test to determine materiality of representation for fraud purposes.

Cases that cite this headnote

**[18]    Fraud**
  ⟳ Existing facts or expectations or promises

To prove fraudulent misrepresentation when future event is involved, promise must involve definite commitment to perform certain act, and plaintiff must prove that, at time promise was made, defendant did not intend to perform it.

Cases that cite this headnote

**[19]    Corporations and Business Organizations**
  ⟳ Disclosure of information to corporation and shareholders or members

Mere inquiries, preliminary discussions, or preparatory communications to possible acquisition of corporation do not require disclosure pursuant to director's fiduciary relationship with corporation's shareholders.

2 Cases that cite this headnote

**[20]    Fraud**
  ⟳ Duty to disclose facts

Disclosure of corporation's potential sale is required only when there are firm offers or acquisition seems reasonably assured at time corporation's insiders are purchasing shares from shareholders.

Cases that cite this headnote

**[21]    Evidence**
  ⟳ Corporate stock and bonds

"Fair market value" of corporate stock is price at which stock would change hands between willing seller, under no compulsion to sell, and willing buyer, under no compulsion to buy, with both parties having reasonable knowledge of relevant facts.

3 Cases that cite this headnote

**[22]    Conspiracy**
  ⟳ Evidence

Civil conspiracy may be established by circumstantial evidence.

1 Cases that cite this headnote

**[23]    Judgment**
  ⟳ Weight and sufficiency

Summary judgment rule is not intended to permit trial by deposition or affidavit, and summary judgment motion should not be resolved by weighing relative strength of conflicting facts and inferences.

Cases that cite this headnote

**[24]    Limitation of Actions**
  ⟳ Nature of harm or damage, in general

Civil conspiracy claims of bank's former shareholders, who alleged that bank and its former director engaged in conspiracy in connection with director's purchase of former shareholders' stock, were barred by two-year limitations statute where latest time at which former shareholders could have reasonably discovered their injury, as well as date that director purchased their stock, were more than two years before former shareholders were joined as plaintiffs in lawsuit. V.T.C.A., Civil Practice & Remedies Code § 16.003.

2 Cases that cite this headnote

**[25]    Limitation of Actions**
  ⟳ Discovery of Fraud

Discovery rule applies to conspiracy to commit fraud.

2 Cases that cite this headnote

**[26]  Pleading**
 ⬦ Statement of cause of action in general

Petition must give fair and adequate notice of facts relied on by petitioner in order to provide opposing party with sufficient information to enable party to prepare defense. Vernon's Ann.Texas Rules Civ.Proc., Rules 45, 47.

Cases that cite this headnote

**[27]  Fraud**
 ⬦ Materiality of matter represented or concealed
 **Fraud**
 ⬦ Reliance on Representations and Inducement to Act

Reliance and materiality elements of statutory fraud do not differ from common law fraud. V.T.C.A., Bus. & C. § 27.01.

2 Cases that cite this headnote

**[28]  Fraud**
 ⬦ Nature and form of remedy

Plaintiff has discretion to sue under fraud statute, common law fraud, or both. V.T.C.A., Bus. & C. § 27.01.

Cases that cite this headnote

**[29]  Fraud**
 ⬦ Allegations of fraud in general

Plaintiff is not required to use term "fraud" in pleadings if factual allegations include all elements of fraud.

Cases that cite this headnote

**[30]  Conspiracy**
 ⬦ Nature and Elements in General

Civil conspiracy is based on underlying tort, and alleged wrongful act must be actionable against individual conspirators.

5 Cases that cite this headnote

**[31]  Conspiracy**
 ⬦ Nature and Elements in General

Conspiracy is derivative tort.

1 Cases that cite this headnote

**[32]  Pleading**
 ⬦ Statement of cause of action in general
 **Pleading**
 ⬦ Mode of pleading defenses in general

Test of sufficiency of pleading is whether reasonably competent attorney can ascertain nature and issues of controversy and probable relevant testimony.

Cases that cite this headnote

**[33]  Judgment**
 ⬦ Documentary evidence or official record

For deposition excerpts to be considered summary judgment proof, they must be attached to summary judgment motion. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

**[34]  Judgment**
 ⬦ Motion or Other Application

Summary judgment motion could be used to outline issues, but it could not be relied on to raise material fact issue.

Cases that cite this headnote

**[35]  Conspiracy**
 ⬦ Combination

Civil conspiracy requires participation of two or more persons.

Cases that cite this headnote

**[36]    Conspiracy**
⟜ Combination

Where bank and bank's director were sued for civil conspiracy, and director provided sufficient summary judgment evidence to show his entitlement, as a matter of law, to summary judgment on conspiracy claim, bank, too, was entitled to summary judgment on conspiracy claim; although bank failed to provide any summary judgment proof in support of its summary judgment motion, it could not, as a matter of law, engage in civil conspiracy by itself.

Cases that cite this headnote

**[37]    Judgment**
⟜ Affidavits, Form, Requisites and Execution of

**Judgment**
⟜ Personal knowledge or belief of affiant

To constitute proper summary judgment evidence, affidavit must be made on personal knowledge, set forth facts which would be admissible in evidence, and show affiant's competency. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(f).

5 Cases that cite this headnote

**[38]    Judgment**
⟜ Sufficiency of affidavit

To constitute proper summary judgment evidence, affidavit's allegations must be direct, unequivocal, and such that perjury is assignable. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(f).

2 Cases that cite this headnote

**[39]    Judgment**
⟜ Affidavits, Form, Requisites and Execution of

Affidavits that merely adopt factual allegations made in response to summary judgment motion are not proper summary judgment evidence.

Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(f).

2 Cases that cite this headnote

**[40]    Judgment**
⟜ Evidence in General

Nonmovant may rely on summary judgment evidence referenced or set forth in movant's own motion in order to raise fact issue.

1 Cases that cite this headnote

**[41]    Pretrial Procedure**
⟜ Persons entitled to use and persons against whom answers may be used

Answers to interrogatories ordinarily may only be used against answering party. Vernon's Ann.Texas Rules Civ.Proc., Rule 168, subd. 2.

Cases that cite this headnote

**[42]    Judgment**
⟜ Documentary evidence or official record

Rule that answers to interrogatories ordinarily may only be used against answering party does not apply when movant for summary judgment makes nonmovant's answers part of movant's own summary judgment evidence; in such situation, movant, not answering party, is one "using" answers, and movant adopts those answers as part of his or her own case, so that if answers raise fact issue and thereby defeat motion, movant is bound by fact issue that his or her own motion raises. Vernon's Ann.Texas Rules Civ.Proc., Rule 168, subd. 2.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*373** Jack N. Price, Austin, for appellants.

Hermann Ivester, Ivester, Skinner, Camp, Little Rock, AR, William C. Gooding, Gooding & Dodson, Texarkana, for appellee First Bank.

Steven W. Caple, George L. McWilliams, Patton, Haltom, Roberts, Texarkana, for appellee Jim Yates.

Before CORNELIUS, C.J., and GRANT and ROSS, JJ.

## OPINION

CORNELIUS, Chief Justice.

Sam Fisher, Edith Fisher, Bill McNatt, Connie Matika, and Gale Fisher Huggins,[1] appeal from an adverse summary judgment rendered in their suit against Jim Yates, FirstBank of Texarkana, Gene Wyatt, and Ron Walker, seeking damages for fraudulent representation, fraudulent concealment, statutory fraud, and conspiracy. Because we find that Edith Fisher's, Connie Matika's, and Gale Fisher Huggins's conspiracy claims were filed after the applicable two-year statute of limitations had expired, we affirm the summary judgment for Yates and FirstBank on these claims. We also affirm the summary *374 judgment for Wyatt and Walker. We reverse the summary judgment for Yates and FirstBank on Fisher's and McNatt's fraud and conspiracy allegations. Those claims are severed and remanded to the district court for trial.

Sam Fisher owns and operates a used car/truck business in Texarkana, Texas. Edith Fisher is his wife. Connie Matika and Gale Fisher Huggins are his daughters. Fisher conducted most of his banking business with FirstBank. Over a period of years, Fisher purchased 1,734 shares of FirstBank stock. Bill McNatt is also in the used car/truck business and used FirstBank for most of his banking services. McNatt purchased 1,004 shares of FirstBank stock over the years.

Jim Yates purchased McNatt's 1,004 shares of FirstBank stock in November 1992 for $50.00 per share, and he purchased Fisher's 1,734 shares in June 1993 for $57.67 per share. In July 1994, FirstBank was acquired by First United. The Fisher group alleges that Yates was aware of the impending sale of FirstBank when he purchased McNatt's and Fisher's stock. In the sale of FirstBank to First United, Yates received $241.00 for each share he owned in FirstBank, realizing a net profit in excess of $515,000.00 on the stock he purchased from Fisher and McNatt.

Fisher and McNatt contend that Yates fraudulently induced them to sell their FirstBank stock. They allege that Yates told Fisher in late fall 1992 that Gene Wyatt, FirstBank's

chairman, was considering "kicking Fisher out" of the bank, meaning that FirstBank was going to stop doing business with him. Yates also allegedly told Fisher that the bank had scheduled a board of directors meeting to discuss the issue. Fisher further contends that Yates told him that if he sold his FirstBank stock to him, he would use his influence as a director to ensure that FirstBank would continue doing business with Fisher. Fisher also alleges that Yates encouraged him to persuade McNatt to sell his FirstBank stock to Yates. Fisher told McNatt about Yates's statements.

On October 31, 1994, Fisher and McNatt filed suit against Yates, FirstBank, Wyatt, and Ron Walker[2] alleging that Yates engaged in fraudulent representations, fraudulent concealment, and statutory fraud[3] and that FirstBank, Wyatt, and Walker acted in "concert, combination, and conspiracy" with Yates in the acquisition of Fisher's and McNatt's FirstBank stock.

On June 28, 1995, Wyatt, Walker, and FirstBank filed a motion for summary judgment. The trial court granted summary judgment as to Wyatt and Walker, but denied it as to FirstBank. Yates and FirstBank subsequently filed separate summary judgment motions. The trial court granted these motions, ordering that the Fisher group take nothing.

We first consider whether we have jurisdiction of this appeal. We conclude that we do.

[1] [2] [3] [4] Texas appellate courts have jurisdiction only over final judgments. *Cherokee Water Co. v. Ross,* 698 S.W.2d 363, 365 (Tex.1985). There can be only one final judgment. TEX.R. CIV. P. 301. A judgment is final for purposes of appellate jurisdiction if it disposes of all issues and parties in a case and no further action is required to determine the controversy. *Houston Health Clubs, Inc. v. First Court of Appeals,* 722 S.W.2d 692, 692 (Tex.1986); *North East Indep. Sch. Dist. v. Aldridge,* 400 S.W.2d 893, 895 (Tex.1966). If a summary judgment order appears to be final and disposes of all claims or parties, the judgment should be treated as final for purposes of appeal. *Inglish v. Union State Bank,* 945 S.W.2d 810, 810–11 (Tex.1997); *Mafrige v. Ross,* 866 S.W.2d 590, 592 (Tex.1993).

[5] [6] There are two judgments in this case. The first one, dated September 7, 1995 and entitled "Judgment," was rendered in response to Wyatt, Walker, and FirstBank's summary judgment motion. The judgment dismisses with

prejudice Fisher and McNatt's claims against Wyatt and Walker in their individual capacity and orders that *375 "the plaintiffs recover nothing from Gene D. Wyatt or Ron Walker." The judgment denied FirstBank's request for summary judgment. No severance was ordered. The second judgment, rendered on October 22, 1996 and entitled "Final Summary Judgment," was issued in response to Yates's and FirstBank's summary judgment motions. The judgment dismisses the Fisher group's claims against Yates and FirstBank and orders that they take nothing against the defendants. The second order makes no reference to the first order.

The first order, granting summary judgment to Wyatt and Walker but denying it to FirstBank, was interlocutory. It became final, however, when the second judgment was entered disposing of the remaining defendants. See, e.g., H.B. Zachry Co. v. Thibodeaux, 364 S.W.2d 192, 193 (Tex.1963); Ramones v. Bratteng, 768 S.W.2d 343, 344 (Tex.App.— Houston [1st Dist.] 1989, writ denied).

The second judgment makes no reference to the first order, but it is not necessary that all parties and issues be disposed of in a single document. Mafrige v. Ross, 866 S.W.2d at 591 n. 5. The language of the second judgment purports to be final and disposes of all remaining issues and parties in this action. As such, it operates as a final and appealable judgment.

The Fisher group's first point of error merely asserts that the trial court erred in granting the defendants' summary judgment motions. There is no citation of authority under the point and, for that reason, it could be considered waived. But the second point of error addresses the same issue and it is adequately briefed, so it will be duly considered.

The Fisher group contends in its second point that the trial court erred in granting summary judgment because the evidence raised issues of fraud, conspiracy, and injury, and the claims are not barred by the statute of limitations.

In reviewing a summary judgment, we must determine whether the moving party has met its burden of establishing that there is no genuine issue of material fact between the parties and that it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); Nixon v. Mr. Property Management Co., 690 S.W.2d 546, 548 (Tex.1985); Lawrence v. Lawrence, 911 S.W.2d 443, 446 (Tex.App.— Texarkana 1995, writ denied).

A defendant moving for summary judgment must disprove at least one of the essential elements of each cause of action alleged by the plaintiff to be entitled to summary judgment. Lear Siegler, Inc. v. Perez, 819 S.W.2d 470, 471 (Tex.1991). A defendant must only meet the plaintiff's case as pleaded. Cook v. Brundidge, Fountain, Elliott & Churchill, 533 S.W.2d 751, 759 (Tex.1976).

Once the movant has established a right to summary judgment, the nonmovant must respond by presenting to the trial court summary judgment evidence raising a material fact issue, thereby precluding summary judgment. City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex.1979); Christensen v. Sherwood Ins. Servs., 758 S.W.2d 801, 804 (Tex.App.—Texarkana 1988, writ denied). Grounds supporting or opposing summary judgment must be raised in the motion or written response. Maintenance, Inc. v. ITT Hartford Group, Inc., 895 S.W.2d 816, 820 (Tex.App.— Texarkana 1995, writ denied).

Given the interaction among the parties and the Fisher group's causes of action, we will first address the merits of their assertions as they apply to Yates.

Yates initially asserts that the Fisher group's second point of error does not apply to him. He contends that the error relates exclusively to the viability of a civil conspiracy claim against Wyatt, Walker, and FirstBank. We disagree. The second point of error states, "The trial court erred in rendering judgment against the appellants because the summary judgment proof raised issues of fraud, conspiracy, and injury to the plaintiffs." The plain language of the error applies to all of the defendants.

Yates attached to his summary judgment motion affidavits in which he denies that he had any advance knowledge of the potential sale of FirstBank, denies that he pressured or otherwise coerced Fisher to sell his stock, *376 and asserts that he paid Fisher and McNatt a fair price for their FirstBank stock.

[7] The Fisher group filed a response to Yates's summary judgment motions, but the response did not attach, nor was it accompanied by, summary judgment evidence supporting the facts alleged in the response. A response to a summary judgment motion is a pleading and does not, standing alone, constitute competent summary judgment evidence. City of Houston v. Clear Creek Basin Auth., 589 S.W.2d at 678; Hidalgo v. Surety Sav. & Loan Ass'n, 462 S.W.2d 540, 543 (Tex.1971); Washington v. City of Houston, 874 S.W.2d

791, 794 (Tex.App.—Texarkana 1994, no writ); *Lawrenson v. Global Marine, Inc.*, 869 S.W.2d 519, 522 (Tex.App.—Texarkana 1993, writ denied); *Cuellar v. City of San Antonio*, 821 S.W.2d 250, 252 (Tex.App.—San Antonio 1991, writ denied); *Baubles & Beads v. Louis Vuitton, S.A.*, 766 S.W.2d 377, 379 (Tex.App.—Texarkana 1989, no writ); *Russell v. Texas Dep't of Human Resources*, 746 S.W.2d 510, 512–13 (Tex.App.—Texarkana 1988, writ denied); *Nicholson v. Memorial Hosp. Sys.*, 722 S.W.2d 746, 749 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.).

Because the response is unaccompanied by any supporting summary judgment evidence, we must determine whether Yates's motion is legally sufficient to support summary judgment, since the **Fisher** group, by default, has failed to raise any genuine issues of material fact.

**[8] [9]** Yates's motion, to be sufficient, must conclusively negate at least one element of each of the **Fisher** group's alleged causes of action. *Lear Siegler, Inc. v. Perez*, 819 S.W.2d at 471; *McKillip v. Employers Fire Ins. Co.*, 932 S.W.2d 268, 269–70 (Tex.App.—Texarkana 1996, no writ). The alleged causes of action against Yates include fraudulent representations, fraudulent concealment, statutory fraud, and civil conspiracy. These actions rest on common law fraud concepts. *See, e.g., Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1025 n. 4 (5th Cir.1990); *Chien v. Chen*, 759 S.W.2d 484, 494–95 (Tex.App.—Austin 1988, no writ). Fraud and conspiracy, however, are separate torts. *Bosworth v. Gulf Coast Dodge, Inc.*, 879 S.W.2d 152, 160 (Tex.App.—Houston [14th Dist.] 1994, no writ).

**[10]** To establish fraud, the plaintiff must prove that the defendant made a material representation that was false, that the defendant knew it was false or recklessly made the representation without knowledge of the truth and as a positive assertion, that he made the statement with the intention that it be acted upon by the plaintiff, that the plaintiff did act in reliance on it, and that the plaintiff suffered injury as a result of the representation. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex.1992); *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex.1977); *First City Bank of Richardson v. Global Auctioneers Inc.*, 708 S.W.2d 12, 17 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.).

**[11]** The elements of a civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) meeting of the minds on the object or course of action; (4) one or more unlawful acts; and (5) damages as a proximate result. *Massey*

*v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983); *Closs v. Goose Creek Consol. Independent Sch. Dist.*, 874 S.W.2d 859, 871–72 (Tex.App.—Texarkana 1994, no writ).

Yates's motion was supported by affidavits from himself, Gene Wyatt, and James Kelley. Yates's affidavit states that he did not have any knowledge of the potential sale of FirstBank. He said he did not know of First United's interest in acquiring FirstBank until December 1992. He stated that FirstBank's board of directors advised First United in January 1993 that they were not interested in being acquired and terminated all discussions with First United. Yates stated that he served on FirstBank's board of directors until October 1993. He stated that he was not aware of any discussion or contact regarding the possible sale of FirstBank when he resigned from the board of directors.

Yates stated that he purchased McNatt's FirstBank stock for $50.00 a share on or about November 6, 1992. This was well before First United contacted FirstBank about possible acquisition. Yates bought Sam **Fisher**'s stock on June 3, 1993, for $57.67 per *377 share.[4] This was about five months after FirstBank refused First United's acquisition offer. Yates stated there were no discussions regarding the potential sale of FirstBank between January 1993 and the sale of **Fisher**'s stock in June 1993.

Wyatt's and Kelley's affidavits support Yates's assertion that the stock purchases were made without knowledge of FirstBank's potential sale or FirstBank's participation.

Wyatt's affidavit states that he did not participate, or benefit in any way, with Yates in his purchase of **Fisher**'s and McNatt's stock; that when Yates purchased McNatt's and **Fisher**'s FirstBank stock there were no offers to acquire the bank; that no meeting was ever held to discuss "kicking" either **Fisher** or McNatt out of the bank or to stop providing banking services to either individual; and that generally the bank continued to provide credit to **Fisher** as late as February 1991.

Kelley's affidavit explains the events leading to First United's acquisition of FirstBank.[5] Kelley stated that he first contacted Wyatt regarding the possible acquisition of FirstBank in December 1992. Several discussions were held in December 1992 and January 1993. Kelley stated that Wyatt informed him in late January 1993 that FirstBank was not interested in being acquired by First United. Kelley stated that his next contact with FirstBank about a possible acquisition was in April 1994. Kelley stated that FirstBank expressed an

interest at that time and an agreement was reached on July 28, 1994.

[12] Yates also attached McNatt's and Fisher's answers to interrogatories as part of his summary judgment proof. Interrogatories are proper summary judgment evidence. TEX.R. CIV. P. 166a(c), (f); *Lawrence v. Lawrence,* 911 S.W.2d at 449.

In his response to Interrogatory # 6, which asked whether Yates had advance knowledge of the potential sale of FirstBank before he bought McNatt's and Fisher's stock, McNatt stated that he did not have any direct knowledge of the relevant facts at that time. He also stated in response to Interrogatory # 21 that he made his decision to sell his FirstBank stock to Yates "based on representations made by Yates to Fisher as related to me by Fisher." McNatt also stated, however, that Fisher did not persuade him to sell his stock. McNatt admitted that he was not present for any of the discussions between Yates and Fisher.

Fisher also stated in his response to Interrogatory # 6, regarding Yates's advance knowledge of FirstBank's potential sale, that he did not have any direct knowledge of the relevant facts at that time. He said that Yates told him Wyatt and FirstBank's board of directors were considering ceasing doing business with him and that if he sold his FirstBank stock to Yates, he would use his influence to ensure that the bank would continue doing business with him. Fisher stated that he was persuaded to sell his stock to Yates based on Yates's statements and representations.

[13] [14] [15] [16] [17] [18] [19] [20] [22] [23] Yates also included excerpts from Fisher's oral deposition as part of his summary judgment proof. Deposition excerpts are proper summary judgment evidence. TEX.R. CIV. P. 166a(c); *McConathy v. McConathy,* 869 S.W.2d 341, 342 (Tex.1994).

The deposition excerpts show that, even though Fisher alleges that Yates had inside information regarding FirstBank's potential sale, Fisher did not have any evidence to support the allegations. Fisher also stated that, other than Yates's promise to use his influence with FirstBank to ensure that the bank continued doing business with him, he could not identify any other misrepresentation or falsehood.

We are required to take as true all evidence favorable to the nonmovant and indulge all reasonable inferences and resolve

*378 all doubts in the nonmovant's favor. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d at 548–49; *Lawrence v. Lawrence,* 911 S.W.2d at 446. We cannot consider evidence favoring the movant unless is it uncontradicted. TEX.R. CIV. P. 166a(c); *see also Great American Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41, 47 (Tex.1965); *Germany v. Frank G. Love Envelopes, Inc.,* 582 S.W.2d 889, 891 (Tex.Civ.App.—Texarkana 1979, writ ref'd n.r.e.).

We conclude that Yates's summary judgment evidence does not conclusively negate all allegations of his conduct leading to and including his purchase of Fisher's and McNatt's stock, as it relates to Fisher's fraud and conspiracy allegations.

Fisher's answers to interrogatories allege that Yates made material misrepresentations to Fisher and that Fisher relied on the misrepresentations to his detriment when he made his decision to sell Yates his stock. These answers were included as part of Yates's summary judgment proof. In his answers, Fisher stated:

[21]

> Yates told me that he (Yates) had been told that Wyatt and the board of directors of the Bank were considering kicking me out of the bank, i.e., ceasing to do any banking business with me. Yates also told me that they (the board of directors) had called a special meeting to get rid of me. Yates pressured me and told me that if I would sell my stock in the Bank to him, he would use his influence with the Bank and Wyatt to insure that the Bank continued doing business with me. Yates also told me to persuade McNatt to sell his stock to Yates. The threat that if I did not do as Yates wanted, my banking relations with the Bank would be terminated was confirmed in my mind by the fact that my loan officer, Walker, had on several occasions refused to loan me money although I had an excellent payment history, a profitable business, and more than adequate collateral to secure every loan requested.

McNatt also stated that he made his decision to sell his FirstBank stock to **Yates**, "based on representations made by **Yates** to **Fisher** as related to me by **Fisher**."

**Yates** provided summary judgment evidence from Wyatt disputing the fact that FirstBank was considering terminating its banking relationship with **Fisher** or McNatt. Wyatt's affidavit, however, does not irrefutably contradict **Fisher's** version of his conversation with **Yates**.

Materiality is an issue of causation. A representation is material if it induces a party to act. *Manges v. Astra Bar, Inc.,* 596 **S.W.2d** 605, 611 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e). Courts also use a "but for" test to determine materiality. *See* 3 J. HADLEY EDGAR, JR. & JAMES B. SALES, TEXAS TORTS AND REMEDIES § 44.02[2][a] (1997). **Yates's** statements to **Fisher** meet both of these tests.

When a future event is involved, such as here, the promise must involve a definite commitment to perform a certain act and the plaintiff must prove that, at the time the promise was made, the defendant did not intend to perform it. *See, e.g., Dowling v. NADW Mktg., Inc.,* 631 **S.W.2d** 726, 727–28 (Tex.1982). Given Wyatt's statements that FirstBank never intended to stop providing banking services to either **Fisher** or McNatt, a reasonable person could conclude that, accepting **Fisher's** statements in the interrogatory answers as true, as we are required to do, **Yates** never intended to perform when he made his alleged promises to **Fisher**.

We must, therefore, conclude that on **Fisher** and McNatt's fraud claim a genuine fact issue exists regarding the making and the materiality of the statements **Yates** allegedly made to **Fisher** before his purchase of the stock and **Fisher's** reliance on those statements.

This does not end our inquiry. **Yates** would still be entitled to summary judgment if he can show that the plaintiffs did not suffer any injury.

**Fisher** and McNatt's allegations rest on the premise that **Yates** had inside information about the potential sale of FirstBank. If **Yates** was aware that FirstBank was about to be acquired, he stood in a fiduciary relationship with FirstBank's minority stockholders, such as **Fisher** and McNatt, and had a *379 duty to disclose that information. [6] *See, e.g., International Bankers Life Ins. Co. v. Holloway,* 368 **S.W.2d**

567, 577 (Tex.1963); *Gaither v. Moody,* 528 **S.W.2d** 875, 877 (Tex.Civ.App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.).

McNatt sold his stock to **Yates** on November 6, 1992. **Yates's** summary judgment evidence conclusively establishes that First United did not approach FirstBank about possible acquisition until early December 1992. This was about a month after **Yates's** purchase of McNatt's FirstBank stock. There is no summary judgment evidence that a potential sale was even being considered at the time of **Yates's** purchase of McNatt's stock. Thus, no fiduciary duty was implicated.

**Fisher** sold his stock to **Yates** on June 3, 1993. **Yates's** summary judgment evidence conclusively establishes that FirstBank refused First United's acquisition offer in January 1993; that **Yates** did not participate in this decision; and that there was no other offer to acquire FirstBank until First United made its second approach in April 1994. **Yates's** purchase of **Fisher's** stock was made after FirstBank refused First United's offer and at least ten months before FirstBank received another acquisition offer. Thus, no fiduciary duty was implicated.

**Yates** stated in his affidavit that he paid fair market value for **Fisher's** and McNatt's FirstBank stock. This is a conclusory opinion unsupported by any factual allegations, and at best can only be considered as raising a fact issue. **Fisher** stated that **Yates** determined the price of the stock, and he accepted it without any negotiation. He also states in his response that the book value of FirstBank's stock was $151.02 per share shortly before the bank was sold. This may be true, but it is not relevant to the stock's value in November 1992 or June 1993, when **Yates** purchased McNatt's and **Fisher's** stock. In addition, the **Fisher** group fails to provide any summary judgment evidence supporting this assertion.

Fair market value has been defined as "the price at which the stock would change hands between a willing seller, under no compulsion to sell, and a willing buyer, under no compulsion to buy, with both parties having reasonable knowledge of relevant facts." *InterFirst Bank Dallas, N.A. v. Risser,* 739 **S.W.2d** 882, 889 (Tex.App.—Texarkana 1987, no writ); *Crockett v. Smith,* 485 **S.W.2d** 321 (Tex.Civ.App.—Tyler 1972, writ ref'd n.r.e.).

**Yates's** summary judgment evidence asserts that he had no knowledge of a potential sale of FirstBank. Accepting **Fisher's** version of his conversation with **Yates**, however, as he related it in his answers to interrogatories, it cannot

be said that **Fisher** and McNatt were "willing sellers with no compulsion to sell." They sold their stock with the expectation, induced by **Yates**, that it would improve **Fisher's** dealings with FirstBank. The evidence fails to conclusively establish that **Yates** paid a fair market value for **Fisher's** and McNatt's stock. Moreover, if there was a known likelihood that FirstBank would be sold in the near future, the stock would have a potential market value higher than the actual value at the time of sale.

Because **Yates** failed to negate at least one essential element of **Fisher** and McNatt's fraud actions, summary judgment on the fraud claims was not proper.

Assessing the trial court's granting of summary judgment on conspiracy grounds is difficult due to the **Fisher** group's failure to provide the court with any supporting summary judgment evidence. Evidence favoring **Yates**, however, cannot be considered unless it is uncontradicted. TEX.R. CIV. P.166a(c).

Conspiracy may be established by circumstantial evidence. *International Bankers Life Ins. Co. v. Holloway*, 368 **S.W.2d** 567. According to the Texas Supreme Court:

> The general rule is that conspiracy liability is sufficiently established by proof *380 showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful, overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators.

*Id.* at 581.

The summary judgment rule is not intended to permit a trial by deposition or affidavit, and a motion for summary judgment should not be resolved by weighing the relative strength of conflicting facts and inferences. *Garcia v. John Hancock Variable Life Ins. Co.*, 859 **S.W.2d** 427, 435 (Tex.App.—San Antonio 1993, writ denied). **Fisher's** answers to interrogatories as to what **Yates** told him about FirstBank's intent to "kick him out" of the bank, together with the affidavits from **Yates** and Wyatt, raise questions as to the credibility and the weight of the evidence, as well as what reasonable inferences arise from such evidence. Therefore, **Yates's** contrary evidence, as the movant, cannot

be considered. Consequently, summary judgment for **Yates** on **Fisher** and McNatt's conspiracy grounds was improper.

**[24]** **[25]** The **Fisher** group also asserts that the conspiracy claims of Edith **Fisher**, Connie Matika, and Gail **Fisher** Huggins are not barred by limitations; thus, the trial court erred in granting summary judgment against them. We disagree.

**Yates** attached to his motion deposition excerpts from Huggins, Matika, and Edith **Fisher**. These excerpts show that Matika and Huggins purchased FirstBank stock from their mother, Edith **Fisher**, in 1990. Matika purchased about 300 shares for $5,000.00. Huggins purchased $2,900.00 worth of stock. Both daughters received $19,577.05 as their share of the proceeds from **Fisher's** sale of his stock to **Yates**.

The discovery rule applies to conspiracy to commit fraud. *Cathey v. First City Bank of Aransas Pass*, 758 **S.W.2d** 818, 822 n. 3 (Tex.App.—Corpus Christi 1988, writ denied). The latest time at which **Fisher's** wife and daughters could have reasonably discovered their injury was in October 1993, when they learned that **Yates** had resigned as a director of FirstBank without having improved **Fisher's** position with FirstBank. The date referenced in **Fisher's** pleadings is June 6, 1993, when **Yates** purchased the **Fisher** stock. Matika and Huggins were not joined as plaintiffs in this suit until **Fisher** filed his second amended petition on August 21, 1996. The June and October 1993 dates are well past the two-year limitation period barring actions for conspiracy.

**Yates** has met his burden of establishing entitlement to summary judgment as a matter of law on this issue. *See* TEX.R. CIV. P. 166a(c); *Nixon v. Mr. Property Management Co.*, 690 **S.W.2d** at 548; *Lawrence v. Lawrence*, 911 **S.W.2d** at 446. We affirm the summary judgment relating to the conspiracy allegations involving **Fisher's** wife and daughters.

We now address the summary judgment as it relates to FirstBank. FirstBank initially asserts in its second summary judgment motion that the **Fisher** group failed to plead fraud as a cause of action. We disagree.

**[26]** A petition must give fair and adequate notice of the facts relied on by the petitioner in order to provide the opposing party with sufficient information to enable him to prepare a defense. TEX.R. CIV. P. 45, 47; *Murray v. O & A Express, Inc.*, 630 **S.W.2d** 633, 636 (Tex.1982); *Lawyers*

*Surety Corp. v. Royal Chevrolet, Inc.,* 847 **S.W.2d** 624, 627 (Tex.App.—Texarkana 1993, writ denied).

[27] [28] The **Fisher** group's pleadings allege that **Yates** engaged in fraudulent representations, fraudulent concealment, and statutory fraud,[7] and that FirstBank "acted in concert, combination, and conspiracy" with **Yates** in the acquisition of the plaintiffs' *381 stock.[8] FirstBank filed several special exceptions against the **Fisher** group's pleadings contending, *inter alia,* that paragraphs 14 and 20 (stating that FirstBank had advance knowledge of the sale or potential sale of the bank and that FirstBank acted in concert, combination, and conspiracy with **Yates**), of the first amended original petition were "[v]ague, overly broad, and failed to give fair notice as required by Rule 47" and that the petition failed "[t]o state a cause of action against FirstBank upon which relief can be granted." The court did not order the **Fisher** group to replead or clarify their petition.

[29] The **Fisher** group did not expressly plead fraud against FirstBank, but a plaintiff is not required to use the term "fraud" if the factual allegations include all the elements of fraud. *Smith v. Harrison County,* 824 **S.W.2d** 788, 792 (Tex.App.—Texarkana 1992, no writ).

[30] [31] **Fisher** expressly pleaded conspiracy as a cause of action against FirstBank. Civil conspiracy is based on an underlying tort-in this case, fraud. *See Schoellkopf v. Pledger,* 778 **S.W.2d** 897, 900 n. 5 (Tex.App.—Dallas 1989, writ denied). The alleged wrongful act must be actionable against the individual conspirators. *International Bankers Life Ins. Co. v. Holloway,* 368 **S.W.2d** at 581; *see generally* 1 J. HADLEY EDGAR, JR. & JAMES B. SALES, TEXAS TORTS AND REMEDIES § 3.02[2] (1997). Conspiracy is a derivative tort. *Tilton v. Marshall,* 925 **S.W.2d** 672, 681 (Tex.1996).

[32] The test of the sufficiency of a pleading is whether a reasonably competent attorney can ascertain the nature and issues of the controversy and the probable relevant testimony. *State Fidelity Mortgage Co. v. Varner,* 740 **S.W.2d** 477, 479 (Tex.App.—Houston [1st Dist.] 1987, writ denied). The **Fisher** group's pleadings state the elements and facts needed to allege fraud against **Yates**. The pleadings state that FirstBank "acted in concert, combination, and conspiracy" with **Yates** in the acquisition of plaintiffs' stock. The effect of these sections is sufficient to notify a reasonably competent attorney that FirstBank, in addition to civil conspiracy allegations, also faced allegations of fraud.

FirstBank failed to expressly contest fraud as a fact issue in its second summary judgment motion and did not provide the court with any supporting summary judgment evidence on this point. FirstBank merely states that "the summary judgment proof establishes that this action against FirstBank is for civil conspiracy in connection with an alleged fraud perpetrated by defendant **Yates**." FirstBank also relies on **Yates's** summary judgment motion asserting that if the trial court finds that **Yates's** summary judgment evidence conclusively establishes that **Yates** did not violate any duty owed **Fisher** or McNatt, or that **Fisher** and McNatt received fair market value for their stock, then FirstBank is also entitled to summary judgment. As discussed *supra,* **Yates** is not entitled to summary judgment on this point; neither is FirstBank.

The remainder of FirstBank's summary judgment motion asserts that **Fisher's** wife's and daughters' conspiracy claims are barred by limitations. It does not address the conspiracy claims as they relate to Sam **Fisher** and McNatt. Since these claims were not addressed in FirstBank's summary judgment motion, it was not entitled to summary judgment on those claims.

The statute of limitations for civil conspiracy is two years. TEX. CIV. PRAC. & REM.CODE ANN. § 16.003 (Vernon 1986); *Stevenson v. Koutzarov,* 795 **S.W.2d** 313, 318 (Tex.App.—Houston [1st Dist.] 1990, writ denied). FirstBank included excerpts from the oral depositions of Gale **Fisher** Huggins, Connie Matika, and Edith **Fisher** in the body of its motion for summary judgment. These excerpts show that the daughters purchased the stock from their mother in 1990. Each daughter received $19,577.05 as their share of the proceeds from the stock sale.

*382 [33] Deposition excerpts are proper summary judgment evidence. TEX.R. CIV. P. 166a(c); *McConathy v. McConathy,* 869 **S.W.2d** at 342. They must, however, be attached to the summary judgment motion to be considered summary judgment proof. These excerpts were included in the body of FirstBank's summary judgment motion.

[34] Summary judgment motions are pleadings and, standing alone, do not constitute competent summary judgment evidence. *City of Houston v. Clear Creek Basin Auth.,* 589 **S.W.2d** at 678; *Hidalgo v. Surety Sav. & Loan Ass'n,* 462 **S.W.2d** at 543; *Lawrenson v. Global Marine, Inc.,* 869 **S.W.2d** at 522; *Cuellar v. City of San Antonio,* 821

S.W.2d at 252; *Russell v. Texas Dep't of Human Resources*, 746 S.W.2d at 512–13. FirstBank's motion can be used to outline the issues, *see, e.g., Shawell v. Pend Oreille Oil & Gas Co.*, 823 S.W.2d 336, 338 (Tex.App.—Texarkana 1991, writ denied), but it cannot be relied on to raise a material fact issue.

[35] [36] FirstBank failed to provide any summary judgment proof in support of its summary judgment motion. Consequently, there is no summary judgment proof regarding the running of the statute of limitations on Edith Fisher's, Matika's, and Huggins's conspiracy allegations.

A conspiracy, however, requires the participation of "two or more persons." *Massey v. Armco Steel Co.*, 652 S.W.2d at 934; *Closs v. Goose Creek Consol. Sch. Dist.*, 874 S.W.2d at 871–72.

Yates provided sufficient summary judgment evidence to show his entitlement, as a matter of law, to summary judgment on these same conspiracy claims. FirstBank, as a matter of law, cannot be engaged in a civil conspiracy by itself. Therefore, even though FirstBank failed to provide supporting summary judgment evidence, summary judgment on these issues for Yates inures to FirstBank's benefit and supports summary judgment for it as well.

The Fisher group also contends that the trial court erred in granting summary judgment to Gene Wyatt and Ron Walker.

FirstBank, Wyatt, and Walker moved for summary judgment. Their summary judgment evidence consisted of affidavits from Wyatt, Walker, Gail Reese and James Kelley; Fisher's answers to Yates's first set of interrogatories; and McNatt's answers to Yates's first set of interrogatories.

The affidavits assert that Wyatt and Walker did not engage in any act of fraud or conspiracy. Wyatt's affidavit states that he had no knowledge of Yates's actions regarding Yates's purchase of Fisher's or McNatt's stock. He stated that he approved all of Fisher's and McNatt's loan applications from January 1990 through December 1993. He stated that no meeting was ever held to "kick out" McNatt or Fisher.

Walker's affidavit states that he did not have any knowledge of Yates's purchase of Fisher's or McNatt's stock. He stated that he worked with Fisher on his loan applications to FirstBank and recommended that the bank approve all of Fisher's and McNatt's loan applications between January 1990 and December 1993. He stated no meeting was ever held to "kick out" or terminate loans to either McNatt or Fisher.

Gail Reese is the secretary of FirstBank's loan committee. She provided a detailed listing of approved loans and credit line increases to Fisher and McNatt from 1989 until 1994. She also stated that no meeting was held to "kick out" or terminate loans to either McNatt or Fisher.

Kelley's affidavit explains the events leading to First United's acquisition of FirstBank. According to Kelley, no offer was being discussed or considered when Yates purchased McNatt's stock in November 1992, and First United's acquisition offer had been rejected by FirstBank when Yates purchased Fisher's stock in June 1993. First United did not acquire FirstBank until July 28, 1994.

Fisher's and McNatt's answers to Yates's first set of interrogatories show that they did not have any direct knowledge of the relevant facts concerning the acquisition of FirstBank by First United and focus primarily on what Yates told Fisher.

The submitted summary judgment evidence supported summary judgment for Wyatt and Walker. Fisher and McNatt *383 were, therefore, required to respond by presenting controverting summary judgment evidence raising a material fact issue. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d at 678; *Christensen v. Sherwood Ins. Servs.*, 758 S.W.2d at 804.

The Fisher group failed to meet this burden. They submitted a response to the trial court accompanied by affidavits from Sam Fisher and McNatt. The two affidavits adopt the factual allegations set forth in the Fisher and McNatt's response to Wyatt and Walker's summary judgment motion.

[37] [38] [39] To constitute proper summary judgment evidence, an affidavit must be made on personal knowledge, set forth facts which would be admissible in evidence, and show the affiant's competency. TEX.R. CIV. P. 166a(f); *Cuellar v. City of San Antonio*, 821 S.W.2d at 252; *Keenan v. Gibraltar Sav. Ass'n*, 754 S.W.2d 392, 394 (Tex.App.— Houston [14th Dist.] 1988, no writ). The allegations must be direct, unequivocal, and such that perjury is assignable. *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex.1984). Affidavits that merely adopt the factual allegations made in a response to a motion for summary judgment, such as those offered by Fisher, are not proper summary judgment

evidence. *See, e.g., Hidalgo v. Surety Sav. & Loan Ass'n,* 462 S.W.2d at 544–45; *Lawrenson v. Global Marine, Inc.,* 869 S.W.2d at 522; *General Elec. Supply Co. v. Gulf Electroquip, Inc.,* 857 S.W.2d 591, 598 (Tex.App.—Houston [1st Dist.] 1993, no writ); *Webster v. Allstate Ins. Co.,* 833 S.W.2d 747, 749 (Tex.App.—Houston [1st Dist.] 1992, no writ); *Law v. Law,* 792 S.W.2d 150, 151 (Tex.App.—Houston [1st Dist.] 1990, writ denied); *Fair Woman, Inc. v. Transland Management Corp.,* 766 S.W.2d 323 (Tex.App.—Dallas 1989, no writ); *Keenan v. Gibraltar Sav. Ass'n,* 754 S.W.2d at 394.

**Fisher** and McNatt failed to provide any summary judgment evidence that raises a material fact issue as to the claims against Wyatt and Walker. Consequently, summary judgment for Wyatt and Walker was proper.

For the reasons discussed, we affirm the summary judgment for **Yates** and FirstBank as to the conspiracy claims of Edith **Fisher**, Connie Matika, and Gale **Fisher** Huggins, and we affirm the summary judgment for Wyatt and Walker on all issues. The summary judgment for **Yates** and FirstBank on the fraud and conspiracy claims of Sam **Fisher** and McNatt is reversed, and those issues are remanded to the trial court for trial.

## OPINION ON REHEARING

[40]  In his motion for rehearing, Jim **Yates** contends that we should not rely on **Fisher's** and McNatt's answers to interrogatories as raising a fact issue because the interrogatory answers were not referenced in **Fisher's** and McNatt's summary judgment responses. The answers, however, were referred to in **Yates'** own motion as a part of his own summary judgment evidence. A nonmovant may rely on the summary judgment evidence referenced or set forth in the movant's own motion in order to raise a fact issue. *Sundance Oil Co. v. Aztec Pipe & Supply Co.,* 576 S.W.2d 780, 781 (Tex.1978); *Jordan v. Geigy Pharmaceuticals,* 848 S.W.2d 176 (Tex.App.-Fort Worth 1992, no writ); *Keever v. Hall & Northway Advertising, Inc.,* 727 S.W.2d 704, 706 (Tex.App.-Dallas 1987, no writ); *see* Tex.R.Civ.P. 166a(c).

**Yates** also contends that it is improper to rely on the **Fisher** and **Yates** answers because interrogatory answers may only be used against, not for, the person answering them.

[41]  [42]  We respectfully disagree with this contention in the context of this case. In ordinary circumstances, answers to interrogatories may only be used against the answering party. Tex.R.Civ.P. 168(2). But we believe that rule does not apply when the movant for summary judgment makes those answers a part of his own summary judgment evidence. In that situation, the movant, not the answering party, is the one "using" the answers, and he adopts those answers as a part of his own case. If the answers raise a fact issue and thereby defeat his motion, he is bound by the fact issue that his own motion raises. This is just an application of the well-settled rule that a party's own pleadings may disprove his case.

*384 The summary judgment rule explicitly provides that "interrogatory answers referred or set forth in the *motion or response* " may be used to raise or negate a fact issue. If the rule meant to limit the use of interrogatory answers in summary judgment cases to use against the answering party only, the rule could have easily so stated. To disallow the use of evidence adopted by the movant in his own motion for summary judgment would violate the longstanding rule that evidence adopted and used by a party is admissible against that party. Now that we have abandoned the "voucher rule," such evidence is no longer binding on the party who uses it, but it may be used against him.

We recognize that in several cases courts have reached a different conclusion from that we reach. *Hanssen v. Our Redeemer Lutheran Church,* 938 S.W.2d 85, 95 (Tex.App.-Dallas 1996, writ denied) (opinion on rehearing); *Nebgen v. Minnesota Mining & Mfg. Co.,* 898 S.W.2d 363 (Tex.App.-San Antonio 1995, writ denied); *Dorsett Bros. Concrete Supply, Inc. v. Safeco Title Ins. Co.,* 880 S.W.2d 417 (Tex.App.-Houston [14th Dist.] 1993, writ denied). But those cases are based on cases where there is no indication that the interrogatory answers were made a part of the *movant's* summary judgment evidence. Thus, those cases do not support the holding in *Hanssen, Nebgen,* and *Dorsett.* The same is true of the other cases we have found that merely state the general rule. [9] We respectfully disagree with the holdings in those cases, and we conclude that summary judgment is improper when the movant's own summary judgment evidence shows that a fact issue is raised, even though some of that summary judgment evidence is in the form of the opposing parties' answers to interrogatories.

For the reasons stated, the motion for rehearing is overruled.

**All Citations**

953 S.W.2d 370

Footnotes

1   Plaintiffs will be referred to collectively as the **Fisher** group for the remainder of this opinion.

2   Ron Walker serves as a FirstBank vice president.

3   *See* TEX. BUS. & COM.CODE ANN. § 27.01 (Vernon 1987).

4   **Yates** states that Edith **Fisher** sold **Fisher's** FirstBank stock to Stacy Floyd on or about June 3, 1993. **Fisher** alleges that **Yates** purchased the stock. **Yates** does not deny this allegation. The record does not identify Stacy Floyd or explain his relationship to **Yates**.

5   James V. Kelley is the chairman of the board of directors, president, and chief executive officer of First United Bancshares, Inc.

6   Mere inquiries, preliminary discussions, or preparatory communications to a possible acquisition do not require disclosure. *Voskamp v. Arnoldy,* 749 **S.W.2d** 113, 119 (Tex.App.—Houston [1st Dist.] 1987, writ denied). Disclosure is required only when there are firm offers or an acquisition seems reasonably assured at the time the corporation's insiders are purchasing shares from shareholders. *Id.* **Yates** was on FirstBank's board of directors when he made his stock purchases.

7   The reliance and materiality elements of statutory fraud, TEX. BUS. & COM.CODE ANN. § 27.01 (Vernon 1987), do not differ from common law fraud. *Haralson v. E.F. Hutton Group, Inc.* 919 F.2d 1014, 1025 n. 4 (5th Cir.1990). A plaintiff has the discretion to sue under this statute, common law fraud, or both. *Wright v. Carpenter,* 579 **S.W.2d** 575, 578 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.).

8   The Texas Supreme Court considers the "concert in action" theory of joint and several liability an open question in Texas. *See Juhl v. Airington,* 936 **S.W.2d** 640, 643–45 (Tex.1996); *see also* 1 J. HADLEY EDGAR, JR. & JAMES B. SALES, TEXAS TORTS AND REMEDIES § 3.02[2] (1997).

9   *See Barragan v. Mosler,* 872 **S.W.2d** 20 (Tex.App.-Corpus Christi 1994, no writ); *Elliott v. State,* 818 **S.W.2d** 71 (Tex.App.-San Antonio 1991, writ denied); *Worley v. Butler,* 809 **S.W.2d** 242 (Tex.App.-Corpus Christi 1990, no writ); *Keever v. Hall & Northway Advertising, Inc.,* 727 **S.W.2d** 704 (Tex.App.-Dallas 1987, no writ); *Walker v. Horine,* 695 **S.W.2d** 572 (Tex.App.-Corpus Christi 1985, no writ); *Thurman v. Frozen Food Express,* 600 **S.W.2d** 369 (Tex.Civ.App.-Dallas 1980, no writ); *Stanford v. Johnson,* 577 **S.W.2d** 791 (Tex.Civ.App.-Corpus Christi 1979, no writ); *Fort Bend Indep. Sch. Dist. v. Weiss,* 570 **S.W.2d** 241 (Tex.Civ.App.-Houston [1st Dist.] 1978, no writ); *Jeffrey v. Larry Plotnick Co.,* 532 **S.W.2d** 99 (Tex.Civ.App.-Dallas 1975, no writ); *Sprouse v. Texas Employers' Ins. Ass'n,* 459 **S.W.2d** 216 (Tex.Civ.App.-Beaumont 1970, writ ref'd n.r.e.).

---

End of Document                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

1(e, h) 4, 50 U.S.C.A. § 1701 note; No. 12544, § 1 et seq., 50 U.S.C.A. § 170*l* note.

Cases that cite this headnote

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Kendrick v. Seibert, Tex.App.-Hous. (1 Dist.), June 12, 2014

## 857 S.W.2d 591
## Court of Appeals of Texas,
## Houston (1st Dist.).

**GENERALELECTRICSUPPLYCOMPANY, A DIVISION OF GENERALELECTRICCOMPANY**, Appellant,

v.

**GULFELECTROQUIP**, INC., Appellee.

No. 01–92–00596–CV. | March 25, 1993. | Rehearing Denied June 24, 1993.

Seller of electric motor brought action against buyer for breach of contract. The 151st District Court, Harris County, Carolyn Garcia, J., entered judgment in favor of seller and awarded seller attorneys' fees, and buyer appealed. The Court of Appeals, Sam Bass, J., held that: (1) contract for sale of electric motor, which buyer intended to immediately resell to Libyan oil **company**, did not violate executive order prohibiting direct transfer of goods, technology, or services to Libya, but (2) fact issue as to whether attorneys' fees sought by seller were reasonable precluded summary judgment in regard to attorneys' fee award.

Affirmed in part, reversed in part and remanded.

West Headnotes (7)

**[1]     War and National Emergency**
        Export restrictions

Contract for sale of electric motor, which buyer intended to immediately resell to Libyan oil **company**, did not violate executive order prohibiting direct transfer of goods, technology, or services to Libya, where seller's obligations were to be performed exclusively inside the United States, and did not involve export of motor to Libya. Vernon's Ann.Texas Rules Civ.Proc., Rules 166a, 166a(c); V.T.C.A., Bus. & C. § 2.308; Executive Order No. 12543, §§

**[2]     Judgment**
        Affidavits, Form, Requisites and Execution of

Affidavit stating that allegations in specified substantive paragraphs of parties' motion for summary judgment were true did not constitute summary judgment evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(a-c).

6 Cases that cite this headnote

**[3]     Sales**
        Excuses for default or delay

Buyer's cancellation of contract for sale of modified electric motor 11 days before performance was due constituted anticipatory repudiation by buyer, which entitled seller to suspend its own performance, accept repudiation, and exercise right to sue for damages; such breach rendered any fact issue concerning seller's ability to timely deliver completed motor immaterial.

1 Cases that cite this headnote

**[4]     Sales**
        Expenses connected with transportation, keeping, and delivery of property

Even if restocking charge was not included in contract for sale of electric motor, seller was entitled to receive actual damages in amount of restocking charge seller had sought during negotiations upon buyer's breach; parties had established agreed price for motor, buyer had failed to pay any portion of that price, and seller destroyed existing motor in process of modifying it for buyer, rendering it worthless.

Cases that cite this headnote

**[5]     Damages**
        Mode of estimating damages in **general**

In absence of contrary agreement, nonbreaching party is entitled to all its actual damages necessary to put in same economic position it would have been had contract not been breached.

7 Cases that cite this headnote

**[6]** **Sales**

◇─ Defenses

Buyer was not precluded as matter of Texas law from raising defense of impracticability or impossibility in action for breach of sales contract. V.T.C.A., Bus. & C. §§ 2.615, 2.615 comment.

Cases that cite this headnote

**[7]** **Judgment**

◇─ Sales cases in **general**

Fact issue as to whether attorneys' fees sought by seller of electric motor were reasonable precluded summary judgment in regard to attorneys' fee award in action for breach of sales contact. V.T.C.A., Civil Practice & Remedies Code §§ 38.001, 38.002.

15 Cases that cite this headnote

**Attorneys and Law Firms**

*592 Ben L. Aderholt, Tina Snelling, Hirsch, Glover, Robinson & Sheinell, P.C., Houston, for appellant.

Raymond A. Krell, P.C., Craig E. Power, P.C., Krell, Torigian & Power, Houston, for appellee.

Before SAM BASS, COHEN and HEDGES, JJ.

**Opinion**

SAM BASS, Justice.

GeneralElectricSupplyCompany (GESCO) appeals from a summary judgment rendered against it in favor of GulfElectroquip, Inc. (Electroquip) on Electroquip's claims for sworn account, breach of contract, and quantum meruit in connection with a sale of goods to GESCO.

We affirm in part and reverse and remand in part.

In 1985, representatives of GESCO and **Electroquip** exchanged telephone calls and, later, purchase orders and similar documents. GESCO sought to reach agreement for **Electroquip** to sell to GESCO a used motor **Electroquip** had in stock. GESCO was in contact with a Libyan oil company, Jawaby Petroleum, that was interested in purchasing such a motor, and planned to resell the motor to Jawaby immediately.

**Electroquip** and GESCO agreed that **Electroquip** would sell the motor to GESCO, for a price of $50,000. As part of the deal, **Electroquip** was to modify the motor extensively, to adapt it to the specifications transmitted by GESCO. The original motor *593 would be consumed in the process; one deposition witness likened it to carving up a Ferrari to reassemble it into a Chevrolet:

> [Y]ou have destroyed something that had value in order to make something else. You've taken a path in which there is no return. You destroyed one thing to build something else. You have to go ahead and continue with it or you don't have anything at all. You don't even have what you started with.

The sale was made subject to approval of **Electroquip's** engineering drawings for the modifications.

On December 2, Sam Phillips, an outside salesman for GESCO, called **Electroquip's** sales manager, Mac Colvin, and told him that the drawings had been approved. Colvin then went over to GESCO and picked up a copy of GESCO's purchase order, dated November 21, 1985. **Electroquip** commenced the modifications to the motor. Phillips testified at deposition that upon commencement of the work, the contract became non-cancellable.

During late 1985, relations between the United States and Libya deteriorated.[1] On January 7, 1986, President Reagan issued executive order 12543,[2] prohibiting trade and certain transactions involving Libya, and on the following day issued executive order 12544, blocking Libyan government *594 property in the United States held by U.S. persons. Exec.Order No. 12,543, 51 Fed.Reg. 875 (1986) and Exec.Order No. 12,544, 51 Fed.Reg. 1235 (1986). On January 8, Phillips called Colvin, informed him of the situation,

and inquired whether **Electroquip** could complete the work and ship the motor by January 16, before all provisions of order 12543 went into effect on February 1. Later that day, Colvin returned a confirming telex to Phillips, stating: "Your request to ship ... motor ... on 1/16/86 is not possible. This is approximately 3 weeks prior to the scheduled delivery. At your request of 1/8/86, we are stopping production on this order. The cancellation charges as of this date are 88 percent of the purchase price."

On January 9, Phillips returned a confirming telex to Colvin, saying: "Confirming receipt of your telex[.] ... Please cancel order[.] ... At this date we do not have a clear understanding from Jawaby on cancellation charges. GESCO cannot guarantee payment of these charges." The following day, Colvin responded, "Confirming receipt of your telex canceling your order [.] ... However, not in agreement that GESCO is not responsible for cancellation charges." A week after that, Colvin telexed Phillips again:

> We previously offered to settle for cancellation charges of 88 percent which we understand you have rejected. Given the fact that these are "specially fabricated" goods near completion, please advise whether or not you wish us to complete the manufacturing process so that the goods are 100 percent complete and in a sellable condition, or whether it is your desire to stop production.

The record contains no response from GESCO. GESCO admits that it cancelled the order not later than January 10, 1986. The goods were never completed; no settlement was ever reached; and this suit followed.

The trial court granted interlocutory summary judgment against GESCO in favor of **Electroquip**, without specific reference to **Electroquip's** several causes of action. **Electroquip** later presented evidence of its attorneys' fees, and the trial court entered a final summary judgment. Where, as here, a trial court's order does not specify the grounds relied on for its ruling, the summary judgment will be affirmed on appeal if any of the theories advanced in the motion for summary judgment are meritorious. *Insurance Co. of North Amer. v. Security Ins. Co.,* 790 **S.W.**2d 407, 410 (Tex.App.—Houston [1st Dist.] 1990, no writ).

In one point of error, GESCO contends that the summary judgment was error because:

(1) **Electroquip** "failed, as a matter of law, to demonstrate that its performance ... was not a prohibited transfer [under executive orders 12543 and 12544]";

(2) even if the indirect transfer prohibitions of order 12543 did not apply to **Electroquip**, summary judgment was still improper because

    (a) the affidavit attached to support **Electroquip's** motion for summary judgment merely stated that the allegations in the motion were true, which is insufficient under *Law v. Law,* 792 **S.W.**2d 150, 151 (Tex.App.—Houston [1st Dist.] 1990, writ denied);

    (b) GESCO's response raised a genuine issue of material fact; and

    (c) **Electroquip's** summary judgment evidence "involves an issue of intent which is inappropriate for summary judgment";

(3) summary judgment on **Electroquip's** allegation of an agreed restocking charge was improper;

(4) summary judgment was improper on GESCO's "claim of impracticability/impossibility"; and

(5) summary judgment was improperly granted on contested attorneys' fees.

In reviewing a summary judgment, this Court will take all evidence favorable to the nonmovant as true. *MMP, Ltd. v. Jones,* 710 **S.W.**2d 59, 60 (Tex.1986); *Goldberg v. United States Shoe Corp.,* 775 **S.W.**2d 751, 752 (Tex.App.—Houston [1st Dist.] 1989, writ denied). Every reasonable inference will be indulged in favor of the nonmovant, and any reasonable doubt will **\*595** be resolved in its favor. *Continental Casing Corp. v. Samedan Oil Corp.,* 751 **S.W.**2d 499, 501 (Tex.1988); *Goldberg,* 775 **S.W.**2d at 752. The movant has the burden of showing that there are no genuine issues of material fact, and that it is entitled to judgment as a matter of law. *MMP,* 710 **S.W.**2d at 60; *Goldberg,* 775 **S.W.**2d at 752. When the plaintiff is the movant, the defendant cannot defeat summary judgment merely by pleading an affirmative defense. *Kirby Exploration Co. v. Mitchell Energy Corp.,* 701 **S.W.**2d 922, 926 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). Instead, to defeat plaintiff's motion for summary judgment, the nonmovant

defendant must respond by producing summary judgment evidence that raises a fact issue on each element of some affirmative defense. *Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex.1984); *Kirby Exploration,* 701 S.W.2d at 926.

[1] GESCO's first argument is that summary judgment for **Electroquip** was improper because GESCO raised a fact issue on every element of its illegality defense, and **Electroquip** then failed, as a matter of law, to meet GESCO's showing by demonstrating that its own performance was not, under executive orders 12543 and 12544, a prohibited direct or indirect transfer of goods, technology, or services to Libya.

Executive order 12544 was not expressly presented to the trial court by written motion, answer, or other response to the motion for summary judgment. A summary judgment cannot be reversed on any grounds not presented in the motion for summary judgment. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 676 (Tex.1979); *Dickey v. Jansen,* 731 S.W.2d 581, 583 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.); TEX.R.CIV.P. 166a(c). For that reason, we will not consider executive order 12544 here.[3] We proceed to consider executive order 12543.

In discovery, **Electroquip** requested GESCO to admit that "in accordance with the agreement ... **GulfElectroquip**, Inc. was to deliver the motor ... FOB, export packer, Houston, Texas on or before January 30, 1986." GESCO responded, "Denied. GESCO's Purchase Order contains all of the terms of the agreement. No mention, inter alia, is made of export packer." Later, GESCO requested **Electroquip** to admit that "among the terms of the subject sale was: delivery by **GulfElectroquip**, Inc. to export packer." **Electroquip** responded, "The plaintiff objects as the contract between the parties speaks for itself. Denied."

The delivery terms of the **Electroquip**–GESCO contract are not set out in the November 21, 1985, purchase order, either on the obverse or the reverse.[4] In an instance where the contract is silent concerning the place for delivery of goods, TEX.BUS. & COM.CODE ANN. § 2.308 (Vernon 1968) controls. The pertinent portion states:

§ 2.308. Absence of Specified Place for Delivery

Unless otherwise agreed,

(1) the place for delivery of goods is the seller's place of business or if he has none his residence; but

(2) in a contract for sale of identified goods which to the knowledge of the parties at the time of contracting are in some other place, that place is the place for their delivery[.]

Under either of these tests, applied to the foregoing summary judgment evidence, the place for delivery of the motor was Houston, Texas. Regarding the first test, every bit of documentary summary judgment evidence in the record recites a Houston address for **Electroquip**. None of the summary judgment evidence suggests that **Electroquip** had any other place of business. Regarding the second test, both Colvin and Jim Petersen, the president of **Electroquip**, testified in their depositions that *596 **Electroquip** had the motor at issue "in stock" when the GESCO order came in. There was no other, contradictory summary judgment evidence to indicate that the motor was elsewhere than in **Electroquip's** possession at its Houston address at the time GESCO and **Electroquip** made their contract.

There was other summary judgment evidence that the contract called for **Electroquip** to deliver the motor by placing it in the possession of a designated export packer in Houston. Phillips testified at deposition that GESCO's contract with Jawaby called for GESCO to deliver the motor by placing it in the possession of a designated export packer in Houston, either by GESCO making whatever arrangements were necessary to get it to the export packer, or by GESCO paying **Electroquip** or some other party to have the motor delivered to the packer. He also testified that the delivery of the motor to the export packer ended GESCO's responsibilities with respect to the motor. Phillips' deposition testimony indicates that there is a conflict in the summary judgment evidence concerning *whether the contract specified* that the place for delivery was Houston. There is, however, no conflict and no genuine issue of material fact concerning the place for delivery; Phillips' deposition testimony also indicates that the place for delivery of the motor was Houston, Texas.

In *U.S. v. Elkins,* 885 F.2d 775 (11th Cir.1989), *cert. denied,*494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990), Elkins appealed his conviction for conspiracy and violation of export restrictions in connection with the sale of two Lockheed C–130 military transport airplanes, one of which ultimately found its way into the hands of the Libyan Arab Air Force. 885 F.2d at 780. His conviction was based, at least in part, on executive order 12543. 885 F.2d at 779. Lockheed sold the two aircraft to a California corporation, AFI, that Elkins had created for the transaction;

their contract provided that AFI had the sole responsibility to obtain a valid export license. 885 F.2d at 780. Lockheed's agreement with Elkins' corporation bore much the same relation to Elkins' illegal transaction with his customer, a West German company owned by Libyans, as Electroquip's agreement with GESCO bore to GESCO's contemplated transaction with its Libyan vendee, Jawaby. The Eleventh Circuit's opinion lacks any hint that Lockheed's actions in any way violated the export restrictions concerning Libya. That void is some indication that the federal court regarded Lockheed's agreement as Electroquip asserts we should regard its agreement: as an "American to American" business deal whose consummation does not require a violation of executive order 12543.

Also instructive here is *Amtorg Trading Corp. v. Miehle Printing Press & Manufacturing Co.,* 206 F.2d 103 (**2d** Cir.1953). The case was a diversity case, governed by New York law. 206 F.2d at 105. There, Amtorg, a Soviet purchasing agency in New York, entered into a written contract to buy 30 printing presses, FOB Milwaukee, for the stated purpose of exporting them to the U.S.S.R. 206 F.2d at 104. The vendor, Miehle, delivered 10 presses on schedule. *Id.* Before delivery of the remaining 20 was due, new federal regulations took effect, and required an export license for export of such presses to the U.S.S.R. *Id.* Amtorg refused to take delivery of the remaining 20 presses and to pay the balance owing on them. *Id.* Amtorg sued to obtain return of the prepaid portion of the purchase price. *Id.* The Second Circuit rejected Amtorg's claim that "the federal export restrictions frustrated the basic purpose of the contract and thus terminated it," citing, *inter alia,* a New York case for the proposition that, even when the buyer's export purpose becomes frustrated, "there is no impossibility of performance where delivery to the buyer is to occur in this country." 206 F.2d at 105 (citing *Pierson & Co. v. Mitsui & Co.,* 111 Misc. 388, 181 N.Y.S. 273 (A.D. 4 Dept.1920)). The summary judgment for Miehle was reversed and the cause remanded, but on other grounds not helpful to GESCO's cause here. [5]

**\*597** GESCO contends on appeal that its contract with Electroquip required Electroquip to do more than merely deliver the motor to the designated export packer in Houston. GESCO asserts that Electroquip was required also to make shipping arrangements with the packer for sending the motor to Jawaby, and that, accordingly, a complete performance by GESCO, *including making the shipping arrangements,* would entail a violation of executive order 12543. This issue was not expressly presented to the trial court by written motion, answer, or other response, and we may not consider it as grounds for reversal. TEX.R.CIV.P. 166a(c). In any event, for the reasons set forth below in connection with the second branch of GESCO's second argument, any issue concerning whether Electroquip was required to make shipping arrangements with the packer for sending the motor to Jawaby is not a material fact issue.

Summary judgment for Electroquip was correct. According to the summary judgment evidence as presented to the trial court, Electroquip's obligations were to be performed exclusively inside the United States. Upon delivery of the motor, Electroquip's obligations under its contract with GESCO were to be complete. Electroquip's obligations did not involve export of the motor to Libya.

The Electroquip–GESCO contract was not a "contract in support of an industrial or other commercial or governmental project in Libya." If there was any such support for such a project, that support stemmed from whatever agreement GESCO had with Jawaby or a related entity. There is no summary judgment evidence that Jawaby or a related entity was a party to the Electroquip–GESCO contract, or any other contract to which Electroquip was also a party.

GESCO's obligations under its contract with Jawaby or a related entity may have involved activity that would have violated executive order 12543. GESCO's unperformed obligation under its contract with Electroquip, however— paying Electroquip for the motor—did not violate executive order 12543. GESCO's paying Electroquip for the motor does not assist any Libyan entity in any way, and does not accomplish, even indirectly, any of the acts expressly prohibited by executive order 12543.

Similarly, Electroquip's performance of its contractual obligation to deliver the motor in Houston effected a transfer of the motor to *GESCO,* not to Jawaby. There was no summary judgment evidence that *GESCO* was, within the meaning of section 4 of executive order 12543, an instrumentality of the government of Libya, an entity controlled by the government of Libya, or an entity owned or controlled, directly or indirectly, by Libya or Libyan nationals. It was GESCO's performance of its contract with Jawaby that held the prospect of a direct transfer in violation of executive order 12543. Under *Elkins* and *Amtorg,* that prospect did not taint the Electroquip–GESCO contract, and did not make it an indirect transfer in violation of order 12543. [6]

GESCO's first argument is without merit.

*598 [2] GESCO's second argument, that summary judgment for Electroquip was improper even if the indirect transfer prohibitions of order 12543 did not apply to Electroquip, has three branches. The first branch is that summary judgment was improper because Colvin's affidavit attached to support Electroquip's motion for summary judgment was insufficient under *Law v. Law,* 792 S.W.2d 150, 151 (Tex.App.—Houston [1st Dist.] 1990, writ denied). Colvin's affidavit, like Law's, is defective because it states no facts, and instead merely states that the allegations in specified substantive paragraphs of Electroquip's motion for summary judgment are true. Like Law's affidavit, Colvin's affidavit did not constitute summary judgment evidence. *Id.* It does not follow, however, that summary judgment for Electroquip was improper.

Summary judgment may be granted in the absence of any supporting affidavit. *See* TEX.R.CIV.P. 166a(a) and (b) (plaintiff or defendant may move for summary judgment with or without supporting affidavits). The trial court could properly look to the deposition transcripts, interrogatory answers, and other discovery responses referenced or set forth in the motion or response, as well as the pleadings and any admissions, stipulations of the parties, or authenticated or certified public records on file at the time of the summary judgment hearing. TEX.R.CIV.P. 166a(c).

We have not considered, and will not consider, the defective Colvin affidavit. GESCO is entitled to no further relief, based on the merits of this branch of this argument.

[3] The second branch of GESCO's second argument is that summary judgment for Electroquip was improper because GESCO's response controverted Electroquip's motion, and successfully raised a genuine issue of material fact. GESCO points to only one such supposed fact issue: whether Electroquip could have delivered the motor on January 30, 1986, before all provisions of executive order 12543 became effective, as Electroquip contends it could have.

GESCO admits that it cancelled the order not later than January 10, 1986. The parties disagree concerning the date delivery of the finished motor was due under their contract. [7] Resolving that dispute in favor of nonmovant GESCO, the deadline for Electroquip to deliver the motor was January 21, 1986, at the earliest. GESCO cancelled the order before the

time for Electroquip's performance was due. Their contract did not give GESCO a right to cancel after work had begun, even if we assume, for argument's sake, that GESCO honestly and reasonably believed at some point prior to January 30 that Electroquip could not complete the work in time for the motor to be on its way to Jawaby before February 1. As of January 10, Electroquip had a right to at least another 11 days in which to perform. [8] GESCO's cancellation therefore constituted an anticipatory repudiation and breach by GESCO, which entitled Electroquip to suspend its own performance, accept the repudiation, and exercise an immediate right to sue for damages. *Universal Life & Accident Ins. Co. v. Sanders,* 129 Tex. 344, 102 S.W.2d 405, 406 (Comm'n App.1937); *599 *Lufkin Nursing Home, Inc. v. Colonial Inv. Corp.,* 491 S.W.2d 459, 463 (Tex.Civ.App.—Amarillo 1973, no writ); *Troy Constr. Co. v. North Carolina Natural Gas Corp.,* 316 S.W.2d 957, 959 (Tex.Civ.App.—Waco 1958, writ ref'd n.r.e.); *Placid Oil Co. v. Humphrey,* 244 F.2d 184, 188 (5th Cir.1957) (citing *Pollack v. Pollack,* 46 S.W.2d 292, 293 (Tex.Comm'n App.1932, holding approved) (opinion on reh'g)). GESCO's own breach rendered any fact issue concerning Electroquip's ability to deliver the completed motor by January 30 immaterial. [9]

In the third branch of its second argument, GESCO asserts that Electroquip's summary judgment evidence involves an issue of intent which, GESCO further asserts, cannot be resolved on summary judgment. This argument also fails. The only supposed "issue of intent" GESCO identifies is this same question whether Electroquip could have delivered the motor on January 30, 1986. That question is immaterial, and is no impediment to the summary judgment for Electroquip.

GESCO is entitled to no relief on the second and third branches of this argument.

[4] [5] GESCO's third argument is that summary judgment for Electroquip was improper because a genuine issue of material fact existed concerning whether the contract terms included a 100 percent "restocking charge" applicable upon GESCO's cancellation of its order. [10] Assuming, as we must, in nonmovant GESCO's favor, that the restocking charge was not included in the contract, then we are left with a contract that was silent on damages recoverable in the event of a breach. In the absence of a contrary agreement, the nonbreaching party is entitled to all its actual damages necessary to put it in the same economic position it would have been in had the contract not been breached. *Capital Title Co., Inc. v. Donaldson,* 739 S.W.2d 384, 391 (Tex.App.—

Houston [1st Dist.] 1987, no writ). In an appropriate case, expenditures to date plus anticipated profits is a proper method of computing such damages. *V.R. Wattinger Co. v. Moore,* 475 S.W.2d 327, 329 (Tex.Civ.App.—Austin 1972, no writ). In the trial court, the parties established the agreed purchase price for the motor; GESCO's failure to pay any portion of that price; and the destruction of the existing motor in the modification process, which rendered it worthless. [11] Even if the restocking charge was not included in the contract, **Electroquip** was entitled to receive actual damages—which, as it happens, were the same amount as the restocking charge **Electroquip** had sought during negotiations. *See Tufts v. Lawrence,* 77 Tex. 526, 14 S.W. 165, 166 (1890) **\*600** (where buyer repudiated contract to purchase specially manufactured goods, seller was entitled to recover difference between the contract price and the value of the goods in the condition they were in when buyer communicated its repudiation); *Lakewood Pipe of Texas, Inc. v. Conveying Techniques, Inc.,* 814 S.W.2d 553, 556 (Tex.App.—Houston [1st Dist.] 1991, no writ) (profit plus incidental damages, as set forth in section 2.708(b) of the Texas Business and Commerce Code, is the applicable measure of damages when a seller sues on buyer's breach of contract to purchase specialized piece of equipment, to be manufactured by seller, that has no market value); TEX.BUS. & COM.CODE ANN. § 2.708(b) (Vernon Supp.1993) (if difference between market price at time and place for tender and the unpaid contract price is inadequate, then the measure of damages is the profit seller would have made, plus incidental damages and costs reasonably incurred, less buyer's credit for payments or proceeds of resale).

In support of this argument, GESCO makes a subsidiary contention that the "standard terms and conditions" on the back of its purchase order were part of the agreement between itself and **Electroquip**. GESCO's admissions, strictly construed, preclude it from making this subsidiary contention. [12] We have reviewed the back side of the purchase order, however, and its terms do not address damages recoverable in the event of a breach, or otherwise affect the resolution of any of GESCO's assignments of error.

GESCO's fourth argument is that summary judgment for **Electroquip** was improper on GESCO's "claim of impracticability/impossibility." Looking beyond GESCO's label to the argument itself, GESCO contends that **Electroquip** failed to establish, as a matter of law, that GESCO, as a buyer, "could not assert the law of impracticability/impossibility under TEX.BUS. &

COM.CODE ANN. § 2.615 [ (Vernon 1968) ]." GESCO reasons that comment 9 to section 2.615 contemplates the exemption of a buyer, in certain circumstances, from fulfilling its contractual obligations when they have become commercially impracticable, such as, in the language of comment 9, "where the buyer's contract is in reasonable commercial understanding conditioned on a definite and specific venture or assumption[.]"

GESCO contends that comment 9 has "yet to be fully addressed by Texas courts," which we take to mean that no Texas court has ever ruled that a buyer may never assert a section 2.615 defense. **Electroquip** rejoins, asserting that there are no published Texas cases specifically authorizing a buyer to assert the defense of impracticability or impossibility for its failure to perform.

[6] GESCO's reading of comment 9 is reasonable. We do not further endorse it, and we express no opinion on whether a buyer in Texas can assert the defense of impracticability or impossibility for its failure to perform. We agree only that **Electroquip** did not establish, as a matter of law, that a buyer is precluded in Texas from asserting the defense, and that GESCO did assert the defense. GESCO's complaint in this argument is that the trial court improperly (a) concluded that, as a matter of law, GESCO was not entitled to assert an impracticability defense, and (b) held that for that reason, GESCO had failed to raise an issue of fact on all elements of its impracticability defense, and, in turn, (c) rendered summary judgment for **Electroquip** on that basis. We find no indication in the record, however, that the judgment was based on this reasoning. **Electroquip's** motion for summary judgment did not urge this reasoning upon the trial court. On the contrary, **Electroquip** expressly stated,

[GESCO's] only defense is set forth in Paragraph V of Defendant's Second **\*601** Amended Original Answer, which states: "GESCO would further show that the President of the United States issued on January 7, 1986, executive order 12543 which forbade GESCO and all parties from the subject transaction from exporting to Libya, purchasing goods or performing contracts with respect to Libya." As a matter of law, the executive order has no effect whatsoever.... There are absolutely no contested material factual issues in this case [.] ... *The only [legal] issue to be determined is the applicability or inapplicability of the Libyan sanctions,* which on their face are inapplicable to the facts in this cause, thus entitling [**Electroquip**] to judgment as a matter of law.

(Emphasis added.) Clearly, **Electroquip** did not attempt to persuade the trial court that reaching the merits of GESCO's defense was unnecessary. On the contrary, **Electroquip** asserted that, as a matter of law, executive order 12543 did not forbid either **Electroquip** or GESCO from completing their respective obligations under their contract. GESCO's fourth argument is without merit.

GESCO's sole remaining contention is a three-pronged attack upon the grant of summary judgment with respect to the contested attorneys' fees. GESCO argues that summary judgment on the fees was improper because (a) **Electroquip** never met its burden, under TEX.CIV.PRAC. & REM.CODE ANN. § 38.002 (Vernon 1986), to show that it had made demand or presentment as a predicate for the award of attorneys' fees; (b) **Electroquip** failed to establish the existence of a "restock agreement" to which TEX.CIV.PRAC. & REM.CODE ANN. § 38.001 (Vernon 1986) would apply; and (c) **Electroquip's** voluminous exhibits and affidavits were specifically controverted, and GESCO's objections were itemized.

Demand letters from **Electroquip's** attorney to GESCO and **GeneralElectricCompany** dated June 18, 1986, and December 1, 1987, appear in the record. **Electroquip** met the prerequisites of section 38.002 for a recovery of its attorneys' fees. Moreover, although **Electroquip** failed to establish the incorporation of a restocking charge term in its agreement with GESCO, **Electroquip** established the existence of an oral or written contract for sale of the motor to GESCO, and section 38.001 applied to that contract. GESCO's first two attacks on the attorneys' fees award fail.

[7]    The third attack has merit. GESCO did controvert **Electroquip's** summary judgment evidence of its reasonable attorneys' fees. GESCO filed a reply to **Electroquip's** motion for final summary judgment, supported by a nine-page affidavit from GESCO's trial counsel, consisting of his opinion that the attorneys' fees sought by **Electroquip** were not reasonable, followed by approximately 45 particularized objections to the form and substance of the affidavits of **Electroquip's** trial counsel supporting **Electroquip's** motion.

**Electroquip** argues that the trial court was nevertheless authorized to take—and must be presumed to have indeed taken—judicial notice of the usual and customary attorneys' fees and of the contents of the case file, and to have awarded **Electroquip** its attorneys' fees on that basis. The cases cited

by **Electroquip**, *Lacy v. First National Bank* [13] and *Bloom v. Bloom,* [14] did not involve summary judgment. [15] Cases dealing with the fixing of attorneys' fees by the trial judge when acting as the trier of fact have no application to a summary judgment proceeding. *Himes v. American Home Fence Co.,* 379 S.W.2d 290, 290–91 (Tex.1964). The only authority we find permitting the award of attorneys' fees on a summary judgment does not apply unless the evidence of the reasonableness of those fees is uncontroverted; it does not apply when, as here, conflicting affidavits from opposing attorneys are presented. *See, e.g.,* *602 *American 10–Minute Oil Change, Inc. v. Metropolitan Nat'l Bank—Farmers Branch,* 783 S.W.2d 598, 602 (Tex.App.—Dallas 1989, no writ); *Querner Truck Lines, Inc. v. Alta Verde Indus., Inc.,* 747 S.W.2d 464, 468–69 (Tex.App.—San Antonio 1988, no writ) (summary judgment on fees proper despite controverting affidavit because affiant was not an attorney and affidavit did not show that affiant was competent to give opinion testimony about attorneys' fees); *Sunbelt Const. Corp., Inc. v. S & D Mechanical Contractors, Inc.,* 668 S.W.2d 415, 418 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.); *Gensco, Inc. v. Transformaciones Metalurgicias Especiales, S.A.,* 666 S.W.2d 549, 554 (Tex.App.—Houston [14th Dist.] 1984, writ dism'd); *Bado Equipment Co., Inc. v. Ryder Truck Lines, Inc.,* 612 S.W.2d 81, 83 (Tex.Civ.App. —Houston [14th Dist.] 1981, writ ref'd n.r.e.). Where the amount of attorneys' fees is not conclusively established, the attorneys' fees question may be severed and remanded for trial. *Pelto Oil Corp. v. CSX Oil & Gas Corp.,* 804 S.W.2d 583, 588 (Tex.App.—Houston [1st Dist.] 1991, writ denied) (citing *Woods Exploration & Producing Co. v. Arkla Equipment Co.,* 528 S.W.2d 568, 571 (Tex.1975)).

Summary judgment for **Electroquip** on attorneys' fees was improper. That portion of the trial court's judgment must be severed, reversed, and remanded for trial. As respects the underlying breach of contract claim, however, **Electroquip** presented summary judgment evidence of the existence and terms of the contract; GESCO's cancellation; the agreed purchase price of the motor; and GESCO's failure to pay any portion of that price. This summary judgment proof encompassed all elements of **Electroquip's** cause of action for breach of contract. GESCO failed to raise a fact issue on all elements of its affirmative defense of illegality, and none of the supposed fact issues GESCO has identified are material.

The issue of attorneys' fees is severed from the cause of action, the award of attorneys' fees is reversed, and that

issue is remanded for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed.

**All Citations**

857 S.W.2d 591

Footnotes

1    See generally, *Farrakhan v. Reagan*, 669 F.Supp. 506, 508 (D.D.C.1987), *aff'd*,851 F.2d 1500 (D.C.Cir.1988) (referring to terrorist bombings at airports in Rome, Italy and Vienna, Austria, and citing 50 Fed.Reg. 49809 (December 4, 1985) (State Department notice declaring U.S. passports invalid for travel to, from, and through Libya without special validation)) and *Chang v. U.S.*, 13 Cl.Ct. 555, 560 (1987), *aff'd*,859 F.2d 893 (Fed.Cir.1988) (referring **generally** to "government pronouncements suggesting an accelerating deterioration of relations with Libya" during that time).

2    Executive order 12543 states, in pertinent part, as follows:

Section 1. The following are prohibited, except to the extent provided in regulations which may hereafter be issued pursuant to this Order.

(a) The import into the United States of any goods or services of Libyan origin, other than publications and materials imported for news publications or news broadcast dissemination;

(b) The export to Libya of any goods, technology (including technical data or other information) or services from the United States, except publications and donations of articles intended to relieve human suffering, such as food, clothing, medicine and medical **supplies** intended strictly for medical purposes;

(c) Any transaction by a United States person relating to transportation to or from Libya; the provision of transportation to or from the United States by any Libyan person or any vessel or aircraft of Libyan registration;

(d) The purchase by any United States person of goods for export from Libya to any country;

*(e) The performance by any United States person of any contract in support of an industrial or other commercial or governmental project in Libya;*

(f) The grant or extension of credits or loans by any United States person to the Government of Libya, its instrumentalities and controlled entities;

(g) Any transaction by a United States person relating to travel by any United States citizen or permanent resident alien to Libya, or to activities by any such person within Libya, after the date of this Order, other than transactions necessary to effect such person's departure from Libya, to perform acts permitted until February 1, 1986, by Section 3 of this Order, or travel for journalistic activity by persons regularly employed in such capacity by a newsgathering organization; and

*(h) Any transaction by any United States person which evades or avoids, or has the purpose of evading or avoiding, any of the prohibitions set forth in this Order.*

For purposes of this order, the term "United States person" means any United States citizen, permanent resident alien, juridical person organized under the laws of the United States or any person in the United States.

. . . . .

Section 3. This order is effective immediately, except that the prohibitions set forth in Section 1(a), (b), (c), (d) and (e) shall apply as of 12:01 a.m. Eastern Standard Time, February 1, 1986.

Section 4. The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes of this Order. Such actions may include prohibiting or regulating payments or transfers of any property or any transactions involving the transfer of anything of economic value by any United States person to the Government of Libya, its instrumentalities and controlled entities, or to any Libyan national or entity owned or controlled, directly or indirectly, by Libya or Libyan nationals....

(Emphasis added). Sections 1(e), 1(h), and 4 of the order are the provisions GESCO relies upon.

3    Neither will we consider GESCO's contention on appeal that summary judgment was improper because "the evidence herein raises fact issues as to whether the parties' conduct was somewhat akin to a joint enterprise." GESCO has likewise failed to comply with this requirement of rule 166a with respect to that contention.

4    See n. 12, *infra*, and accompanying text.

5    Some time after the first legal battles between Miehle and Amtorg arising from the transaction, Miehle sold the 20 presses to the United States Bureau of Engraving and Printing for a price which was $18,765 more than its contract price to Amtorg. 206 F.2d at 105. Because of that sale, the court held that the federal Foreign Aid Appropriations Act of 1949

entitled Amtorg to restitution of its payments, to the extent they exceeded the damages Miehle suffered. 206 F.2d at 107 and 108.

6   *Phillips v. Wier,* 328 F.2d 368 (5th Cir.1964), cited by GESCO, does not warrant a contrary result. There, a bankrupt transferred property in alleged fraud of its creditors, by pledging it to a bank. 328 F.2d at 369. The bank later foreclosed upon the pledged property and sold it to Wier and Cullen. *Id.* The first act, the pledge, was held to be a direct "transfer" within the meaning of the relevant prohibitory provision of the Bankruptcy Act. 328 F.2d at 370. The second act, the foreclosure sale, was held to be an indirect transfer within that same provision. *Id.* Even if a bankruptcy case like *Phillips* were somehow more germane to the instant case than cases like *Elkins* and *Amtorg,Phillips* does not stand for the proposition that GESCO urges upon us here—namely, that a *subsequent* statutorily-prohibited direct transfer can cause a prior intermediate transfer to become an indirect transfer to the ultimate transferee within the meaning of the prohibition.

7   All copies of the November 21, 1985, purchase order reflect that delivery was due 8–10 weeks after approval of **Electroquip's** engineering drawings for the modifications. On that basis, GESCO contends on appeal that under the contract, the deadline for **Electroquip** to deliver the motor was "somewhere between January 21, 1986 and February 10, 1986." A copy of the November 21, 1985 purchase order produced from **Electroquip's** records contains the date "1/30/86" handwritten next to the typewritten "8–10 weeks" provision. On that basis, **Electroquip** asserts it was required to deliver the motor on or before January 30, 1986.

8   The Court's own calculation of the deadline for **Electroquip** to deliver the motor differs from GESCO's. GESCO contends on appeal that under the contract, the deadline for **Electroquip** to deliver the motor was "somewhere between January 21, 1986 and February 10, 1986." By our calculation, 8 weeks (56 days) from November 21, 1985 was January 16, 1986, and 10 weeks (70 days) from November 21, 1985 was January 30, 1986. The outcome does not change, however, because even by this calculation, as of January 10, 1986, **Electroquip** had a right to at least another 5 days in which to perform.

9   Any issue concerning whether **Electroquip** was required to make shipping arrangements with the packer for sending the motor to Jawaby was likewise rendered immaterial.

10  Ralph Mouret was the inside salesman for GESCO who worked with Phillips on this deal. He was the one who first called **Electroquip** seeking a quote on the motor and modification work. Mouret's notes of the call show, *inter alia,* that **Electroquip** made its quote subject to a "100% restock" fee, to apply if GESCO cancelled the order. The parties dispute whether this term was subsequently incorporated into their contract.

11  On appeal, GESCO complains that **Electroquip** "cannibalized valuable copper from the motor, failed to account for the sales proceeds from the copper windings, and further failed to make provision for the sales proceeds from other motor parts, including the salvage value of the motor [,] [even though] ... [**Electroquip**] judicially admitted that the motor shell, alone, had a salvage value." Mitigation of damages was not an element of **Electroquip's** breach of contract action. In a breach of contract action, the burden of proving the extent to which the plaintiff did or could have mitigated its damages is on the defendant. *Houston Chronicle Publishing Co. v. McNair Trucklease, Inc.,* 519 **S.W.**2d 924, 929 (Tex.Civ.App. —Houston [1st Dist.] 1975, writ ref'd n.r.e.). The only summary judgment evidence GESCO presented on mitigation was one conclusory statement in Mouret's affidavit, that "[t]he motor has some present value." The "judicial admission" is, apparently, the statement in **Electroquip's** First Amended Original Petition that "[t]he motor ... had a value of less than $1,000.00 as of January 8, 1986 as scrap." That statement is not an admission that any part of the motor had a salvage value, especially when taken in light of **Electroquip's** assertion in its motion for summary judgment that the "original motor had been destroyed in the manufacturing process and had little or no value[.]" GESCO did not raise a fact issue concerning any asserted failure by **Electroquip** to mitigate its damages.

12  On appeal, the parties dispute whether the copy of the purchase order given to Colvin that day was just an obverse, or instead also included the reverse side, which set forth GESCO's "Standard Terms and Conditions of Purchase." GESCO, however, admitted, in response to a request for admission, that the document **Electroquip** attached to the request was a true and correct copy of the purchase order that Colvin picked up. That document consisted only of an obverse.

13  809 **S.W.**2d 362 (Tex.App.—Beaumont 1991, no writ).

14  767 **S.W.**2d 463 (Tex.App.—San Antonio 1989, writ denied).

15  The *Lacy* court conducted a "full hearing on the merits," 809 **S.W.**2d at 363, while the *Bloom* decision was a post-answer default judgment, 767 **S.W.**2d at 465.

---

916 S.W.2d 59
Court of Appeals of Texas,
Houston (1st Dist.).

Robert L. and Eleanor C. **BOEKER**, Appellants,

v.

James L. **SYPTAK**, Franklin R. Schodek,
and Henry Steinkamp, Jr., Inc., Appellees.

No. 01–9500757–CV.    |    Jan. 11, 1996.

Property owners whose tract of land had been reduced in size as result of surveyor's error brought action against surveyor, who moved for summary judgment based on ten-year surveyor's statute of repose. The 239th District Court, Brazoria County, J. Ray Gayle, 3rd, J., granted motion, and property owners appealed. The Court of Appeals, Taft, J., held that: (1) affidavits which had initially been attached to original petition of plaintiff were properly before court on defendant's motion for summary judgment, and (2) statute of repose barred action as it was undisputed that allegedly erroneous survey was completed over ten years before action was brought and subsequent survey did not toll or otherwise implicate running of repose period.

Affirmed.

West Headnotes (8)

[1]     **Judgment**
        ☞ Motion or Other Application

        **Judgment**
        ☞ Evidence in General

        **Judgment**
        ☞ Defects and Objections

        Both reasons for summary judgment and objections to it must be in writing and before trial judge at hearing, and party must expressly and specifically identify supporting evidence on file which it seeks to have considered by trial court.

        3 Cases that cite this headnote

[2]     **Judgment**
        ☞ Evidence in General

Affidavits which are attached to pleadings but are not attached to motion for summary judgment will not be included as summary judgment evidence.

4 Cases that cite this headnote

[3]     **Judgment**
        ☞ Documentary Evidence or Official Record

        Affidavits which had initially been attached to original petition of plaintiff were properly before court on defendant's motion for summary judgment where defendant attached plaintiff's original petition as exhibit to motion for summary judgment, also attached affidavits in question, and in motion expressly and specifically identified affidavits as being relied upon as summary judgment evidence.

        11 Cases that cite this headnote

[4]     **Limitation of Actions**
        ☞ Nature of Statutory Limitation

        Recognized purpose of statute of limitations is to compel settlement of claims within reasonable time after their origin.

        Cases that cite this headnote

[5]     **Limitation of Actions**
        ☞ Operation as to Rights or Remedies in General

        Statutes of repose protect parties from burden of indefinite potential liability and represent response to inadequacy of traditional statutes of limitation, whose time periods begin upon discovery of claim or upon occurrence of injury.

        Cases that cite this headnote

[6]     **Judgment**
        ☞ Presumptions and Burden of Proof

        In deciding whether genuine issue of material fact exists, as will preclude summary judgment, movant has burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as matter of law.

1 Cases that cite this headnote

[7] **Limitation of Actions**
 ⟜ Negligence in Performance of Professional Services

Action brought by owner of property against surveyor based on alleged error was barred by ten-year surveyor's statute of repose where it was undisputed that survey was signed, sealed, and delivered over ten years before action was brought, even though surveyor had later performed further survey of same tract; later survey did not toll or otherwise implicate running of repose period. V.T.C.A., Civil Practice & Remedies Code § 16.011(a)(2).

Cases that cite this headnote

[8] **Limitation of Actions**
 ⟜ Negligence in Performance of Professional Services

**Limitation of Actions**
 ⟜ Professional Negligence or Malpractice

There is no statutory revival provision or discovery rule applicable under surveyor's statute of repose, and each survey must stand alone for purposes of determining whether ten-year statute of repose has elapsed. V.T.C.A., Civil Practice & Remedies Code § 16.011(a)(2).

Cases that cite this headnote

**\*60** Appeal from 239th District Court, Brazoria County; J. Ray Gayle, 3rd, Judge.

**Attorneys and Law Firms**

Steven J. Gilbert, Richmond, for Appellants.

J. Michael Lytle, Richmond, for Appellees.

Before TAFT, COHEN and HEDGES, JJ.

**OPINION**

TAFT, Justice.

Appellants, Robert L. **Boeker** and his wife, Eleanor C. **Boeker** (collectively, "the **Boekers**"), appeal from a take-nothing summary judgment on all claims against Franklin R. Schodek and a take-nothing summary judgment on all claims, except a cause of action for trespass, against Henry Steinkamp, Jr., Inc. and James L. **Syptak** (collectively, "appellees"). This appeal involves a surveyor's error that, once found, eroded 2.477 acres from a 40–acre tract of land owned by the **Boekers**. We affirm.

**Facts**

Between 1962 and 1983, the **Boekers** purchased several parcels of land out of a 373–acre tract owned by the Wieckers. Each time the **Boekers** purchased a parcel, it was surveyed by an employee of Henry Steinkamp, Jr., Inc. The last parcel purchased was a 40–acre tract purchased in 1983. This dispute arises out of the survey conducted in connection with that purchase.

In December 1981, the **Boekers** purchased a 60–acre parcel from the Wieckers. Franklin Schodek, from the office of Henry Steinkamp, Jr., Inc., surveyed the 60–acre tract. When the survey was conducted, the one-half inch pipe set at the intersection of the northwest line of the 60 acres with the southwest right-of-way line of County Road 505 was incorrectly set 99.96 feet ("100–foot bust") too far northwest.

In 1983, the **Boekers** purchased the 40–acre tract made the subject of this dispute from the Wieckers, leaving the Wieckers a remaining tract encompassing 156.576 acres. In November 1983, Schodek conducted a survey of the 40 acres. The 40–acre tract is located between the northwest side of the 60–acre tract and the southeast side of the remaining 156.576 Wiecker tract. Being adjacent to the northwest side of the 60–acre tract, the 40–acre parcel was surveyed in the field by beginning at the north corner of the 60–acre tract. However, because the north corner of the 60–acre tract was off by the 100–foot bust, the north corner of the 40–acre tract was also incorrectly set by nearly the same distance. Thus, the northwest boundary line on the 40 acres actually extended approximately 100 feet into the 156.576–acre tract still owned by the Wieckers (see corresponding map). This survey was completed, signed, sealed, and delivered to the **Boekers** on November 23, 1983.

*61



In November 1993, Henry Steinkamp, Jr., Inc. was employed once more to conduct a survey on the remaining 156.576 acres owned by the Wieckers in anticipation of selling the acreage to a third party. While conducting this survey, the original error was found, and the northwest boundary line of the 40 acres was moved back approximately 100 feet. Moving the boundary line created a loss of approximately 2.477 acres out of the **Boekers'** 40–acre tract.

### Sole Point of Error

In their sole point of error, the **Boekers** contend that the trial court erred by granting a defective summary judgment. More specifically, the **Boekers** contend that appellees' motion for summary judgment is defective because the affidavits in support of the motion were attached to appellants' original petition and then attached to appellee's motion for summary judgment, rather than being attached to the motion directly, thus, the affidavits not properly before the trial court.

Alternatively, the **Boekers** contend that even if the affidavits were properly before the trial court, and considered to be competent summary judgment evidence, the **Boekers'** affidavit attached to their reply to appellees' motion for

summary judgment raised a fact issue as to the date on which the statute of limitations began to run. The **Boekers** argue that because they had the same survey company conduct an additional survey on a 2–acre parcel out of their 60–acre parcel in 1984, and the survey depicted the incorrect boundary lines as originally drawn, this revived the statute of limitations so that it ran anew from the date the survey was completed on the 2–acre parcel (sometime in June or July 1984), rather than the date the survey on the 40–acre parcel was completed (November 23, 1983).

### Summary Judgment Evidence

[1] [2] "Both the reasons for the summary judgment and the objections to it must be in writing and before the trial judge at the hearing." *City of Houston v. Clear Creek Basin Auth.,* 589 **S.W.2d** 671, 678 (Tex.1979). A party must expressly and specifically identify the supporting evidence on file which it seeks to have considered by the trial court. *Taylor v. Taylor,* 747 **S.W.2d** 940, 946 (Tex.App.—Amarillo 1988, writ denied); *Nicholson v. Naficy,* 747 **S.W.2d** 3, 4–5 n. 1 (Tex.App.—Houston [1st Dist.] 1987, no writ). Additionally, affidavits attached to pleadings but not attached to the motion for summary *62 judgment will not be included as summary

judgment evidence. *Sugarland Business Ctr., Ltd. v. Norman,* 624 **S.W.2d** 639, 642 (Tex.App.—Houston [14th Dist.] 1981, no writ) (citing *Hidalgo v. Surety Sav. & Loan Assoc.,* 462 **S.W.2d** 540 (Tex.1971)).

The **Boekers** rely on *Norman* for the proposition that, because appellees' affidavits were attached to the appellant's original petition, the affidavits are not attached to appellee's motion for summary judgment. In *Norman,* the movant filed a motion for summary judgment which incorporated its original petition. The motion expressly relied on the affidavit of movant that was attached to the petition. However, the motion for summary judgment did not mention the affidavit that was attached to the petition. *Id.* at 641.

[3] In this case, appellees attached appellant's original petition to their motion for summary judgment as "Exhibit B." They also attached the affidavits of Franklin R. Schodek and James L. **Syptak** as "Exhibit C" and "Exhibit E," respectively. Additionally, paragraph six of appellees' motion for summary judgment expressly and specifically identified the affidavits as being relied upon as summary judgment evidence for the trial court to consider. Thus, appellees' affidavits in support of their motion for summary judgment were properly before the trial court.

### Surveyor's Statute of Repose

Appellees affirmatively raised the defense of statute of limitations under Texas Civil Practice and Remedies Code section 16.011, sometimes called the surveyor's statute of repose. This statute requires a person to "bring suit for damages arising from an injury or loss caused by an error in a survey conducted by a registered public surveyor ... not later than September 1, 1991 or 10 years after the date the survey was completed, whichever is later, if the survey was completed before September 1, 1989." TEX.CIV.PRAC. & REM.CODE ANN. § 16.011(a)(2) (Vernon Supp.1995).

[4] [5] "The recognized purpose of a statute of limitations is to compel the settlement of claims within a reasonable time after their origin." *Sowders v. M.W. Kellogg Co.,* 663 S.W.2d 644, 647 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). Additionally, statutes of repose protect parties from the burden of indefinite potential liability and represent a response to the inadequacy of the traditional statutes of limitation, whose time periods begin upon discovery of the claim or upon occurrence of the injury. *See id.*

[6] [7] [8] In deciding whether a genuine fact issue exists, the movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.,* 690 **S.W.2d** 546, 548–49 (Tex.1985). There is no dispute between the parties that the survey of the 40–acre tract of land was completed, signed, sealed, and delivered to the **Boekers** on November 23, 1983. Appellants did not file suit until June 28, 1994, more than 10 years after the survey was completed; thus, the suit is time-barred. Furthermore, we are not persuaded by the argument that the survey of the 2–acre tract conducted in June or July of 1984 revived the statute of limitations for the error that was made on the survey of the 40–acre tract, even though the later survey repeated the original error. There is no statutory revival provision, nor is there a discovery rule whereby the statute of limitations begins to run only when the cause of action is discovered. We conclude that each survey must stand apart and alone. To hold otherwise would defeat the purpose of the statute, because surveyors continuously base new surveys on previous surveys which may depict an error not known at the time the subsequent survey is produced.

Accordingly, appellees have sustained their burden of proving their entitlement to summary judgment as a matter of law. The **Boekers'** sole point of error is without merit and is overruled.

We affirm the judgment of the trial court.

### All Citations

916 S.W.2d 59

End of Document                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Hewlett-Packard Co. v. Benchmark Electronics, Inc., Tex.App.-Hous. (14 Dist.), August 3, 2004

15 S.W.3d 124
Court of Appeals of Texas,
Houston (14th Dist.).

COOK **COMPOSITES**, INC. n/k/a Curran **Composites**, Inc., Total **Composites**, Inc., and Cook **Composites** and Polymers Co., Appellants,

v.

**WESTLAKE STYRENE**
CORPORATION, Appellee.

No. 14–98–01064–CV. | Jan. 20, 2000.

Seller of manufacturing product sued buyer for breach of contract when buyer refused to honor the contract formula price. The 190th District Court, Harris County, John P. Devine, J., granted summary judgment to seller, awarding damages for the difference between the contract price and the spot market prices for which seller sold product that buyer had agreed to purchase, plus interest and attorney fees. Buyer appealed. The Court of Appeals, Frost, J., held that: (1) contract language in meeting-competition clause was not ambiguous; (2) buyer's failure to produce competitor's contract at time it sought to invoke meeting-competition clause did not satisfy terms of sales contract; (3) as a matter of first impression, seller's failure to plead or provide evidence that resale of contract goods was conducted in a commercially reasonable manner and that notice of resale was given to buyer precluded a remedy under provision of Uniform Commercial Code (UCC) allowing seller to measure contract damages by the difference between the contract price and the resale price; but (4) seller's proof of the average monthly spot price of contract goods, instead of the spot price for every sale, was sufficient evidence of market price to measure damages by the UCC's contract market differential.

Affirmed.

West Headnotes (47)

[1] Contracts
⟳ Existence of ambiguity

Conflicting interpretations of a contract and unclear and uncertain language do not necessarily mean a contract is ambiguous.

1 Cases that cite this headnote

[2] Contracts
⟳ Application to Contracts in General
Contracts
⟳ Construction by Parties
Evidence
⟳ Grounds for admission of extrinsic evidence

There are two steps to an ambiguity analysis of a contract: (1) the courts apply the applicable rules of construction and decide if the contract is ambiguous, and if so, (2) the trier of fact may consider the parties' interpretation and other extraneous evidence.

3 Cases that cite this headnote

[3] Contracts
⟳ Existence of ambiguity

A contract is not ambiguous if it can be given a certain and definite meaning or interpretation.

8 Cases that cite this headnote

[4] Contracts
⟳ Ambiguity in general

Court must interpret an unambiguous contract as a matter of law.

3 Cases that cite this headnote

[5] Contracts
⟳ Existence of ambiguity

If a contract can be given two or more reasonable interpretations, it is ambiguous.

1 Cases that cite this headnote

[6] Judgment
⟳ Contract cases in general

An ambiguous contract raises a question of fact which cannot be disposed of on summary judgment.

Cases that cite this headnote

**[7]    Contracts**
    ☞ Language of contract

In determining if a contract is ambiguous, the court's primary concern is to determine and give effect to the intentions of the parties as expressed in the instrument.

2 Cases that cite this headnote

**[8]    Contracts**
    ☞ Language of contract

In determining the intention of the parties to a contract, courts look only within the four corners of the agreement to see what is actually stated, and not at what was allegedly meant.

10 Cases that cite this headnote

**[9]    Contracts**
    ☞ Construing whole contract together

In determining the intention of the parties to a contract, courts must consider all of the provisions with reference to the entire contract; no single provision will be controlling.

4 Cases that cite this headnote

**[10]    Contracts**
    ☞ Subject, object, or purpose as affecting construction

**Contracts**
    ☞ Language of Instrument

**Contracts**
    ☞ Extrinsic circumstances

In construing a contract, courts consider how a reasonable person would have used and understood the language, by pondering the circumstances surrounding the contract's negotiation, and by considering the purposes which the parties intended to accomplish by entering into the contract.

3 Cases that cite this headnote

**[11]    Contracts**
    ☞ Preliminary negotiations and agreements

**Evidence**
    ☞ Contracts in General

In construing a contract, courts are free to examine prior negotiations and all other relevant incidents bearing on the intent of the parties; however, the parties may not contradict or vary the terms of the agreement by oral statements of their intentions, and courts look to these circumstances merely to assist them in understanding the object and purpose of the contractual language the parties chose.

9 Cases that cite this headnote

**[12]    Sales**
    ☞ Price, Expenses, and Costs of Transportation

Contract language in meeting-competition clause of sales contract, providing that seller of goods would meet a competitor's lower price "as long as" the offer was good over the term of the contract was not ambiguous and meant "if" competitive offers were longer than or equal to the remaining term of the contract, considering that contract's meet-or-release clause used key phrase "for as long as" when giving seller option of releasing buyer to purchase goods for as long as the lower price was in effect, meaning for the life of the competitive offer.

Cases that cite this headnote

**[13]    Customs and Usages**
    ☞ Construction of particular words and phrases

Contract language providing that seller of manufacturing product would meet a competitor's lower price upon "satisfactory written evidence" of a "legitimate" competitor's price was not ambiguous, such that it would require evidence of industry practice to show parties' intent, even though terms "satisfactory" and "legitimate" were not defined in contract, considering that industry practice was simply to inform seller of the competitive price, and

contract specifically called for written evidence of that price.

1 Cases that cite this headnote

**[14]  Sales**
    ⊕⇒ Price, Expenses, and Costs of Transportation

Contract language providing that seller of goods would meet a competitor's lower price so long as competitive offer was "valid over the term of the contract" was not ambiguous, and meant that competitive offer must be valid at least until end of sales contract, considering that purpose of meeting-competition clause was to obligate seller to sell to buyer at competitive prices offered for comparable quality, quantity, and duration, not to allow buyer to purchase from seller at the spot market price in certain months when the spot price was lower than the contract price.

Cases that cite this headnote

**[]  Sales**
    ⊕⇒ Price, Expenses, and Costs of Transportation

Buyer's failure to produce competitor's contract at time it sought to invoke contract clause, providing that seller would meet a competitor's price upon written evidence of a lower price offered by that competitor under substantially similar terms and conditions, did not satisfy terms of sales contract, even if buyer produced competitor's contract before parties signed their contract, and seller was aware of its terms.

Cases that cite this headnote

**[16]  Judgment**
    ⊕⇒ Sales of real and personal property

Buyer's statement that competitor's contract had price adjustment provisions not included in its contract with seller was insufficient to create genuine issue of material fact as to whether competitor's contract triggered seller's contractual duty to meet competitor's price, as required to preclude summary judgment for

seller on breach-of-contract claim, where pricing formula of competitor's contract was identical to pricing formula in seller and buyer's contract.

Cases that cite this headnote

**[17]  Judgment**
    ⊕⇒ Existence of defense

For a non-movant to avoid summary judgment based upon an affirmative defense, it must produce sufficient summary judgment evidence to raise a question of fact as to each element of the affirmative defense.

Cases that cite this headnote

**[18]  Sales**
    ⊕⇒ Resale of goods by seller

Seller's refusal to sell contract goods to buyer at a price lower than their contract formula price, instead selling product at a much lower spot market price, did not amount to a failure to mitigate damages upon buyer's breach; seller was not required to mitigate its damages by foregoing its rights under the contract.

1 Cases that cite this headnote

**[19]  Sales**
    ⊕⇒ Presumptions and burden of proof

To assert affirmative defense that seller failed to mitigate its damages, buyer, as breaching party, had burden of proving that damages could have been mitigated.

3 Cases that cite this headnote

**[20]  Damages**
    ⊕⇒ Breach of contract

Although an injured party is required to exercise reasonable efforts to minimize damages, it is not required to mitigate its losses by accepting an arrangement with the repudiator if that is made conditional on its surrender of its rights under the repudiated contract.

3 Cases that cite this headnote

**[21] Estoppel**
☞ Essential elements

A defensive doctrine founded on principles of fraud, equitable estoppel requires, among other things, a false representation or concealment of material facts.

1 Cases that cite this headnote

**[22] Estoppel**
☞ Contracts

Refusal by seller to honor competitive pricing clause would not amount to a false representation that competitive prices would be honored, and thus, buyer could not assert equitable estoppel defense to seller's breach-of-contract claim on that basis.

Cases that cite this headnote

**[23] Estoppel**
☞ Contracts

Seller did not represent in contract that it would meet any competitive price, but only that it would meet such price upon satisfactory written evidence, and thus, seller was not equitably estopped from refusing to meet a competitor's lower price, where buyer did not produce requisite documentation.

Cases that cite this headnote

**[24] Estoppel**
☞ Nature and Application of Estoppel in Pais

Quasi estoppel is an equitable doctrine that prevents a party from repudiating an act or assertion if it would harm another who reasonably relied on the act or assertion.

3 Cases that cite this headnote

**[25] Estoppel**
☞ Nature and Application of Estoppel in Pais

Under defensive doctrine of "quasi estoppel," a party is precluded from asserting a right to the disadvantage of another, where doing so would be inconsistent with the party's previous position.

8 Cases that cite this headnote

**[26] Estoppel**
☞ Contracts

That seller exercised its rights under discretionary clause of sales contract for two months to voluntarily give seller a price lower than the contract formula price, but higher than the price buyer requested under meeting-competition clause, did not estop seller, under doctrine of quasi estoppel, from demanding written evidence of a lower competitive price, as required by the contract for lowering the price for the term of the contract.

Cases that cite this headnote

**[27] Estoppel**
☞ Relying and acting on representations

Buyer could not have relied on testimony of seller given after lawsuit commenced that buyer only had to produce invoice showing lower competitive price and a contract valid for same term as seller's and buyer's contract to invoke clause providing that seller would honor competitor's price upon written documentation, and thus testimony was insufficient to estop seller, under doctrine of quasi estoppel, from demanding written evidence of a lower competitive price, as required by contract.

Cases that cite this headnote

**[28] Judgment**
☞ Absence of issue of fact

A plaintiff must offer legally sufficient proof on every element of its case to entitle it to summary judgment.

Cases that cite this headnote

**[29] Sales**
☞ Recovery of difference in price or between price and market value

Seller's failure to plead or provide evidence that resale of contract goods was conducted in a commercially reasonable manner and that

notice of resale was given to breaching buyer precluded a remedy under provision of Uniform Commercial Code allowing seller to measure contract damages by the difference between the contract price and the resale price. V.T.C.A., Bus. & C. § 2.706.

1 Cases that cite this headnote

**[30]    Sales**
    ⬥ Recovery of difference in price or between price and market value

When an aggrieved seller chooses to privately resell the contract goods and measure its damages by the difference between the contract price and the resale price, the Uniform Commercial Code sets out three simple steps the seller must follow: (1) identify the resale contract to the broken contract; (2) give the buyer reasonable notice of the seller's intention to resell; and (3) resell in good faith and in a commercially reasonable manner. V.T.C.A., Bus. & C. § 2.706.

Cases that cite this headnote

**[31]    Sales**
    ⬥ Recovery of difference in price or between price and market value

Breaching buyer's allegations that seller failed to give presale notice and failed to act in a commercially reasonable manner, as required to measure damages by the difference between the contract price and the resale price, was not the assertion of an affirmative defense, and thus, buyer did not have burden of proof as to such allegations. V.T.C.A., Bus. & C. § 2.706.

1 Cases that cite this headnote

**[32]    Pleading**
    ⬥ Necessity for defense

Generally speaking, "affirmative defenses" are any propositions that a defendant may interpose to defeat the plaintiff's prima facie case.

4 Cases that cite this headnote

**[33]    Pleading**
    ⬥ Necessity for defense

"Affirmative defenses" do not rebut any factual propositions asserted in the plaintiff's case, but open the way for the defendant to adduce evidence establishing an independent reason why the plaintiff may not recover.

3 Cases that cite this headnote

**[34]    Pleading**
    ⬥ Necessity for defense

An "affirmative defense" usually accepts the existence at one time or another of a prima facie case but alleges propositions which, if established, would defeat the claim.

3 Cases that cite this headnote

**[35]    Sales**
    ⬥ Recovery of difference in price or between price and market value

Presale notice and commercial reasonableness are elements of seller's prima facie claim for damages measured by the difference between contract price and resale price and not affirmative defenses of the breaching buyer. V.T.C.A., Bus. & C. § 2.706.

2 Cases that cite this headnote

**[36]    Sales**
    ⬥ Damages

Aggrieved seller's proof of the average monthly spot price of contract goods, instead of proving the spot price for every sale, was sufficient evidence of market price to measure damages by the contract market differential when buyer breached contract, even though contract did not specify the time and place for tender, where under the contract, the formula price was computed on a monthly basis and buyer purchased and received goods in equal monthly quantities. V.T.C.A., Bus. & C. § 2.708(a).

Cases that cite this headnote

**[37]  Sales**

    ⟊⊸ Issues, proof, and variance

A party bringing suit under section of Uniform Commercial Code governing seller's damages for non-acceptance or repudiation, providing for a traditional contract market differential recovery, must plead and prove the statutory elements to make its prima facie case for damages. V.T.C.A., Bus. & C. § 2.708(a).

1 Cases that cite this headnote

**[38]  Sales**

    ⟊⊸ Resale of goods by seller

When a resale price is from an arm's length transaction, it adequately represents market price, for purposes of measuring damages by the traditional contract market differential. V.T.C.A., Bus. & C. § 2.708(a).

Cases that cite this headnote

**[39]  Judgment**

    ⟊⊸ Motion or Other Application

Aggrieved seller's motion for summary judgment in breach-of-contract action did not have to address buyer's affirmative defenses raised in the pleadings, and thus, buyer could not avoid summary judgment based on an affirmative defense, where buyer failed to produce any evidence as to each element of each of its affirmative defenses.

Cases that cite this headnote

**[40]  Judgment**

    ⟊⊸ Existence of defense

To avoid summary judgment a defendant must produce evidence to raise a genuine issue of material fact as to each element of its affirmative defense; merely pleading an affirmative defense will not preclude summary judgment.

Cases that cite this headnote

**[41]  Contracts**

    ⟊⊸ Defenses

Anticipatory repudiation is an affirmative defense to a breach of contract claim.

2 Cases that cite this headnote

**[42]  Contracts**

    ⟊⊸ Discharge of contract by breach

Under defensive theory of anticipatory repudiation, an injured party is discharged.

2 Cases that cite this headnote

**[43]  Contracts**

    ⟊⊸ Acts constituting renunciation and liabilities therefor

Traditionally, anticipatory repudiation of a contract occurs when the promissor unequivocally disavows any intention to perform in the future.

Cases that cite this headnote

**[44]  Appeal and Error**

    ⟊⊸ Nature or subject-matter in general

By failing to present to the trial court issue of whether buyer was justified in suspending its own performance under the contract by seller's alleged failure to provide adequate assurances of its performance, buyer waived issue on appeal. V.T.C.A., Bus. & C. § 2.609; Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

1 Cases that cite this headnote

**[45]  Sales**

    ⟊⊸ Demand or notice by buyer

Buyer of manufacturing product had no basis for insecurity and no grounds to request adequate assurance of performance from seller that seller would meet competition's price, as provided in contract, considering that buyer failed to present seller with the documentation contractually required to trigger seller's obligation to perform. V.T.C.A., Bus. & C. § 2.609.

1 Cases that cite this headnote

**[46]** **Interest**

~ Construction and Operation

When a contract provides for a specific interest rate, the postjudgment interest will be the lesser of: (a) the rate specified in the contract or (b) 18% a year.

Cases that cite this headnote

**[47]** **Interest**

~ Construction and Operation

Seller that prevailed in breach-of-contract action against buyer of manufacturing product was entitled to the lesser statutory rate of 18% as annual prejudgment interest, where the contract provided for 1.5% monthly interest on amounts that were 30 days past due, compounded monthly. V.T.C.A., Finance Code §§ 304.102, 304.103.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*129** Andrew T. McKinney, IV, Kim A. Cooper, Houston, for appellants.

Bradley M. Whalen, Stephen Lee, Houston, for appellee.

Panel consists of Justices YATES, FOWLER and FROST.

**OPINION**

KEM THOMPSON FROST, Justice.

This is a breach of contract case arising out of a written agreement between two companies for the purchase and sale of goods. At issue is the propriety of the trial court's granting of the seller's motion for summary judgment notwithstanding the buyer's assertion of various affirmative defenses, both under common law and arising under the Uniform Commercial Code.

**INTRODUCTION**

The appellee, **Westlake Styrene** Corporation sued the appellants, Cook **Composites**, Inc. n/k/a Curran **Composites**, Inc., Total **Composites**, Inc. and Cook **Composites** and Polymers Co. (collectively, "CCP") for breach of contract. Initially, CCP filed a general denial and asserted the affirmative defense of estoppel. **Westlake** filed a traditional motion for summary judgment on its contract claim and a "no evidence" motion for summary judgment on CCP's affirmative defense of estoppel. Before this combined motion was set for submission, CCP amended its answer to add ambiguity, modification of contract, abandonment, waiver and failure to mitigate damages as affirmative defenses to **Westlake's** claim. The trial court granted **Westlake's** motion and entered final judgment in favor of **Westlake** for $1,337,777.50, plus post-judgment interest and attorney's fees.

**\*130** CCP presents seven issues for appellate review. In the first six issues, CCP contends that the trial court erred by granting summary judgment because: (1) the contract is ambiguous; (2) genuine issues of material fact exist with respect to **Westlake's** entitlement to damages; (3) CCP raised questions of fact on its affirmative defenses; (4) **Westlake** failed to prove all elements of its *prima facie* case for recovery of damages under the Uniform Commercial Code ("UCC"), as adopted in Texas; (5) **Westlake's** motion for summary judgment failed to address several of CCP's affirmative defenses; and (6) **Westlake** anticipatorily repudiated the contract when it failed to provide adequate assurance of due performance, thereby excusing CCP's obligation to perform. In its seventh issue, CCP claims the trial court erred in setting the rate of pre-judgment interest too high. We affirm the decision of the lower court.

**FACTUAL BACKGROUND**

In January of 1995, CCP and **Westlake** entered into a three-year contract for the purchase and sale of **styrene** monomer. Under the parties' contract, CCP agreed to buy a set quantity of product from **Westlake** through the end of 1997, at an agreed formula price. CCP was to purchase the product in equal monthly installments in the following volumes: (i) 12 million pounds in 1995; (ii) 14 million pounds in 1996; and (iii) 16 million pounds in 1997. Because the market price for **styrene** monomer fluctuates on a daily basis, the parties included in the contract a "meeting competition" clause in an effort to buffer the effects of market price movements. The clause reads in part:

If Buyer [CCP] furnishes Seller [Westlake] satisfactory written evidence of a legitimate price, which is lower than Seller's effective price to buy, offered by a recognized domestic manufacturer on standard products of like quantity and quality on substantially similar terms and conditions, Seller agrees to meet such lower price on the base volume as long as such competitive offer is valid over the term of this contract.

In early 1995, CCP (buyer) advised Westlake (seller) of a competitive situation and produced written evidence in the form of a contract with Amoco, one of CCP's competitors. The Amoco contract was for a term at least as long as the Westlake/CCP contract. Westlake met the competitive situation by adopting the competitor's pricing formula as part of the Westlake/CCP contract.

In July and August of 1996, CCP, in response to a fall in the market price for styrene monomer, asked Westlake for a reduction in the contract price. The Westlake/CCP contract contained a discretionary clause which provided that Westlake, as seller, "at any time may lower its price or institute or remove a temporary voluntary allowance or other similar competitive allowance off the list price without being obligated to provide [CCP] with any advance notice thereof." Although Westlake did not meet the price CCP had requested, it granted CCP a price reduction.[1] Westlake required no written evidence from CCP before lowering the price.

In October of 1996, CCP attempted to invoke the "meeting competition" clause by producing a competitor's invoice for one shipment of styrene monomer for the month of October 1996. This invoice did not contain the terms and conditions of the offer, did not verify quantity, and did not contain evidence that the offer was valid over the term of the Westlake/CCP contract, all of which was information required by the contract. When CCP refused to provide any written evidence of the terms and conditions, quantity or term over which the allegedly competitive offer *131 was valid, Westlake refused to meet the price stated in the competitor's invoice.

Beginning in December of 1996, CCP refused to honor the Westlake/CCP contract formula price. Westlake filed suit against CCP for breach of contract. To mitigate its damages, Westlake sold the styrene monomer CCP had agreed to purchase on the spot market at prices well below the price specified in the Westlake/CCP contract. Westlake did not give CCP advance notice of the sale. At trial, the court found in favor of Westlake and awarded damages for the difference between the contract price and the spot market sales price, plus prejudgment and postjudgment interest and attorney's fees.

## STANDARD OF REVIEW

The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See Nixon v. Mr. Property Management Co., Inc.,* 690 S.W.2d 546, 548 (Tex.1985). In deciding whether a disputed material fact issue precludes summary judgment, we take as true all evidence favoring the non-movant. *See id.* at 548–49. We review conclusions of law *de novo* and will uphold them if the judgment can be sustained on any legal theory supported by the evidence. *See National Environmental Service Co., Inc. v. Homeplace Homes, Inc.,* 961 S.W.2d 632, 634–35 (Tex.App. —San Antonio 1998, no pet.) (citing *Nelkin v. Panzer,* 833 S.W.2d 267, 268 (Tex.App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.)).

## AMBIGUITY

In its first issue, CCP claims there are at least three ambiguities in the "meeting competition" clause which make the trial court's granting of Westlake's summary judgment motion improper. To support its argument, CCP offers various interpretations of the language in the clause.

[1] [2] [3] [4] [5] [6]   At the outset, we note that conflicting interpretations of a contract and unclear and uncertain language do not necessarily mean a contract is ambiguous. *See Kelley–Coppedge, Inc. v. Highlands Ins. Co.,* 980 S.W.2d 462, 465 (Tex.1998); *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (1951); *Preston Ridge Fin. Servs. Corp. v. Tyler,* 796 S.W.2d 772, 777 (Tex.App.—Dallas 1990, writ denied). There are two steps to an ambiguity analysis. First, we apply the applicable rules of construction and decide if the contract is ambiguous. *See Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). A contract is not ambiguous if it can be given a certain and

definite meaning or interpretation. *See id.* We must interpret an unambiguous contract as a matter of law. *See id.* If, however, the contract can be given two or more reasonable interpretations, it is ambiguous. *See Kelley–Coppedge,* 980 S.W.2d at 465. If we find the contract ambiguous, the second part of the ambiguity analysis comes into play and the trier of fact may consider the parties' interpretation and other extraneous evidence. *See National Union Fire Ins. Co. v. CBI,* 907 S.W.2d 517, 520 (Tex.1995); *Quality Oilfield Products, Inc. v. Michigan Mut. Ins. Co.,* 971 S.W.2d 635, 639 (Tex.App.—Houston [14th Dist.] 1998, no pet.). In that event, we must find that summary judgment is improper. An ambiguous contract raises a question of fact which cannot be disposed of on summary judgment. *See Calhoun v. Killian,* 888 S.W.2d 51, 54 (Tex.App.—Tyler 1994, writ denied).

**[7]** **[8]** **[9]** **[10]** **[11]** In the first step of the ambiguity analysis, our primary concern is to determine and give effect to the intentions of the parties as expressed in the instrument. *See Coker,* 650 S.W.2d at 393; *Tyler,* 796 S.W.2d at 775. In determining the intention of the parties, we look only within the four corners of the agreement to see what is actually stated, and not at what was allegedly meant. *See* **\*132** *Esquivel v. Murray Guard, Inc.,* 992 S.W.2d 536, 544 (Tex.App.—Houston [14th Dist.] 1999, pet.denied). We must consider all of the provisions with reference to the entire contract; no single provision will be controlling. *See Coker,* 650 S.W.2d at 393; *Esquivel,* 992 S.W.2d at 543. In construing the contract, we consider how a reasonable person would have used and understood the language, by pondering the circumstances surrounding the contract's negotiation, and by considering the purposes which the parties intended to accomplish by entering into the contract. *See Manzo v. Ford,* 731 S.W.2d 673, 676 (Tex.App.—Houston [14th Dist.] 1987, no writ). We are free to examine prior negotiations and all other relevant incidents bearing on the intent of the parties; however, the parties may not contradict or vary the terms of the agreement by oral statements of their intentions. *See Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 734 (Tex.1982); *Medical Towers, Ltd. v. St. Luke's Episcopal Hosp.,* 750 S.W.2d 820, 823 (Tex.App.—Houston [14th Dist.] 1988, writ denied). We look to these circumstances merely to assist us in understanding the object and purpose of the contractual language the parties chose. *See Garcia v. King,* 139 Tex. 578, 164 S.W.2d 509, 512 (1942); *St. Luke's,* 750 S.W.2d at 823. With these basic rules of contract construction and interpretation in mind, we now address each of the alleged ambiguities in the **Westlake/CCP** contract.

**[12]** The first alleged ambiguity involves the "time-offered" component of the competitive offer. The "meeting competition" clause states that **Westlake** will meet the lower price on the base volume "as long as" the offer is good "over the term of this contract." To help define the meaning of this language, we look at comparable language in a related clause of the **Westlake/CCP** contract. The related clause, known as a "meet or release" clause, relates only to amounts over the base volume. This clause basically gives **Westlake** the option of either "meeting" the price or "releasing" CCP to purchase the product from the other source "while such lower price is in effect." The sentence immediately following this "meet or release" clause allows **Westlake** to become CCP's supplier again, if **Westlake** opted to release CCP, "for as long as it [the lower price] is in effect." We note that the parties used a key phrase "for as long as" in the "meet or release" provision, but *not* in the "meeting competition" provision, where they instead used the phrase "as long as." The logical effect of this word choice is that: (i) **Westlake's** *obligation* to supply at a lowered price could only be triggered "as long as" (meaning *if*) the lower offer covered a period of time at least as long as the **Westlake/CCP** contract; and (ii) **Westlake's** "meet or release" *option* could be triggered "for as long as it is in effect" (meaning for the life of the competitive offer however short it may be). The committed base volume required comparable commitment from the alternative supplier; the excess volumes did not. The selective use of the preposition "for" gives clear and definite meaning to this regime. Looking within the four corners of the agreement, the intent of the parties is clear: the time period "over the term of this contract" pertains to competitive offers longer than or equal to the remaining term of the **Westlake/CCP** contract, i.e., at least through 1997. Because this portion of the contract can be given a clear and definite meaning, the "time-offered" provisions are not ambiguous.

**[13]** Next, CCP claims that because the contract failed to define what constitutes "satisfactory written evidence" of a "legitimate" **styrene** monomer price, the "meeting competition" clause is ambiguous. The terms "satisfactory" and "legitimate," as used in this context, are not ambiguous as a matter of law and, therefore, it is not necessary to look beyond the four corners of the contract to glean the parties' intent. Even if we were to do so, the only evidence CCP produced to show the parties' intent was the purported practice in the industry "simply to inform the seller of the competitive price." This "industry **\*133** practice," however, is wholly inconsistent with the express terms of the **Westlake/CCP** contract, which, on its face, calls for *written*

evidence.[2] Given this express term of the contract, we cannot conclude that Westlake and CCP intended to follow the stated "industry practice," nor can we find that the parties had two different intents when drafting the contract. Therefore, the evidence of "industry practice" is insufficient to create two reasonable interpretations of the contract's terms. We find that these terms are not ambiguous in this contract.

[14]   Finally, CCP claims the phrase "valid over the term of the contract" is ambiguous. Again, by looking within the four corners of the Westlake/CCP contract, the parties' intention is clear: the competitive offer must be valid at least until the end of the Westlake/CCP contract. The general purpose of a "meeting competition" clause like the one at issue here is to obligate the seller to sell to the buyer at competitive prices offered for comparable quality, quantity, and duration. The purpose is not to allow the buyer to purchase from the seller at the spot market price in certain months when the spot price is lower than the contract price. If this were true, the seller would have all the price risk under the contract and the buyer would have none. The phrase "valid over the term of the contract" has a clear and definite meaning and is not subject to two reasonable interpretations. Because we find that the phrase is not ambiguous, we do not reach the second step of the ambiguity analysis (consideration of evidence of conflicting interpretations that CCP provided); rather, we interpret the phrase as a matter of law. We find that the commercial rationale for the "meeting competition" clause is sufficient to uphold the trial court's judgment as to the meaning of this provision of the contract. Having determined that there is no ambiguity in the "meeting competition" clause, we overrule CCP's first issue.

### GENUINE ISSUES OF MATERIAL FACT

[][15][]   In its second issue, CCP claims there are genuine issues of material fact that make the trial court's granting of Westlake's summary judgment motion improper. Specifically, CCP contends there existed two disputed fact questions as to whether CCP was excused from its obligation to pay the full formula price under the Westlake/CCP contract. These issues, both of which arise out of the "meeting competition" clause, are: (1) whether CCP provided Westlake "satisfactory written evidence of a legitimate price" and (2) whether the "competitive offer [was] valid over the term of this contract."

The "meeting competition" clause provides that CCP must furnish Westlake with satisfactory written evidence of a legitimate price which is offered by a recognized domestic manufacturer on standard products of like quantity and quality on substantially similar terms and conditions. Additionally, the contract specifies that the competitive offer must be valid over the term of the Westlake/CCP contract. CCP produced an invoice that contained the price of the product and the name of the manufacturer. CCP did not produce written evidence of a legitimate price of like quantity on substantially similar terms and conditions, and did not produce any evidence that the offer was valid over the term of the Westlake/CCP contract. CCP argues that (1) its production of the Amoco contract in early 1995 (before the parties signed the Westlake/CCP contract in dispute) was sufficient to satisfy the "written evidence" requirement, (2) Westlake knew the terms and conditions were substantially the same, and (3) the Amoco contract was valid over the term of the Westlake/CCP contract.

*134   Although the Westlake/CCP contract does not specifically provide a time when the written evidence must be furnished, it is clear from the implicit "if/then" structure of the clause that the written evidence must be furnished when the "meeting competition" clause is invoked so as to enable Westlake (seller) the opportunity to confirm that the requirements for CCP (buyer) to be entitled to a lower price have been satisfied. By failing and refusing to produce the Amoco contract at the time it sought to invoke the "meeting competition" clause, CCP failed to comply with the documentation requirements of the Westlake/CCP contract. Without the information required by the contract, Westlake could not determine if CCP was properly invoking the clause. Indeed, as Westlake points out, the actions of CCP were consistent with a buyer who had received a voluntary allowance from a seller or bought on the spot market and not consistent with the actions of a buyer who had met the criteria specified in the parties' agreement. In light of CCP's failure to provide (1) written evidence of a legitimate price of like quantity on substantially similar terms, and (2) evidence that the offer was valid over the term of the Westlake/CCP contract, there is no genuine issue of material fact to preclude summary judgment in favor of Westlake.

[16]   Even if we were to conclude that CCP's production of the Amoco contract in 1995 satisfied the requirements of the "meeting competition" clause, that contract would not produce the lower price reflected in the October 1996 invoice. The pricing formula of the Amoco contract was identical to

the pricing formula of the Westlake/CCP contract. Therefore, the price calculated under the Amoco contract should have been identical to what Westlake was offering.[3] Although CCP alleges that the Amoco contract contained rebate and other provisions which made it different from the Westlake/CCP contract, CCP did not identify those provisions or allege that such provisions accounted for the lower price, nor did CCP otherwise establish that the price offered was valid over the term of the Westlake/CCP contract. Even taking the evidence of other rebate or price adjustment provisions as true, we cannot blindly leap to the conclusion that the invoice price was calculated under one of those provisions. A general statement that the Amoco contract had rebate and other price adjustment provisions does not raise a genuine issue of material fact sufficient to defeat summary judgment. We overrule CCP's second issue.

## AFFIRMATIVE DEFENSES RAISED IN SUMMARY JUDGMENT RESPONSE

[17]    In its third issue, CCP asserts that the trial court improperly granted the motion for summary judgment because CCP raised a question of fact on several affirmative defenses, namely failure to mitigate, ambiguity, and estoppel. For a non-movant, such as CCP, to avoid summary judgment based upon an affirmative defense, it "must produce sufficient summary judgment evidence to raise a question of fact as to each element of the affirmative defense." *Wiggins v. Overstreet,* 962 S.W.2d 198, 200 (Tex.App.—Houston [14th Dist.] 1998, pet. denied). We now examine each of CCP's affirmative defenses to determine if CCP met this requirement.[4]

### Mitigation of Damages

[18]    CCP argues that Westlake failed to mitigate its damages. To support this argument, CCP points out that the price *135 Westlake obtained for the styrene monomer on the spot market was much lower than the price CCP had offered. CCP argues that *had* Westlake sold the product to CCP at the price CCP offered each month (which was less than the formula price under the Westlake/CCP contract), Westlake could have mitigated its damages significantly; therefore, CCP argues, Westlake is not entitled to the full amount awarded. We reject CCP's argument.

[19]    [20]    As the breaching party, CCP had the burden of proving that damages could have been mitigated. *See Copenhaver v. Berryman,* 602 S.W.2d 540, 544 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.); *Houston Chronicle Pub. Co. v. McNair Trucklease, Inc.,* 519 S.W.2d 924, 929 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.). Although an injured party is required to exercise reasonable efforts to minimize damages, it is not required to mitigate its losses "by accepting an arrangement with the repudiator if that is made conditional on [its] surrender of [its] rights under the repudiated contract." *Publicker Chemical Corp. v. Belcher Oil Co.,* 792 F.2d 482, 488 (5th Cir.1986). Westlake's acceptance of CCP's price, as presented, would have required Westlake to forgo its entitlement to the contract price and/or recognize the existence of a competitive situation under the "meeting competition" clause, an event which Westlake disputed and which we have found did not occur. Had Westlake accepted CCP's offer as presented, it would have surrendered its right to insist on the formula price under the repudiated Westlake/CCP contract. Westlake was not required to mitigate its damages by forgoing its rights under the contract. Without other evidence that damages could have been mitigated, CCP failed to raise a question of fact on failure to mitigate.

### Equitable Estoppel

[21]    CCP argues that Westlake was not entitled to recover based on principles of equitable estoppel. A defensive doctrine founded on principles of fraud, equitable estoppel requires, among other things, a false representation or concealment of material facts. *See Schroeder v. Texas Iron Works, Inc.,* 813 S.W.2d 483, 489 (Tex.1991). To support its equitable estoppel defense, CCP claims that Westlake made a false representation when it represented in the contract that competitive prices would be honored if the conditions of the "meeting competition" clause were met. There are at least two fatal flaws in CCP's argument.

[22]    [23]    First, a refusal by Westlake to honor the competitive price alone would not be evidence of a false representation in the contract; yet, that is the *only* summary judgment proof CCP offered to show a false representation. Second, the "meeting competition" clause had very specific requirements for the type of evidence CCP had to produce in order to trigger Westlake's obligation under that provision. Westlake did not represent that it would meet *any* price *without the evidence required* by the "meeting competition"

clause. To the contrary, **Westlake** contracted to meet a competitive price if and when CCP produced satisfactory written evidence. Because CCP did not produce the requisite documentation, **Westlake's** obligation to perform under the "meeting competition" clause was never triggered. Thus, CCP's equitable estoppel argument fails.

### Quasi Estoppel

CCP also argues that **Westlake** is barred under the doctrine of quasi estoppel from demanding written evidence of the competitive price in light of (1) **Westlake's** agreement to accept a lower price for July and August 1996 and (2) the testimony of **Westlake's** president that only an invoice and evidence of a contract valid over the same term were required to invoke the "meeting competition" clause.

***136** **[24]** **[25]** Quasi estoppel is an equitable doctrine that prevents a party from repudiating an act or assertion if it would harm another who reasonably relied on the act or assertion. Under this defensive doctrine, a party is precluded from asserting a right to the disadvantage of another, where doing so would be inconsistent with the party's previous position. *See Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.,* 817 S.W.2d 160, 164 (Tex.App.—Houston [14th Dist.] 1991, no writ).

**[26]** CCP first argues that the principles of quasi estoppel bar **Westlake** from insisting on CCP's compliance with the contract's "written evidence" requirement based on the fact that **Westlake** gave a prior price reduction without insisting on written evidence. This argument fails because there was no evidence that **Westlake** had ever lowered the price under the "meeting competition" clause without the requisite written evidence. Notably, when CCP asked for a lower price in July and August of 1996, **Westlake** agreed to a reduced price but not to the price CCP had requested. **Westlake** claims to have granted this reduction under the provision which gave it discretion over temporary allowances and reductions, *not* under the "meeting competition" clause. Under the former, **Westlake** was entitled to lower the price, in its discretion, at any time. Had the price been reduced pursuant to the terms of the "meeting competition" clause, **Westlake** would have had to meet the price CCP asked. There is nothing in the record to suggest that the price reduction was granted under the "meeting competition" clause. To the contrary, the evidence suggests that **Westlake** gave CCP a temporary voluntary price allowance that yielded a price that was higher

than the price CCP had requested, but that was lower than the contract's formula price. The fact that **Westlake** exercised its rights under the discretionary clause does not estop it from insisting on compliance with another provision of the same contract. We find that CCP failed to raise a fact issue on quasi estoppel arising out of **Westlake's** agreement to accept a lower price in July and August of 1996.

**[27]** CCP also argues that the testimony of **Westlake's** president bars **Westlake** from insisting on written evidence. He testified that under his reading of the contract, CCP had to produce only an invoice showing the competitive price and evidence of a contract which is valid for the same term as the **Westlake**/CCP contract in order to invoke the "meeting competition" clause. This testimony, however, was not given nor was the president's view stated until the lawsuit commenced. Therefore, CCP could not possibly have relied on the president's statements in entering into the contract or at any time before suit was filed. Furthermore, there is nothing in the record to suggest that **Westlake** ever represented that, contrary to the express terms of the contract, only two items were necessary to invoke the "meeting competition" clause. Even if it had, there is nothing to demonstrate that CCP changed its position in detrimental reliance. Thus, CCP failed to raise a question of material fact as to quasi estoppel with regard to the testimony of **Westlake's** president.

Having determined that CCP failed to raise a question of fact on any of the affirmative defenses asserted in response to **Westlake's** motion for summary judgment, we overrule the third issue.

### FAILURE TO ESTABLISH ELEMENTS OF *PRIMA FACIE* CASE

**[28]** In its fourth issue, CCP claims the trial court erroneously granted summary judgment because **Westlake** did not prove the elements of its *prima facie* case for recovery of damages under either UCC section 2.706 or UCC section 2.708, as adopted in the Texas Business and Commerce Code. A plaintiff must offer legally sufficient proof on every element of its case to entitle it to summary judgment. *See Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex.1972); *Green v. Unauthorized Practice ***137** *of Law Committee,* 883 S.W.2d 293, 297 (Tex.App.—Dallas 1994, no writ). **Westlake's** first response is that it was not required to do so because the matters CCP raised under UCC sections 2.706 and 2.708 are affirmative defenses. We now examine these UCC provisions

to determine if they are in the nature of affirmative defenses, which would place the burden on CCP, or part of the claimant's *prima facie* case, which would place the burden on Westlake.

### Recovery of Damages Under UCC § 2.706

[29]    [30]    UCC section 2.706, as adopted in Texas, authorizes an aggrieved seller to resell the contract goods and to measure its damages by the difference between the contract price and the resale price. Where, as here, the seller chooses to resell privately, section 2.706 sets out three simple steps the seller must follow:

(1) identify the resale contract to the broken contract;

(2) give the buyer reasonable notice of the seller's intention to resell; and

(3) resell in good faith and in a commercially reasonable manner.

*See* TEX. BUS. & COM.CODE § 2.706 (Vernon 1994).

CCP claims that because Westlake failed to prove (1) presale notice and (2) commercial reasonableness, it cannot recover under section 2.706. Texas has not decided whether recovery under section 2.706 is precluded in the absence of strict compliance with its terms. However, several other UCC states have considered the matter and concluded that recovery under section 2.706 is precluded if the seller does not prove each of the elements. *See Larsen Leasing, Inc. v. Thiele, Inc.,* 749 F.Supp. 821, 823 (W.D.Mich.1990) (finding party seeking damages must plead and prove sale was made in good faith and in a commercially reasonable manner); *Sprague v. Sumitomo Forestry Co., Ltd.,* 104 Wash.2d 751, 709 P.2d 1200, 1204 (1985) (finding party seeking damages must show notice of intent to resell); *Anheuser v. Oswald Refractories Co.,* 541 S.W.2d 706, 711 (Mo.Ct.App.1976) (finding party seeking damages must plead and prove compliance with notice requirements). Therefore, characterizing the terms of section 2.706 as essential elements of a seller's *prima facie* case is consistent with the characterization adopted in other UCC states.

[31]    [32]    [33]    [34]    Characterizing the requirements set forth in section 2.706 as elements of a seller's *prima facie* case for recovery of damages is also consistent with the way Texas courts have traditionally distinguished affirmative

defenses from the elements of a *prima facie* case. Generally speaking, affirmative defenses are any propositions that a defendant may interpose to defeat the plaintiff's *prima facie* case. *See W.R. Grace Co. v. Scotch Corp., Inc.,* 753 S.W.2d 743, 746 (Tex.App.—Austin 1988, writ denied). "They do not rebut any factual propositions asserted in the plaintiff's case, but open the way for the defendant to adduce evidence establishing an *independent* reason why the plaintiff may not recover." *Id.* "An affirmative defense usually accepts the existence at one time or another of a *prima facie* case but alleges propositions which, if established, would defeat the claim." *Cooper v. Scott Irr. Const., Inc.,* 838 S.W.2d 743, 747 (Tex.App.—El Paso 1992, no writ) (dissenting opinion). By claiming that Westlake failed to give presale notice and failed to act in a commercially reasonable manner, CCP is not seeking to establish independent reasons why Westlake should not recover damages under section 2.706; rather, these allegations tend to rebut the factual propositions necessary for Westlake to recover under section 2.706.

[35]    Finally, in making the determination, we note that the seller is in the best position to know what affirmative steps were taken to ensure the sale was conducted in a commercially reasonable manner and whether notice of intent to resell was *138 given to the buyer. It would make no sense to impose the burden on the buyer to prove a negative as an affirmative defense, i.e., to prove the seller's failure to satisfy the elements of section 2.706. Considering the plain language of the statute and other UCC states' characterizations, and applying traditional notions of Texas jurisprudence, we find that presale notice and commercial reasonableness are elements of a *prima facie* claim for damages and not affirmative defenses.

Westlake, anticipating this possibility, next argues that because it pled that the conditions precedent to recovery had been satisfied, under Texas Rule of Civil Procedure 54, it was merely required to offer summary judgment proof on those conditions CCP specifically denied. *See* TEX.R. CIV. P. 54. Because CCP failed to specifically deny that any conditions precedent had been satisfied, Westlake contends its failure to plead presale notice and commercial reasonableness as part of its *prima facie* case is inconsequential. The record, however, does not support Westlake's factual assertions. Westlake did not plead that all conditions precedent to its recovery on the contract had been performed or had occurred, but only that all "conditions precedent to Westlake's recovery of *attorney's fees* have been performed."[5] Pleading the performance of conditions precedent to the recovery of attorney's fees merely

relieved Westlake of the burden of proof, in the absence of a specific denial, on those conditions precedent to the recovery of attorney's fees.[6] A statement that conditions precedent to the recovery of attorney's fees have been performed is not tantamount to pleading that all conditions precedent to recovery on the breach of contract claim have occurred or have been performed. Consequently, Westlake's reliance on Rule 54 is misplaced.

Even if its pleading were sufficient, Westlake still would not be able to prove the *prima facie* elements of section 2.706 because Westlake did not give CCP notice of intent to resell the product. Therefore, Westlake could not recover under section 2.706 in any event.

Westlake's inability to prevail under section 2.706, however, is not necessarily fatal to its recovery of damages on a breach of contract claim. The comments to section 2.706 provide that failure to comply with the procedural provisions of that section still leaves the seller its remedy under UCC section 2.708. *See* TEX. BUS. & COM.CODE ANN. § 2.706 (cmt.2) (Vernon 1967).

## Measure of Damages Under UCC § 2.708

[36]  [37]  Section 2.708, which embodies the seller's right to the traditional contract market differential recovery, basically provides that the seller's measure of damages for non-acceptance of goods is (a) the difference between the market price and the unpaid contract price (together with incidental damages but less expenses saved) or (b) if the first measure of damages is inadequate, the profit which the seller would have made from full performance by the buyer. *See* TEX. BUS. & COM.CODE ANN. § 2.708 (Vernon 1994). The party bringing suit under section 2.708(b) must plead and prove each element of recoverable damage. *See Lakewood Pipe of Texas, Inc. v. Conveying Techniques, Inc.*, 814 S.W.2d 553, 556 (Tex.App.—Houston [1st Dist.] 1991, no writ). A party bringing suit under section 2.708(a) must also plead and prove the elements of section 2.708 to make its *prima facie* case for damages. "[T]he measure of damages for non-acceptance or repudiation by the buyer is the difference between the *market price* at the time and place for tender and the unpaid *139 contract price...." TEX. BUS. & COM.CODE ANN. § 2.708(a) (Vernon 1994) (emphasis added). CCP claims that Westlake failed to prove the "market price" of styrene monomer at the time of its resale on the spot market, as required by section 2.708.

[38]  Texas courts have yet to interpret the meaning of "market price," but the term is generally defined as the "prevailing price at which something is sold in a specific market." BLACK'S LAW DICTIONARY 1207 (7th ed.1999). "Spot price" is defined as the "amount for which a commodity is sold in a spot market." *Id.* When the resale price is from an arm's length transaction, it adequately represents market price. We find that the spot price is an adequate representation of the market price of a commodity such as styrene monomer.

Section 2.708 directs the aggrieved seller to measure the market "at the time and place for tender." TEX. BUS. & COM.CODE ANN. § 2.708(a) (Vernon 1994). Although the Westlake/CCP contract does not specify the time and place for tender, it is clear from the invoices in the record that Westlake made several shipments to CCP each month at various locations. The formula price set out in the Westlake/CCP contract was computed on a monthly basis and the contract provided that the buyer would purchase and receive the product in equal monthly quantities. As part of its summary judgment proof, Westlake provided an average monthly spot price instead of the spot price for every sale. We find this proof is sufficient under the facts of this case to establish this element of a section 2.708 damage claim. We overrule CCP's fourth issue.

## AFFIRMATIVE DEFENSES NOT ADDRESSED BY MOTION FOR SUMMARY JUDGMENT

[39]  [40]  In its fifth issue, CCP argues the trial court erred in granting summary judgment when Westlake did not address all of CCP's affirmative defenses in its motion for summary judgment. A defendant seeking to avoid summary judgment based on an affirmative defense is in much the same position as a plaintiff seeking to avoid summary judgment based on an affirmative claim. In order to avoid summary judgment, a plaintiff must produce evidence to raise a genuine issue of material fact as to each element of its claim. *See* TEX.R. CIV. P. 166a(i). Likewise, to avoid summary judgment, a defendant must produce evidence to raise a genuine issue of material fact as to each element of its affirmative defense. *See "Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 936–37 (Tex.1972); *Wiggins*, 962 S.W.2d at 200. Merely pleading an affirmative defense will not preclude summary judgment. *See Nicholson v. Memorial Hospital Sys.*, 722 S.W.2d 746, 749 (Tex.App.

—Houston [14th Dist.] 1986, writ ref'd n.r.e.). In order to rely on its affirmative defenses to defeat Westlake's motion for summary judgment, it was incumbent upon CCP to come forward with evidence to raise a genuine issue of material fact as to each element of each of its affirmative defenses. CCP did not. Westlake did not have to address CCP's affirmative defenses in Westlake's motion for summary judgment. We overrule the fifth issue.

## ANTICIPATORY REPUDIATION OF CONTRACT

[41]    [42]    [43]    In its seventh issue, CCP claims that Westlake's failure to provide assurance of due performance in response to CCP's requests for the lower price constituted anticipatory repudiation of the parties' contract, thereby excusing CCP from performance. Anticipatory repudiation is an affirmative defense to a breach of contract claim. Under this defensive theory, an injured party is discharged from its remaining duties to perform under a contract where the other party repudiates its contractual duty before the time for performance. Traditionally, this type of repudiation occurs when the promissor unequivocally disavows any intention to perform in the future. These time-honored principles of anticipatory repudiation are embodied in UCC *140 section 2.609, as adopted in Texas. Under this statutory provision, when reasonable grounds for insecurity arise with respect to the performance of either party under a contract, the other may demand adequate assurance of due performance. See TEX. BUS. & COM.CODE ANN. § 2.609(a) (Vernon 1994). The insecure party may suspend any performance for which it has not already received the agreed return until the assurance is received. See id. Failure to provide assurance of due performance within thirty days following receipt of a justified demand constitutes repudiation of the contract. See id. § 2.609(d).

CCP contends that the letters it sent to Westlake in December of 1996, and February, April, May, June, July, August and October of 1997, asking if Westlake intended to match the competitive price Amoco had purportedly offered, constituted requests for adequate assurance. CCP argues that Westlake's failure to respond to these letters constituted a repudiation of the Westlake/CCP contract and released CCP from its contractual obligations to purchase product from Westlake each month no adequate assurance was provided. According to CCP, once Westlake repudiated the parties' contract, CCP had the option of awaiting performance or suing for breach, and that, in either case, it was justified in

suspending its own performance under the Westlake/CCP contract.

[44]    Issues that are not expressly presented to the trial court by the answer, motion or other response are not grounds for reversal. See TEX.R. CIV. P. 166a(c); see also Hollingsworth v. City of Dallas, 931 S.W.2d 699, 705 (Tex.App.—Dallas 1996, writ denied) (finding appellant cannot raise affirmative defense on appeal when it failed to plead affirmative defense in its written response to other party's motion for summary judgment). To rely on UCC section 2.609 as a bar to Westlake's claims, CCP would have had to have raised the defense in its pleadings as well as in its summary judgment response. CCP, however, failed to raise these matters in the trial court and, accordingly, has waived them.

[45]    Even if CCP had properly pleaded and raised anticipatory repudiation, its arguments under UCC section 2.609 would still fail. The party invoking section 2.609 must have "reasonable grounds for insecurity." Inasmuch as CCP had failed to produce the written evidence required by the Westlake/CCP contract, CCP had no reasonable grounds for insecurity as to Westlake's performance. Westlake's obligation to meet the competitive price was triggered only by CCP's compliance with the documentation requirement of the "meeting competition" clause. CCP never satisfied that requirement. Moreover, there is nothing in the record to suggest that Westlake communicated any intention not to perform under the "meeting competition" clause if and when CCP produced the requisite documentation. CCP could have no basis for insecurity and no grounds to request adequate assurance under section 2.609 until after it presented the requisite documentation to trigger Westlake's obligation to perform. Having failed to do so, CCP had no reasonable grounds for insecurity and thus could not rely on section 2.609.

Furthermore, only an "aggrieved party" is entitled to invoke section 2.609. UCC section 1.201 defines an "aggrieved party" as a party that is entitled to resort to a remedy. See TEX. BUS. & COM.CODE ANN. § 1.201 (Vernon 1994). Inasmuch as CCP had failed to present the necessary documents, it was in no position to assert a breach by Westlake or to resort to a remedy. [7]

CCP's failure to raise its section 2.609 argument in the trial court and its resulting *141 waiver of that defense notwithstanding, we find that CCP did not produce sufficient evidence on summary judgment to raise a question of fact as

to whether **Westlake's** failure to provide adequate assurance of due performance constituted a repudiation of the contract. Accordingly, we overrule the seventh issue.

## RATE OF PREJUDGMENT INTEREST

In its sixth issue, CCP argues the trial court erred in awarding prejudgment interest at eighteen percent. According to CCP, the provision in the **Westlake**/CCP contract on which the trial court purportedly relied in arriving at the prejudgment interest rate applies only to interest charged on overdue invoices and not to the calculation of prejudgment interest on a damage award.[8] The parties' contract states:

> INVOICE AND PAYMENT. Invoices for Products purchased by Buyer shall be rendered promptly following shipment. Payment of each invoice shall be made by Buyer to the location specified therein in such manner as will place the Seller in possession of United States Currency or equivalent domestic bank demand deposit in the full amount thereof within thirty (30) days following the date of such invoice. Buyer shall pay interest on all past due amounts at the lower of (1) one and one-half percent (1 ½ %) per month or (2) the maximum non-usurious rate permitted by applicable law; provided, however, that should Buyer dispute the accuracy of any portion of any invoice, Buyer may withhold payment of the disputed amount and shall promptly notify Seller specifying the amount in dispute and the reasons therefor. Buyer will make timely payment of any amounts not in dispute. The parties will promptly attempt to resolve the dispute and upon resolution, Buyer will promptly pay all additional amounts due Seller.

CCP argues that because **Westlake** stopped sending invoices to CCP when it stopped shipping product, "there was nothing to trigger the interest obligation" and the trial court erred in awarding prejudgment interest at the rate of eighteen percent. We reject this argument.

[46]  [47]  The Texas Finance Code provides for awards of prejudgment interest in wrongful death, personal injury, and property damage cases and sets the rate equal to the postjudgment interest rate. *See* TEX. FIN.CODE ANN. §§ 304.102, 304.103 (Vernon 1998). The Texas Supreme Court has held that prejudgment interest equals postjudgment interest in a breach of contract case. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 532 (Tex.1998). When a contract provides for a specific interest rate, the postjudgment interest will be the lesser of: (a) the rate specified in the contract or (b) 18% a year. *See Triton Oil & Gas Corp. v. E.W. Moran Drilling Co.,* 509 S.W.2d 678, 687–88 (Tex.Civ.App.—Fort Worth 1974, writ ref'd n.r.e.) (where seller provided services and equipment). Here, the parties' contract provides that 1.5% interest will be paid a month on amounts that are thirty days past due for goods delivered. Inasmuch as the **Westlake**/CCP contract calls for monthly compounding of interest, the rate specified in the contract exceeds eighteen percent a year. **Westlake** is thus entitled to prejudgment interest at the lesser statutory rate of eighteen percent a year, which is exactly the rate specified in the final judgment. We overrule the sixth issue.

The judgment of the trial court is affirmed.

## All Citations

15 S.W.3d 124, 40 UCC Rep.Serv.2d 703

## Footnotes

1    CCP contends that **Westlake** made the price adjustment under the "meeting competition" clause. **Westlake**, however, insists that it was merely a temporary allowance granted under the discretionary clause.

2    Because CCP never provided *any* written evidence of the terms and conditions of the competing offer, or of the duration of the competing offer, the trial court never had to reach the issue of what constituted "satisfactory" written evidence.

3    There was a voluntary allowance provision under the Amoco contract that could have provided for the price differential, but then the offer would not have been valid over the term of the **Westlake**/CCP contract since any price break under that provision would have been contingent on the sole discretion of the seller. Therefore, that price would not be a price that **Westlake** had to meet under the "meeting competition" clause.

4    Having already decided that the contract is not ambiguous as a matter of law, we do not reach any factual questions on ambiguity.

5    Emphasis added.

6    Those conditions are: (1) the party seeking attorney's fees was represented by an attorney; (2) the claim was presented to the other party or its duly authorized agent; and (3) the other party failed to pay the amount owed before the expiration of thirty days after the claim was presented. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.002 (Vernon 1997).

7    **Westlake** brought suit against CCP in December of 1996. All but one of the demands for adequate assurance were sent after that date and long after CCP had failed to fulfill its purchase obligations.

8    The final judgment recites only the rate of prejudgment interest and is silent as to the trial court's rationale for determining the rate.

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 1301568
Only the Westlaw citation is currently available.

NOTICE: NOT DESIGNATED FOR PUBLICATION.
UNDER TX R RAP RULE 47.7, UNPUBLISHED
OPINIONS HAVE NO PRECEDENTIAL
VALUE BUT MAY BE CITED WITH THE
NOTATION "(not designated for publication)."

Court of Appeals of Texas,
El Paso.

Floyd **OLIVER** and Layton **Oliver**, Appellants,
v.
**CARTER** AND COMPANY **IRR.**, INC., Appellee.

No. 08-01-00446-CV. | June 13, **2002.**

Seller brought action on a sworn account against purchasers, alleging they defaulted in making payment on their account. The County Court, Gaines County, granted seller's motion for summary judgment. Purchasers appealed. The Court of Appeals, McClure, J., held that: (1) verified pleading attached to original answer sufficiently denied the account; (2) verification attached to pleading did not constitute required affidavit; (3) amended answer was sufficient to controvert seller's claim; and (4) purchasers had leave to file amended answer.

Reversed and remanded.

West Headnotes (4)

**[1]** **Account Stated**
  ⬤⟶ Vacating and Setting Aside
  Verified pleading attached to purchasers' original answer to seller's complaint on sworn account, in which purchasers denied the amount due and "whether such charges were usual, customary and/or reasonable prices for said merchandise and/or services," sufficiently denied the account on which the claim was stated, although seller alleged it was nothing more than a verified general denial. Vernon's Ann.Texas Rules Civ.Proc., Rules 93(10), 185.

Cases that cite this headnote

**[2]** **Account Stated**
  ⬤⟶ Vacating and Setting Aside
  Verification attached to purchasers' original answer to seller's complaint for sworn account did not contain an oath that the facts alleged in the answer were true, and thus verification did not satisfy requirement of a supporting affidavit, although it was signed by purchasers and sworn to before two notaries. Vernon's Ann.Texas Rules Civ.Proc., Rules 93(10), 185.

Cases that cite this headnote

**[3]** **Pleading**
  ⬤⟶ Sufficiency of Verification
  Purchasers' first amended answer was sufficient to controvert seller's sworn account claim, where answer contained more than a broad denial of the allegations and specifically referred to the account, answer denied that the amount alleged due and owing was not in accordance with any agreement, and supporting affidavit affirmed under oath that the statements in the answer were "true and correct" and contained all other recitations required in an affidavit. Vernon's Ann.Texas Rules Civ.Proc., Rules 93(10), 185.

Cases that cite this headnote

**[4]** **Appeal and Error**
  ⬤⟶ Amendments
  Purchasers had presumed leave to file amended answer to seller's complaint regarding alleged failure to pay account, although there was no express trial court order granting them leave, where purchasers filed amended answer prior to hearing on seller's motion for summary judgment, there was no evidence that seller objected to it or suffered unfair prejudice or surprise, and there was no indication that trial court did not consider the amended answer when ruling on seller's summary judgment motion or denied leave. Vernon's Ann.Texas Rules Civ.Proc., Rule 63.

Cases that cite this headnote

Appeal from County Court of Gaines County, Texas, (TC # 1765).

Before Panel No. 4 BARAJAS, C.J., LARSEN, and McCLURE, JJ.

### OPINION

ANN CRAWFORD McCLURE, Justice.

\*1 Carter and Company Irr., Inc. (Carter & Co.) filed suit on a sworn account against Floyd and Layton Oliver (the Olivers). Alleging a defect in the Olivers' answer, Carter & Co. successfully sought summary judgment. We reverse and remand.

### FACTUAL SUMMARY

Carter & Co. filed an original petition in the Gaines County Court alleging that the Olivers defaulted in making payment on their account with the company. Carter & Co. claimed that they sold services and/or merchandise to the Olivers which they accepted and became bound to pay at the designated price, "which is a reasonable, usual, and customary price for such merchandise." The total balance claimed to be due to Carter & Co. was $6,796.01, "exclusive of interest after all just and lawful offsets, credits, and payments have been allowed." Attached to the petition was a statement of account, which included a copy of a calculator tape and copies of six invoices.

The Olivers' original answer contains the following recitation:

COMES NOW, FLOYD OLIVER and LAYTON OLIVER, Defendants in the above-entitled and numbered cause, and files this their verified Original Answer and would show the Court:

### I. GENERAL DENIAL

Defendants deny each and every, all and singular, the allegations of Plaintiff's Original Petition and demand strict proof thereof as required by the Texas Rules of Civil Procedure. Said Defendants *deny the charges as reasonable and customary and the amount asserted and/or claimed.*

### II. PRAYER

Defendants pray the Court, after notice and hearing or trial, enter judgment in favor of Defendants, award Defendants their costs of court, attorney's fees, and such other and further relief as Defendants may be entitled to in law or in equity. [Emphasis added].

The Olivers verified their original answer by "verification" that reads as follows:

### VERIFICATION

...

We the undersigned, FLOYD OLIVER and LAYTON OLIVER, Defendants in the above-numbered and entitled cause do hereby enter this verification of denial of the said sworn account. We hereby enter said denial, denying each and every allegation contained therein and specifically denying an amount due, the specifics of said amount being due, and the debt and/or account. A denial is hereby entered as to the amount charged and as to whether such charges were usual, customary, and/or reasonable prices for said merchandise and/or services and denying the amount asserted.

Signed this the *15th* day of *June,* 2001.

/s/ *Floyd Oliver*

/s/ *Layton Oliver*

SWORN TO AND SUBSCRIBED BEFORE ME, by the said FLOYD OLIVER, this *15th* day of *June,* 2001.

/s/ *Scarlett Eastteam*

Notary Public, State of Texas

SWORN TO AND SUBSCRIBED BEFORE ME, by the said LAYTON OLIVER, this *15th* day of *June,* 2001.

/s/ *Rhonda Marion Trent*

Notary Public, State of Texas

Four days later, Carter & Co. moved for summary judgment pursuant to Rule 166a of the Texas Rules of Civil Procedure on the grounds that the Olivers' answer was

*2 [D]efective and insufficient in law to constitute or raise a defense to Plaintiff's cause of action on the account referred to in Plaintiff's Original Petition. The pleadings, exhibits, and affidavits filed in this cause show that there is no genuine issue as to any material fact between the parties and accordingly plaintiff is entitled to judgment against Defendant as a matter of law as requested in the Plaintiff's original Petition. [Emphasis added].

The Olivers failed to file their objections and response to the motion within the required time period and asked for leave of court to file the response. The trial court denied the request. The Olivers then filed a motion to reconsider which was also denied.

The day before the trial court denied the motion to reconsider, the Olivers filed an amended original answer. It included two paragraphs, one setting forth a "general denial" and the other a "specific denial." The general denial was a reassertion of the general denial made in the original answer:

> Defendants deny each and every, all and singular, the allegations of Plaintiff's Original Petition and demand strict proof thereof as required by the Texas Rules of Civil Procedure. Said Defendants deny the charges as reasonable and customary and the amount asserted and/or claimed.

The specific denial provided:

> Defendants enters [sic] a verified denial pursuant to TEX.R.CIV.P. 93(10), and for proof thereof, incorporates the attached verification and Exhibit 'A' herein. Further, Defendants would show that in connection with the account in question, there was no sale or delivery of goods and/or services, the amount alleged due and owing by the Plaintiff was not in accordance with an agreement, if any, and the amount is not unpaid.

The amended answer was supported by an affidavit by Floyd Oliver. In its summary judgment, the trial court stated:

> Having considered the Plaintiff's Motion, the Pleadings and Affidavits on file herein as well as the argument of counsel, the Court finds that Plaintiff's suit is founded upon a sworn account, but that the Defendant has failed to file a Response in compliance with the Texas Rules of Civil Procedure, and that no such Response has been timely tendered; it is, therefore, ORDERED that such Response not be filed in the record of this cause. [Emphasis added].

The court also ordered that Carter & Co. recover from the Olivers the sum of $6,796.01 together with pre-judgment and post-judgment interest, and attorney's fees and costs. The Olivers timely filed this appeal. In their sole point of error, the Olivers claim that the trial court erred in granting summary judgment because Carter & Co. failed to prove the requisite elements of a suit on a sworn account as a matter of law with sufficient summary judgment evidence. The Olivers claim they filed a proper verified denial of Carter & Co.'s claims and amended the verified denial prior to the summary judgment hearing so as to raise a material fact issue. Consequently, Carter & Co.'s *prima facie* case was rebutted and Carter & Co. was required to prove each element of its claim on the account, but failed to do so.

## STANDARD OF REVIEW

*3 The standard of review on appeal is whether the successful movant at the trial level demonstrated that there are no issues of material fact and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co., Inc.,* 690 S.W.2d 546, 548 (Tex.1985). In resolving the issue of whether the movant has carried this burden, all evidence favorable to the non-movant must be taken as true and all reasonable inferences, including any doubts, must be resolved in the non-movant's favor. *Id.* at 548-49. When a trial court's order granting summary judgment does not articulate the grounds relied on for its ruling, an appellate court will affirm a summary judgment if any of the theories advanced are meritorious. *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989).

## SUIT ON A SWORN ACCOUNT

Texas Rules of Civil Procedure 185 and 93(10) govern suits for debt on a sworn account. Rule 185 provides:

> When any action or defense is founded upon an open account or other claim for goods, wares and merchandise, including any claim for a liquidated money demand based upon written contract or founded on business dealings between the parties, or is for personal service rendered, or labor done or labor or materials furnished, on which a systematic record has been kept, and is supported by the affidavit of the party, his agent, or attorney taken before some officer and authorized to administer oaths, to the effect that such claim is, within the knowledge of affiant, just and true, that it is due, and that all just and lawful offsets, payments and credits have been allowed, the same shall be taken as prima facie evidence thereof, *unless the party resisting such claim shall file a written denial, under oath. A party resisting such a sworn claim shall comply with the rules of pleading as are required in any other kind of suit,* provided, however, that if he does not timely file a written denial, under oath, he shall not be permitted to deny the claim, or any item therein, as the case may be. No particularization or description of the nature of the component parts of the account or claim is necessary unless the trial court sustains special exceptions to the pleadings. [Emphasis added].

TEX.R.CIV.P. 185. Rule 93 provides:

> A pleading setting up any of the following matters, unless the truth of such matters appear of record, shall be *verified by affidavit.*
>
> ...
>
> 10. A denial of an account which is the foundation of the plaintiff's action, and supported by affidavit. [Emphasis added].

TEX.R.CIV.P. 93(10).

In order to establish sufficient evidence to support a *prima facie* case in a suit on a sworn account and sufficient evidence to support a summary judgment disposition, the movant must strictly adhere to the provisions of the Texas Rules of Civil Procedure. TEX.R.CIV.P. 185, 93(10), 166a. *Andrews v. East Texas Med. Ctr.-Athens,* 885 S.W.2d 264, 267 (Tex.App.-Tyler 1994, no writ); *Cooper v. Scott Irrigation Constr. Inc.,* 838 S.W.2d 743, 746 (Tex.App.-El Paso 1992, no writ). If there is a deficiency in the plaintiff's sworn account, the account will not constitute *prima facie* evidence of the debt. *See Enernational Corp. v. Exploitation Eng'rs, Inc.,* 705 S.W.2d 749, 750 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.). At the same time, the defendant's denial must be written and supported by an affidavit denying the account. TEX.R.CIV.P. 93(10); *Andrews,* 885 S.W.2d at 267. A sworn general denial is insufficient. *Huddleston v. Case Power & Equipment Co.,* 748 S.W.2d 102, 103 (Tex.App.-Dallas 1988, no writ); *Cooper,* 838 S.W.2d at 746. A proper denial will destroy the *prima facie* effect of the verified claim and will force the plaintiff to prove his claim. *Cooper,* 838 S.W.2d at 746. A party who fails to file a sworn denial as required by Rules 185 and 93(10) may not dispute the receipt of items or services or the correctness of the stated charges. *Canter v. Easley,* 787 S.W.2d 72, 73 (Tex.App-Houston [1st Dist.] 1990, writ denied), *citing Vance v. Holloway,* 689 S.W.2d 403 (Tex.1985); *Cooper,* 838 S.W.2d at 745-46. Should the defendant's answer not satisfy the requirements of Rule 93(10), the plaintiff's affidavit attached to its petition will be considered *prima facie* evidence to support a summary judgment and additional proof of the accuracy of the account is unnecessary. *Rizk v. Financial Guardian Ins. Agency, Inc.* 584 S.W.2d 860, 862 (Tex.1979). Consequently, the plaintiff may dispose of the case on the pleadings alone. *Andrews,* 885 S.W.2d at 268.

*4 The issue before us is the sufficiency of the **Olivers'** sworn denial in their original answer. **Carter** & Co.'s motion for summary judgment alleged that the **Olivers'** answer was "defective and insufficient in law to constitute or raise a defense" to their cause of action. It is unclear from the language of the motion or the trial court's order granting summary judgment whether the summary judgment was granted because of an insufficiency of the language used in the answer to deny **Carter** & Co.'s claim or because of a defect in the form of the purported affidavit supporting the answer. In either case, we find that the **Olivers'** original answer did not satisfy the requirements of Rules 185 and

93(10) to destroy the *prima facie* effect of **Carter** & **Co.**'s sworn account claim.

### Sufficiency of the Olivers' Original Answer

[1] **Carter** & **Co.**'s original petition and supporting affidavit complied with Rule 185 and established a *prima facie* case on the sworn account claim. At this point, **Carter** & **Co.** was entitled to summary judgment on the pleadings without additional proof unless the **Olivers** properly controverted the claim with a written denial. Rule 185 requires that the party resisting a sworn account "file a written denial, under oath" and comply with Rule 93(10) requiring a special verified denial of the account supported by an affidavit in order to put the plaintiff's claim at issue. *Huddleston,* 748 S.W.2d at 103. Neither Rule 185 nor Rule 93(10) specifies a particular form or mandate magic words to be used in a defendant's sworn denial. *Andrews,* 885 S.W.2d at 267. Rule 185 was amended in 1984 to eliminate the technical pleading requirements of the former version and to make suits on account subject to ordinary rules of pleading and practice. *Canter,* 787 S.W.2d at 74. While no specific form or words are required, the answer must "sufficiently deny" the account upon which the plaintiff's claim is founded. *Id.; Cooper,* 838 S.W.2d at 746. A defendant need not deny each and every item of a sworn account claim, but must deny the account upon which the plaintiff's case is based. *Huddleston,* 748 S.W.2d at 103-04. **Carter** & **Co.** argues that the verified pleading attached to the **Olivers'** answer is no more than a verified general denial and fails to satisfy the requirements of Rules 185 and 93(10). We disagree.

The **Olivers** denied the account upon which **Carter** & **Co.**'s claim is based with specific facts. They denied the amount due and "whether such charges were usual, customary and/ or reasonable prices for said merchandise and/or services...." This denial directly controverts the claim made by **Carter** & **Co.** in their original petition regarding the reasonableness of the prices for the merchandise at issue. While no specific form or words are required, the denial must be directed at the particular account in question.

In *Canter,* the court held that a defendant's sworn answer met the requirements of Rules 185 and 93(10) and that it sufficiently denied the account upon which the plaintiff's claim was based when it denied "the allegations contained in Paragraphs II and III and IV of the Plaintiff's Original Petition" and where Paragraph II of the plaintiff's original

petition contained the sworn account allegations. *Canter,* 787 S.W.2d at 73-74. The **Olivers'** answer is more specific. *See Worley v. Butler,* 809 S.W.2d 242, 245 (Tex.App.-Corpus Christi 1990, no writ)(where plaintiff would have to show that the prices charged in the absence of an agreement are the usual, customary, and reasonable prices for that merchandise or services). The **Olivers'** answer included a denial that the charges were reasonable and customary. This was sufficient to raise a fact issue to overcome the plaintiff's *prima facie* case. However, whether or not the language in the **Olivers'** answer sufficiently denies the sworn account claim, the attached "verification" renders the answer fatally defective.

### The "Verification" as Affidavit

*5 [2] **Carter** & **Co.** argues that the **Olivers'** answer was insufficient because it failed to have an affidavit in support of the answer as required by Rules 185 and 93(10). We agree. The "verification" attached by the **Olivers** did not constitute an affidavit. "Affidavit" is defined as "a statement in writing of a fact or facts signed by the party making it, sworn to before an officer authorized to administer oaths, and officially certified to by the officer under his seal of office." TEX.GOV'T CODE ANN. § 312.011(1)(Vernon 1998). No particular terminology is required by Section 312.011 to render a document an affidavit. *Norcross v. Conoco, Inc.,* 720 S.W.2d 627, 630 (Tex.App.-San Antonio 1986, no writ). It is the substance and not the form of an affidavit that is important. *Id., citing Taylor v. Fred Clark Felt Company,* 567 S.W.2d 863 (Tex.Civ.App.-Houston [14th Dist.] 1978, writ ref'd n.r.e .). However, the form of a statement is important for purposes of determining whether such statement qualifies as an affidavit that must accompany a written denial under Rules 185 and 93(10).

In order for the "verification" to satisfy the requirements of an affidavit under Rules 185 and 93, it must recite under oath that the factual statements contained in the defendant's answer are *true. See Brown Foundation Repair and Consulting, Inc., v. Friendly Chevrolet* Co., 715 S.W.2d 115, 117 (Tex.App.-Dallas 1986, writ ref'd n.r.e.). *Brown* involved a sworn account where the defendant's trial pleading read in relevant part, "SUBSCRIBED AND SWORN TO before me, the undersigned authority, by Robert L. Brown, known to me to be the Vice-President of Brown Foundation Repair and Consulting, Inc., to certify which witness my hand and seal of office this *28* day of June, 1985." *Id.* The court held that the affidavit did not constitute a verified denial because

"[n]owhere does it appear that Robert L. Brown has sworn or affirmed under oath that the facts stated are true." *Id.* at 118. While the verification here was signed by both of the **Olivers** and was sworn to before two notaries, it does not contain an oath that the facts alleged in the answer are *true* and thus does not satisfy the requirements for an affidavit under Rules 185 and 93(10).

### *Sufficiency of the Olivers' First Amended Original Answer*

[3]  Having determined that the **Olivers'** original answer failed to satisfy the requirements of Rules 185 and 93(10) so as to properly controvert **Carter & Co.'s** sworn account claim, we now turn to the **Olivers'** claim that their first amended answer sufficed. The day before the trial court denied the motion to reconsider the request for the late filing of a response to the motion for summary judgment, the **Olivers** filed an amended original answer containing both a "general" denial reasserting the denials made in the original answer and a "specific" denial that provided additional facts controverting the sworn account claim. The answer was supported by an "affidavit" signed by Floyd **Oliver**.

**\*6** The amended answer and supporting affidavit easily satisfy the requirements of Rules 185 and 93(10). It contained more than a broad denial of the allegations against the **Olivers** and specific reference was made to the account which is the basis of the plaintiff's petition, stating, "in connection with the account in question, there was no sale or delivery of goods and/or services...." The **Olivers** also denied that "the amount alleged due and owing by the Plaintiff was not in accordance with any agreement, if any...." The affidavit contained the essential affirmation under oath that the statements contained in the **Olivers'** amended answer were "true and correct" as well as all other recitations required in an affidavit.

### *Was the First Amended Answer Considered by the Trial Court?*

[4]  The **Olivers** argue that because they filed the amended answer prior to the hearing on the motion for summary judgment, because there was no evidence in the record that **Carter & Co.** objected to it or suffered unfair prejudice or surprise, and because there was no indication that the trial court did not consider it, leave to file the amended answer should be presumed. We agree. Rule 63 of the Texas Rules of Civil Procedure provides:

> Parties may amend their pleadings ... provided, that any pleadings, responses or pleas offered for filing within seven days of the date of trial or thereafter, or after such time as may be ordered by the judge under Rule 166, shall be filed only after leave of the judge is obtained, which leave shall be granted by the judge unless there is a showing that such filing will operate as a surprise to the opposite party.

TEX.R.CIV.P. 63. Rule 63 has been given a liberal interpretation. *Goswami v. Metropolitan Savings and Loan Association,* 751 S.W.2d 487 (Tex.1988). In *Goswami,* the Texas Supreme Court held that since the record in the case was silent of any basis to conclude that the amended petition was *not* considered by the trial court and that the opposite party did not show surprise or prejudice, leave of court was presumed. *Goswami,* 751 S.W.2d at 490. Here, the amended answer was filed within seven days of the summary judgment hearing. The *Goswami* court determined that a summary judgment proceeding is a "trial" within the meaning of Rule 63. *Id.* The trial court's order granting summary judgment states that it "considered the Plaintiff's Motion, the Pleadings and Affidavits on file herein." The record does not indicate that the trial court refused leave to file the amended answer; it indicates only that the trial court denied leave to file an untimely response to the motion for summary judgment. Nor does the record contain any indication that **Carter & Co.** would suffer surprise or prejudice. Thus, we presume that the trial court granted leave to amend and that the amended answer was properly before the trial court when it entered its order on the motion for summary judgment. The amended answer and supporting affidavit satisfied the requirements of Rules 185 and 93(10). Consequently, **Carter & Co.'s** petition cannot be considered *prima facie* evidence to support summary judgment in their favor. We overrule Appellants' sole issue and reverse and remand for further proceedings.

**All Citations**

Not Reported in S.W.3d, 2002 WL 1301568

---

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** In re Wave Energy, Inc., 5th Cir.(Tex.), March 20, 2012

720 S.W.2d 627
Court of Appeals of Texas,
San Antonio.

John **NORCROSS**, Appellant,
v.
**CONOCO**, INC., Appellee.

No. 04–86–00001–CV. | Oct. 15, 1986.

Operator of oil and gas wells brought action on account against one of working interest owners. The 49th District Court, Webb County, Ruben Garcia, J., entered summary judgment for operator of oil and gas well and working interest owner appealed. The Court of Appeals, Cantu, J., held that operator of oil and gas wells failed to prove each and every allegation of account allegedly owed by working interest owner precluding summary judgment.

Reversed and remanded.

West Headnotes (6)

**[1]** **Account, Action On**
⬥ Pleading
**Judgment**
⬥ Presumptions and burden of proof
Filing of a proper, sworn denial destroys the evidentiary effect of the plaintiff's petition and forces the plaintiff to present proof of his account in action founded upon account and this principle is applicable to a subsequent motion for summary judgment, and requires plaintiff to submit proof of elements of his case in a summary judgment proof. Vernon's Ann.Texas Rules Civ.Proc., Rule 185.

3 Cases that cite this headnote

**[2]** **Account, Action On**
⬥ Pleading

If the party resisting a sworn account fails to file a written denial under oath he cannot deny the claim or any item in it in action on account. Vernon's Ann.Texas Rules Civ.Proc., Rule 185.

Cases that cite this headnote

**[3]** **Affidavits**
⬥ Form and contents
No particular terminology is required to render a document an affidavit and it is the substance and not the form of an affidavit that is important. V.T.C.A., Government Code §§ 312.011, 312.011(1).

8 Cases that cite this headnote

**[4]** **Affidavits**
⬥ Jurat or certificate of officer
Where affidavit stated that defendant was duly sworn, the absence of the words "subscribed and sworn to" did not render affidavit insufficient to deny account. Vernon's Ann.Texas Rules Civ.Proc., Rule 93, subd. 10; V.T.C.A., Government Code §§ 312.011, 312.011(1).

6 Cases that cite this headnote

**[5]** **Appeal and Error**
⬥ Objections to evidence and witnesses
Defendant objected to admission of plaintiff's affidavits in support of motion for summary judgment on account on sufficiency of proof offered within affidavits rather than form of affidavits, so that defendant did not waive point on appeal. Rules of Evid., Rules 803(6), 902(10); Vernon's Ann.Texas Rules Civ.Proc., Rule 166–A(e).

1 Cases that cite this headnote

**[6]** **Judgment**
⬥ Accounting and accounts
Failure of operator of oil and gas wells to state that invoices or accounts submitted in affidavit were correct and accurate or just and true, and instead merely stating that true and correct copies of original documents were attached, resulted

in failure of oil well operator to prove each and every allegation of account allegedly owed by working interest owner, precluding summary judgment on open account.

Cases that cite this headnote

## Attorneys and Law Firms

*628 Mitchell O. Sawyer, Edinburg, for appellant.

Charles R. Borchers, Laredo, and Charles Puckett, Houston, for appellee.

Before CADENA, C.J., and BUTTS and CANTU, JJ.

## OPINION

CANTU, Justice.

This is an appeal from the granting of a Motion for Summary Judgment in favor of the appellee, Conoco, Inc. Conoco originally sued the appellant, John Norcross, on a suit on account. Conoco is the operator of several oil and gas wells located in Zapata County, Texas, and under its operating agreement, is responsible for charging and collecting expenses for operating the wells from the working interest owners. Norcross is one of the working interest owners.

Conoco filed a suit on account seeking to recover approximately $124,000.00 in unpaid expenses and interest, foreclosure of various liens to secure payment of the expenses and for attorney fees.

Norcross answered with a general denial. Conoco then filed a Motion for Summary Judgment, alleging that no fact issues existed. Norcross responded by filing an Amended Original Answer denying Conoco's cause of action, and alleging that the *629 items made the basis of Conoco's account were not just or true. Norcross also alleged a conspiracy between Conoco and others to defraud him of his interest in the various wells. Norcross filed a Response to Conoco's Motion for Summary Judgment, alleging that numerous questions of fact existed as to the amounts allegedly due on the accounts owed Conoco, in an amount not less than $76,488.09.

The trial court found that no material issues of fact existed, and awarded Conoco $124,994.89 plus attorney fees and foreclosure of its liens. Norcross brings six points of error, and presents his argument in support of them together. For clarity and cohesiveness, we shall address the points out of order.

Point of error number five alleges that the trial court erred in failing to hold that Norcross' affidavit, which was attached to his First Amended Original Answer, was sufficient. Norcross contends that the affidavit was sufficient to constitute a sworn denial which would rebut Conoco's prima facie case pursuant to Rule 185, and required Conoco to prove the elements of a suit on account.

TEX.R.CIV.P. 185 provides in pertinent part:

> When any action or defense is founded upon an open account ... or is for personal service rendered, or labor done or labor or materials furnished, on which a systematic record has been kept, and is supported by the affidavit of the party, his agent or attorney taken before some officer authorized to administer oaths, to the effect that such claim is, within the knowledge of affiant, just and true, that it is due, and that all just and lawful offsets, payments and credits have been allowed, the same shall be taken as prima facie evidence thereof, unless the party resisting such claim shall file a written denial, under oath. A party resisting such a sworn claim shall comply with the rules of pleading as are required in any other kind of suit, provided, however, that if he does not timely file a written denial, under oath, he shall not be permitted to deny the claim, or any item therein, as the case may be.

[1]    The filing of a proper, sworn denial destroys the evidentiary effect of the plaintiff's petition and forces the plaintiff to present proof of his account. *Rizk v. Financial Guardian Insurance Agency,* 584 **S.W.2d** 860 (Tex.1979). This principle is applicable to a subsequent motion for summary judgment and requires the plaintiff to submit proof

of the elements of his cause in his summary judgment proof. *See* Hittner, *Summary Judgments in Texas,* 22 Baylor L.Rev. 1109, 1114 (1985). *See also Burtis v. Butler Bros.,* 243 S.W.2d 235 (Tex.Civ.App.—Dallas 1951, no writ).

[2] However, if the party resisting a sworn account fails to file a written denial under oath he cannot deny the claim or any item in it. *Carr Well Service, Inc. v. Skytop Rig Company,* 582 S.W.2d 500 (Tex.Civ.App.—El Paso 1979, writ ref'd n.r.e.). Thus we must initially decide if appellant filed a proper sworn denial in this case.

[3] [4] The affidavit attached to Norcross' First Amended Original Answer states:

> Before me, the undersigned authority, on this day personally appeared JOHN W. NORCROSS, the defendant in the above entitled and numbered cause, and after having been duly sworn, did state that he has read and fully understands the above and foregoing allegations set out in paragraph II of Defendant's First Amended Original Answer and can and does state from personal knowledge that said allegations are true and correct.
> /S/ JOHN W. NORCROSS

A notary's acknowledgment form then follows:

> On this the 11th day of September 1985, before me, Cynthia A. Scott, the undersigned notary public, personally appeared, JOHN W. NORCROSS, proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument, and acknowledged that he executed it. WITNESS my hand and official seal.
> /S/ CYNTHIA A. SCOTT

*630 Paragraph two of Defendant's Amended Original Answer, referred to in the affidavit, states:

> Defendant would further show that each and every item made the basis of plaintiff's account herein is not just or true.

TEX.R.CIV.P. 93(10) provides:

> A pleading setting up any of the following matters ... shall be verified by affidavit.

(10) A denial of an account which is the foundation of the plaintiff's action, and supported by affidavit.

Conoco contends that Norcross' affidavit is insufficient to deny its account because it is not sworn to and does not contain the phrase "Subscribed and Sworn to before me ... the undersigned notary." TEX.GOV'T CODE ANN. § 312.011(1) (Vernon Pamp.1986) sets out the definition of an affidavit:

> "Affidavit" means a statement in writing of a fact or facts signed by the party making it, sworn to before an officer authorized to administer oaths, and officially certified to by the officer under his seal of office.

No particular terminology is required by Section 312.011 to render a document an affidavit. The cases cited by Conoco in support of its contention do not require use of the words "subscribed and sworn to," but rather involve situations where it did not appear that the affiant swore to the allegations in the affidavit at all. *See Hardy v. Beaty,* 84 Tex. 562, 19 S.W. 778 (1892); *Failing v. Equity Management Corporation,* 674 S.W.2d 906 (Tex.App.—Houston [1st Dist.] 1984, no writ); *Sturm Jewelry, Inc. v. First National Bank, Franklin,* 593 S.W.2d 813 (Tex.Civ.App.—Waco 1980, no writ). By contrast, the affidavit of Norcross expressly states that Norcross was duly sworn. It is the substance and not the form of an affidavit that is important. *Taylor v. Fred Clark Felt Company,* 567 S.W.2d 863 (Tex.Civ.App.—Houston [14th Dist.] 1978, writ ref'd n.r.e.).

Conoco also argues that Norcross' point concerning the affidavit to his answer is irrelevant because in a summary judgment proceeding only those matters germane to the summary judgment are considered. However, if Norcross sufficiently denied the allegations of Conoco's suit, Conoco would be required to prove the allegations of its action rather than relying on the prima facie case provision of Rule 185. Thus the trial court would be required to determine whether Norcross' affidavit was sufficient to deny Conoco's allegations before granting the motion for summary judgment.

Nevertheless, we must presume, in the absence of any showing to the contrary, that the trial court correctly decided all matters of law before it necessary to support its judgment. *Strackbein v. Prewitt,* 671 S.W.2d 37 (Tex.1984); *Gulf Land*

*Co. v. Atlantic Refining Co.,* 134 Tex. 59, 131 **S.W.2d** 73 (1939). Therefore, because we find that **Norcross'** affidavit was sufficient to constitute a sworn denial, we presume that the trial court did so as well. Thus the trial court did not err in failing to hold that **Norcross'** affidavit was sufficient. Point of error number five is overruled.

Point of error number six similarly alleges that the trial court erred in failing to hold that **Norcross'** affidavit attached to his Response to the Motion for Summary Judgment was sufficient to constitute summary judgment proof. This affidavit is of the same form as that attached to **Norcross'** answer, although it contains additional information concerning the allegation of inaccuracies in **Conoco's** accounts.

The form of this affidavit is also sufficient based upon our discussion of point of error number five. Therefore, as discussed above, we will presume the trial court correctly held that the affidavit was sufficient. Point of error number six is overruled.

Next, we must decide if the trial court correctly found that **Conoco** was entitled to summary judgment as a matter of law. **Norcross** raises four points of error contending that the summary judgment was improper. In his first point, **Norcross** complains that the court erred in granting summary *631 judgment because **Conoco** was required to prove each and every allegation of its account inasmuch as **Norcross** properly denied the allegations. **Norcross** contends that **Conoco** failed to so prove the elements of a suit on account.

**Norcross** then attacks the proof made by **Conoco** in his points of error two and three, by alleging that there was no evidence establishing any amount due on the account since the invoices attached to the motion for summary judgment were not admissible because no proper predicate was laid to admit them as business records; and by alleging that the motion for summary judgment was supported totally by affidavits of interested persons, whose statements were controverted by his own summary judgment proof. **Norcross'** fourth point of error alleges that numerous fact issues were raised in that the account records contained inaccuracies.

A summary judgment is proper when there are no material issues of fact presented and the movant is entitled to judgment as a matter of law. TEX.R.CIV.P. 166–A. The rules to be followed by an appellate court in reviewing a summary judgment record were set out in *Wilcox v. St. Mary's*

*University of San Antonio, Inc.,* 531 **S.W.2d** 589 (Tex.1975). They are:

1. The movant for summary judgment ... has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

2. In deciding whether or not there is a disputed material fact issue precluding summary judgment evidence favorable to the non-movant ... will be taken as true.

3. Every reasonable inference must be indulged in favor of the non-movant and any doubt resolved in their favor.

In summary judgment proceedings the trial is conducted on independently produced proof, such as affidavits, the motion for summary judgment and the response. *Hidalgo v. Surety Savings and Loan Association,* 462 **S.W.2d** 540 (Tex.1971). The pleadings, however, do not constitute summary judgment proof. *City of Houston v. Clear Creek Basin Authority,* 589 **S.W.2d** 671 (Tex.1979).

In ruling on a motion for summary judgment, all conflicts in the evidence must be disregarded and the evidence which tends to support the non-movant accepted as true. *Gonzalez v. Global Truck and Equipment, Inc.,* 625 **S.W.2d** 348 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ). The movant has the burden of showing that he is entitled to judgment as a matter of law by conclusively establishing all elements of his cause of action. *Hill v. Milani,* 678 **S.W.2d** 203 (Tex.App.—Austin 1984) *aff'd* 686 **S.W.2d** 610 (Tex.1985). If such burden is met, the non-movant must present summary judgment proof to establish a genuine fact issue. *Ramirez v. Bagley Produce Company,* 614 **S.W.2d** 582 (Tex.Civ.App.—Corpus Christi 1981, no writ).

Rule 166–A(e) provides:

> Form of Affidavits; Further Testimony. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith ... Defects in the

form of affidavits or attachments will not be grounds for reversal unless specifically pointed out by objection by an opposing party with opportunity, but refusal, to amend.

Affidavits by J.C. Curry, the regional manager of **Conoco**, Inc., and Paul Shively, Director of Treasury Services for **Conoco**, Inc., were submitted as summary judgment proof by **Conoco**. Curry's affidavit states that he has personal knowledge of all facts stated in his affidavit and that he is familiar with the events and circumstances involving the dispute between **Conoco** and **Norcross**. Shively's affidavit also states that he has personal knowledge of the facts stated and that they are true and correct. According to his affidavit, Shively manages the accounts receivable for **Conoco** \***632** owed by **Norcross**. Under his direction, bills were sent to **Norcross** for his share of costs. Attachments to both affidavits include copies of the invoice records sent to **Norcross**.

[5]    **Norcross** contends that these affidavits are insufficient to permit consideration of the account invoice records, because neither affiant stated that he was a custodian of the records, that it was the regular course of **Conoco's** business for an employee with personal knowledge of the information to make such a record or that the information was transmitted to the person making the record by one with personal knowledge; as required by the Texas Business Records Act, TEX.R.EVID. 803(6) and 902(10).

As noted, Rule 166–A(e) requires that affidavits in support of a motion for summary judgment set forth facts as would be admissible in evidence, and that defects in the form of the affidavit will not be grounds for reversal unless specifically pointed out by objection, with an opportunity to amend. **Conoco** argues that **Norcross** failed to specifically point out the defects, if any, and further that **Conoco** was not given an opportunity to amend. **Conoco**, therefore, contends that **Norcross** has waived this point.

The record reflects that **Norcross** objected to admission of **Conoco's** affidavits at the hearing on the Motion for Summary Judgment, on the grounds that the affidavits failed to comply with the requirements of Rules 803(6) and 902(10). **Norcross** was not objecting to the form of the affidavits, but rather was complaining about the admissibility of the records for consideration as summary judgment proof, because no predicate was laid within the affidavits. The complaint was not an objection to the form of the affidavits that, under Rule 166–A(e), would require a specific objection with an opportunity to amend. The affidavits themselves are sufficient. It is the sufficiency of the proof offered within these affidavits in support of the motion that **Norcross** questions.

[6]    Once **Norcross** filed a sworn denial, **Conoco** was required to prove the elements of its suit on account. These elements include: (1) that there was a sale and delivery of merchandise or services; (2) that the amount of the account is just in that the prices charged are in accordance with the agreement and they are the usual, customary and reasonable prices for such merchandise or services, and (3) that the account balance is unpaid. *See Airborne Freight Corporation v. CRB Marketing, Inc.,* 566 **S.W.2d** 573 (Tex.1978).

Nowhere in the affidavits offered by **Conoco**, does it state that the invoices or accounts are correct and accurate or just and true. The affiants merely state that true and correct *copies* of the original documents are attached, not that the originals contained information that was just and true. The affiants' statements that they have personal knowledge of the "facts stated herein" refers only to those facts laid out in the affidavits themselves. No reference is made to having personal knowledge of the information contained in the attached invoice records.

Therefore, the invoices attached to the affidavits in support of **Conoco's** motion for summary judgment are not competent summary judgment proof. Thus there is no evidence before us setting out an account as required by Rule 185. Consequently, **Conoco** has failed to prove each and every allegation of the account allegedly owed by **Norcross**. Summary judgment was not proper as **Conoco** did not establish entitlement to judgment as a matter of law.

Point of error number two is sustained. Our disposition of this cause based upon point of error number two renders a discussion of **Norcross'** remaining points unnecessary.

This cause is reversed and remanded for a trial on the merits.

CADENA, C.J., and BUTTS, J., concur in result.

**All Citations**

720 S.W.2d 627

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

567 S.W.2d 863
Court of Civil Appeals of Texas,Houston (14th Dist.).

John W. TAYLOR, Appellant,

v.

FRED CLARK FELT COMPANY, Appellee.

No. 1795. | June 7, 1978. |
Rehearing Denied June 28, 1978.

Holder filed suit against maker on promissory note. The District Court, Harris County, Reagan Cartwright, J., entered summary judgment in favor of plaintiff, and defendant appealed. The Court of Civil Appeals, J. Curtiss Brown, C. J., held, inter alia, that defendant maker raised a fact issue concerning the affirmative defense of failure of consideration, precluding entry of summary judgment.

Reversed and remanded.

West Headnotes (17)

[1] **Judgment**
&#9758; Presence of Question of Law

Summary judgment is a harsh remedy, and it may be upheld only if the record establishes movant's right thereto as a matter of law. Rules of Civil Procedure, rule 166–A.

6 Cases that cite this headnote

[2] **Judgment**
&#9758; Presumptions and Burden of Proof

Summary judgment rule is strictly construed against the movant. Rules of Civil Procedure, rule 166–A.

4 Cases that cite this headnote

[3] **Judgment**
&#9758; Absence of Issue of Fact

Summary judgment should be granted only if the record establishes as a matter of law that there is no genuine issue as to any material fact in the case. Rules of Civil Procedure, rule 166–A.

3 Cases that cite this headnote

[4] **Judgment**
&#9758; Negotiable Instrument Cases

In order to show himself entitled to summary judgment in suit on a promissory note in which defendant has made a general denial, plaintiff must establish that he is the present legal owner or holder of the note sued upon. Rules of Civil Procedure, rule 166–A; V.T.C.A., Bus. & C. §§ 1.201(20), 3.301.

1 Cases that cite this headnote

[5] **Bills and Notes**
&#9758; Title to Sustain Action

A "holder" of a note is the person in possession of a note drawn, issued or indorsed to him or to his order or to bearer or in blank. V.T.C.A., Bus. & C. § 1.201(20).

1 Cases that cite this headnote

[6] **Bills and Notes**
&#9758; Title to Sustain Action

Even if he is not the owner thereof, the holder of a note may enforce payment of the note in his own name. V.T.C.A., Bus. & C. § 3.301.

1 Cases that cite this headnote

[7] **Judgment**
&#9758; Negotiable Instruments

Plaintiff, suing on a promissory note, presented sufficient summary judgment evidence that it was the holder of the note, where plaintiff's proof consisted of a copy of the note and the affidavit of counsel, wherein he stated that he was the attorney of record for plaintiff, that the attached copy of the note was true and correct, and that he had the original in his possession and was prepared to tender it into court at such time as judgment was rendered, and where the sworn copy of the note showed on its face that it was issued to the order of plaintiff. Rules of Civil Procedure, rule 166–A; V.T.C.A., Bus. & C. §§ 1.201(20), 3.301.

2 Cases that cite this headnote

**[8]** **Appeal and Error**
⬤⇒ Judgment

**Judgment**
⬤⇒ Personal Knowledge or Belief of Affiant

Affidavit of plaintiff's counsel, tendered in support of motion for summary judgment in suit on promissory note, was defective since it did not show affirmatively that it was made upon personal knowledge; however, because defendant failed to object to the failure of the affidavit to make that affirmative showing, such formal defect would not furnish a basis for disturbing the summary judgment on appeal. Rules of Civil Procedure, rule 166–A(e).

1 Cases that cite this headnote

**[9]** **Judgment**
⬤⇒ Sufficiency of Pleading

Mere pleading of an affirmative defense does not prevent the rendition of summary judgment for a plaintiff who has established the nonexistence of disputed fact issues in his claim for relief. Rules of Civil Procedure, rule 94.

4 Cases that cite this headnote

**[10]** **Judgment**
⬤⇒ Sufficiency of Pleading

In order to show that there is a disputed fact issue which will preclude the rendition of summary judgment for plaintiff, defendant must offer summary judgment proof on each element of at least one of the affirmative defenses that it has pleaded. Rules of Civil Procedure, rule 94.

1 Cases that cite this headnote

**[11]** **Appeal and Error**
⬤⇒ Judgment

It was incumbent upon plaintiff, at summary judgment hearing, to except to the affidavits of the individual defendant and a bookkeeper for defendant company, and having failed to do so,

plaintiff was precluded from objecting for the first time on appeal to the admission of the affidavits on the basis that they failed to contain required seal. Vernon's Ann.Civ.St. art. 23, subd. 18.

Cases that cite this headnote

**[12]** **Appeal and Error**
⬤⇒ Documents in General

The Court of Civil Appeals will not assume the responsibility of searching out the originals of all documents and appellate records, where exceptions to those documents are made for the first time on appeal, in order to verify that those documents were filed with the trial court in proper form. Vernon's Ann.Civ.St. art. 23, subd. 18.

Cases that cite this headnote

**[13]** **Judgment**
⬤⇒ Personal Knowledge or Belief of Affiant

Although written in the form of an acknowledgment, the sentence with which defendants' affidavits, filed in opposition to plaintiff's summary judgment motion, concluded did not purport to be a statement that the affiant executed a written instrument for the consideration and purposes therein stated; rather, the sentence was an oath which complied with the requirements of statute. Vernon's Ann.Civ.St. art. 23, subd. 18.

3 Cases that cite this headnote

**[14]** **Judgment**
⬤⇒ Use of Affidavits

Although, prior to January 1, 1978, the summary judgment rule provided for the filing of opposing affidavits prior to the day of the summary judgment hearing, that provision was regarded as directory only; it was within the discretion of the trial court to allow opposing affidavits to be filed on or following the day of the hearing. Rules of Civil Procedure, rule 166–A.

1 Cases that cite this headnote

**[15] Judgment**

⌐ Defects and Objections

Since plaintiff, which filed a motion for summary judgment, failed to allege an abuse of discretion by the trial court in accepting opposing affidavits, the affidavits were properly before the court and, therefore, were to be considered in determining whether appellant-defendant, sued on a promissory note, raised fact issues concerning failure of consideration, fraud in the inducement, and payment. Rules of Civil Procedure, rule 166–A.

1 Cases that cite this headnote

**[16] Contracts**

⌐ Presumptions and Burden of Proof

There is a rebuttable statutory presumption that a written instrument imports consideration.

1 Cases that cite this headnote

**[17] Judgment**

⌐ Existence of Defense

In suit on a promissory note, defendant maker raised a fact issue concerning the affirmative defense of failure of consideration, precluding entry of summary judgment. Rules of Civil Procedure, rule 166–A; Vernon's Ann.Civ.St. art. 3737e, § 3.

1 Cases that cite this headnote

**Attorneys and Law Firms**

***865** Roy E. Hungerford, Houston, for appellant.

C. John Mayer, Ross, Banks, May, Cron & Cavin, Houston, for appellee.

**Opinion**

J. CURTISS BROWN, Chief Justice.

This is an appeal from a summary judgment granted the appellee in its suit on a promissory note.

John W. Taylor (appellant), individually and doing business as John Taylor Co., is the maker of a promissory note for $22,862.19 payable to the order of Fred Clark Felt Company (appellee). The appellee filed suit on the note on June 17, 1977. The appellant's first amended answer contained a general denial and allegations of payment and fraud in the inducement. The appellee subsequently filed a motion for summary judgment, which was granted on September 27, 1977. [^1]

**[1] [2] [3]** The appellant asserts, in his first point of error, that the trial court erred in granting summary judgment because the appellee's counsel failed to verify that Fred Clark Felt Company was the present owner and holder of the note and was entitled to receive payment thereunder and that he had personal knowledge of that fact. We note, initially, that summary judgment is a harsh remedy, and it may be upheld only if ***866** the record establishes the movant's right thereto as a matter of law. Wilcox v. St. Mary's University of San Antonio, 531 S.W.2d 589 (Tex.Sup.1975); Tex.R.Civ.P. 166-A. Rule 166-A, the summary judgment rule, is therefore strictly construed against the movant, and summary judgment should be granted only if the record establishes as a matter of law that there is no genuine issue as to any material fact in the case. In re Price's Estate, 375 S.W.2d 900 (Tex.Sup.1964).

**[4] [5] [6]** In order to show himself entitled to summary judgment in a suit on a promissory note in which the defendant has made a general denial, the plaintiff must establish that he is the present legal owner or holder of the note sued upon. Perkins v. Crittenden, 462 S.W.2d 565 (Tex.Sup.1970). A holder of a note is the person in possession of a note "drawn, issued or indorsed to him or to his order or to bearer or in blank." Tex.Bus. & Comm.Code Ann. s 1.201(20) (Tex.UCC 1968). Even if he is not the owner thereof, the holder of a note may enforce payment of the note in his own name. Tex.Bus. & Comm.Code Ann. s 3.301 (Tex.UCC 1968).

**[7]** The appellee's summary judgment proof in this case consisted of a copy of the promissory note and the affidavit of the appellee's counsel, wherein he stated that he was the attorney of record for the appellee, that the attached copy of the promissory note was true and correct, and that he had the original of the note in his possession and was prepared to tender it into court at such time as judgment was rendered. The sworn copy of the note shows on its face that it was issued to the order of the appellee. It can be reasonably inferred from the statements contained in the affidavit that appellee's

counsel possessed the original of the note in his capacity as agent for the appellee. We hold, therefore, that the appellee presented sufficient summary judgment evidence that it was the holder of the note.

[8] We agree with the appellant that the affidavit of the appellee's counsel was defective since it did not show affirmatively that it was made upon personal knowledge. Youngstown Sheet & Tube Co. v. Penn, 363 S.W.2d 230 (Tex.Sup.1962); see Tex.R.Civ.P. 166-A(e). Because the appellant failed to object to the failure of the affidavit to make that affirmative showing, however, that formal defect will not furnish a basis for disturbing the summary judgment on appeal. Youngstown Sheet & Tube Co. v. Penn, supra.

[9] [10] The appellant asserts, in his second point of error, that the trial court erred in granting summary judgment because the appellant pleaded and raised fact issues concerning failure of consideration, fraud in the inducement, and payment. Those matters are affirmative defenses. Tex.R.Civ.P. 94. The mere pleading of an affirmative defense does not prevent the rendition of summary judgment for a plaintiff who has established the nonexistence of disputed fact issues in his claim for relief. Hudnall v. Tyler Bank and Trust Company, 458 S.W.2d 183 (Tex.Sup.1970). The plaintiff need not negative all affirmative defenses pleaded by the defendant; in order to show that there is a disputed fact issue which will preclude the rendition of summary judgment for the plaintiff, the defendant must offer summary judgment proof on each element of at least one of the affirmative defenses that it has pleaded. Seale v. Nichols, 505 S.W.2d 251 (Tex.Sup.1974).

[11] [12] The summary judgment proof presented by the appellant at the hearing consisted of the affidavits of John Taylor and a bookkeeper for John Taylor Co. The appellee alleges that neither affidavit contains a seal as required by Tex.Rev.Civ.Stat.Ann. art. 23, s 18 (1969), and, therefore, the affidavits are fatally defective. We reject that argument. Although our copies of these two affidavits do not contain visible seals, neither does the copy of the affidavit of the appellee's counsel. In any event, the lack of a seal is a purely formal defect, and we assume that in this case the deficiencies, if any, would have been corrected by the appellant upon exception by the appellee prior to the conclusion of the hearing on the summary judgment. It was incumbent upon the appellee to except to the affidavits *867 prior to or during the hearing. Having failed to do so, it is precluded from objecting for the first time on appeal to the admission

of the affidavits on that basis. See Youngstown Sheet & Tube Co. v. Penn, 363 S.W.2d 230 (Tex.Sup.1962). This court will not assume the responsibility of searching out the originals of all documents in appellate records, where exceptions to those documents are made for the first time on appeal, in order to verify that those documents were filed with the trial court in proper form.

[13] The appellee also alleges that each of the affidavits contains an acknowledgment rather than a jurat, and, therefore, both are fatally defective for that reason. Each affidavit concludes with the sentence:

> BEFORE ME, the undersigned authority, on this day personally appeared (the affiant), known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged, and swore to me that the statements made therein are true and correct.

Although written in the form of an acknowledgment, the sentence does not purport to be a statement that the affiant executed a written instrument for the consideration and purposes therein stated. See Tex.Rev.Civ.Stat.Ann. arts. 6603, 6607 (1969). The sentence is, rather, an oath which complies with the requirements of Tex.Rev.Civ.Stat.Ann. art 23, s 18 (1969). We hold, therefore, that the affidavits were not fatally defective.

[14] [15] The appellee contends that the two affidavits filed by the appellant were not properly before the trail court because they were filed during the course of the hearing on the summary judgment. Prior to January 1, 1978, Tex.R.Civ.P. 166-A(c) provided for the filing of opposing affidavits prior to the day of the summary judgment hearing. That provision was regarded as directory only; it was within the discretion of the trail court to allow opposing affidavits to be filed on or following the day of the summary judgment hearing. Axcell v. Phillips, 473 S.W.2d 554 (Tex.Civ.App.-Houston (1st Dist.) 1971, writ ref'd n.r.e.). The appellee failed to allege an abuse of discretion by the trial court in accepting the opposing affidavits. The affidavits were properly before the trial court and, therefore, should be considered in determining whether the appellant raised fact issues concerning failure of consideration, fraud in the inducement, and payment.

[16] [17] There is a rebuttable statutory presumption that a written instrument imports consideration. Thigpen v. Thigpen, 563 S.W.2d 868 (Tex.Civ.App.-San Antonio 1978, no writ history); Maykus v. Texas Bank & Trust Co. of Dallas, 550 S.W.2d 396 (Tex.Civ.App.-Dallas 1977, no writ); see Tex.Rev.Civ.Stat.Ann. art. 27 (1969). The two opposing affidavits filed by the appellant contain statements that John Taylor Co. had no record of ever receiving the goods for which the promissory note was issued and that it was the customary practice of that company to keep records of the receipt of such goods. That summary judgment evidence counters the presumption of consideration and raises the inference that the goods were never delivered. See Tex.Rev.Civ.Stat.Ann. art. 3737e, s 3 (Supp. 1978). The appellant having raised a fact issue concerning the affirmative defense of failure of consideration, the trail court erred in granting summary judgment. Hudnall v. Tyler Bank and Trust Company, 458 S.W.2d 183 (Tex.Sup.1970).

The judgment of the trial court is hereby reversed, and the case is remanded for a trial on the merits.

Reversed and remanded.

**All Citations**

567 S.W.2d 863

Footnotes

1    Amendments to Tex.R.Civ.P. 166-A, effective January 1, 1978, are inapplicable in this case since judgment was rendered prior to that date.

          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

489 S.W.2d 368
Court of Civil Appeals of Texas,
Austin.

James C. DAY et al., Appellants,
v.
The STATE of Texas, Appellee.

No. 11988. | Dec. 6, 1972. |
Rehearing Denied Jan. 24, 1973.

Temporary mandatory injunction was entered against an insurance company, its alleged subsidiary, a trust and an individual by the 53rd Judicial District Court, Travis County, Herman Jones, J., in State's quo warranto proceeding to cancel insurer's and subsidiary's corporate charters and certificates of authority, and defendants appealed. The Court of Civil Appeals, John C. Phillips, C.J., held that where trial court was justified in concluding that by subtle and devious artifice, defendants had failed to produce certain records, trial court was justified in concluding that mandatory injunction was necessary for State to complete its investigation, and issuance of mandatory injunction was not abuse of discretion.

Affirmed in part and vacated in part.

West Headnotes (12)

**[1]** **Quo Warranto**
&#9758; Scope and Extent of Relief

Where trial court was justified in concluding that by subtle and devious artifice, defendants in State's quo warranto proceeding to cancel corporate charters and certificates of authority of insurer and a subsidiary on grounds of numerous violations of the law had failed to produce certain records, trial court was justified in concluding that mandatory injunction was necessary for State to complete its investigation, and issuance of mandatory injunction was not abuse of discretion.

1 Cases that cite this headnote

**[2]** **Quo Warranto**
&#9758; Scope and Extent of Relief

In quo warranto proceeding to cancel charter and certificate of authority of an insurance company and its subsidiary on grounds of violations of the law, it was of particular importance, when drafting an injunction order, that State's investigators be given the broadest authority the law would permit. Rules of Civil Procedure, rule 683.

Cases that cite this headnote

**[3]** **Quo Warranto**
&#9758; Scope and Extent of Relief

In quo warranto proceeding by State to cancel corporate charters and certificates of authority of insurance company and its subsidiary on grounds of numerous violations of the law, although terms of temporary injunction order restraining all defendants from diverting funds from the corporate defendants and directing them to produce the records and assets of the corporate defendants were quite broad, terms of order were not, in context of record as a whole, impermissibly vague. Rules of Civil Procedure, rule 683.

Cases that cite this headnote

**[4]** **Courts**
&#9758; Pendency and Scope of Prior Proceeding

Where neither a mandatory injunction or a receivership was being sought in prior pending suit between State and defendants named in subsequent quo warranto proceeding in the same court to cancel corporate charters and certificates of authority, the two suits lacked the identity necessary to deprive the court of active jurisdiction of the subsequent suit.

Cases that cite this headnote

**[5]** **Abatement and Revival**
&#9758; Time for Making Objection or Filing Plea

Pendency of a prior suit between the same parties involving the same subject matter must be seasonably pleaded by plea in abatement, and in absence of such pleading, the objection

is waived. Rules of Civil Procedure, rules 93, 93(d).

5 Cases that cite this headnote

**[6] Quo Warranto**
⟜ Scope and Extent of Relief

Under statute, the **State** was not barred, on ground it had prior unexhausted remedy at law by reason of pending administrative proceeding of **State** Board of Insurance to create a **state** of supervision over insurer and its subsidiary, from receiving temporary mandatory injunction to restrain those defendants and others from diverting funds and requiring them to produce records pursuant to **State's** quo warranto proceeding to cancel corporate charters and certificates of authority of insurer and its subsidiary. V.A.T.S. Insurance Code, arts. 21.28, § 13, 21.28–A, § 1.

Cases that cite this headnote

**[7] Attorney General**
⟜ Bringing and Prosecution of Actions

Attorney General is authorized to act independently of any certification from Commissioner of Insurance in pursuit of Attorney General's constitutional and statutory duty to take such action in the courts as may be proper and necessary to prevent any private corporation from exercising any power not authorized by law and to institute forfeiture proceedings whenever sufficient cause exists. Vernon's Ann.Civ.St. art. 6253; Vernon's Ann.St.Const. art. 4, § 22.

1 Cases that cite this headnote

**[8] Quo Warranto**
⟜ Scope and Extent of Relief

Under statutory and constitutional provisions pertaining to authority of Attorney General, court had authority to enter temporary mandatory injunction restraining defendants in **State's** quo warranto proceeding to cancel corporate charters and certificates of authority of insurer and its subsidiary from diverting funds from corporate

defendants and directing defendants to produce records and assets of corporate defendants, even though there was a prior pending administrative proceeding of **State** Board of Insurance creating a **state** of supervision over defendants, and even though order granting leave to file **State's** petition in quo warranto was allegedly not timely signed and filed. Vernon's Ann.Civ.St. art. 6253; Vernon's Ann.St.Const. art. 4, § 22.

Cases that cite this headnote

**[9] Appeal and Error**
⟜ Recitals

Generally, where a judgment recites that a particular party appeared, such recital is presumed true, but such presumption is subject to rebuttal.

4 Cases that cite this headnote

**[10] Evidence**
⟜ Rebuttal of Presumptions of Fact

Presumption that recitation in injunction order, which was approved "as to form" by attorney for parties who had not been served with process, as well as for those who had, that those parties who had not been served had appeared was true was rebutted by evidence appearing in record wherein trial court **stated** that none of the testimony or rulings would apply to those parties and that those parties which had not been served would be excused from the order.

2 Cases that cite this headnote

**[11] Appearance**
⟜ Relation of Party to Cause in General

An attorney can appear for one or more of his clients while at the same time not appear for others who were not cited.

1 Cases that cite this headnote

**[12] Appeal and Error**
⟜ Discretion of Court

Denial of supersedeas to defendants, with respect to temporary mandatory injunction, restraining

defendants from diverting funds from corporate defendants and directing them to produce records and assets of corporate defendants in **State's** quo warranto proceeding to cancel insurer's and its subsidiary's corporate charters and certificates of authority on grounds of numerous violations of the law, was not abuse of discretion. Rules of Civil Procedure, rule 385(d).

Cases that cite this headnote

**Attorneys and Law Firms**

*370 John Gano, Jamail & Gano, Houston, for appellants.

Crawford C. Martin, Atty. Gen., John H. Banks, Asst. Atty. Gen., Austin, for appellee.

**Opinion**

JOHN C. PHILLIPS, Chief Justice.

The **State** of Texas brought this suit against James C. **Day**, The **Day** Trust, Credit Factoring, Inc., James Wohlenaus, Shearn Moody, Empire Life Insurance Company of America, and W. L. Moody & Company, Bankers, Unincorporated.

The **State's** suit consisted of a proceeding in the nature of quo warranto seeking to cancel Empire Life Insurance Company's and Credit Factoring's Corporate Charters and Certificates of Authority on grounds of numerous violations of the law; it sought injunctions against all of the defendants restraining each of them from diverting funds from the corporate defendants and directing them to produce the records and assets of the corporate defendants; it sought an ancillary receivership of the appellants (defendants below) Empire Life and Credit Factoring on the ground, among others, that a delinquency proceeding had been commenced against Empire in its domiciliary **state** (Alabama). The petition further alleged that Credit Factoring is the wholly owned subsidiary and alter ego of Empire, that Credit Factoring is being employed by the appellants (defendants below) to loot the insurance company, and that a receivership, in order to be effective, must include both corporate defendants Empire Life and Credit Factoring.

On June 30, 1972, the Court entered its order which recites that all of the parties appeared by and through their attorneys of record and that the attorneys of record had 'made known

to the Court that they had agreed upon the entry of an order granting a temporary (prohibitory) injunction and continuing the appointment of a temporary receiver and temporary ancillary receiver' except that the appellants (defendants) declined to agree upon the entry of a temporary mandatory injunction as asked in the **State's** petition.

The order further recites that the Court heard evidence and argument upon this issue, and that after hearing the evidence, the Court found that the agreement to continue the injunction and receivership should be approved and that the temporary mandatory injunction should be issued as 'the Court finds that some of the records of Credit Factoring, Inc. have not been received by the receiver of this Court; and that the temporary mandatory relief hereinafter granted is necessary in order to enable the receiver of this Court to marshal the assets and to ascertain the liabilities of the defendant, Credit Factoring, Inc. and the defendant, Empire Life Insurance Company of America . . .'

[1] Consequently, the principal question before this Court is whether the trial court abused its discretion in issuing the mandatory injunction. We hold that he did not and that his order granting the mandatory injunction should stand.

In Janus Films, Inc. v. City of Ft. Worth, 163 Tex. 616, 358 **S.W.2d** 589 (1962), the Supreme Court **stated** that the scope of review over the trial court granting or denying a temporary injunction is limited to the narrow question of whether *371 the trial court's action constitutes a 'clear abuse of discretion.' In the case at bar, the testimony discloses that the trial court was fully justified in concluding that by subtle and devious artifice, these appellants, especially the powers behind Empire Life and Credit Factoring, failed to produce certain records such as groups of checks for certain specific periods, certain general ledgers and records that might explain certain specific transactions. In spite of the protestations of appellants that all of the records were and would be made available to the **State**, the trial court was fully justified in concluding that the mandatory injunction was necessary for the **State** to complete its investigation.

[2] [3] We also find the terms of this injunction order, in the context of the record as a whole, not to be impermissibly vague under Rule 683, Texas Rules of Civil Procedure. In a situation of this nature involving the rights of the innocent policy holders of a quasi-public insurance company, it is of particular importance that the **State's** investigators be given the broadest authority the law will permit. While the terms of this order are admittedly quite broad, we find it to be

sufficiently specific to put the appellants to notice of what is required of them.

Appellants' numerous points of error can be grouped into three main categories, viz: questions of jurisdiction of the court; objections to the order itself which we have discussed above; and objection to the denial of supersedeas.

With respect to jurisdiction of the court, appellants contend that because of a prior pending suit between the State and these appellants, involving the same subject matter, the court in the case at bar was without jurisdiction of this cause; that because of the prior pending administrative proceeding of the State Board of Insurance creating a state of supervision in that governmental organization over these appellants, the State had its prior unexhausted remedy at law; that the court had no jurisdiction over James C. Day or the Day Trust.

[4] [5] Appellants point concerning the prior suit (which incidentally was filed in the same court as the case at bar) must be overruled for two reasons. First, the suit now before us sought a mandatory injunction and a receivership, neither of which was sought in the first suit. Therefore the two suits lack the identity necessary to deprive the subsequent court of active jurisdiction. Cleveland v. Ward, 116 Tex. 1, 285 S.W. 1063, 1926; Holcombe v. Hanbury, 63 S.W.2d 735 (Tex.Civ.App.1933, no writ hist.). Secondly, the rule is that pendency of a prior suit between the same parties involving the same subject matter must be seasonably pleaded by plea in abatement. In the absence of such pleading, the objection is waived. Cleveland v. Ward, 116 Tex. 1, 285 S.W. 1063, 1926; Mitchell v. Allis Chalmers Mfg. Co., 291 S.W. 1099 (Tex.Comm.App.1927, adopted). In addition, Rule 93, Texas Rules of Civil Procedure, which requires verification of certain pleas, including this plea in abatement, T.R.C.P. 93(d) has not been complied with.

[6] With respect to the prior administrative proceeding as a prior 'unexhausted remedy at law' under Section 13 of Article 21.28 of the Texas Insurance Code, V.A.T.S., The Commissioner of Insurance is authorized to seek the appointment of the State Liquidator as ancillary receiver of an insurance company domiciled in another state whenever a domiciliary receiver is appointed in such state. The evidence before us discloses that a domiciliary receiver has been appointed with respect to Empire Life in the State of Alabama. The last sentence in Section 1 of Article 21.28 —A, Texas Insurance Code, authorizes the Commissioner of Insurance at 'any time' during the pendency of a supervision or conservatorship order, to seek 'receivership and liquidation.'

*372 [7] [8] Independent of the specific statutory authorization of the action taken by the Commissioner of Insurance, the Attorney General is authorized and required by Article IV, Section 22 of the Texas Constitution, Vernon's Ann.St., to 'take such action in the Courts as may be proper and necessary to prevent any private corporation from exercising any power . . . not authorized by law . . .', and Article 6253, Vernon's Ann.Civ.St., to institute forfeiture proceedings whenever 'sufficient cause' exists. The Attorney General is authorized to act independently of any certification from the Commissioner of Insurance in the pursuit of his constitutional and statutory duty. John L. Hammond Life Insurance Co. v. State, 299 S.W.2d 163 (Tex.Civ.App.1957, err. ref. n.r.e.); State v. Teacher's Annuity Life Insurance Co., 149 S.W.2d 318 (Tex.Civ.App.1941, err. ref.). These additional powers of the Attorney General also answer appellants' point that the order granting leave to file the State's petition in quo warranto was not timely signed and filed. The State contends that the discrepancy was due to inadvertency. Be that as it may, we hold that the court had the authority under the pleadings and proof to enter the order before us.

[9] [10] [11] We must, however, sustain appellants' points relative to the jurisdiction of the court over James C. Day and the Day Trust, and hold that the judgment against James C. Day and the Day Trust be vacated. It is uncontroverted that these two defendants were not served with process. This fact was called to the attention of the court and the court acknowledged the fact that these parties were not before it. Nevertheless, the court included these parties in its order which contained a recitation that Day and the Day Trust had appeared and which was approved 'as to form' by the attorney for Day and the Day Trust. The general rule, of course, is that where a judgment recites that a particular party appeared, such recital is presumed true. Yturri v. McLeod, 29 Tex. 84 (1861); Southwest National Bank of Dallas v. Cates, 262 S.W. 569 (Tex.Civ.App.1924, no writ hist.); Allstate Insurance Co. v. Universal Underwriters Insurance Co., 439 S.W.2d 385 (Tex.Civ.App.1969, no writ hist.). However, the presumption established by this rule is subject to rebuttal, and was here rebutted by evidence appearing in the record wherein the trial court stated that none of the testimony or rulings would apply to these two defendants and that those defendants who had not been served would be excused from the order. It seems elementary that an attorney can appear for

one or more of his clients while at the same time not appearing for others who were not cited. This is what was done here and it is difficult to imagine how the attorney for **Day** and the **Day** Trust could have been more vigilant in keeping his unserved clients out of court.

[12] We also hold that the trial court did not abuse its discretion in denying appellants supersedeas. Rule 385(d), Texas Rules of Civil Procedure; Wesware, Inc. v. Blackwell, 486 **S.W.2d** 599, Tex.Civ.App. Austin, decided October 25, 1972; Ralph Williams Gulfgate Chrysler—Plymouth, Inc. v. **State**, 449 **S.W.2d** 139 (Tex.Civ.App.1969, no writ hist.).

The trial court did not abuse its discretion in entering its order against appellants and as modified above, the judgment of the trial court is in all things affirmed.

Judgment of trial court is affirmed in part and vacated in part.

Affirmed in part and vacated in part.

**All Citations**

489 S.W.2d 368

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Hamm v. Millennium Income Fund, L.L.C.,
Tex.App.-Hous. (1 Dist.), July 28, 2005

### 929 S.W.2d 567
### Court of Appeals of **Texas**,
### Fort Worth.

## **ATTORNEY GENERAL** OF **TEXAS**, Appellant,

v.

## Joe Ebony **DUNCAN**, Appellee.

### No. 2–95–237–CV. | Aug. 29, 1996.

**Attorney General** filed suit seeking to establish paternity of putative father. The 322nd District Court, Tarrant County, Randy Catterton, J., granted putative father's motion for summary judgment. **Attorney General** appealed. The Court of Appeals, Livingston, J., held that: (1) clear and convincing evidence rebutted presumption that wife's husband was father of child; (2) statute of limitations for paternity suit had not yet run since child was only 15 years old; (3) res judicata did not bar paternity suit against putative father; and (4) laches was not defense available against **Attorney General** in paternity suit.

Reversed and remanded.

West Headnotes (12)

**[1] Judgment**
 Presumptions and burden of proof

Summary judgment movant has burden of establishing that no genuine issue of material fact exists and that movant is entitled to judgment as matter of law, and all doubts about existence of material fact are resolved against movant. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

1 Cases that cite this headnote

**[2] Appeal and Error**
 Extent of Review Dependent on Nature of Decision Appealed from

**Appeal and Error**

 Judgment

In reviewing grant of summary judgment, Court of Appeals must view evidence and its reasonable inferences in light most favorable to nonmovant, and summary judgment will be affirmed only if record establishes that movant has conclusively proved all essential elements of movant's cause of action or defense as matter of law. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

**[3] Judgment**
 Presumptions and burden of proof

In deciding whether there is material fact issue precluding summary judgment, all conflicts in evidence will be disregarded and evidence favorable to nonmovant will be accepted as true. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

**[4] Appeal and Error**
 Judgment

In reviewing grant of summary judgment, evidence that favors movant's position will not be considered unless it is uncontroverted. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

**[5] Judgment**
 Evidence in General

Affidavits that are attached to pleadings do not constitute summary judgment evidence.

Cases that cite this headnote

**[6] Judgment**
 Evidence in General

In considering motion for summary judgment, trial court may take judicial notice of its file at any stage of proceedings and is presumed to have done so with or without request from

party. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

7 Cases that cite this headnote

**[7]    Parent and Child**
    ⟜ Particular cases

Clear and convincing evidence rebutted presumption of husband's paternity of child where wife and husband's divorce decree stated that two children were born to wife during marriage, but did not state that children were born to wife and husband or "of the marriage," husband was named possessory conservator of only one child, and statement contained in divorce file indicated that husband and wife had lived apart without cohabitation for more than "past three years" and that wife had not seen husband for several years thereby indicating that it was impossible that husband fathered child. V.T.C.A., Family Code § 151.002(a)(1), (b).

2 Cases that cite this headnote

**[8]    Judgment**
    ⟜ Presumptions and burden of proof

Movant for summary judgment on basis of running of statute of limitations assumes burden of showing as matter of law that suit is barred by limitations.

Cases that cite this headnote

**[9]    Limitation of Actions**
    ⟜ Infancy

Statute of limitations applicable to paternity action had not yet run where child was only 15 years old at time of action. V.T.C.A., Family Code § 160.001(a).

Cases that cite this headnote

**[10]    Divorce**
    ⟜ Merger and bar of causes of action and defenses

**Parent and Child**
    ⟜ Other proceedings, effect of

No language in husband and wife's divorce decree stated that husband was parent of child, established visitation or support for child, severed parent-child relationship, or stated that children "were born to the marriage," and thus father's paternity of child had not been litigated and res judicata did not bar subsequent paternity action concerning child.

1 Cases that cite this headnote

**[11]    Parent and Child**
    ⟜ Time for proceedings; limitations and laches

Laches was not defense available against **Attorney General** in paternity suit.

1 Cases that cite this headnote

**[12]    Judges**
    ⟜ Nature and effect in general

**Judges**
    ⟜ Relationship to attorney or counsel

Trial judge did not have authority to transfer paternity action based on fact that he was former shareholder in law firm that represented putative father; if trial judge wished to recuse himself, proper procedure was to have another district judge preside in same district court. V.T.C.A., Family Code § 155.002.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*568** Dan Morales, **Attorney General**, Rhonda Amkraut Pressley, Assistant **Attorney General**, Jorge Vega, First Assistant **Attorney General**, Charles G. Childress, Director, Child Support Division, Austin, for appellant.

Mark J. Rosenfield, Mike Windsor, Loe, Warren, Rosenfield, Kaitcer & Hibbs, Fort Worth, for appellee.

Before CAYCE, C.J., and DAY and LIVINGSTON, JJ.

## *569 OPINION

LIVINGSTON, Justice.

The **Attorney General** of **Texas** brought suit against Joe Ebony **Duncan** to establish his paternity of E.M., who is now fifteen years old. **Duncan** filed a motion for summary judgment, claiming that: 1) the **Attorney General** had failed to rebut the presumption that the man to whom E.M.'s mother was married at E.M.'s birth was E.M.'s father; 2) the **Attorney General** could not challenge paternity when neither E.M.'s mother nor the presumed father had done so within a two- or four-year statute of limitations; 3) the doctrine of res judicata barred the paternity suit; 4) laches barred suing for retroactive child support and pre- and post-natal expenses. The trial court granted summary judgment on all the grounds. We reverse and remand.

### FACTS

Barbara McCauley and Robert McCauley married in August 1975, separated in January 1976, and divorced in January 1983. They had one child together, C.M., who was born in January 1976. Barbara also gave birth to another daughter, E.M., in February 1981. When the parties divorced in January 1983, Barbara and Robert had lived apart without cohabitation for more than three years. Barbara claimed not to have seen Robert since 1978. Paternity testing conducted in 1993 confirmed that Robert was not E.M.'s biological father.

The **Attorney General** brought suit in 1991 to establish that Joe Ebony **Duncan** was E.M.'s father and to recover retroactive child support and health care expenses. **Duncan** filed a motion for summary judgment, which the family law special master approved. The **Attorney General** appealed the master's recommendation, and the trial court set a hearing for August 3, 1995. The trial court granted **Duncan's** motion for summary judgment without a hearing on July 24, 1995. [1] The **Attorney General** appeals that order in two points of error.

### SUMMARY JUDGMENT

[1] [2] In its first point of error, the **Attorney General** contends that the trial court erred in granting **Duncan's** motion for summary judgment. In a summary judgment case,

the issue on appeal is whether the movant met his summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Cate v. Dover Corp.*, 790 **S.W.2d** 559, 562 (Tex.1990); *City of Houston v. Clear Creek Basin Auth.*, 589 **S.W.2d** 671, 678 (Tex.1979). The burden of proof is on the movant, *Acker v. Texas Water Comm'n*, 790 **S.W.2d** 299, 301–02 (Tex.1990), and all doubts about the existence of a genuine issue of a material fact are resolved against the movant. *Cate*, 790 **S.W.2d** at 562; *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 **S.W.2d** 41, 47 (Tex.1965). Therefore, we must view the evidence and its reasonable inferences in the light most favorable to the nonmovant. *Great Am.*, 391 **S.W.2d** at 47. The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of the movant's cause of action or defense as a matter of law. *City of Houston*, 589 **S.W.2d** at 678.

[3] [4] In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence will be disregarded and the evidence favorable to the nonmovant will be accepted as true. *Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 **S.W.2d** 170, 173 (Tex.1995); *Montgomery v. Kennedy*, 669 **S.W.2d** 309, 311 (Tex.1984). Evidence that favors the movant's position will not be considered unless it is uncontroverted. *Great Am.*, 391 **S.W.2d** at 47.

### Presumption of Paternity

In the first ground of his motion for summary judgment, **Duncan** claimed that the **Attorney General** had failed to rebut the presumption that Robert is E.M.'s father. **\*570** Former section 12.02 of the Family Code [2] provides:

(a) A man is presumed to be the biological father of a child if:

(1) he and the child's biological mother are or have been married to each other and the child is born during the marriage....

TEX. FAM. CODE ANN. § 12.02(a) (now § 151.002(a)(1) (Vernon 1996)). Robert is presumed to be E.M.'s father because she was born during his marriage to her biological mother, Barbara. Presumption of paternity can

be rebutted by clear and convincing evidence. *Id.* § (b) (now § 151.002(b)). *See Espiricueta v. Vargas,* 820 **S.W.2d** 17, 19 (Tex.App.—Austin 1991, writ denied) (prior decree establishing paternity may be clear and convincing evidence); *In re S.C.V.,* 750 **S.W.2d** 762, 764 (**Tex.**1988) (blood test excluding alleged father is clear and convincing evidence). If the summary judgment evidence fails to provide clear and convincing proof that would rebut the presumption of Robert's parentage, **Duncan** is entitled to summary judgment as a matter of law on this ground. *Cf. Sanders v. Davila,* 593 **S.W.2d** 127, 129 (Tex.Civ.App. —Amarillo 1979, writ ref'd n.r.e.) (stating that absent contrary evidence, a true presumption invokes a rule of law that compels a jury to reach a conclusion).

[5] **Duncan's** summary judgment evidence consists of Robert and Barbara's divorce decree, Barbara's First Amended Petition for Divorce, and Robert's Original Answer.[3] The divorce decree states that the material allegations in Barbara's petition for divorce "have been proved by full and satisfactory evidence." And one such allegation in Barbara's petition is that she and Robert separated and ceased to live together as husband and wife in 1976, five years before E.M.'s birth in 1981. Further, the two-page divorce decree recites that C.M. and E.M. were born *to Barbara* during the marriage, but does not state that C.M. and E.M. were born *to Barbara and Robert* or *"of the marriage."* Instead, the trial court names Robert possessory conservator of C.M. only, finding that such an order is "just and right, having due regard for the rights of each party and *the child of the marriage.*" There is simply no determination by the trial court that E.M. was the child of Barbara and Robert.

Although pleadings in and of themselves do not constitute summary judgment evidence, the trial court may consider the pleadings and affidavits on file at the time of the hearing. *See* **TEX.** R. CIV. P. 166a(c). A statement of the evidence from Robert and Barbara's divorce was on file with and signed by the court. That statement, dated January 25, 1983, says Barbara and Robert had "lived apart without cohabitation for more than the past three years." E.M. was born on February 19, 1981. Also, an affidavit filed by Barbara in October 1982 states that she had not seen Robert since 1978.[4] *See Schafer v. Federal Serv. Corp.,* 875 **S.W.2d** 455, 457 (Tex.App.—Houston [1st Dist.] 1994, no writ) (in granting summary judgment, court is free to consider items in the case file). Simple mathematics from these dates show that it is impossible that Robert fathered E.M.

[6]   [7]   Rule 166a(c) does not require that pleadings and affidavits on file with the court **\*571** be referenced in the motion for summary judgment or response to be considered by the trial court. Rather, the trial court may take judicial notice of its file at any stage of proceedings and is presumed to have done so with or without a request from a party. *Lacy v. First Nat'l Bank of Livingston,* 809 **S.W.2d** 362, 367 (Tex.App.—Beaumont 1991, no writ). Viewing this evidence and its reasonable inferences in the light most favorable to the nonmovant, *Great Am.,* 391 **S.W.2d** at 47, we find that the summary judgment evidence submitted with the motion and the evidence on file with the court from the divorce proceeding raises clear and convincing evidence that rebuts the presumption of Robert's paternity of E.M. The trial court erred in granting summary judgment in favor of **Duncan** on the ground that the presumption had not been rebutted, thus creating a fact issue that precludes summary judgment.

### Limitations, Waiver, and Estoppel

In the second ground of his motion for summary judgment, **Duncan** claimed that this paternity suit is barred because neither Barbara nor Robert rebutted the presumption that Robert is E.M.'s father within a two-year or four-year statute of limitations.[5] He claims that the failure to rebut presumed paternity during that time constituted a waiver of the right to do so and estops either party from rebutting the presumption now.

[8]   "The movant for summary judgment on the basis of the running of the statute of limitations assumes the burden of showing as a matter of law that the suit is barred by limitations." *Rogers v. Ricane Enter.,* 772 **S.W.2d** 76, 80– 81 (**Tex.**1989). Although **Duncan** claimed in his motion for summary judgment that either a two-year statute of limitations under section 16.003 or a four-year statute of limitations under section 16.004 of the **Texas** Civil Practice and Remedies Code applies to this case, he has not briefed this contention on appeal. In any event, these statutes are inapplicable. The appropriate statute of limitations for a paternity suit is former section 13.01(a) of the Family Code, which states:

> (a) A suit to establish paternity ... must be brought on or before the second anniversary of the day the child becomes an adult, or the suit is barred.

TEX. FAM. CODE ANN. § 13.01(a) (now § 160.001(a) (Vernon 1996)).

[9]   Because E.M. is only fifteen years old, the statute of limitations for this paternity suit has not yet run. The parties were not required to challenge paternity within a two- or four-year period of E.M.'s birth. Accordingly, **Duncan's** waiver and estoppel claims fail. Therefore, we hold that the trial court erred in granting summary judgment to **Duncan** on the ground that Robert and Barbara waived the right to file suit and are estopped from filing suit because the statute of limitations had run.

### Res Judicata

In the third ground of his motion for summary judgment, **Duncan** claims that the affirmative defense of res judicata bars a paternity suit against him. He directs our attention to Robert and Barbara's divorce decree, which states in part: "The Court, having considered the circumstances of the parents and the children, finds that the following orders are in the best interest of the children." **Duncan** claims that this language adjudicated Robert's paternity of E.M. In support of his argument, **Duncan** cites *Dreyer v. Greene*, 871 S.W.2d 697 (Tex.1993) and *In re A.L.J.*, 929 S.W.2d 467 (Tex.App. —Tyler 1996, n.w.h.). In both cases, the court barred a paternity suit on res judicata grounds. However, both cases are distinguishable.

In *Dreyer*, the mother alleged under oath that she and her husband were the parents of three children "of this marriage." *Dreyer*, 871 S.W.2d at 697. The trial court appointed the husband as possessory conservator for all three children and ordered him to pay child support. The mother later attempted to establish that another man fathered two of the *572 three children. *Id.* at 697–98. The court held that the trial court's finding in the divorce decree that the children were "of the marriage" was an adjudication of the children's parentage. *Id.* at 698. But the divorce decree at issue in this case states, "the following [two] children were born *to Petitioner* during the marriage." Further, after addressing possession, visitation, and support[6] for only C.M., the court delineates that it made such determinations with "due regard for the rights of each party and *the child of the marriage.*"

In *A.L.J.*, the divorce decree stated that the mother and presumed father were "the parents of A.L.J." *A.L.J.*, 929

S.W.2d at 469. Also, the trial court ordered that the "parent-child relationship between [the presumed father] and A.L.J. be terminated." *Id.* There is no such express determination in Robert and Barbara's divorce decree. To the contrary, the decree is silent about who would be possessory conservator of and pay child support for E.M.

[10]   We find that **Duncan** failed to prove as a matter of law that Robert and Barbara's divorce decree adjudicated Robert's paternity of E.M. No language in the decree states that Robert was the parent of E.M., establishes visitation or support for E.M., severs a parent-child relationship, or states that *children* "were born to the marriage." The issue of E.M.'s parentage has simply not been litigated. *See Attorney General of Texas v. Lavan*, 833 S.W.2d 952, 955 (Tex.1992). Accordingly, the trial court erred as a matter of law in granting summary judgment based on the defense of res judicata.

### Laches

[11]   In the last ground in his motion for summary judgment, **Duncan** argues that the **Attorney General's** claim for retroactive child support and pre- and post-natal expenses is barred by laches. However, laches is not a defense available against the **Attorney General** in a paternity suit. *Reyna v. Attorney General of Texas*, 863 S.W.2d 558, 559 (Tex.App. —Fort Worth 1993, no writ). It was error to grant summary judgment on this basis.

Having determined that the trial court erred in granting summary judgment on each ground of **Duncan's** motion for summary judgment, we remand for further proceedings.

### JURISDICTION

The only remaining question we must address is to which court we must reverse and remand this cause. In its second point of error, the **Attorney General** claims that the trial court erred in transferring the case to a court that lacks jurisdiction. The trial judge of the 231st District Court, who granted **Duncan's** motion for summary judgment, is a former shareholder in the law firm that represents **Duncan**. Because of this, the **Attorney General** filed a motion to recuse and **Duncan** filed a motion to transfer. The cause was transferred to the 322nd District Court of Tarrant County, which **Duncan** and the **Attorney General** approved.

[12]  Former section 11.05 of the Family Code states:

> (a) ... [W]hen a court acquires jurisdiction of a suit affecting the parent-child relationship, that court retains continuing, exclusive jurisdiction of all parties and matters provided for under this subtitle in connection with the child. No other court of this state has jurisdiction of a suit affecting the parent-child relationship with regard to that child except on transfer as provided in Sections 11.06, 11.061, or 17.06 of this code.

TEX. FAM. CODE ANN. § 11.05(a) (now § 155.002 (Vernon 1996)). The 231st became a court of continuing, exclusive jurisdiction in 1983 when the divorce decree named Barbara E.M.'s managing conservator. **Duncan's** motion to transfer did not assert grounds under sections 11.06, 11.061, or 17.06 for which the 231st District Court could transfer the case. Because the transfer was not made for permissible reasons, the 231st *573 did not have authority to transfer this case to the 322nd. *Alexander v. Russell,* 699 **S.W.2d** 209, 210 (Tex.1985). As *Alexander* points out, if the trial judge of the 231st wishes to recuse, the proper procedure is to have another judge preside in his place in the 231st. *Id.*

We reverse the summary judgment and remand to the 231st District Court for further proceedings.

**All Citations**

929 S.W.2d 567

## Footnotes

1    The **Attorney General** does not assign error to the procedural history of this case.

2    The Family Code was extensively reorganized and recodified by the **Texas** Legislature in 1995. *See* Act of April 20, 1995, 74th Leg., R.S., ch. 20, 1995 **Tex**. Gen. Laws 113. All references to the Family Code will be to the old version of the Code, with parenthetical references to the corresponding current version.

3    The **Attorney General's** response to the motion for summary judgment and its evidence, the results of a paternity test that prove Robert is not E.M.'s biological father, were filed after the trial court granted summary judgment to **Duncan**. Thus, we cannot consider the paternity test results to be summary judgment evidence.
     The **Attorney General** points out that the affidavit containing the paternity test results was attached to a motion for paternity testing of **Duncan**, which was filed before the trial court granted summary judgment. But affidavits that are attached to pleadings do not constitute summary judgment evidence. *Sugarland Business Ctr. v. Norman,* 624 **S.W.2d** 639, 642 (Tex.App.—Houston [14th Dist.] 1981, no writ).

4    Both the statement of evidence and Barbara's affidavit were filed in her divorce action, cause number 231–40650–82. The paternity suit against **Duncan** was also a part of cause number 231–40650–82.

5    **Duncan** has never argued when a two- or four-year statute of limitations would begin to run, *i.e.,* from E.M.'s birth.

6    The decree stated that a visitation schedule an an amount of child support would be set after Robert was located.

End of Document                                         © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Cogdell v. Fort Worth Nat. Bank, Tex.Civ.App.-Eastland, December 9, 1976

462 S.W.2d 540
Supreme Court of Texas.

Carolina E. **HIDALGO**, a femme sole, Petitioner,

v.

**SURETY SAVINGS** AND **LOAN ASSOCIATION**, a corporation, Respondent.

No. B—2366. | Feb. 3, 1971.

Suit wherein alleged holder in due course sought to recover on note and lien instrument securing same. The District Court, El Paso County, Jack N. Fant, J., granted summary judgment in favor of plaintiff, and defendant appealed. The El Paso Court of Civil Appeals, Eighth Supreme Judicial District, Ward, J., 457 S.W.2d 341, affirmed judgment of the District Court, and defendant brought error. The Supreme Court, Calvert, C.J., held that pleadings, even if sworn could not be regarded as summary judgment evidence, and that promissor's affidavit that house repair work for which he had executed note was never substantially performed in that job called for plastering and home was only painted, and deposition that house was cracking and paint was fading was sufficient to raise fact issue of failure of consideration for note, precluding summary judgment for purchaser in absence of conclusive showing that purchaser was holder in due course.

Reversed and remanded.

Walker, J., concurred and filed opinion in which Reavley, J., joined.

West Headnotes (3)

**[1]** **Judgment**
⟜ Negotiable Instruments

Promissor's affidavit that house repair work for which he had executed note was never substantially performed in that job called for plastering and home was only painted, and deposition that house was cracking and paint was fading was sufficient to raise fact issue of failure of consideration for note on which purchaser thereof was attempting to recover, precluding summary judgment for purchaser in absence of conclusive showing that purchaser was holder in due course. Rules of Civil Procedure, rule 166–A; V.T.C.A., Bus. & C. §§ 3.302, 3.305, 3.306.

203 Cases that cite this headnote

**[2]** **Judgment**
⟜ Evidence in General

Pleadings, even if sworn, could not be regarded as summary judgment evidence.

276 Cases that cite this headnote

**[3]** **Evidence**
⟜ Private Contracts and Other Writings

Recitations contained in completion certificate, signed by promissor, that home repair work for which note was given had been satisfactorily completed and accepted by promissor, that no statement had been made which would affect payment of the note, that there were no counterclaims to the obligation and that note would be paid according to its terms did not conclusively establish that assignee of note was a holder in due course of note. Rules of Civil Procedure, rule 166–A; V.T.C.A., Bus. & C. §§ 3.302, 3.305, 3.306.

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*541** Armendariz & Armendariz, Albert Armendariz, Sr., El Paso, for petitioner.

Arturo R. Aguirre, El Paso, for respondent.

**Opinion**

CALVERT, Chief Justice.

In this suit brought by **Surety Savings** and **Loan Association** against Mrs. Carolina E. **Hidalgo** to recover on a promissory note and to foreclose a lien on real property securing the note, the trial court rendered a summary judgment awarding **Surety**

the relief sought, and the court of civil appeals has affirmed. 457 S.W.2d 341. We reverse the judgments of both courts and remand the cause to the trial court.

The note, dated June 13, 1967, in the principal sum of $3,283.20, and payable in monthly installments of $54.72, was signed and delivered by Mrs. Hidalgo to Western States Improvement Co., Inc., the payee. If the judgment on the note cannot stand, the judgment foreclosing the lien must fall.

Surety's live pleading at the time of the summary judgment hearing was its First Amended Petition. Surety alleged that the defendant executed and delivered the note to Western States; that 'the Plaintiff, for a valuable consideration, became the legal owner and holder of said promissory note by written endorsement' from Western, and that 'at the time of paying the consideration therefor' the 'note had not been matured or dishonored and no notice of *542 any infirmity in said note was given to Plaintiff, constituting Plaintiff a holder in due course of said promissory note.' The petition was sworn to by Surety's attorney who on oath stated that 'the foregoing petition and pleadings therein and all allegations therein contained are true and correct within his knowledge.'

Mrs. Hidalgo had on file a Second Amended Original Answer and a First Supplement to her Answer and a Cross Action at the time of the hearing. She alleged in substance that Surety was not a holder in due course; and among her pleaded defenses to liability on the note were (1) that she was fraudulently induced to execute and deliver the same by false representations as to the nature, extent and quality of certain repairs to be made to her home, and (2) failure of consideration.

In moving for summary judgment, Surety assumed the burden of establishing that 'there (was) no genuine issue as to any material fact' and that it was 'entitled to a judgment as a matter of law.' Rule 166—A(c), Texas Rules of Civil Procedure; Gibbs v. General Motors Corporation, 450 S.W.2d 827 (Tex.Sup.1970), at 828; Torres v. Western Casualty and Surety Co., 457 S.W.2d 50 (Tex.Sup.1970). Compare Glenn v. Prestegord, 456 S.W.2d 901 (Tex.Sup.1970) with Prestegord v. Glenn, 441 S.W.2d 185 (Tex.Sup.1969).

At the time of the hearing, the trial court also had before it an affidavit by Mrs. Hidalgo and her deposition. In her deposition Mrs. Hidalgo admitted the execution and delivery of the note to Western States in payment for certain repairs to be made to her home and the execution of the lien instrument to secure payment of the note. She also admitted the signing of a completion certificate directed to Surety. Copies of

the note, lien instrument and completion certificate were attached to the deposition. The copy of the note shows that the same had been transferred and assigned by Western States to Surety. From this summary judgment proof we may assume that Surety established conclusively that Mrs. Hidalgo executed and delivered the note in question to Western States; that at the time of hearing a balance thereon was due and unpaid, and that Surety was the legal owner and holder. If this had been all of the evidence, the judgment would have been proper; but it is not all of the evidence.

[1] There was also summary judgment evidence supporting Mrs. Hidalgo's affirmative defense of failure of consideration as required by Rule 166—A if the motion was to be overruled. See Gulf, Colorado & Santa Fe Railway Co. v. McBride, 159 Tex. 442, 322 S.W.2d 492, 500 (1959). Mrs. Hidalgo's affidavit contains this statement:

> 'Defendant states as a fact that the work called for in the contract was never substantially performed in that the job called for a plastering of the home with a new product and the same was only painted.'

Mrs. Hidalgo gave testimony to the same effect in her deposition. She testified: 'I made payments but as soon as I noticed the house was cracking and also that the paint was fading then I will not (make payments) because the job isn't any good and I will have to repaint the house because it looks bad.' Again: 'I did it voluntarily yes (signed the papers) in order to fix my house but something that is not worth it I can't pay for it. It is all cracked and the paint is faded. The man promised me that it would be free of cracks and of blemishes or fading.' The quoted testimony is obviously in the language of one who does not express herself too well in English, but we are satisfied that it is adequate to raise a fact issue of failure of consideration.

With the record as here outlined, Surety filed and presented its Amended Motion for Summary Judgment. The judgment was sought on the ground that Mrs. Hidalgo did not set up in her pleading, affidavit and deposition a valid defense to Surety's cause of action. The theory of the motion was that the summary judgment record established *543 conclusively that Surety was a 'holder in due course,' and that the defenses of fraud in the inducement and failure of consideration are not valid defenses to a suit on a negotiable instrument by such a holder. This, by virtue of certain

provisions of Acts 1965, 59th Leg., ch. 721, the Uniform Commercial Code, which was in effect at the time of the transaction.

s 3—302 provided:

'(1) A holder in due course is a holder who takes the instrument

(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person. * * *'

s 3—305 of the same act provided:

'To the extent that a holder is a holder in due course he takes the instrument free from

(1) (not applicable)

(2) all defenses of any party to the instrument with whom the holder has not dealt except

(a), (b), (c), (d), (e) (none applicable).'

s 3—306 provided:

'Unless he has the rights of a holder in due course any person takes the instrument subject to

(a) (not applicable)

(b) all defenses of any party which would be available in an action on a simple contract; and

(c) the defenses of failure of consideration * * * etc. (See also s 3—408)

(d) (not applicable)'

The court of civil appeals seems to have been of the view that **Surety's** status as a holder in due course was conclusively established by the excerpts we have quoted from **Surety's** verified First Amended Petition and from recitations in the completion certificate. We are not convinced that these instruments have the controlling effect ascribed to them.

The allegations in **Surety's** petition, although sworn to, do not constitute summary judgment proof. Pleadings simply outline the issues; they are not evidence, even for summary judgment purposes.[1] See Stayton, 29 Texas L.Rev. 688; LeMond and Kreager, The Scope of Pleading as Proof in Summary Judgment Procedure, 30 Texas L.Rev. 613, 618; McDonald, Summary Judgments, 30 Texas L.Rev. 285, 297.

Stayton's writing is a very brief casenote on Haley v. Nickels, 235 S.W.2d 683 (Tex.Civ.App.—Austin 1950, no writ). In that case, both parties presented affidavits at the hearing on the motion for summary judgment. Neither party verified his pleadings. It is obvious that the case did not involve sworn pleadings. Professor Stayton's comment on the use of pleadings in summary judgment proceedings, however, is not limited to unsworn pleadings. He stated that authorities interpreting the Federal rule 'indicate that the office of the pleadings in this kind of proceeding is to show what the Alleged[2] issues are'; and continued:

'If controversy in the pleading were alone enough to prevent summary judgment, *544 this practice would ordinarily be useless, for there is no effective constraint upon what may be asserted or denied in the pleadings and there are many generalities which are good pleading but, to the full extent of their application in a particular case, bad truth. In any state like Texas, where the general denial can be and is used in practically every civil case, summary judgment would be almost always ineffective, and that in many situations where it would be useful and just.'

There are a number of cases which pick up Professor Stayton's general statement that pleadings will not constitute summary judgment evidence. See Turinsky v. Turinsky, 359 S.W.2d 114, 116 (Tex.Civ.App.—Dallas 1962, no writ); Hansen v. Eagle Mountain, etc., School District, 373 S.W.2d 817, 820 (Tex.Civ.App.—Fort Worth 1963, ref'd n.r.e.); Blount v. Westinghouse Credit Corp., 432 S.W.2d 549, 554 (Tex.Civ.App.—Dallas 1968, no writ).

LeMond and Kreager note that there have been differing views in different jurisdictions concerning the place of sworn pleadings in summary judgment proceedings and conclude: '* * * As a practical matter, The summary judgment hearing would be facilitated if the parties were required to submit actual proof supporting their allegations, rather than mere allegations alone in a sworn pleading. A possible exception to this theory occurs when the sworn pleadings set out in great detail the essential facts. In such a case it has been held that the sworn pleadings may be used as proof against general

allegations. However, It is submitted that for uniformity, as in the case of particularized unsworn pleadings, the use of pleadings as proof is questionable, for the required degree of particularity must be established and less certainty regarding proof will result. There is also the difficulty presented by the requirement of first-hand knowledge.' (30 Texas L.Rev. 618)

McDonald put his conclusion in the following language:
'* * * It has been held that where the respondent's pleading was verified, contrary statements in the movant's affidavits need not be accepted as established. An argument of some plausibility can be erected in support of this view. But to have any validity, this argument must rest on two questionable assumptions: first, that the factual detail in the pleading is as precise as it would be in a counter-affidavit; and second, that the verification of the pleading is taken as seriously as is the verification of special affidavits submitted on motion. Experience does not persuade this writer that either assumption is valid.' (30 Texas L.Rev. 297)

McDonald also states in his Texas Civil Practice, vol. 4, s 17.26, p. 1389:

> '* * * Formal issues framed in the pleading clearly are not controlling when the extrinsic evidence demonstrates the absence of an issue of material fact. The object of the summary judgment practice is to permit the prompt disposition of just such cases. Hence the sound rule is that a genuine issue of material fact is not raised by allegations in a pleading when they are controverted by affidavits or other evidence, in the absence of counter-affidavits or evidence to sustain them. * * *'

There is some authority for considering properly sworn pleadings as summary judgment evidence. Moore, in his work on Federal Practice 2d, vol. 6, p. 2176, states that

> '* * * Rule 56(e) demands that both supporting and opposing affidavits be made on personal knowledge, set forth such facts as would be admissible in evidence, and show affirmatively that affiant is competent to testify to the matters stated therein. To the extent that a verified pleading meets that requirement

then *545 it may properly be considered as equivalent to a supporting or opposing affidavit, as the case may be. Usually it will not. And in that event we believe that the verified pleading should have no greater effect than an unverified pleading has in a summary judgment proceeding.'

In Pine v. Gibraltar Savings Ass'n, 427 S.W.2d 714, 718 (Tex.Civ.App.—Houston 1968, no writ), the court held that 'a pleading which alleges facts and which is sworn in a manner that affirms under oath the truth of the facts alleged' may be treated as an affidavit in a summary judgment proceeding. To the same effect, see Central Bank and Trust Company v. Davis, 102 So.2d 600 (Fla.1958).

[2] On balance, we are convinced that orderly judicial administration will be better served in the long run if we refuse to regard pleadings, even if sworn, as summary judgment evidence. Taking this course will make for more orderly trials with fewer problems for courts and attorneys. If we took the opposite course, we would be confronted with constant problems concerning whether there was an adequate showing that the person making oath was personally acquainted with the facts and was competent to testify to the facts alleged.

The trial process includes both the pleading and the trial stages, whether the trial stage be in summary or conventional trial proceedings. If trial judges will be diligent in requiring in summary judgment proceedings that trial be on independently produced proofs, such as admissions, affidavits and depositions, the rule we have here approved should present no problems.

[3] We cannot agree that recitations contained in the completion certificate, signed by Mrs. Hidalgo, conclusively established that Surety was a holder in due course. The certificate did recite, as indicated by the court of civil appeals, that the work for which the note was given had been satisfactorily completed and accepted by Mrs. Hidalgo, and that no statement had been made which would affect payment of the note; further, that there were no counterclaims to the obligation, and that the note would be paid according to its terms. These recitations may or may not estop Mrs. Hidalgo from contending that Surety was not a holder in due course, a question we need not decide, but they do not constitute Surety a holder in due course of the note given Western States. And, in view of our holding on this question, neither is it necessary for us to decide whether the holding is correct, as made by the

court of civil appeals in Allied Building Credits, Inc. v. Ellis, 258 S.W.2d 165 (Tex.Civ.App.—Waco 1953, no writ), that such a certificate conclusively defeats the status as a holder in due course of one who requires it.

The judgments of the court of civil appeals and trial court are reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion.

WALKER, Justice (concurring).

While I concur in the judgment rendered in this case, I would not go out of my way, as the Court does, to hold that a verified pleading may never constitute proof in a summary judgment proceeding. That question is not squarely presented for decision here. In support of the contention that it is a holder in due course, Surety relies solely upon the allegations of the petition, verified by its attorney, that it acquired the note for a valuable consideration and became a holder in due course. These allegations are mere conclusions, expressly authorized for pleading purposes but unacceptable as proof in summary judgment proceedings. Rules 45 and 166—A, Texas Rules of Civil Procedure; **Associates** Discount Corp. v. Rattan Chevrolet, Inc., Tex.Sup., 462 S.W.2d 546.

If a live pleading states facts in sufficient detail and is verified by one who clearly has personal knowledge of the facts and is clearly competent to testify to the matters *546 stated, it is my opinion that the pleading should be given the same effect as any other affidavit filed in the case.

REAVLEY, J., joins in this concurring opinion.

**All Citations**

462 S.W.2d 540, 8 UCC Rep.Serv. 879

Footnotes

1    We are not to be understood as holding that summary judgment may not be rendered, when authorized, On the pleadings, as, for example, when suit is on a sworn account under Rule 185, Texas Rules of Civil Procedure, and the account is not denied under oath as therein provided, or when the plaintiff's petition fails to state a legal claims or cause of action. In such cases summary judgment does not rest on proof supplied by pleading, sworn or unsworn, but on deficiencies in the opposing pleading. See 22 Texas L.Rev. 433, 439—440; 30 Texas L.Rev. 285, 297.

2    Emphasis ours throughout.

End of Document                                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

716 S.W.2d 83
Court of Appeals of Texas,
Dallas.

Joan D. **BECKMAN**, Petitioner,

v.

Jerome C. **BECKMAN**, Respondent.

No. 05–85–01122–CV. | July 11, 1986. | Rehearing Denied Aug. 18, 1986.

Wife filed suit for divorce in Tom Green County, and husband filed separate suit for divorce in Dallas County one day later. The 256th District Court, Dallas County, Linda Thomas, J., rendered default judgment in favor of husband in his divorce action and denied wife's motion for new trial and plea in abatement, and wife appealed. The Court of Appeals, Akin, J., held that: (1) wife met all requirements necessary for grant of new trial following default judgment, and (2) determination of whether wife's plea in abatement was seasonably raised could not be made and required remand.

Reversed and remanded.

West Headnotes (11)

[1] **Judgment**
⬤⟶ Requisites and Sufficiency in General

It is sufficient that factual allegations be set forth in defendant's affidavit in support of motion for new trial in determining whether new trial should be granted after default judgment.

Cases that cite this headnote

[2] **Divorce**
⬤⟶ Opening or Setting Aside

Wife who failed to answer husband's divorce action because she claimed parties had orally agreed to dismiss husband's suit and proceed in wife's divorce action showed that her failure to answer husband's suit, which resulted in default judgment, was not due to conscious indifference, thus satisfying necessary element of test for determining whether new trial should be granted after default judgment.

1 Cases that cite this headnote

[3] **Divorce**
⬤⟶ Opening or Setting Aside

Wife who sought new trial after default judgment was rendered for husband in his divorce action established meritorious defense necessary for grant of new trial by presenting evidence that she had filed separate divorce action and obtained divorce decree.

Cases that cite this headnote

[4] **Divorce**
⬤⟶ Opening or Setting Aside

Wife who sought new trial following default judgment for husband in his divorce action, and who filed motion ten days after default judgment was rendered, would occasion no delay or work injury on husband by being granted new trial where husband had agreed to new trial in wife's divorce action and actively participated in it.

Cases that cite this headnote

[5] **New Trial**
⬤⟶ Payment of Costs, Expenses, and Attorney Fees in General

Failure of movant to offer reimbursement to opposing party for attorney's fees in motion for new trial does not preclude granting of new trial.

Cases that cite this headnote

[6] **Divorce**
⬤⟶ Opening or Setting Aside

Wife, who sought new trial following default judgment rendered in husband's favor in his divorce action, did not need to offer to reimburse husband for his attorney's fees in motion for new trial where husband actively participated in wife's divorce action and where wife relied on husband's representations that he would dismiss his divorce action.

Cases that cite this headnote

[7] **Divorce**
 ⟲ Opening or Setting Aside

Wife who sought new trial following default judgment in husband's favor in his divorce action, and whose motion showed that her failure to answer before default judgment was entered was unintentional, was entitled to new trial where she was able to show that husband had participated in her divorce suit and where she contended that husband had orally agreed to dismiss his suit.

Cases that cite this headnote

[8] **Abatement and Revival**
 ⟲ Necessity and Mode of Making Objection
 **Courts**
 ⟲ Pendency and Scope of Prior Proceeding

Court in which suit is first filed acquires dominant jurisdiction to exclusion of other coordinate courts; any subsequent suit involving same parties in controversy must be dismissed if party to that suit calls second court's attention to pendency of prior lawsuit by plea in abatement.

Cases that cite this headnote

[9] **Abatement and Revival**
 ⟲ Necessity and Mode of Making Objection

Plea in abatement grounded on pendency of prior suit must be predicated upon state of facts that are seasonably alleged and proved, and, unless this is done, subsequent suit is not abated.

Cases that cite this headnote

[10] **Abatement and Revival**
 ⟲ Necessity and Mode of Making Objection

In absence of seasonable plea in abatement, plea is waived.

Cases that cite this headnote

[11] **Divorce**
 ⟲ Determination and Disposition of Cause

Determination of whether wife's plea in abatement, which was entered ten days after she discovered default judgment had been rendered in husband's divorce action, was seasonably raised could not be made by reviewing court in view of possible estoppel against husband due to his representation to wife that he would dismiss his suit, and remand was required.

1 Cases that cite this headnote

**Attorneys and Law Firms**

*84 Theodore A. Hargrove, III, San Angelo, for petitioner.

John H. Hagler, William F. Kortemier, Dallas, for respondent.

Before AKIN, GUILLOT [1] and SCALES, JJ.

**Opinion**

AKIN, Justice.

Joan D. Beckman appeals by writ of error the overruling of her "Motion for New Trial and Plea in Abatement" after default judgment was rendered in favor of Jerome C. Beckman. For the reasons below, we reverse the judgment of the trial court and remand for reconsideration of Mrs. Beckman's plea in abatement.

Mrs. Beckman filed suit for divorce on January 11, 1985, in Tom Green County. Mr. Beckman filed for divorce in Dallas County on January 12, 1985. This appeal is in the Dallas County case. Mr. Beckman answered and actively participated in the Tom Green County suit in which divorce was granted on March 14, 1985. Mrs. Beckman then requested and received a new trial in the Tom Green County case on March 25, 1985, based upon new information obtained concerning the equitable division of military retirement benefits. The divorce action is still pending in Tom Green County.

Mrs. Beckman did not answer Mr. Beckman's Dallas County divorce suit, and Mr. Beckman obtained a default judgment in the Dallas County suit on April 8, 1985. Mrs. Beckman then, upon notice of the default, filed her motion for new trial and plea in abatement on April 18, 1985, alleging that the parties had orally agreed, prior to the default judgment, that Mr. Beckman would dismiss his Dallas County divorce

action. A hearing was held on the motion for new trial and plea in abatement on June 18, 1985, but the motion was overruled by operation of law on June 24, 1985, although Mrs. Beckman had diligently sought a ruling from the trial judge.

Mrs. Beckman contends in her sole point of error that the trial court erred in failing to grant her motion for new trial. We agree. A motion for new trial is addressed to the trial court's discretion, and the court's ruling will not be disturbed on appeal in the absence of a showing of an abuse of discretion. *Strackbein v. Prewitt*, 671 **S.W.2d** 37, 38 (Tex.1984). However, as stated by the supreme court in *Craddock v. Sunshine Bus Lines, Inc.*, 134 Tex. 388, 133 **S.W.2d** 124, 126 (1939), "while trial courts have some measure of discretion in the matter, as, in truth, they have in all cases governed by equitable principles, it is not an unbridled discretion to decide cases as they might deem proper, without reference to any guiding rule or principle." The *Craddock* court then established a guiding principle for trial courts to follow in determining whether to grant a motion for new trial after a default judgment:

> A default judgment should be set aside and a new trial ordered in any case in which the failure of defendant to answer before judgment was not intentional, or a *85 result of conscious indifference on his part, but was due to mistake or accident, provided the motion for new trial sets up a meritorious defense and is filed at a time when the granting thereof will occasion no delay of otherwise work an injury to the plaintiff.

*Id.; see Ivy v. Carrell*, 407 **S.W.2d** 212, 213 (Tex.1966).

**[1]** Generally, factual allegations set forth in a defendant's affidavit in support of a motion for new trial are sufficient to establish the elements of the *Craddock* test. *Strackbein*, 671 **S.W.2d** at 39. Mrs. Beckman attempted to satisfy the *Craddock* test with her verified motion for new trial and plea in abatement.

**[2]** First, Mrs. Beckman alleged that her failure to answer in the Dallas suit was not due to conscious indifference and was not intentional. In this respect, she contended that the parties had orally agreed to dismiss the Dallas County lawsuit and proceed in the Tom Green County case, which was filed

earlier. She did not answer in the Dallas County suit because she thought that it had been dismissed.

**[3]** Second, Mrs. Beckman set up a meritorious defense in her motion for new trial and plea in abatement. She attached to her motion copies of her original petition for divorce in Tom Green County and a copy of the divorce decree entered in that suit.

**[4]** Third, Mrs. Beckman's motion was filed ten days after the default judgment was granted. The court in *National Rigging, Inc. v. City of San Antonio*, 657 **S.W.2d** 171, 173 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.), held that the granting of a new trial shortly after a default judgment would have occasioned no delay or otherwise worked an injury to the plaintiff. Mrs. Beckman also contends that the granting of her motion would occasion no delay or work injury to Mr. Beckman because Mr. Beckman had actively participated in the Tom Green County suit and had agreed to the granting of a new trial in that cause, occasioned because Mr. Beckman had failed to supply correct information with respect to his retirement benefits.

**[5]** **[6]** Although Mrs. Beckman has not offered to reimburse Mr. Beckman for his attorney's fees and costs in the Dallas suit, the failure to offer reimbursement in the motion for new trial does not preclude the granting of a new trial. *Boulware v. Security State Bank, Navasota*, 598 **S.W.2d** 687, 689 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.); *Dallas Heating Co. v. Pardee*, 561 **S.W.2d** 16, 22 (Tex.Civ.App.—Dallas 1977, writ ref'd n.r.e.). In light of Mr. Beckman's active participation in Tom Green County and Mrs. Beckman's reliance on Mr. Beckman's representations that he would dismiss his Dallas County divorce action, we hold that Mrs. Beckman did not need to offer to reimburse Mr. Beckman for his attorney's fees in the Dallas default.

**[7]** In conclusion, we hold that Mrs. Beckman has met the requirements of the *Craddock* test. Accordingly, we sustain Mrs. Beckman's point of error, reverse the judgment of the trial court, and remand for a reconsideration of Mrs. Beckman's plea in abatement.

**[8]** **[9]** **[10]** **[11]** With respect to the plea in abatement, the court in which suit is first filed acquires dominant jurisdiction to the exclusion of other coordinate courts. *Curtis v. Gibbs*, 511 **S.W.2d** 263, 267 (Tex.1974). Any subsequent suit involving the same parties and controversy must be dismissed if a party to that suit calls the second court's

attention to the pendency of the prior lawsuit by plea in abatement. *Id.* A plea in abatement grounded on the pendency of a prior suit must be predicated upon a state of facts that are seasonably alleged and proved, and, unless this is done, the subsequent suit is not abated. *Cleveland v. Ward,* 116 Tex. 1, 285 S.W. 1063, 1072 (1926); *Texas Employers Insurance Association v. Baeza,* 584 S.W.2d 317, 321 (Tex.Civ.App.—Amarillo 1979, no writ); *Day v. State,* 489 S.W.2d 368, 371 (Tex.Civ.App.—Austin 1972, writ ref'd n.r.e.). In the absence of a seasonable plea in abatement, *86 the plea is waived. *Cleveland,* 285 S.W.2d at 1072. However, because of Mrs. Beckman's reliance upon Mr. Beckman's representation that the Dallas County suit would be dismissed, a question of estoppel against Mr. Beckman exists with respect to whether Mrs. Beckman's plea in abatement was seasonably raised when she first discovered that a default judgment had been rendered and, within ten days thereafter, filed her motion for new trial and plea in abatement.

Reversed and remanded.

**All Citations**

716 S.W.2d 83

Footnotes

1    Justice Guillot concurred in the result reached prior to his resignation.

End of Document                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Gordon v. Jones, Tex.App.-Hous. (1 Dist.), June 8, 2006

511 S.W.2d 263
Supreme Court of Texas.

Daniel **CURTIS**, Relator,

v.

Honorable Dan **GIBBS**, Judge, et al., Respondents.

No. B—4518. | May 22, 1974.

Original mandamus and prohibition proceeding by husband for an order directing Domestic Relations Court of Dallas County to abate suit by wife in that court for removal of restrictions on her custody of children and to increase husband's child support payments and to vacate orders of that court interfering with husband's suit in the Bowie County District Court for change of custody of children. The Supreme Court, Greenhill, C.J., held that Bowie County court had dominant jurisdiction over controversy since husband's action was instituted prior to wife's action, that husband was not estopped from relying on his prior suit to abate wife's suit because of 26-day delay between filing of suit and procuring of issuance of citation or because he filed original petition under docket number of original divorce action, and that Bowie County court had exclusive jurisdiction to determine the venue question.

Writs granted.

West Headnotes (12)

**[1]** **Child Custody**
⟜ Modification

Phrase "continuing jurisdiction" in statute providing that once a court acquires jurisdiction of parent-child relationship with respect to particular child it has exclusive continuing jurisdiction means that jurisdiction which continues after final judgment. V.T.C.A., Family Code, § 11.05.

5 Cases that cite this headnote

**[2]** **Courts**
⟜ Exclusive or Concurrent Jurisdiction

Under statute which provides that court once it acquires jurisdiction of parent-child relationship with respect to child has exclusive continuing jurisdiction of all suits affecting that relationship and which is not applicable to a suit to modify a judgment entered prior to January 1, 1974 affecting parent-child relationship, both the Bowie County suit by husband to change custody order in 1971 divorce decree and Dallas County suit by wife for an increase in child support were new suits in which no court had continuing exclusive jurisdiction so that priority between two proceedings had to be determined in accordance with common-law rules. V.T.C.A., Family Code § 11.05.

28 Cases that cite this headnote

**[3]** **Courts**
⟜ Pendency and Scope of Prior Proceeding

General common-law rule is that court in which suit is first filed acquires dominant jurisdiction to exclusion of other coordinate courts.

74 Cases that cite this headnote

**[4]** **Abatement and Revival**
⟜ Ground of Abatement in General

Any subsequent suit involving same parties and same controversy must be dismissed if party to that suit calls second court's attention to pendency of prior suit by a plea in abatement.

33 Cases that cite this headnote

**[5]** **Courts**
⟜ Courts, Judges, and Judicial Officers, Acts and Proceedings Of

If second court refuses to sustain a proper plea in abatement or attempts to interfere with the prior action, Supreme Court has the power to act by mandamus or other appropriate writ to settle the conflict of jurisdictions.

26 Cases that cite this headnote

**[6]** **Courts**
  ☞ Pendency and Scope of Prior Proceeding

Court in which suit is first filed acquires dominant jurisdiction to exclusion of other courts unless plaintiff in first suit is guilty of such inequitable conduct as will estop him from relying on first suit to abate subsequent proceeding brought by his adversary.

89 Cases that cite this headnote

**[7]** **Abatement and Revival**
  ☞ Time for Making Objection or Filing Plea

Husband's delay of 26 days between his filing of suit in Bowie County for change of custody of children and procuring issuance of citation, during which period he attempted to obtain waiver of service, did not estop him from relying on his Bowie County suit to abate wife's subsequent Dallas County suit for an increase in child support.

5 Cases that cite this headnote

**[8]** **Abatement and Revival**
  ☞ Pleading Out of Order

Husband who brought first action in Bowie County for change of custody of children did not waive his plea in abatement by filing motion raising issue of venue in subsequent action brought by wife in Dallas County for an increase in child support.

1 Cases that cite this headnote

**[9]** **Abatement and Revival**
  ☞ Pleading Out of Order

Fact that husband's petition in his suit in Bowie County for change of custody of children was filed under docket number of 1971 divorce action which had resulted in custody of children being granted to wife when it should have been filed as a new action, did not preclude husband from relying on his suit to abate wife's subsequent action in Dallas County for an increase in child support.

Cases that cite this headnote

**[10]** **Courts**
  ☞ Suits for Divorce

Bowie County Court in which husband instituted action in January 1974 to change custody of children, not Dallas County Court in which wife instituted action in February 1974 for an increase in child support, had dominant jurisdiction over parent-child relationship.

2 Cases that cite this headnote

**[11]** **Courts**
  ☞ Suits for Divorce

Bowie County Court in which husband instituted action for change of custody of children, not Dallas County Court in which wife instituted subsequent action for an increase in child support, had exclusive jurisdiction to determine venue question, in light of fact that Bowie County Court had dominant jurisdiction over parent-child relationship.

9 Cases that cite this headnote

**[12]** **Courts**
  ☞ Transfer of Causes

Remedy for wife who objected to venue in Bowie County where husband instituted action for change of custody on ground that children resided in Dallas County where she instituted subsequent action for an increase in child support was to file motion to transfer in Bowie County Court which had dominant jurisdiction. V.T.C.A., Family Code §§ 11.04, 11.06(a).

4 Cases that cite this headnote

**Attorneys and Law Firms**

*264 Hubbard, Patton, Peek, Haltom & Roberts, James N. Haltom, Texarkana, for relator.

Smith, Glaspy, Jones & Moss, Bill Glaspy, Mesquite, for respondents.

## Opinion

GREENHILL, Chief Justice.

In this original mandamus proceeding, we are called upon to settle a jurisdictional conflict between the 202nd District Court of Bowie County and the Third Domestic Relations Court of Dallas County. The conflict arises from a child custody dispute between the parents of Shawn Danelle **Curtis** and Shanna Michelle **Curtis**, ages 8 and 7, respectively. For simplification, *265 the Relator Daniel **Curtis**, the children's father, will be referred to as 'the father,' and the respondent, Jerri **curtis** Spencer, as 'the mother.' The 202nd District Court of Bowie County will be called 'the Bowie court,' and the Third Domestic Relations Court of Dallas County will be called 'the Dallas court.' The judge of the Dallas court, the Honorable Dan **Gibbs**, is the principal respondent herein.

The background of the case will be set out later herein. The immediate reasons for the mandamus proceedings are these:

The father and mother were divorced by a judgment of the Bowie court in 1971, and the mother was awarded custody of the children; but she was not to remove the children from Bowie and an adjacent county without permission. The parents and the children all lived in Bowie County at that time.

On January 18, 1974, the father filed a petition for change of custody in the Bowie court. Subsequently, on February 15, 1974, the mother filed a petition in the Dallas court to remove restrictions on her custody of the children and to increase the father's child support payments.

Judge Guy Jones, Judge of the Bowie court, issued a writ of attachment ordering that the children, who were in Dallas with their mother, be returned to Bowie County. Judge Dan **Gibbs** of the Dallas court issued an order suspending the writ of attachment and forbidding the sheriff of Dallas County from executing it. The father thereupon filed his original petition in this court seeking writs of mandamus and prohibition directing Judge **Gibbs** to abate the mother's suit in Dallas County and to vacate orders interfering with the Bowie County proceeding. After the filing of the petition in this court, the father has presented his plea in abatement in the Dallas court, and Judge **Gibbs** has overruled it.

We conclude that the Bowie court first acquired jurisdiction of the controversy between the parties and therefore retained dominant jurisdiction to the exclusion of other courts. Judge **Gibbs** had no right to interfere with the actions or orders of Judge Jones, or to take any other action with respect to the suit filed in Dallas except to sustain the plea in abatement and to dismiss the suit.

In order to discuss adequately the contentions raised by the parties in this court, it will be necessary to set out the history of this litigation in some detail. As noted, the father and the mother were divorced in Bowie County in 1971. The decree gave the mother custody of the children, subject to the restriction that she must not remove them from Bowie County Texas, or Miller County, Arkansas, for a period longer than ten days without permission. In 1973, the mother filed a petition in the Bowie court seeking to expunge this restriction, but the petition was denied. No appeal was taken from that order.

In December of 1973, the mother, now remarried, determined to move to Dallas with her present husband. For reasons concerning which there is conflicting testimony, she left the children with the father in Bowie County. The father apparently believed that the mother intended to leave the children with him indefinitely.

On January 18, 1974, the father filed in Bowie County a suit to change custody, i.e., to obtain custody of the children. He did not immediately procure a citation in that suit; but on February 4, his counsel wrote to the mother requesting that she sign a waiver of citation.

On February 12, 1974, the mother took the children from the home of the father in Bowie County upon the representation that she was taking them for an overnight visit. In fact, she took them with her to Dallas and put them in school there. She has not since returned the children to the father, nor does she intend to do so.

This act precipitated a series of legal moves which has culminated in the present mandamus action. On February 13, 1974, *266 the father procured a citation to the mother in his pending Bowie County suit. The following day, February 14, 1974, Judge Jones of the Bowie court issued his writ of attachment commanding the return of the children to Bowie County.

On February 15, 1974, the mother filed a new suit in Dallas County, asking for unrestricted custody and for increased child support. Judge **Gibbs** of the Dallas court issued a temporary restraining order forbidding the father from removing the children from Dallas County, and setting a hearing on a temporary injunction for February 22.

On February 22, the father appeared in the Dallas court and filed a Motion to Transfer, a Motion to Change Venue, and a Motion to Dismiss. The last of these motions alleged pendency of the prior action in Bowie County, but it was not sworn to as required by Rule 93, Texas Rules of Civil Procedure.

After a hearing, Judge **Gibbs** issued a temporary injunction forbidding removal of the children from Dallas County and 'suspending' the Bowie County writ of attachment 'until this court can determine the status of this matter in relation to the case pending in Bowie County.'

On March 12, Judge Jones in Bowie County issued another writ of attachment for the children. Judge Tate McCain, sitting in Judge **Gibbs's** court in Dallas, issued an order directing the sheriff of Dallas County to suspend any Bowie County writ of attachment pending further orders of Judge **Gibbs**.

On March 18, the father filed a proper plea in abatement in the Dallas court, setting up the pendency of the Bowie County proceeding. On March 19, he filed his petition for writs of prohibition and mandamus in this court. When the petition came on for submission, on March 27, it appeared that the plea in abatement was pending in Judge **Gibbs's** court. Accordingly, we directed Judge **Gibbs** to pass upon the plea in abatement. Judge **Gibbs** held a hearing on the plea in abatement; and, on April 2, he overruled it.

The question in this case is one of dominant jurisdiction. Both the Bowie court and the Dallas court have potential jurisdiction of the subject matter—child custody suits. Obviously, however, both courts cannot exercise this jurisdiction at the same time with respect to the same children without unseemly conflict.

[1]  Recognizing the need to commit the decision of all controversies that directly affect the welfare of particular children to a single court, the Legislature recently enacted Chapter 11 of the Texas Family Code, which provides that once a court acquires jurisdiction of 'the parent-child relationship' with respect to a particular child, it has exclusive 'continuing jurisdiction' of all suits affecting that relationship. Texas Family Code s 11.05. [1] Here, no court has 'continuing jurisdiction.' We assume the Legislature intended to use the phrase 'continuing jurisdiction' in the same sense in which this court has heretofore used it in connection with child support orders, to mean that jurisdiction which

continues after final judgment. See Boney v. Boney, 458 **S.W.2d** 907 (Tex.1970).

Furthermore, the Act which adopted Chapter 11 of the Family Code has a transitional provision as follows:
'(b) Any action or suit commenced after January 1, 1974, that has as its object the modification of an order, judgment, or decree entered prior to January 1, 1974, but which under this Act would be a suit affecting the parent-child relationship, is governed by the provisions of this Act, and shall be treated as the commencement of a suit affecting the parent-child relationship in which no court *267 has continuing exclusive jurisdiction.' Acts 1973, 63rd Leg., Reg.Sess., Ch. 543 s 4, page 1459. [2]

[2]  Under this provision, no court could have 'continuing jurisdiction' based on its jurisdiction of any suit in which final judgment was entered prior to January 1, 1974. Both the Bowie County and the Dallas County proceedings are suits which, under the Family Code, would be suits affecting the parent-child relationship, and both seek to modify the 1971 divorce judgment. Hence, each of the suits before us is a new suit in which 'no court has continuing exclusive jurisdiction,' and priority as between the two proceedings must be determined in accordance with common law rules.

[3]  [4]  [5]  The general common law rule in Texas is that the court in which suit is first filed acquires dominant jurisdiction to the exclusion of other coordinate courts. Cleveland v. Ward, 116 Tex. 1, 285 S.W. 1063 (1926), Ex parte Lillard, 159 Tex. 18, 314 **S.W.2d** 800 (1958). Any subsequent suit involving the same parties and the same controversy must be dismissed if a party to that suit calls the second court's attention to the pendency of the prior suit by a plea in abatement. If the second court refuses to sustain a proper plea in abatement, or attempts to interfere with the prior action, this court has the power to act by mandamus or other appropriate writ to settle the conflict of jurisdictions. Cleveland v. Ward, Supra; Wheeler v. Williams, 158 Tex. 383, 312 **S.W.2d** 221 (1958); Way & Way v. Coca-Cola Bottling Co., 119 Tex. 419, 29 **S.W.2d** 1067 (1930); Conn v. Campbell, 119 Tex. 82, 24 **S.W.2d** 813 (1930).

[6]  There is an exception to the rule of Cleveland v. Ward which the mother seeks to invoke in this case. It has been held that the plaintiff in the first suit may be guilty of such inequitable conduct as will estop him from relying on that suit to abate a subsequent proceeding brought by his adversary.

V. D. Anderson Co. v. Young, 128 Tex. 631, 101 S.W.2d 798 (1937); Russell v. Taylor, 121 Tex. 450, 49 S.W.2d 733 (1932); Johnson v. Avery, 414 S.W.2d 441 (Tex.1966).

In those cases, answers were filed to the pleas in abatement in the subsequent proceedings alleging that the plaintiffs in the prior suits (1) had filed suit merely to obtain priority, without a bona fide intention to prosecute the suit, and (2) had prevented their adversaries from filing the subsequent suits more promptly by fraudulently representing that they would settle. This court held that those contentions alleged facts which, if established, would estop the plaintiff in the prior action from asserting his plea in abatement. The court in which subsequent suit was filed, having jurisdiction to pass on the plea in abatement addressed to it, had jurisdiction to determine the fact issues raised by the allegations of fraud. If that court overruled the plea in abatement, then it, the subsequent court, had dominant jurisdiction of the controversy unless and until its action in overruling the plea in abatement was reversed upon appeal.

[7] The mother contends that V. D. Anderson Co. v. Young controls the present case. She argues that relator's delay of twenty-six days, from January 18 to February 13, between filing suit in Bowie County and procuring issuance of citation indicated bad faith which should estop the father from relying on that suit to abate the mother's subsequent suit in Dallas County. We disagree. It is true that this court has held that a plea in abatement might properly be overruled where the party asserting it had delayed unreasonably in procuring a citation. Reed v. Reed, 158 Tex. 298, 311 S.W.2d 628 (1958). There, however, the period of delay was nearly fifteen months, and the second suit *268 was filed and citation served therein before citation issued in the first suit. In the present case, the father waited only twenty-six days before procuring citation; and the evidence shows that, during that time, he attempted to obtain a waiver of service. Significantly, also, the mother did not file her suit during the period of delay. Even if the father had not filed the Bowie County suit until February 13, when he took out a citation, it would still have had priority over the mother's suit which was not filed until February 15.

V. D. Anderson Co. v. Young and its progeny depend upon the existence of an issue of fact in connection with the plea in abatement. We hold here, as a matter of law, that there was no want of diligence shown on the part of the father sufficient to raise an issue of estoppel so as to defeat his plea in abatement.

[8] The mother further contends that the father waived his plea in abatement by the motions he filed in the Dallas court on February 22. We overrule this contention. The only issue raised in the father's motions, other than the pendency of a prior action, was that of venue. A plea of privilege contesting the venue did not waive a subsequent plea of prior action pending even when our rules required due order of pleading. Royal Petroleum Co. v. McCallum, 134 Tex. 543, 135 S.W.2d 958 (1940); Benson v. Fulmore, 269 S.W. 71 (Tex.Comm.App.1925, judgm't adopted).

[9] The mother points out that the father's original petition in the Bowie County suit was filed under the docket number of the 1971 divorce action. We hold that the docket number is irrelevant. Under the pre-Family Code law, the courts had continuing jurisdiction after final judgment to modify child support orders, but not child custody orders. Mistakes in filing under the wrong docket number were frequent. In that context, we have treated a petition which sets forth a cause of action within the jurisdiction of the court in which it is filed as effective to commence a new suit even though it was erroneously filed as a motion to modify judgment in a previous cause. Boney v. Boney, 458 S.W.2d 907 (Tex.1970); Ex parte Lillard, 159 Tex. 18, 314 S.W.2d 800 (1958). We apply the same rule here.

[10] [11] [12] The mother further asserts that venue properly lies in Dallas County under Texas Family Code s 11.04 because the legal residence of the children is in Dallas County where she now resides. This is also irrelevant. The Dallas court did not have jurisdiction to pass on the venue question in connection with a plea of prior action pending. The court which has dominant jurisdiction of the controversy, in this case the Bowie court, has exclusive jurisdiction to determine the venue question. Neal v. Texas Employers' Insurance Ass'n, 118 Tex. 236, 14 S.W.2d 793 (1929); Wheelis v. Wheelis, 226 S.W.2d 224 (Tex.Civ.App.1950, no writ history). If the mother objects to the venue, her remedy is to file a motion to transfer in the Bowie court. Texas Family Code s 11.06(a).

We hold that the Bowie court has dominant jurisdiction of the parent-child relationship with respect to the children involved in this suit. It was the clear duty of Judge Gibbs to sustain the plea in abatement and to dismiss the mother's suit.

Accordingly, the following writs shall issue:

(1) A writ of prohibition directing Judge Gibbs to take no further action with respect to Cause No. 74—2063—DR/3, styled 'In the Interest of Shawn Danelle Curtis and Shanna

Michelle **Curtis**,' pending in his court, except to dismiss the same, and

(2) a writ of mandamus directing Judge **Gibbs** to vacate any and all orders of his court which interfere with the exercise of

the jurisdiction of the 202nd District Court of Bowie County in this matter.

**All Citations**

511 S.W.2d 263

Footnotes

1    The statute is also carried as Vernon's Texas Code Annotated, Family Code s 11.05.
2    This provision is carried as a preamble to Title 2, in Vernon's Texas Family Code Annotated.

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Disapproved of by    Walker v. Packer,    Tex.,    February 19, 1992

116 Tex. 1
Supreme Court of **Texas**.

**CLEVELAND** et al.

v.

**WARD**, judge, et al.

(No. 4224.)    |    June 9, 1926.

Original application for mandamus by John L. **Cleveland** and others against Irwin T. **Ward**, Judge of the District Court of the Eighteenth Judicial District in and for Johnson county, and others. Writ granted.

See, also, 265 **S. W.** 732.

West Headnotes (36)

[]    **Mandamus**

   Entertaining and proceeding with cause

Supreme Court has power to require a district court or judge to proceed to trial and judgment, in view of Rev.St.1911, art. 1528 [Vernon's Ann.Civ.St. art. 1734].

Cases that cite this headnote

[2]    **Courts**

   Prohibition

Supreme Court, having power by mandamus to direct judge of district court to proceed to judgment, necessarily has correlative authority to make all other orders, including prohibition, to protect exercise of that power, in view of Vernon's Ann.St.Const. art. 5, § 3.

5 Cases that cite this headnote

[2]    **Courts**

   Injunction

Supreme Court, having power by mandamus to direct judge of district court to proceed to judgment, necessarily has correlative authority to make all other orders, including injunction, to protect exercise of that power, in view of Vernon's Ann.St.Const. art. 5, § 3.

3 Cases that cite this headnote

[3]    **Courts**

   Issuance of Prerogative or Remedial Writs

Power of Supreme Court to issue all writs necessary to enforce its jurisdiction exists, regardless of statutory omissions or declarations.

4 Cases that cite this headnote

[4]    **Mandamus**

   Successive writs or proceedings

That Court of Civil Appeals may have acted by mandamus on subject-matter of litigation does not preclude Supreme Court from exercising its power to require trial court to proceed with trial of the case, unimpeded by orders of any other court.

1 Cases that cite this headnote

[5]    **Mandamus**

   Remedy by Appeal or Writ of Error

Mandamus does not ordinarily issue when an adequate remedy by appeal exists.

1 Cases that cite this headnote

[6]    **Mandamus**

   Motions and orders in general

Where right of appeal from adverse order on pleas in abatement and injunction, the cause of another action pending, was inadequate, remedy of mandamus was not superseded (Vernon's Ann.Civ.St. art. 1734).

8 Cases that cite this headnote

[8]    **Courts**

   Mode of acquiring or exercising jurisdiction in general

District court, by filing of petition, acquired jurisdiction of suit for cancellation of notes secured by trust deed and removal of cloud on title. Vernon's Ann.Civ.St. arts. 1906, 1913, Rules of Civil Procedure, rule 22.

12 Cases that cite this headnote

[9]    Courts
⟜ In general; nature and source of judicial authority

"Jurisdiction" is power to hear and determine matter in controversy according to established rules of law, and to carry sentence or judgment of court into execution.

8 Cases that cite this headnote

[10]    Courts
⟜ Scope and Extent of Jurisdiction in General

Where jurisdiction of district court attached, it had power to permit pleading to be amended, new parties to be made, to determine all essential questions, and to do anything with reference thereto authorized by law. Rev.St.1911, arts. 1824, 1848, now Rules of Civil Procedure, rules 37, 60, 61, 63.

25 Cases that cite this headnote

[11]    Cancellation of Instruments
⟜ Parties

In suit to cancel notes secured by deed of trust, payees of notes and one claiming interest in some of notes or in land held either necessary or proper parties.

5 Cases that cite this headnote

[12]    Courts
⟜ Pendency and Scope of Prior Proceeding

Jurisdiction having attached on filing of suit in district court, it could not be taken away or arrested by subsequent proceedings in another court.

9 Cases that cite this headnote

[13]    Courts
⟜ Pendency and Scope of Prior Proceeding

District Court first acquiring jurisdiction of suit might exercise it to dispose of whole subject-matter of litigation.

54 Cases that cite this headnote

[14]    Judgment
⟜ Defenses which might have been urged in former action

Valid judgment for plaintiff is conclusive, not only as to defenses which were set up and adjudicated, but as to those which might have been raised.

4 Cases that cite this headnote

[15]    Abatement and Revival
⟜ Court of same state

Suit to cancel notes secured by deed of trust brought in Johnson county court held to abate subsequent suit on same notes and to foreclose same deed of trust in Dallas county court, where judgment of Johnson county court would be res judicata as against any judgment that Dallas county court might render.

35 Cases that cite this headnote

[16]    Courts
⟜ Acts and proceedings without jurisdiction

Judicial action without jurisdiction is void.

4 Cases that cite this headnote

[17]    Courts
⟜ Pendency and Scope of Prior Proceeding

Judgment or order of court subsequently acquiring jurisdiction is void, so far as it conflicts with any judgment or order of court first acquiring jurisdiction.

3 Cases that cite this headnote

[18]    Courts

⟲ Injunction or Prohibition Against Proceedings

Injunction granted by judge of one district court *held* void in so far as it attempted to enjoin a judge of another district court of co-ordinate power and jurisdiction.

6 Cases that cite this headnote

[19]    **Courts**

⟲ Injunction or Prohibition Against Proceedings

Where district court had jurisdiction of subject-matter of suit to cancel notes secured by deed of trust, and was entitled to proceed to judgment, it could issue temporary injunction restraining defendants from prosecuting identical suit in another jurisdiction.

27 Cases that cite this headnote

[20]    **Courts**

⟲ Appellate or Supreme Courts

Where district court had jurisdiction to restrain defendants from prosecuting a similar suit in another jurisdiction, exclusive remedy for relief therefrom through any Court of Civil Appeals was by special statutory method of appeal to Court of Civil Appeals for district in which court was located, in view of Vernon's Ann.Civ.St. arts. 1819, 2251, 4662, which court had full power, in view of Vernon's Ann.St.Const. art. 5, § 6, and Vernon's Ann.Civ.St. art. 1823, to protect interests of defendants.

1 Cases that cite this headnote

[21]    **Courts**

⟲ Vacating or annulling decisions

Where remedy by appeal to Court of Civil Appeals of district wherein district court restraining defendants from prosecuting similar suit in another jurisdiction was located, was exclusive, no other court could set aside such injunction.

3 Cases that cite this headnote

[22]    **Prohibition**

⟲ Notice or rule to show cause

Writ of prohibition, issued without notice to interested parties, held void (Vernon's Ann.Civ.St. art. 2328).

Cases that cite this headnote

[23]    **Mandamus**

⟲ Entertaining and proceeding with cause

Writ of mandamus to compel district judge to proceed with trial of cause held void for want of jurisdiction, where suit had been abated by suit in another jurisdiction.

8 Cases that cite this headnote

[24]    **Mandamus**

⟲ Entertaining and proceeding with cause

While Courts of Civil Appeals can require district judge to proceed to trial and judgment under Vernon's Ann.Civ.St. art. 1824, writ of mandamus can rightly issue only when judge improperly refuses to act on a matter within his jurisdiction.

10 Cases that cite this headnote

[25]    **Courts**

⟲ Acts and proceedings without jurisdiction

Where Court of Civil Appeals had no jurisdiction to award writs of mandamus or prohibition, its orders doing so were void.

Cases that cite this headnote

[26]    **Mandamus**

⟲ Conflict or interference with other proceeding

Mandamus will not lie to an inferior court where proceedings therein have been enjoined.

Cases that cite this headnote

[27]    **Courts**

⟲ Pendency and Scope of Prior Proceeding

Court of Civil Appeals *held* without jurisdiction of mandamus to compel district judge to proceed with trial of cause under Vernon's Ann.Civ.St. arts. 1823, 1824, where plaintiffs therein had been enjoined from prosecuting suit by district judge of another jurisdiction, since exercise of such power would necessarily conflict with right of review confided to another Court of Civil Appeals.

16 Cases that cite this headnote

**[28]** **Courts**

&#9758; Vacating or annulling decisions

Courts of Civil Appeals cannot vacate an order made by another or review causes confided to another, unless upon transfer. Vernon's Ann.St.Const. art. 5, § 6; Vernon's Ann.Civ.St. art. 1819.

1 Cases that cite this headnote

**[29]** **Injunction**

&#9758; Actions or Proceedings in Other Courts

District judge held without jurisdiction to restrain defendants from proceeding with trial of similar cause in another jurisdiction, where suit in his court had been abated, and he had no jurisdiction to exercise or protect.

5 Cases that cite this headnote

**[32]** **Mandamus**

&#9758; Mandamus to review proceedings

Remedy for relief against mandamus order of Court of Civil Appeals, an injunction of district judge restraining defendants therein from prosecuting similar suit in another jurisdiction, was by application for mandamus to Supreme Court (Vernon's Ann.Civ.St. arts. 1733, 1734).

2 Cases that cite this headnote

**[33]** **Injunction**

&#9758; Illegality or invalidity of injunction

Contempt proceedings in Court of Civil Appeals, which were predicated on a void injunction issued by district judge, held void.

1 Cases that cite this headnote

**[32]** **Courts**

&#9758; Vacating or annulling decisions

Writs of mandamus and prohibition, issued by Court of Civil Appeals, *held* void, where direct effect of their issuance was to adjudicate validity of judgments and orders of Court of Civil Appeals of another jurisdiction.

1 Cases that cite this headnote

**[33]** **Mandamus**

&#9758; Remedy by Appeal or Writ of Error

Remedy by appeal to supersede right to resort to mandamus must be adequate and equally effective (Vernon's Ann.Civ.St. art. 1734).

7 Cases that cite this headnote

**[34]** **Prohibition**

&#9758; Notice or rule to show cause

Writs of mandamus and prohibition held void, where issued upon an ex parte hearing without notice to any party except judge against whom writ of mandamus was sought (Vernon's Ann.Civ.St. art. 2328).

Cases that cite this headnote

**[35]** **Mandamus**

&#9758; Notice or rule to show cause

Writ of mandamus issued without notice to interested parties, held void (Vernon's Ann.Civ.St. art. 2328).

1 Cases that cite this headnote

**[36]** **Mandamus**

&#9758; Notice or rule to show cause

Writ of mandamus held void, where issued upon an ex parte hearing without notice to any party except judge against whom writ of mandamus was sought (Vernon's Ann.Civ.St. art. 2328).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*1065** *2 Thomas, Frank, Milam & Touchstone, of Dallas, Spell, Naman & Penland, of Waco, and Keith & Prestridge, of Cleburne, for relators.

J. W. Hassell, C. F. O'Donnell, and Chas A. Rasbury, all of Dallas, for respondent Judges of Court of Civil Appeals.

*4 Rosser J. Coke, of Dallas, Thos. G. Murname and Warren & Russell, all of Cleburne, and Coke & Coke, of Dallas, for other respondents.

## *8 Statement of the Case.

CURETON, C. J.

This controversy is before us on an original application for mandamus by John L. Cleveland, Annie H. Cleveland, T. K. Cleveland, and George Cleveland, against Hon. Irwin T. Ward, judge of the Eighteenth judicial district, composed of Johnson and other counties, the Home National Bank of Cleburne, Tex., James B. Long and W. T. Whaley, of Johnson county, and the American Exchange National Bank of Dallas. The relators pray for writ of mandamus against Judge Ward, requiring him to proceed with the trial of a certain cause in his court in Johnson county, no. 12207, styled John L. Cleveland et al. v. Home National Bank et al. They also pray for writs of prohibition against Judge Louis Wilson, judge of the Forty-Fourth district court at Dallas and the judges of the Court of Civil Appeals at Dallas, prohibiting and restraining the judges named and the courts presided over by them from enforcing certain orders hereafter named, and from punishing the relators for disobedience thereof, and restraining Judge Wilson from trying a case pending in his court in Dallas county, being No. 52470B, **1066 styled Home National Bank of Cleburne v. John L. Cleveland et al. Prayer is also made for prohibitive and restraining orders against the attorneys for the respondent private parties.

The long train of events leading up to this proceeding will be stated in its chronological order, and with as much brevity as the record permits.

The controversy involves a suit between the parties in the district court of Johnson county, another in the district court of Dallas county, an original and one appellate proceeding in the Court of Civil Appeals at Dallas, as well as a contempt hearing and order in that court, an original proceeding in the Court of Civil Appeals at Fort Worth, and various orders, injunctions, writs of mandamus, and prohibition, issued by these several courts, each in aid of its own jurisdiction, but in serious conflict with the jurisdiction asserted by the other courts involved. So it may be said that in one proceeding here we are called upon to dispose of five cases pending in four different courts, involving many orders and numerous and intricate conflicts of power; and of necessity this opinion must be of greater length than is ordinarily desirable.

On June 18, 1924, John L. Cleveland and wife, Annie H. Cleveland, relators here, filed a suit in the district court of Johnson *9 county against the Home National Bank of Cleburne, one of the respondents in the present action. The object of the suit was the cancellation of certain notes, renewals thereof, the deed of trust securing them, and the removal of the cloud cast thereby on the land described in the trust deed.

June 24th, six days after the filing of the suit just described, the Home National Bank, the defendant therein, joined by Joseph B. Long and W. S. Whaley, filed suit in the district court of Dallas county against John L. Cleveland and wife, Annie H. Cleveland, plaintiffs in the Johnson county suit, and also against George Cleveland and T. K. Cleveland. The object of this, the Dallas county suit, was to recover judgment on the identical promissory notes and to foreclose on the same deed of trust lien for the cancellation of which John L. Cleveland and wife had previously county. Citation properly issued of Johnson county. Citation properly issued in both suits.

July 20, 1924, all the Clevelands filed a plea in abatement in the Dallas county suit, setting up the pendency of the Johnson county suit at the time of the filing of the Dallas county case, stating that the issues and the real parties at interest in the two cases were the same.

On the 30th of July, 1924, upon an ex parte application made by the Home National Bank and Whaley and Long, the Dallas county district judge appointed a receiver to collect and hold the rents from the properties covered by the lien in controversy. This receiver qualified, and is now acting in that capacity.

September 24, 1924, John L.Cleveland and Annie H. Cleveland, original plaintiffs in the Johnson county case, filed in that case their first amended original petition, wherein they, as well as T. K. and George Cleveland, were named as plaintiffs, and, in addition to the Home National Bank,

W. S. Whaley, Joseph B. Long, and the American Exchange National Bank were named as defendants. Citation issued to the additional defendants. To state fully the contents of this pleading would unnecessarily prolong this opinion. Among other things, it showed the origin of the notes and deed of trust for the cancellation of which the Johnson county suit had been brought, and for the collection and enforcement of which the Dallas county suit was filed.

In the course of the transaction complained of, seven notes were executed by John l. Cleveland, three for $4,000 each, payable to the Home National Bank, and four to Joseph B. Long and W. S. Whaley, payable at the Home National Bank, aggregating $11,000. There were also four notes aggregating approximately $5,900, payable to the order of Joseph B. Long and W. S. *10 Whaley, signed by George Cleveland, and indorsed by John L. Cleveland, and one note payable to the Home National Bank for $1,616, signed by T. L. Cleveland and indorsed by John L. Cleveland. Allegations of fraud were made against the bank and Long and Whaley, by reason of which it was said that the deed of trust became void, etc. It was stated in this amended petition that prior to the filing thereof Annie H. Cleveland and John l. Cleveland had conveyed the lands and properties involved to George Cleveland, but that in truth and in fact the property really belonged to Annie H. Cleveland, subject to certain rights held by George Cleveland. The pleading also alleged that the American Exchange National Bank was claiming some interest in the property, or was in some way holding some of the notes involved in the controversy. The prayer was for rescission and cancellation of the instruments involed in this litigation.

On October 12, 1924, the plaintiffs in the Johnson county case obtained an ex parte injunction from the Honorable Irwin T. Ward, district judge of that county, enjoining the Honorable Louis Wilson, the district judge of Dallas county, the Home National Bank, Joseph B. Long, and W. S. Whaley, from proceeding further in the Dallas county case, except to enter an order of dismissal, until further orders of the Johnson county district court. The application was based upon allegations that the Johnson county court had first acquired jurisdiction of the parties and subject-matter of both suits, and was entitled to go to judgment thereon.

**1067 On October 13, 1924, the parties appeared in the Dallas county district court, the plea in abatement filed theretofore by the four Clevelands on July 20th was heard, and on October 14th determined adversely to them by Judge Wilson. Thereafter on the same day the injunction issued

on October 12th by the distrct judge of Johnson county was served on Judge Wilson, and on the 15th on Whaley, Long, and the Home National Bank.

On October 14, 1924, appearance day for the district court of Johnson county, all parties defendant answered, some moved to quash citations, and the bank moved for a continuance. The defendants called for a jury, and the court set the case regularly for trial on Monday, October 20th, at 9 o'clock a. m.

On October 18th the plaintiffs in the Johnson county case filed therein, under leave of the court, their second amended petition, setting forth more fully the grounds for avoidance and cancellation of the deed of trust, etc.

On this same date, Saturday, October 18th, Home National Bank of Cleburne, Whaley, and Long, filed a petition for writs of *11 mandamus and prohibition in the Court of Civil Appeals for the Fifth District at Dallas, in which they complained of the Honorable Irwin T. Ward, judge of the Cleburne district court, the four Clevelands, and their attorneys, naming them, and the Honorable Louis Wilson, judge of the Forty-Fourth district court at Dallas. The prayer was for a mandamus directing Judge Wilson to proceed with the trial of the Dallas county suit, and that a writ of prohibition or mandamus be issued against Judge Ward, the four Clevelands, their agents and attorneys, etc., prohibiting them from taking any action in the Johnson county case, etc.

Judge Wilson appeared by answer, but as to all others the hearing in the Court of Civil Appeals at Dallas was purely ex parte, and the writs of mandamus and prohibition were awarded.

The court afterwards modified this order, but just when is not clear to us from the record, nor is the matter of any consequence. By the modified order, Judge Wilson was directed 'to proceed to trial and judgment, or to enter such preliminary or dilatory orders within the judicial discretion of said court, agreeably to the principles and usages of law.' In order 'to effectuate this order and judgment of the court' a writ of prohibition was granted prohibiting Judge Ward form holding Judge Wilson accountable for proceeding in the Dallas county case, in disregard of the injunction previously issued by Judge Ward. See the opinion of the Court of Civil Appeals for full description of the final order. Home National Bank v. Wilson, 265 S. W. 732, 734.

On the day the above-described petition for mandamus and prohibition was presented to the Court of Civil Appeals, and we presume after the mandamus and writ had been

awarded, the Home National Bank, Long, and Whaley, upon application without notice obtained from the Dallas county district court a temporary writ of injunction, enjoining the Clevelands and their attorneys from proceeding to trial in the Johnson county case, which was served on the Clevelands late at night October 18th and on their attorneys on October 20th.

At 8:30 on the morning of October 20, 1924, the four Clevelands and their attorneys filed an application for mandamus and prohibition in the Court of Civil Appeals for the Second District at Fort Worth, in which Judge Ward of the Johnson county court, the Home National Bank, Whaley, Long, the American Exchange National Bank, and Judge Wilson of the Dallas district court were made parties.

At 11:30 o'clock on that morning, that court, evidently *12 on an ex parte hearing, granted the writs of mandamus and prohibition, directiong Judge Ward to proceed to trial with the Johnson county case, and prohibiting Judge Wilson and the other parties just named from in any manner holding the Clevelands or their attorneys accountable for proceeding to try the Johnson county case in disregard of the injunction issued by Judge Wilson.

Prior to this time, at 9:45 on the morning of October 20th, the four Clevelands filed a transcript of the proceedings on the application for injunction by the other parties in the district court of Dallas county in the Court of Civil Appeals at Dallas, showing an appeal from the injunction previously issued by Judge Wilson.

At about 10 o'clock on the same day the four Clevelands and their attorneys and Judge Irwin T. Ward filed in the Court of Civil Appeals at Dallas a motion to abate the writ of mandamus theretofore issued by that court. One of the grounds of the motion was that the writ was issued upon an ex parte hearing without notice, in violation of Revised Statutes 1925, art. 2328. Another ground was that the Court of Civil Appeals had no jurisdiction to hear the application and grant the writs, because that would necessarily involve a review and adjudication of the injunction theretofore issued by the district court of Johnson county, over which the Court of Civil Appeals at Dallas had no jurisdiction.

We have stated that the Court of Civil Appeals at Dallas modified its original order for mandamus and prohibition, but whether in response to this motion we are unable to say, nor is the matter important here.

At about 1:30 o'clock in the afternoon on October 20th, after the issuance of the writ of mandamus and prohibition by the Court of Civil Appeals at Fort Worth, Judge Ward called the Johnson county case for trial. The trial was proceeding when the attorneys **1068 for the Clevelands learned that the Court of Civil Appeals at Dallas had issued an order for them to appear at 4 p. m. that afternoon and show cause why they and their clients, the Clevelands, should not be punished for contempt. Whereupon Judge Ward adjourned court until 9 o'clock October 22d, so that said parties might present themselves in response to that order.

The order to show cause was issued upon an application by the Home National Bank, Whaley, and Long, against the Clevelands and their attorneys, hearing had, and judgment entered as hereafter stated.

*13 Upon this voluminous and intricate record, which we have attempted to outline, Judge Ward, judge of the district court of Johnson county, refused to proceed further in the trial of the Johnson county case. Prayer is made for a mandamus commanding him to proceed to trial in that case, and for necessary writs of prohibition, etc.

## Opinion.

Without discussing in detail all the questions presented, we have concluded that we have power to issue the mandamus and corelative writs, and that we ought to issue them, or make such orders as will accomplish the same purpose. The reasons which impel us to this conclusion will now be stated.

[][1][] That this court has power by mandamus to require a district judge or court to proceed to trial and judgment is settled by the Constitution, statutes, and decisions. Revised Statutes 1925, art. 1734; Yett v. Cook (Tex. Sup.) 268 S. W. 715; Aycock v. Clark, 94 Tex. 375, 60 S. W. 665; Burgemeister v. Anderson, 113 Tex. 495, 259 S. W. 1078.

[2] Having the power to issue the writ of mandamus direction Judge Ward to proceed to judgment, we necessarily have the corelative authority to make all other orders, including those for prohibition and injunction, to protect and make efficacious the exercise of that power by us. State Constitution, art. 5, s 3; Hovey v. Shepherd, 105 Tex. 237, 147 S. W. 224; City of Houston v. City of Palestine, 114 Tex. 306, 267 S. W. 663; Wells v. Littlefield, 62 Tex. 30, 31.

[3] This power to issue all writs necessary to enforce our jurisdiction finds its sanction in the Constitution, and exists,

regardless of statutory omissions or declarations. 15 Corpus Juris, p. 858, s 181c; 7 Ruling Case Law, pp. 1033, 1034, ss 62, 63; Milam County Oil Mill Co. v. Bass, 106 Tex. 260, 163 S. W. 577; Taylor v. Hulett, 15 Idaho, 265, 97 P. 37, 19 L. R. A. (N. S.) 535; State v. Assurance Co., 251 Mo. 278, 158 S. W. 640, 46 L. R. A. (N. S.) 955, Ann. Cas. 1915A, 247; Root v. Woolworth, 150 U. S. 401, 14 S. Ct. 136, 37 L. Ed. 1123, 1126; Campbell Lumber Co. v. River Logging Co., 68 Wash. 431, 123 P. 596; 15 Corpus Juris, p. 810, s 108(3), page 815, s 112, and cases in the notes.

[4]　The fact that the Court of Civil Appeals may have acted on the subject-matter of this litigation is no reason why this court should not exercise its power to require the trial court to proceed with the trial of this case, unimpeded by orders of any other court. Yett v. Cook (Tex. Sup.) 268 S. W. 715, 721; *14 G. C. & S. F. Ry. Co. v. Nuse, 109 Tex. 352, 363, 207 S. W. 897, 4 A. L. R. 613.

[5]　[6]　[7] We recognize the rule that mandamus does not ordinarily issue when an adequate remedy by appeal exists. In this case, however, no appeal was possible from the action of Judge Ward in refusing to go forward with the trial in his court. The right of appeal from the adverse order on the pleas in abatement and the injunction in the Dallas district court is inadequate and not commensurate with the relief to which the relators here are entitled; so that right of appeal cannot supersede the remedy of mandamus provided by statute. To supersede the remedy by mandamus authorized by the organic law, and specially provided by statute (Vernon's Ann. Civ. St. 1925, art. 1734), there must exist, not only a remedy by appeal, but the appeal provided for must be competent to afford relief on the very subjectmatter of the application, equally convenient, beneficial, and effective as mandamus. G. C. & S. F. Ry. Co. v. Muse, 109 Tex. 352, 362, 207 S. W. 897, 4 A. L. R. 613; Spelling on Extraordinary Relief, vol. 2, s 1375; Eureka Pipe Line Co. v. Riggs, 75 W. Va. 353, 83 S. E. 1020, Ann. Cas. 1918A, 995, 996; 38 Corpus Juris, p. 561, s (32) 2; High on Extraordinary Legal Remedies (2d Ed.) s 17; Terrell v. Greene, 88 Tex. 539, 31 S. W. 631; International Water Co. v. El Paso, 51 Tex. Civ. App. 321, 112 S. W. 816; St. Louis, etc., Ry. Co. v. Smith (Tex. Civ. App.) 99 S. W. 171; Gaines v. Rugg, 148 U. S. 228, 243, 13 S. Ct. 611, 37 L. Ed. 432.

Mr. Spelling correctly states the rule as follows:

'In order that the existence of another remedy shall constitute a bar to relief by mandamus, such other remedy must not only be an adequate remedy in the general sense of the term, but it must be specific and appropriate to the circumstances of the particular case. It must be such a remedy as is calculated to afford relief upon the very subject of the controversy. For, if it is not adequate to afford the party aggrieved the particular right which the law accords him, mandamus will lie, notwithstanding the existence of such other remedy. * * *

'The remedy at law which will operate as a bar to mandamus must generally be such a remedy as will enforce a right or the performance of a duty. A remedy cannot be said to be fully adequate to meet the justice and necessities of a case, unless it reaches the end intended and actually compels a performance *15 of the duty in question, and is not an adequate remedy within the meaning of the rule under consideration. * * *

'The controlling question is not, 'Has the party a remedy at law?' but 'Is that remedy fully **1069 commensurate with the necessities and rights of the party under all the circumstances of the particular case?' Or, as was said in one case, 'To supersede the remedy by mandamus, the party must not only have a specific remedy, but one competent to afford relief upon the very subjectmatter of his application, and one which is equally convenient, beneficial, and effective as the proceeding by mandamus.' * * *

'The court will interfere by mandamus in a proper case, notwithstanding the fact that the form and method of proceeding by mandamus are such as to prevent the judgment of the court from being revised by writ of error.'

Certainly if there was ever a case which calls for action by this court, this is the case. The record presents an instance of judicial stalemate without parallel in the history of the jurisprudence of this state, and perhaps of any other state. The two cases pending are between identically the same parties, except the Johnson county case has one additional, apparently necessary, defendant. They involve the same subject-matter, identically the same transactions, and the relief in one would be res adjudicata as to the relief prayed for in the other suit. The parties plaintiff in the Johnson county case cannot proceed in that case without violating an injunction issued by the district court of Dallas county; the judge cannot proceed without violating a writ of prohibition issued by the Court of Civil Appeals at Dallas, nor refuse to proceed without violating a mandamus issued by the Court of Civil Appeals at Fort Worth. The Dallas county district court cannot proceed to try that case, nor can the plaintiffs in the case proceed with it without violating an injunction of the district court of Johnson county; and the judge of the Dallas county district

court cannot proceed without violating a writ of prohibition issued by the Fort Worth Court of Civil Appeals, nor refuse to proceed without violating a mandamus issued by the Court of Civil Appeals at Dallas. It is impossible for either of the trial courts or any litigant to do anything in the causes pending in the respective trial courts without being in danger of contempt, either of a trial court, of a Court of Civil Appeals, or both. The relief which might be granted in any appeal of the defendants in the Dallas county *16 case to the Court of Civil Appeals at Dallas is wholly inadequate to grant any substantial relief to any one, or untangle the instant judicial troubles.

Further discussion is unnecessary. It is plainly our duty, in the exercise of an undoubted power, to take jurisdiction of this case. It is obvious that the Johnson county suit, the first filed, is an equitable one, and the rights of the parties to be determined herein will be discussed in the light of that fact. Pomeroy's Equity-Jurisprudence (2d Ed.) Vol. 5, s 2105; Story's Equity Jurisprudence, vol. 2, ss 931, 937; Black on Rescission and Cancellation, vol. 1, s 20.

[8]     Regardless of the question as to whether the original petition was sufficient in all respects against demurrer, its subject-matter was within the jurisdiction of the district court of Johnson county, and that court, by the filing of the petition, acquired jurisdiction of the suit. Revised Statutes 1925, arts. 1906, 1913, 1971; Corpus Juris, vol. 15, p. 797, ss 92, 94, page 822, s 134, page 733, s 32; Moore v. Perry, 13 Tex. Civ. App. 204, 35 S. W. 838, 841; Chivers v. Board of County Com., 62 Okl. 2, 161 P. 822, L. R. A. 1917B, 1296, 1300.

[9]     Jurisdiction is power to hear and determine the matter in controversy according to established rules of law, and to carry the sentence or judgment of the court into execution. Banton v. Wilson, 4 Tex. 400, 402; Withers v. Patterson, 27 Tex. 491, 496, 86 Am. Dec. 643; Templeton v. Ferguson, 89 Tex. 47, 54, 33 S. W. 329; G., T. & W. Ry. Co. v. Lunn (Tex. Civ. App.) 141 S. W. 538, 541; Corpus Juris, vol. 15, pp. 723 to 726; Swift & Co. v. Memphis Cold Storage Warehouse Co., 128 Tenn. 82, 158 S. W. 480, 485.

[10]     When suit was filed in the Johnson county district court, the jurisdiction of that court attached, with power on the part of the court to permit the pleadings to be amended and amplified, new parties to be made, to determine all essential questions, and to do any and all things with reference thereto authorized by the Constitution and statutes, or permitted district courts under established principles of law, 31 Cyc. pp. 360, 361, 365, 367, 470, 396; Revised Statutes 1911, arts. 1824, 1848; Rev. St. 1925, arts. 2001, 1998, 1992; Reagan v.

Copeland, 78 Tex. 551, 14 S. W. 1031; Jolley v. Oliver (Tex. Civ. App.) 106 S. W. 1152; I. & G. N. Ry. Co. v. Howell (Tex. Civ. App.) 105 S. W. 560; Hartford Fire Ins. Co. v. City of Houston (Tex. Civ. App.) 110 S. W. 973; Id., 102 Tex. 317, 116 S. W. 36; *17 Latham v. Tombs, 32 Tex. Civ. App. 270, 73 S. W. 1060; Taylor v. Hulett, 15 Idaho, 265, 97 P. 37, 19 L. R. A. (N. S.) 535, 539; 15 Corpus Juris, p. 810; Lanes v. Squyres, 45 Tex. 382; Jolley v. Oliver, supra; Foster v. Wright (Tex. Civ. App.) 217 S. W. 1091, 1092. See, also, Benson v. Fulmore (Tex. Com. App.) 269 S. W. 71; Bailey v. Fly, 97 Tex. 425, 79 S. W. 299; Reed v. Harris, 37 Tex. 167; Connoly v. Hammond, 58 Tex. 11; McDannell v. Cherry, 64 Tex. 177; Foster v. Wright (Tex. Civ. App.) 217 S. W. 1090, 1092.

[11]     It is too plain for argument that Whaley, Long, T. K. and George Cleveland, and the American Exchange National Bank, were all either necessary or proper parties to the suit filed in Johnson county. Story's Equity Jurisprudence (14th Ed.) vol. 3, s 1981; Black on Rescission and Cancellation, vol. 2, ss 657, 658, 659, 661; Corpus Juris, vol. 21 (subject 'Equity') ss 253, 255, 256, 276, 282, volume 9, p. 1125 (subject 'Cancellation of Instruments'), ss 126 to 139; 4 Ruling Case **1070 Law, p. 517, s 29; Business Men's Oil Co. v. Priddy (Tex. Com. App.) 250 S. W. 156, 158; Hurst v. Knight (Tex. Civ. App.) 164 S. W. 1072; American Cotton Co. v. Collier, 30 Tex. Civ. App. 105, 69 S. W. 1021 (writ refused); Jones v. Nix (Tex. Civ. App.) 174 S. W. 685; Perkins v. Terrell (Tex. Civ. App.) 214 S. W. 551 (writ refused); McKay v. Phillips (Tex. Civ. App.) 220 S. W. 176.

The district court of Johnson county, then, in permitting the pleadings in that court to be amended so as to bring in parties interested in and to be affected by the decree sought, acted clearly within its express statutory jurisdiction and power to permit additional parties to be made 'when they are necessary or proper parties to the suit.'

The case therefore stands in that court, in so far as any jurisdictional question is concerned, precisely upon the same basis as if the original pleading filed had embraced fully the declarations of the last amendment, and had made all of those who are now parties to the suit parties in the first instance.

[12]     Since jurisdiction attached upon filing the suit in Johnson county, the rule is elementary that it could not be taken away or arrested by the subsequent proceedings in another court. Corpus Juris, vol. 15, p. 822, s 135, pages 1134 to 1138, s 583, pages 1161, 1162, 1163, s 637; Palestine Water & P. Co. v. City of Palestine, 91 Tex. 540, 44 S. W. 814, 40 L. R. A. 203; Riesner v. Gulf, etc., R. Co., 89 Tex. 656, 36 S. W.

53, 33 L. R. A. 171, 59 Am. St. Rep. 84; Waters-Pierce Oil Co. v. State, 47 Tex. Civ. App. 162, 103 S. W. 836; Arthur v. Batte, 42 Tex. 159; Burdett v. State, 9 Tex. 43, 44; Goggan & Bros. v. Morrison (Tex. Civ. App.) 163 S. W. 119, 120, and cases there cited; Neill v. Johnson (Tex Civ. App.) 234 S. W. 147, 150; State ex rel. Sullivan v. Reynolds, 209 Mo. 161, 107 S. W. 487, 15 L. R. A. (N. S.) 963, 970, 123 Am. St. Rep. 468, 14 Ann. Cas. 198; 7 Ruling Case Law, p. 1067, s 105; *18 State ex rel. Parsons Mining Co. v. McClure, 17 N. M. 694, 133 P. 1063, 47 L. R. A. (N. S.) 744, Ann. Cas. 1915B, 1110; Phelps v. Mutual Reserve Fund Life Ass'n, 112 F. 453, 50 C. C. A. 339, 61 L. R. A. 717; Beardslee v. Ingraham, 183 N. Y. 411, 76 N. E. 476, 3 L. R. A. (N. S.) 1073.

[13]    The Johnson county court, having first acquired jurisdiction, may exercise it to dispose of the whole subject-matter of the litigation and adjust all the equities between the parties, and is entitled to do so. Black on Rescission and Cancellation, vol. 2, s 689; Corpus Juris, vol. 15, p. 810, s 107, volume 21, p. 134, s 117, page 137, s 118, volume 9, p. 1260, s 202; Story's Equity Jurisprudence, vol. 3, s 1981; Chambers v. Cannon, 62 Tex. 293, 294; Pioneer Savings & Loan Co. v. Peck, 20 Tex. Civ. App. 111, 49 S. W. 160, 169 (writ refused).

The causes of action in the two conflicting trial courts involve the same transaction and the same state of facts. That the two cases present in substance and effect the same cause of action we do not think debatable. A recovery in the Johnson county case canceling the notes and deed of trust involved would necessarily be res adjudicata as against the cause of action asserted on these notes and deed of trust by the respondents herein as plaintiffs in the Dallas county suit. 34 Corpus Juris, pp. 750, 752, ss 1162, 1163, page 802, s 1225, page 805, s 1226. See, also, 34 Corpus Juris, p. 854, s 1266, page 856, s 1267, page 818, s 1236; Black on Rescission and Cancellation, vol. 2, s 704; and authorities cited below.

It is true the Johnson county suit is for the cancellation of the instruments involved, while the Dallas county case is for recovery on them. However, such defenses as the defendants in the Johnson county case have to the suit for cancellation they may there assert. They must there assert the validity of the notes and deed of turst involved or be barred.

[14]    The rule that a valid judgment for plaintiff is conclusive, not only as to defenses which were set up and adjudicated, but as to those which might have been raised inconsistent with the facts necessary to sustain the judgment, is one of universal acceptance. Authorities supra; Goggan &

Bros. v. Morrison (Tex. Civ. App.) 163 S. W. 119; Camp v. First Nat. Bank of Alpine (Tex. Civ. App.) 195 S. W. 217; Sparks v. National Bank of Commerce (Tex. Civ. App.) 168 S. W. 48; Foster v. Wells, 4 Tex. 101, 103; Freeman v. McAninch, 87 Tex. 132, 27 W. W. 97, 47 Am. St. Rep. 79; Nichols v. Dibrell, 61 Tex. 539; Peden Iron & Steel Co. v. El Campo Rice Milling Co. (Tex. Civ. App.) 251 S. W. 543; Deaton v. So. Irr. Co. (Tex. Civ. App.) 144 S. W. 294; Thompson v. Lester, 75 Tex. 521, 14 S. W. 20; 34 Corpus Juris, p. 854, s 1266, *19 page 856, s 1267; Freeman on Judgments (5th Ed.) vol. 2, ss 674, 688, 692, 693, 774, 787.

[15]    Since the Johnson county court is a court of competent jurisdiction, and first acquired jurisdiction of this controversy, has all the necessary parties before it, and is entitled to proceed to judgment, and since it is evident that all questions necessarily or properly involved will be settled in that case, and that its judgment will be res adjudicata as against any judgment the Dallas county court might render, it follows that the Dallas county case is abated by the Johnson county suit. Authorities supra; Benson v. Fulmore (Tex. Com. App.) 269 S. W. 71; Long v. Long (Tex. Civ. App.) 269 S. W. 207, and cases cited therein; Goggan & Bros. v. Vorrison (Tex. Civ. App.) 163 S. W. 120; Miller & Vidor Lbr. Co. v. Williamson (Tex. Civ. App.) 164 S. W. 440 (writ refused); Sparks v. National Bank (Tex. Civ. App.) 168 S. W. 48; Camp v. National Bank (Tex. Civ. App.) 195 S. W. 217; **1071 State v. Reynolds, 209 Mo. 161, 107 S. W. 487, 15 L. R. A. (N. S.) 963, 967, 123 Am. St. Rep. 468, 14 Ann. Cas. 198.

The reason of the abatement of the subsequent suit by the first, where the latter is filed in a court of competent jurisdiction, and that jurisdiction has attached, is that, when the suit is brought, it is thereby segregated as it were from the general class to which it belonged, and withdrawn from the authority and jurisdiction of all other courts of coordinate power. Authorities supra; State v. Reynolds, 15 L. R. A. (N. S.) 963, 967; 7 Ruling Case Law, p. 1067, s 105; Peck v. Jenness, 7 How. 612, 624, 12 L. Ed. 841; French v. Hay, 22 Wall. 250, 253, 22 L. Ed. 857; Freeman on Judgments (5th Ed.) vol. 1, pp. 672, 673, s 335; Burdett v. State, 9 Tex. 43, 44; Maclean v. Speed, 52 Mich. 258, 18 N. W. 396.

In the case of Peck v. Jenness, just cited, the Supreme Court of the United States said:

'It is a doctrine of law too long established to require a citation of authorities, that, where a court has jurisdiction, it has a right to decide every question which occurs in the cause, and, whether its decision be correct or otherwise, its judgment, till

reversed, is regarded as binding in every other court; and that, where the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested or taken away by proceedings in another court. These rules have their foundation, not merely in comity, but on necessity. For, if one may enjoin, the other may retort by injunction, and thus the parties be without remedy; being liable to a process for contempt in one, if they dare to proceed in the other.' (Italics ours.)

*20 In the French Case, that court also declared:

> 'Having the possession and jurisdiction of the case, that jurisdiction embraced everything in the case, and every question arising which could be determined in it until it reached its termination and the jurisdiction was exhausted. While the jurisdiction lasted it was exclusive, and could not be trenched upon by any other tribunal.'

In the case of Maclean v. Speed, supra, Chief Justice Cooley declared the rule, which has become a familiar text, as follows:

'It is a familiar principle that, when a court of competent jurisdiction has become possessed of a case, its authority continues, subject only to the appellate authority, until the matter is finally and completely disposed of; and no court of co-ordinate authority is at liberty to interfere with its action. The principle is essential to the proper and orderly administration of the laws; and while its observance might be required on the grounds of judicial comity and courtesy, it does not rest upon such considerations exclusively, but is enforced to prevent unseemly, expensive, and dangerous conflicts of jurisdiction and of process. If interference may come from one side, it may from the other also, and what is begun may be reciprocated indefinitely.' (Italics ours.)

The Supreme Court of Missouri, in the case of Sullivan v. Reynolds, cited above, correctly declared the law as follows: 'As each cause of action arises, and when suit is brought thereon in a court of competent jurisdiction, it is thereby segregated, as it were, from the general class to which it belonged, and is thereby withdrawn from the authority and jurisdiction of all other courts of co-ordinate jurisdiction. * * * It is the possession of jurisdiction of the court over the particular case in litigation that segregates and takes it from

the general class of cases to which it belongs which excludes the jurisdiction of another court of co-ordinate jurisdiction from attaching to the same cause; and the reason for this is apparent, because it no longer belonged to the class of cases over which the latter court has jurisdiction at the time the second suit was filed therein. It had become extinct or ceased to exist as a cause of action so far as the latter court was concerned, and had become merged, as it were, into an action pending in another court.' (Italics ours.)

[16] Since the Dallas county district court had no jurisdiction of this particular case, what was done therein was necessarily void, *21 for judicial action without jurisdiction is void. Freeman on Judgments (5th Ed.) vol. 2, p. 1351, volume 1, pp. 672, 673, s 335; Burdett v. State, 9 Tex. 43, 44.

[17] Mr. Freeman, discussing the very question here involved (in volume 1, s 335), says:
'It seems impossible that two courts can, at the same time, possess the power to make a final determination of the same controversy between the same parties. If either has authority to act, its action must necessarily be exclusive, and therefore it is our judgment that whenever either the state or the national courts acquire jurisdiction of an action and the parties thereto, this jurisdiction cannot be destroyed, diminished, or suspended by one of the parties bringing an action in another court, and that any judgment or order of the latter court is void so far as it conflicts with any judgment or order of the court first acquiring jurisdiction.' (Italics ours.)

This extract from Freeman we believe states the sound rule, and the only rule which will prevent races from court to court by vigilant counsel, such as this record discloses, and that conflict in the exercise of judicial power in evidence here, which we believe was never contemplated under our judicial system. Courts are erected to settle controversies, not to multiply them. At any rate, the rule announced by Freeman is the one we adopt, and is consistent with that declared by Justice Lipscomb in 1852 in the Burdett Case, cited above.

What has been said is not in conflict with the doctrine of various cases that the pendency of a suit in another jurisdiction must be seasonably pleaded in abatement, that the plea may be waived, and that final judgment by default, or, in the absence of pleading and proof of the pendency of a prior suit will be **1072 sustained. See the cases of Cook v. Burnley, 11 Wall. 659, 20 L. Ed. 29; Cook v. Burnley, 45 Tex. 97; Blasingame v. Cattlemen's Trust Co. (Tex.) 174 S. W.

900; Cattlemen's Trust Co. v. Blassingame (Tex. Civ. App.) 184 S. W. 574; McCoy v. Bankers' Trust Co. (Tex. Civ. App.) 200 S. W. 1138. See, also, 1 Ruling Case Law, pp. 19, 20.

These opinions are authority for the proposition that, since the pendency of a prior suit is predicated upon a state of facts, the facts must be seasonably alleged and proved, and, unless this is done, the judgment of the subsequent court is conclusive on the fact of jurisdiction as upon any other fact. Freeman on Judgments (5th Ed.) vol. 2, ss 660, 662. This does not militate against our conclusion that, once the necessary facts are pleaded and admitted or proven, or shown by the undisputed record, as *22 in this case, the subsequent suit is abated and its orders void for want of jurisdiction.

All the foregoing on the present point is consistent with the rule as to the issuance of writs of prohibition under the common law. This writ issued by a superior court to an inferior or subordinate one to keep the latter within the bounds of its jurisdiction, a power we are called upon to exercise in this case. The writ, however, did not issue after sentence and judgment, unless the want of jurisdiction was apparent on the face of the record. High's Extraordinary Legal Remedies (2d Ed.) s 774.

The rule adverted to is analogous to that followed in cases of final judgments void for want of service. Such judgments against the parties not served are void, and yet, because of recitals in the judgments, they cannot be collaterally attacked. Levy v. Roper, 113 Tex. 356, 361, 256 S. W. 251, and cases there cited.

So, in a subsequent suit, abated by one previously filed, a final judgment may not be collaterally attacked for facts not appearing in the record, although in fact a nullity for want of jurisdiction. It is not the validity of such a judgment which renders it immune from collateral attack, but, on the principle of estoppel, invoked in aid of a sound public policy, the parties are denied the right in a collateral action to show the actual facts as against the recitations or necessary implications of the judgment.

However, in the instant case, no such situation as those described in the case referred to confronts us. The pendency of the suit in Judge Ward's court was seasonably presented by proper pleas and proof in Judge Wilson's court, and that court, notwithstanding this, was proceeding with the trial of the case. Ordinarily, of course, the remedy for his adverse ruling would have been by appeal, and the question of abatement would have been finally determined by that method. The case has, however, reached this court by a different route, and we now

in the exercise of our original, rather than appellate power, pass upon the subject. We do not mean to say that in every case of conflicting jurisdiction this court would exercise its original jurisdiction as we are doing in the present case. We will do so only where necessary under established rules of law, and where, as in this case, the trial court first taking jurisdiction has been unable by writ of injunction against the parties to the abated action to stop proceedings thereon.

We have heretofore referred to cases holding the pendency of *23 a prior suit must be pleaded in abatement in the subsequent case in order to be available, although it involves a jurisdictional question. This, however, is not the only remedy in trial courts. The parties may, upon proper showing, receive from the court which first obtained jurisdiction an injunction enjoining the parties to the second action from maintaining it.

In the instant case Judge Wilson was in process of the trial, and had passed on the plea in abatement when the injunction was served, although issued before the actual hearing on the plea. At this stage of the proceeding it was entirely proper for the injunction to issue against the parties (except of course Judge Wilson), and there was no impropriety in its issuance before, for that may have been reasonably necessary.

Under the common law, in order to secure a writ of prohibition to prevent the exercise of power by a court for want of jurisdiction, it was necessary that a plea to the jurisdiction be presented. This appears to be the rule now. High on Extraordinary Legal Remedies (2d Ed.) s 773; Spelling on Extraordinary Relief, vol. 2, s 1731. These authorities make it clear that the proceedings in Judge Wilson's court had not reached that stage where they could not be enjoined in order to prevent further action in the case pending before him.

[18] The injunction granted by Judge Ward is void in so far as it attempted to enjoin Judge Wilson, the judge of a district court of co-ordinate power and jurisdiction. 7 Ruling Case Law, pp. 1071, 1072, s 108; High on Injunctions (4th Ed.) vol. 1, ss 45, 46; 32 Corpus Juris, p. 84, s 71; 14 Ruling Case Law, p. 410, s 110, volume 7, p. 1070, s 108; Story on Equity Jurisprudence, vol. 2, s 1195; High on Extraordinary Legal Remedies (2d Ed.) ss 762, 763; 22 Ruling Case Law, pp. 2, 3, ss 1, 2, page 26, s 24, page 4, s 3.

[19] Since, however, the district court of Johnson county did have power and dominant jurisdiction of the subject-matter of the controversy, and was entitled to proceed to judgment in the cause, Judge Ward did have the power to issue the temporary injunction against the bank, Long, and Whaley.

As to them, it was a valid exercise of power. 7 Ruling Case Law, p. 1070, s 108; High on Injunctions (4th Ed.) ss 48, 49; **1073 Blume v. Case Threshing Machine Co. (Tex. Civ. App.) 225 S. W. 831, 832; Moton v. Hull, 77 Tex. 80, 13 S. W. 849, 8 L. R. A. 722; Neill v. Johnson (Tex. Civ. App.) 234 S. W. 147, 150. See, also, Nelson v. Lamm (Tex. Civ. App.) 147 S. W. 664, 667 (writ refused); *24 Steger & Sons Piano Mfg. Co. v. MacMaster, 51 Tex. Civ. App. 527, 113 S. W. 337 (writ refused); Supreme Lodge v. Ray (Tex. Civ. App.) 166 S. W. 46; Farthing Lumber Co. v. G., H. & S. A. R. Co. (Tex. Civ. App.) 178 S. W. 725; Houston Heights Water & Light Ass'n v. Gerlach (Tex. Civ. App.) 216 S. W. 634; Simpson v. McGuirk (Tex. Civ. App.) 194 S. W. 979.

[20] There can be no doubt that, since the Johnson county district court had jurisdiction to grant the temporary injunction, the exclusive remedy for relief therefrom through any Court of Civil Appeals was by the special statutory method of appeal to the Court of Civil Appeals for the Second District, sitting at Fort Worth, in which district Johnson county was located. Revised Statutes 1925, arts. 4662, 2251, 1819; Livingston v. State, 70 Tex. 393, 11 S. W. 115; Schleicher v. Runge, 90 Tex. 456, 39 S. W. 279; 15 Corpus Juris, pp. 1143, 1144, s 600(8).

The Court of Civil Appeals at Fort Worth had full power to have protected the interests of the bank, Long, and Whaley by the issuance of such temporary and final orders and writs as were necessary, upon appeal and application therefor. State Constitution, art. 5, s 6; Vernon's Ann. Civ. St. 1925, art. 1823; Birchfield v. Bourland (Tex. Civ. App.) 187 S. W. 422; Williams v. Foster (Tex. Civ. App.) 229 S. W. 896; Witherspoon v. Daviss (Tex. Civ. App.) 163 S. W. 700; Hurley v. Buchanan (Tex. Civ. App.) 233 S. W. 590; Gibbons v. Ross (Tex. Civ. App.) 167 S. W. 17; Cattlemen's Trust Co. v. Willis (Tex. Civ. App.) 179 S. W. 1115; City of Houston v. City of Palestine, 114 Tex. 306, 267 S. W. 663; Ellis v. Lamb-McAshan Co. (Tex. Civ. App.) 278 S. W. 858.

[21] Since the remedy by appeal to the Court of Civil Appeals at Fort Worth was exclusive, no other Court of Civil Appeals and no other district judge was authorized to set aside, annul, or vacate the temporary injunction issued by Judge Ward. Authorities supra; 15 Corpus Juris, pp. 1143, 1144, s 600(8); Dawson v. Dawson (Tex. Civ. App.) 136 S. W. 1149; Ward v. Scarborough (Tex. Civ. App.) 223 S. W. 1107, and cases cited in (Tex. Com. App.) 236 S. W. 441.

The injunction proceeding was not appealed, and no motion made to dissolve or vacate in the trial court. On the contrary, the bank, Long, and Whaley sought to avoid the consequences of the temporary injunction granted by Judge Ward by applying to the Court of Civil Appeals at Dallas for writs of mandamus and prohibition, and to the Dallas district court, presided over by Judge Wilson, for an injunction.

[22] The Court of Civil Appeals awarded a writ of mandamus, and in aid thereof a writ of prohibition, the effect of which has been heretofore stated. These writs having issued without notice to Judge Ward, the four Clevelands, and their attorneys, are not only void because issued in violation of Revised Statutes 1925, *25 art. 2328, but because in direct contravention of the law of due process as declared by this court from an early date, to the effect that such extraordinary writs will not issue unless the interested parties are before the court. 21 Ruling Case Law, p. 1272, s 3; 15 Ruling Case Law, p. 846, s 321; Crumley v. McKinney (Tex. Sup.) 9 S. W. 157; Cullem v. Latimer, 4 Tex. 329; Winder v. Williams, 23 Tex. 601; Chappell v. Rogan, 94 Tex. 492, 62 S. W. 539; Nevell v. Terrell, 99 Tex. 355, 87 S. W. 659, 89 S. W. 971; Old River R. Irr. Co. v. Stubbs, 63 Tex. Civ. App. 350, 133 S. W. 494 (writ refused); 18 Ruling Case Law, pp. 330, 331 ss 278, 279, page 358, s 319; High on Extraordinary Legal Remedies (2d Ed.) s 552; Spelling on Extraordinary Relief, vol. 2, s 1638; 38 Corpus Juris, p. 929, s 707.

The failure to abate the writs on motion was not only error, but a denial of an express statutory right, as well as the commonlaw right that void judgments are to be abated on motion. Revised Statutes 1925, art. 2328; 15 Ruling Case Law, p. 688, s 1403, page 700, s 152; Freeman on Judgments (5th Ed.) vol. 1, ss 226, 227, 194.

The fact that Judge Wilson, a coparty in the mandamus proceedings, had notice and appeared was not notice to nor binding on the other parties. 38 Corpus Juris, pp. 907, 908, s 643; Borah v. Dussel, 152 La. 589, 93 So. 910.

The writ of prohibition was not an alternative or temporary one, but final in its' form and effect, and, even if separate from the mandamus, was void for want of due process. 22 Ruling Case Law, p. 31, s 31; High on Extraordinary Legal Remedies (2d Ed.) ss 803, 804; Spelling on Extraordinary Relief, vol. 2, s 1757.

[23] Aside from what has heretofore been said, the writs of mandamus and prohibition were both void for want of jurisdiction on the part of the Court of Civil Appeals to issue

them in this case. The suit in Judge Wilson's court having been abated by the Johnson county case, he was without jurisdiction, and could not lawfully proceed to trial, and therefore did not improperly refuse to do so.

[24] Courts of Civil Appeals are clothed with authority to require district judges to proceed to trial and judgment. Vernon's Ann. Civ. St. 1925, art. 1824. But the writ can rightly issue only when the judge improperly refuses to act on a matter within his jurisdiction; and, since Judge Wilson did not improperly refuse to go forward with the trial, the Court of Civil Appeals had no **1074 jurisdiction to require him to proceed. *26 Dunn v. St. Louis S. W. R. Co., 40 Tex. Civ. App. 242, 88 S. W. 532; 18 Ruling Case Law, p. 295, s 229; Spelling on Extraordinary Relief, vol. 2, ss 1378, 1397.

[25] Since the Court of Civil Appeals had no jurisdiction to award the writs under the facts of this case, its orders doing so are void. 3 Corpus Juris, p. 369, s 124D. The writs were void for additional reasons. In our opinion, the necessary effect of the mandamus directing Judge Wilson to proceed was to adjudge that he could lawfully proceed. This necessarily involved the conclusion that the injunction by Judge Ward against the bank, Long, and Whaley was not effective, or that Judge Wilson had the right to try the case without the enjoined plaintiffs. To say that the case could be tried without the presence of the plaintiffs who brought the suit would be a denial to them of due process. Farmers' Gas. Co. v. Calame (Tex. Civ. App.) 262 S. W. 546, Cragin v. Henderson County Oil Co. (Tex. Civ. App.) 270 S. W. 202, and authorities cited in these cases.

[26] [27] The rule is, of course, an elementary one that mandamus will not lie to an inferior court where proceedings therein have been enjoined. Spelling on Extraordinary Relief, vol. 2, ss 1403, 1402, 1378. We must conclude, therefore, that the Court of Civil Appeals was of the opinion that the enjoined parties could be lawfully present and participate in the directed trial by Judge Wilson, and that the injunction standing against their doing so was not effective, was in fact no injunction.

[28] The conclusion therefore is inescapable that the order of the Court of Civil Appeals had the effect of adjudicating the invalidity of the injunction issued by Judge Ward. For this plain additional reason the mandamus issued by the Court of Civil Appeals at Dallas was void. True, the Court of Civil Appeals at Dallas, if jurisdiction otherwise existed, had the power to direct a district judge to proceed to judgment,

and authority to issue necessary writs to protect him in its exercise. Vernon's Ann. Civ. St. 1925, arts. 1824, 1823. But they are without authority to do so when the exercise of the power would necessarily conflict with a right of review confided to another Court of Civil Appeals, as in this case. Courts of Civil Appeals are courts of co-ordinate jurisdiction within the limits of their respective districts, and no one of them has authority to set aside, annul, or vacate an order made by another, or review causes confided to another (unless upon transfer). This is necessarily so from the language of the Constitution and statutes. State Constitution, art. 5, s 6; *27 Vernon's Ann. Civ. St. 1925, art. 1819; Authorities supra; Home National Bank v. Wilson (Tex. Civ. App.) 265 S. W. 732, 734; 7 Ruling Case Law, p. 1071, 1072, s 108.

[29] The injunction granted by Judge Wilson restraining the Clevelands and their attorneys from proceeding with the trial of the Johnson county case was void because the suit in Judge Wilson's court had been abated, and he had no jurisdiction to exercise or protect.

[30] The mandamus and prohibition writs issued by the Court of Civil Appeals at Fort Worth against Judge Ward, requiring him to proceed with the trial of the Johnson county case, and against Judge Wilson, the bank, Whaley et al., were void because issued upon ex parte hearing without notice to any party except Judge Ward. Revised Statutes 1925, art. 2328, and authorities supra.

Prior to the issuance of these writs, the Court of Civil Appeals at Dallas issued a mandamus in which Judge Wilson was directed to proceed with the trial of the Dallas county case, etc.

It is thus seen that the writs issued by the Fort Worth Court of Civil Appeals prohibited Judge Wilson of the Dallas county district court from proceeding, after he had been commanded to proceed by the Dallas Court of Civil Appeals, and enjoined Judge Wilson from taking any action in the enforcement of the injunction issued by him against the Clevelands and their attorneys.

[31] These writs were therefore void because the direct effect of their issuance was to adjudicate the validity of the judgments and orders of the Dallas Court of Civil Appeals in directing Judge Wilson to proceed. See the authorities previously cited to the effect that one court of co-ordinate power cannot, in a suit of this character, abrogate the orders and judgment of a court of similar rank and authority. If it be said, as we have said, that the decrees of the Dallas

Court of Civil Appeals were void, the Fort Worth Court of Civil Appeals could not adjudicate that fact and execute and enforce its decrees, since the Dallas Court of Civil Appeals had adjudicated exactly to the contrary, and had equal power to enforce its decrees.

[32]    The writ of prohibition issued by the Fort Worth Court of Civil Appeals against Judge Wilson, enjoining him from enforcing the injunction issued by him against the Clevelands and their attorneys from proceeding with the trial of the Johnson county case also involved an adjudication that the mandamus order of the Dallas Court of Civil Appeals, directing Judge Wilson to proceed, was invalid for the reason that, if he had *28 lawful authority to proceed under the mandamus order, he had the power to protect the exercise of his jurisdiction by injunction against the parties proceeding in another court. So, on the grounds stated above, the writs issued by the Fort Worth court must fall. The remedy for relief against the orders of the Dallas Court of Civil Appeals and Judge Wilson, under the facts of this case, was by application for mandamus to the Supreme **1075 Court. Vernon's Ann. Civ. St. 1925, arts. 1733, 1734; Yett v. Cook (Tex. Sup.) 268 S. W. 715.

[33]    Since the contempt proceedings in the Dallas Court of Civil Appeals were predicated upon a void injunction issued by Judge Wilson, they are, of course, void. High on Injunctions (4th Ed.) vol. 2, s 1425; 13 Corpus Juris, p. 13, s 14-3; Kansas City, M. & O. Ry. Co. v. Cole (Tex. Civ. App.) 145 S. W. 1098, 1101 (writ refused).

In this opinion we hold:

(1) The suit in Judge Wilson's court in Dallas county was abated by the previously filed suit in Johnson county.

(2) Since the Dallas county suit was abated, Judge Wilson's court had no jurisdiction thereof except to dismiss the same.

(3) That the injunction issued by Judge Ward against Judge Wilson was void.

(4) That the injunction issued by Judge Ward against the bank, Long, and Whaley was issued in the exercise of an active jurisdictional power conferred upon him by the Constitution and statutes, and, whether rightly or erroneously exercised, reviewable under the facts of this case only on appeal to the Court of Civil Appeals at Fort Worth.

(5) That the writs of mandamus and prohibition issued by the Court of Civil Appeals at Dallas were void.

(6) That the injunction granted by Judge Wilson against the Clevelands and others, enjoining them from prosencuting the Johnson enjoining them from prosecuting the Johnson

(7) That the writs of mandamus and prohibition granted by the Court of Civil Appeals at Fort Worth were void.

(8) That the contempt proceedings in the Court of Civil Appeals at Dallas were void.

(9) That this court has power to direct Judge Ward to proceed with the trial of the Johnson county case, and to issue all orders necessary to enable him and all the parties litigant to hear, try, and determine that case unimpeded by the orders and actions of any other court, or courts, trial or appellate.

Mandamus will therefore issue directing Judge Ward to proceed *29 with the trial of the case pending in his court in Johnson county. All orders and decrees heretofore named, of both trial and appellate courts, as void, are hereby vacated and annulled.

The injunction issued by Judge Ward against the bank, Long, and Whaley being still in effect, and Judge Ward being free under this opinion to enforce it, it is unnecessary for us to issue any injunction or writ of prohibition against said parties and their attorneys. A decree will be entered in accordance with this opinion, and a copy thereof, together with a copy of this opinion, will be certified to the trial and appellate courts, whose orders are involved in this controversy, for observance.

**All Citations**

116 Tex. 1, 285 S.W. 1063

---

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by    Rush v. Bucyrus-Erie Co.,    Tex.App.-Tyler,    January 27, 1983

584 S.W.2d 317
Court of Civil Appeals of Texas, Amarillo.

**TEXAS EMPLOYERS INSURANCE ASSOCIATION**, Appellant,

v.

Juan G. **BAEZA**, Appellee.

No. 9025.    |    May 31, 1979.

Workers' compensation carrier, after giving notice of its unwillingness to abide by an award of the Industrial Accident Board, filed suit to set aside the award. The injured worker interposed an unsworn plea in abatement alleging that there was a prior action pending between the parties in the county of the injured worker's residence. The 14th Judicial District Court, Dallas County, Fred Harless, J., rendered judgment sustaining the plea in abatement and dismissing the **insurer's** suit. The insurer appealed, and the Court of Civil Appeals, Reynolds, J., held that: (1) absent any evidence to support the **insurer's** claim that the injured worker commenced suit in Ector County without a bona fide intention to prosecute the suit and merely to deny the insurer access to the Dallas County court, the trial court did not err in failing to strike the injured worker's plea in abatement; (2) where, at the hearing on the merits of the plea in abatement, no proof was presented apart from the plea itself to establish the pendency of the prior suit, the worker failed to discharge his burden of proof and was not entitled to have his plea sustained; and (3) even if the plea in abatement were sustainable, it would have been error to dismiss the action.

Reversed and rendered.

West Headnotes (11)

**[1]**    **Courts**
⬦ Courts from and to Which Transfer May Be Made

The section which provides that if suit is not brought in the county where the injury occurred, the court in which suit is filed, upon ascertaining that it does not have jurisdiction, shall transfer the case to the proper court in the county where the injury occurred operates to recognize and confer potential jurisdiction of the subject matter in courts otherwise competent to exercise jurisdiction over the subject matter outside the county where the injury occurred. Vernon's Ann.Civ.St. art. 8307a.

2 Cases that cite this headnote

**[2]**    **Courts**
⬦ Pendency and Scope of Prior Proceeding

**Workers' Compensation**
⬦ Jurisdiction of Courts

The district court of the county of the injured worker's residence was a court of competent jurisdiction over the subject matter of worker's suit against workers' compensation carrier and, therefore, if the injured worker's suit was first filed and was pending in a district court of that county, that court acquired the prior right to exercise active jurisdiction and no other state court in which such a suit was subsequently filed had a right to interfere unless, as the insurer alleged, the injured worker was guilty of conduct which estopped him from asserting the active jurisdiction of the county court in the county of his residence.

4 Cases that cite this headnote

**[3]**    **Action**
⬦ Proceedings Constituting Commencement

A prerequisite for commencement of suit is the plaintiff's bona fide intention to prosecute the suit.

Cases that cite this headnote

**[4]**    **Appeal and Error**
⬦ Findings of Fact and Conclusions of Law

Whether plaintiff had a bona fide intention to prosecute suit is a question of fact which must be determined by the trial court and not by the appellate court.

1 Cases that cite this headnote

**[5]** **Workers' Compensation**
 ⟶ Abatement or Revival

In absence of any evidence as to issue concerning injured worker's intent in filing suit against worker's compensation carrier in the district court of the county of the injured worker's residence, the trial court did not err in failing to strike plea in abatement that was filed by the injured worker in action that was subsequently commenced by the workers' compensation carrier in another county.

2 Cases that cite this headnote

**[6]** **Abatement and Revival**
 ⟶ Time for Making Objection or Filing Plea

A plea in abatement grounded on the pendency of a prior suit is predicated on a state of facts which must be seasonably alleged and proved and, unless this is done, the subsequent suit is not abated.

3 Cases that cite this headnote

**[7]** **Abatement and Revival**
 ⟶ Pendency of Other Action

Facts essential to a plea in abatement grounded on the pendency of a prior suit are the present pendency of a prior suit between the parties in which the same subject matter or the same issues are involved and determinable.

1 Cases that cite this headnote

**[8]** **Pleading**
 ⟶ Abatement in General

Even though the plea in abatement is verified, defendant has the burden to prove the allegations of his plea in abatement.

Cases that cite this headnote

**[9]** **Pleading**
 ⟶ Weight and Sufficiency of Evidence

In absence of any proof apart of the plea itself of the pendency of a prior suit between the same parties in which the same subject matter was involved and determinable, defendant failed to discharge his burden to prove the allegations of his plea in abatement and, therefore, defendant was not entitled to have his plea in abatement sustained.

1 Cases that cite this headnote

**[10]** **Pretrial Procedure**
 ⟶ Grounds in General

Unlike facts pleaded to bar the action at any time, facts pleaded in abatement are merely designed to defeat present proceedings and, therefore, when a plea in abatement is sustained because of the pendency of a prior suit between the same parties involving the same subject matter, the cause should be retained on the docket so that, when the cause of abatement is removed, the suit may be revived if anything remains to be litigated.

7 Cases that cite this headnote

**[11]** **Judgment**
 ⟶ Prayer for Relief in General

**Pleading**
 ⟶ Prayer for Relief

Though a mere matter of form is seldom controlling, where one asks for a specific relief which is consistent with his pleadings and there is no general prayer for relief, the special prayer must by regarded as evidencing the object of the plea and ordinarily will not entitle one to a judgment different from that for which he prayed.

1 Cases that cite this headnote

**Attorneys and Law Firms**

***319** Logan Ford, Dallas, for appellant.

Burnett & Ahders **Associated**, Warren Burnett, Odessa, for appellee.

## Opinion

REYNOLDS, Justice.

Sustaining a plea in abatement grounded on the pendency of a prior suit, the trial court dismissed this suit. Under the record, the actions were erroneous. Reversed and rendered.

Juan G. Baeza sustained an injury in Midland County on 1 November 1968 in the course of his employment. By a 30 March 1978 order in its Cause No. H-007696, the Industrial Accident Board ordered the compensation carrier, Texas Employers Insurance Association, to pay Baeza $35 per week for 401 weeks for total and permanent incapacity, specially finding that payments of compensation have matured in the sum of $14,035.

Texas Employers Insurance Association timely gave notice of its unwillingness to abide by the Board's award and, on 6 April 1978, filed this suit in a district court of Dallas County to set aside the award. T.E.I.A. alleged in its petition that the suit was filed in the county where the alleged injuries were sustained.

Before answering with a general denial, Baeza interposed on 17 April 1978 an unsworn plea in abatement containing the following allegations and prayer:

### I.

There is on file in the District Court of Ector County, Texas, a lawsuit styled Juan G. Baeza vs. Texas Employers Insurance Association, Cause No. A-51,954, 70th Judicial District. Said cause of action being filed on April 5, 1978.

### II.

Defendant herein, Juan G. Baeza, has a right to try his suit in the county of his residence, Ector County. His lawsuit was filed on April 5, 1978. One day prior to the lawsuit herein.

Wherefore, premises considered, this Court should abate the trial of this cause pending the trial of the lawsuit in Ector County, Texas.

Accompanying Baeza's plea were unverified copies of a petition and a signed receipt. The petition is numbered A-51,954 in the District Court of Ector County, 70th Judicial District, and styled Juan G. Baeza vs. Texas Employers Insurance Association. Allegations in the petition are that while employed in Ector County on 1 November 1968, Baeza was injured and that he has complied with all jurisdictional requisites to perfect this appeal from the Board's final decision in its Cause No. H-007696. Based on his allegations, Baeza seeks compensation of $35 per week for 401 weeks payable in a lump sum ($14,035). The petition carries no date, but the receipt is dated 5 April 1978 and is for a deposit of $56 made by Baeza's attorney with the district clerk of Ector County in Cause No. A-51,954, styled Baeza vs. T.E.I.A.

T.E.I.A. moved to strike the plea because (1) it was not verified; and (2) Baeza had received all he was entitled to from the Board's award and, consequently, he had filed his suit to obtain priority without a bona fide intention to prosecute it. Baeza then filed his amended, verified plea in abatement, without attachments, alleging the same matters contained in his original plea.

*320 When the matters came on for a 30 June 1978 hearing, T.E.I.A. offered the instruments designated above, except for the amended, verified plea in abatement, and they were "admitted into evidence for the purposes of this hearing on the (T.E.I.A.'s) motion to strike." T.E.I.A. then introduced the record from prior litigation in Dallas County between the parties over an earlier award of the Board regarding the same injury. No other evidence was introduced.

The trial court rendered judgment sustaining the plea in abatement and dismissing T.E.I.A.'s suit. This appeal resulted.

T.E.I.A. initially charges the trial court with error in not striking Baeza's plea in abatement. T.E.I.A. theorizes that Baeza could not be aggrieved by the Board's decision which awarded him a lump sum payment of the maximum compensation to which he was entitled under the law and, hence, Baeza's Ector County suit was fraudulently filed without a bona fide intention to prosecute it in an attempt to deny T.E.I.A. access to the Dallas County court.

[1] [2] Implicit in T.E.I.A.'s accusation that Baeza raced to the Ector County courthouse to deny T.E.I.A. access to the Dallas County court is the recognition that each district court had potential jurisdiction of the suit to set aside the Board's award. [1] If Baeza's suit was first filed and is pending in a district court of Ector County, a court of competent

jurisdiction over the subject matter with the power to bring all necessary parties before it, that court acquired the prior right to exercise active jurisdiction of the cause, and no other state court in which such a suit is subsequently filed has the right to interfere, unless, as T.E.I.A. alleges, **Baeza** is guilty of conduct which estops him from asserting the active jurisdiction of the Ector County court. V. D. Anderson Co. v. Young, 128 **Tex**. 631, 101 **S.W.2d** 798, 800 (1937).

[3] [4] [5] The core of the conduct complained of is that **Baeza** filed his suit without a bona fide intention to prosecute it. A requisite for the commencement of a suit is the plaintiff's bona fide intention to prosecute it, but this is a question of fact which must be determined by the trial court and not by the appellate court. Russell v. Taylor, 121 **Tex**. 450, 49 **S.W.2d** 733, 737-38 (1932). No evidence was presented to the trial court on the fact issue of **Baeza's** intent in filing his suit. Absent evidence of the conduct which was the basis of T.E.I.A.'s motion to strike, the court did not err in failing to strike **Baeza's** plea in abatement.

[6] [7] [8] Next, T.E.I.A. contends that it was error to sustain the plea in abatement because **Baeza** waived it by failing to prove *321 any of the elements of the pendency of a prior suit. In this connection, a plea in abatement grounded on the pendency of a prior suit is predicated upon a state of facts which must be seasonably alleged and proved; and, unless this is done, the subsequent suit is not abated. Cleveland v. Ward, 116 **Tex**. 1, 285 S.W. 1063, 1072 (1926). Those essential facts are the present pendency of a prior suit between the parties in which the same subject matter is, or issues are, involved and determinable. Cleveland v. Ward, supra, 285 S.W. at 1070. The burden remains on the defendant to prove the allegations in his plea in abatement, Flowers v. Steelcraft Corporation, 406 **S.W.2d** 199 (**Tex**.1966), even though his plea is verified. Railroad Commission v. Shell Oil Co., 164 **S.W.2d** 773, 774 (Tex.Civ.App. Austin 1942, writ ref'd).

[9] As reflected by the record, **Baeza** offered no proof of the allegations in his plea at the 30 June 1978 hearing. **Baeza's** original plea in abatement with the accompanying petition and receipt were admitted in evidence, not in support of the plea in abatement but for the purposes of T.E.I.A.'s motion to strike. If it reasonably can be argued that the record from the Ector County court was before the trial court for all purposes, [2] the most that it shows is the pendency of a prior suit on 17 April 1978, some two and one-half months before the hearing on the plea. The instruments do not prove,

and there is no other evidence to show, that the prior suit was pending when the plea in abatement was heard. There being no proof independent of the plea itself of the pendency of the prior suit at the hearing on the merits of the plea in abatement, the defendant failed to discharge his burden of proof and, thereby, is not entitled to have his plea sustained. Street v. J. I. Case Threshing Mach. Co., 188 S.W. 725, 728 (Tex.Civ.App. Amarillo 1916, writ ref'd). Accord, Rosenfield v. Childs, 304 **S.W.2d** 391, 393 (Tex.Civ.App. Texarkana 1957, no writ); Montague County v. White, 241 S.W. 740, 741 (Tex.Civ.App. Fort Worth 1922, writ dism'd).

[10] Further, T.E.I.A. correctly submits that, even were the plea in abatement sustainable, the court erred in dismissing this suit. Admittedly, there are cases holding that the proper order on sustaining a plea in abatement on the ground of a prior pending suit is one of dismissal; but, usually, the holding is coupled with the caveat that the dismissal is to be effective only so long as the cause of abatement continues to exist, and without prejudice to bringing a new suit upon the same set of facts if the cause of action still exists. See, e. g., Zarsky v. Moss, 193 **S.W.2d** 245, 246 (Tex.Civ.App. San Antonio 1946, no writ). However, facts pleaded in abatement are, as opposed to facts pleaded to bar the action at any time, merely designed to defeat present proceedings. Accordingly, when a plea in abatement is sustained because of the pendency of a prior suit between the same parties involving the same subject matter, the cause should be retained on the docket so that, when the cause of abatement is removed, the suit may be revived if anything remains to be litigated. Haney v. Temple Trust Co., 55 **S.W.2d** 891, 893-94 (Tex.Civ.App. Austin 1932, writ dism'd); Forman v. Prince, 97 **S.W.2d** 1002, 1005 (Tex.Civ.App. Dallas 1936, no writ). Accord, Beyersdorff v. Spillar, 224 **S.W.2d** 272, 273 (Tex.Civ.App. San Antonio 1949, no writ). This principle is particularly applicable where, as here the dismissal would foreclose the refiling of this suit because of the mandatory time in which the suit must be filed. Tex.Rev.Civ.Stat.Ann. art. 8307, s 5 (Vernon Supp.1978-79).

[11] Moreover, **Baeza** only prayed that T.E.I.A.'s suit be abated, not that it be dismissed. Though mere matter of form is seldom controlling, yet where one asks for a specific relief which is consistent with his pleadings and there is no general prayer for relief, the special prayer must be regarded as evidencing the object of the plea and *322 ordinarily will not entitle one to a judgment different from that for which he has prayed. See Hogan v. Kellum, 13 **Tex**. 396, 399-400 (1855).

The judgment of the trial court is reversed, and judgment is here rendered overruling the plea in abatement and ordering this suit reinstated upon the docket of the district court of Dallas County. Tex.R.Civ.P. 434.

**All Citations**

584 S.W.2d 317

Footnotes

1 By its original provisions, Tex.Rev.Civ.Stat.Ann. art. 8307, s 5, required the suit to set aside an award to be filed in a "court of competent jurisdiction in the county where the injury occurred"; so, if the suit was filed in any other county, the court had no jurisdiction except to dismiss. Oilmen's Reciprocal **Ass'n** v. Franklin, 116 **Tex.** 59, 286 S.W. 195, 196-97 (1926).

In 1931, the legislature enacted Tex.Rev.Civ.Stat.Ann. art 8307a to provide that if the suit was not brought in the county where the injury occurred, "the Court in which the same is filed shall, upon ascertaining that it does not have jurisdiction to render judgment upon the merits, transfer the case to the proper Court in the county where the injury occurred." This enactment operates to recognize and confer potential jurisdiction of the subject matter in courts, otherwise competent to exercise jurisdiction over the subject matter, outside the county where the injury occurred. Federal Underwriters Exchange v. Pugh, 141 **Tex.** 539, 174 **S.W.2d** 598, 600 (1943).

At the time the Board made its 1978 decision, Tex.Rev.Civ.Stat.Ann. art. 8307, s 5 (Vernon Supp. 1978-79), had been amended, effective 29 August 1977, to provide in part:

Any interested party who is not willing and does not consent to abide by the final ruling and decision of said Board shall, within twenty (20) days after the rendition of said final ruling and decision by said Board, file with said Board notice that he will not abide by said final ruling and decision. And he shall within twenty (20) days after giving such notice bring suit in the county where the injury occurred, or in the county where the employee resided at the time the injury occurred (or, if such employee is deceased, then in the county where the employee resided at the time of his death), to set aside the final ruling and decision . . . .

However, Tex.Rev.Civ.Stat.Ann. art. 8307a has not been amended.

2 See Payne v. Benham, 16 **Tex.** 364, 367 (1856), for the statement that the truth of the plea for abatement of the present suit because of the pendency of a prior suit between the same parties involving the same subject matter is tried by the record in the prior suit.

---

**End of Document**       © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
**Declined to Extend by** McGee v. Deere & Co., Tex.App.-Austin, March 24, 2005

945 S.W.2d 812
Supreme Court of Texas.

ARTHUR ANDERSEN & CO., Petitioner,

v.

PERRY EQUIPMENT
CORPORATION, Respondent.

No. 95–0444. | Argued March 19, 1997. | Decided May 16, 1997.

Purchasing corporation sued accounting firm, alleging violations of Deceptive Trade Practices Act (DTPA) in connection with firm's preparation of audited financial statements of acquired corporation. The 55th District Court, Harris County, Kathleen S. Stone, J., entered judgment for purchasing corporation, and the Houston Court of Appeals, First District, 898 S.W.2d 914, affirmed. On writ of error, the Supreme Court, Cornyn, J., held that: (1) purchasing corporation was "consumer" under DTPA although it did not pay for audit; (2) failure to instruct jury on proper measure of direct damages was reversible error; and (3) award of attorney fees under DTPA had to be dollar amount, not percentage of judgment.

Reversed and remanded.

West Headnotes (19)

**[1]** **Antitrust and Trade Regulation**
⟜ Accountants and tax preparers

For purposes of Deceptive Trade Practices Act (DTPA) claim against accounting firm, purchasing corporation was a "consumer," although it did not pay for audit, where purchasing corporation insisted as condition of sale that acquired corporation provide audited financial statements, acquired corporation hired accounting firm for that purpose, purchasing corporation then relied on those statements in reaching its decision to purchase acquired corporation, and accounting firm was aware that purchasing corporation had required audit and would rely on its accuracy and knew specific purpose for which it was conducted. V.T.C.A., Bus. & C. § 17.45(4).

23 Cases that cite this headnote

**[2]** **Antitrust and Trade Regulation**
⟜ Consumers, purchasers, and buyers; consumer transactions

In determining whether plaintiff is consumer under Deceptive Trade Practices Act (DTPA), focus is on plaintiff's relationship to transaction. V.T.C.A., Bus. & C. § 17.45(4).

19 Cases that cite this headnote

**[3]** **Antitrust and Trade Regulation**
⟜ Measure and amount

Under Deceptive Trade Practice Act (DTPA), amount of actual damages recoverable is total loss sustained as result of deceptive trade practice. V.T.C.A., Bus. & C. § 17.50(b)(1).

2 Cases that cite this headnote

**[4]** **Antitrust and Trade Regulation**
⟜ Grounds and Subjects

Under Deceptive Trade Practices Act (DTPA), actual damages are those damages recoverable under common law, either direct or consequential. V.T.C.A., Bus. & C. § 17.50(b)(1).

16 Cases that cite this headnote

**[5]** **Damages**
⟜ Direct or indirect consequences

Direct damages are necessary and usual result of defendant's wrongful act; they flow naturally and necessarily from the wrong.

50 Cases that cite this headnote

**[6]** **Damages**
⟜ Direct or indirect consequences

Direct damages compensate plaintiff for loss that is conclusively presumed to have been foreseen by defendant from his wrongful act.

22 Cases that cite this headnote

[7]     **Damages**
        ⟜ Proximate or Remote Consequences

Consequential damages result naturally, but not necessarily, from defendant's wrongful acts; under common law, they need not be usual result of the wrong, but they must be foreseeable, and must be directly traceable to wrongful act and result from it.

68 Cases that cite this headnote

[8]     **Antitrust and Trade Regulation**
        ⟜ Reliance; causation; injury, loss, or damage

Foreseeability is not an element of producing cause under Deceptive Trade Practices Act (DTPA). V.T.C.A., Bus. & C. § 17.50(b)(1).

1 Cases that cite this headnote

[9]     **Antitrust and Trade Regulation**
        ⟜ Grounds and Subjects

Under Deceptive Trade Practices Act, if damages are too remote, too uncertain, or purely conjectural, they cannot be recovered. V.T.C.A., Bus. & C. § 17.50(b)(1).

10 Cases that cite this headnote

[10]    **Fraud**
        ⟜ Difference between actual and represented value
        **Fraud**
        ⟜ Difference between value and price paid

Under common law, direct damages for misrepresentation are measured either by out-of-pocket damages, which measure difference between value buyer has paid and value of what he has received, or by benefit-of-the-bargain damages, which measure difference between value as represented and value received.

44 Cases that cite this headnote

[11]    **Antitrust and Trade Regulation**
        ⟜ Measure and amount

Under Deceptive Trade Practices Act (DTPA), plaintiff may recover under damage theory that provides greater recovery, either out-of-pocket damages or benefit-of-the-bargain damages. V.T.C.A., Bus. & C. § 17.50(b)(1).

25 Cases that cite this headnote

[12]    **Antitrust and Trade Regulation**
        ⟜ Measure and amount

Under Deceptive Trade Practices Act(DTPA), both out-of-pocket and benefit-of-the-bargain measure of damages are determined at time of sale. V.T.C.A., Bus. & C. § 17.50(b)(1).

29 Cases that cite this headnote

[13]    **Antitrust and Trade Regulation**
        ⟜ Instructions
        **Appeal and Error**
        ⟜ Failure or refusal to charge

Failure to instruct jury on proper measure of direct damages on purchasing corporation's claim under Deceptive Trade Practices Act (DTPA) regarding accounting firm's audit of acquired corporation was reversible error, where jury was not asked to find direct damages at time of sale as well as consequential damages attributable to accounting firm's misrepresentations, but was simply asked to consider purchase price as part of overall damages, and purchasing corporation did not establish how much of its loss was attributable to accounting firm. V.T.C.A., Bus. & C. § 17.50(b)(1).

17 Cases that cite this headnote

[14]    **Antitrust and Trade Regulation**
        ⟜ Grounds and Subjects

Under Deceptive Trade Practice Act, losses subsequent to time of sale are recoverable only

if misrepresentation is producing cause of loss. V.T.C.A., Bus. & C. § 17.50(b)(1).

Cases that cite this headnote

**[15]  Fraud**
 ⟳ Reliance on Representations and Inducement to Act

Basis of a misrepresentation claim is that defendant's false statement induced plaintiff to assume risk he would not have taken had truth been known.

1 Cases that cite this headnote

**[16]  Antitrust and Trade Regulation**
 ⟳ Grounds and Subjects

Plaintiff's recovery of damages under Deceptive Trade Practices Act (DTPA) is limited not only by his own evidence, but also by defendant's evidence of plaintiff's failure to reasonably mitigate losses or evidence of intervening causes.

4 Cases that cite this headnote

**[17]  Attorney and Client**
 ⟳ Construction and Operation of Contract

Attorney contingency fee contracts allow plaintiffs who cannot afford to pay a lawyer up-front to pay lawyer out of any recovery, and, because they offer potential of greater fee than might be earned under hourly billing method, compensate attorney for risk that attorney will receive no fee whatsoever if case is lost.

151 Cases that cite this headnote

**[18]  Antitrust and Trade Regulation**
 ⟳ Proceedings to impose; evidence

Party's contingent fee agreement should be considered by fact finder, and is therefore admissible in evidence, but that agreement cannot alone support award of attorney's fees under Deceptive Trade Practices Act (DTPA). V.T.C.A., Bus. & C. § 17.50(d); State Bar Rules, V.T.C.A., Government Code Title 2, Subtitle G

App., Art. 10, § 9, Rules of Prof.Conduct, Rule 1.04(b)(8).

136 Cases that cite this headnote

**[19]  Antitrust and Trade Regulation**
 ⟳ Attorney fees
**Antitrust and Trade Regulation**
 ⟳ Proceedings to impose; evidence

To recover attorney's fees under Deceptive Trade Practices Act (DTPA), plaintiff must prove that amount of fees was both reasonably incurred and necessary to prosecution of case, and must ask jury to award fees in specific dollar amount, not as percentage of judgment. V.T.C.A., Bus. & C. § 17.50(d); State Bar Rules, V.T.C.A., Government Code Title 2, Subtitle G App., Art. 10, § 9, Rules of Prof.Conduct, Rule 1.04.

229 Cases that cite this headnote

## Attorneys and Law Firms

**\*813** Ben Taylor, Dallas, Thomas C. Godbold, Houston, for Petitioner.

Christopher B. Allen, Michael P. Cash, James W. Paulsen, Houston, for Respondent.

## Opinion

CORNYN, Justice.

We withdraw our opinion of January 10, 1997, and substitute the following in its place. The parties' motions for rehearing are overruled.

**\*814** In this accounting malpractice case, **Perry Equipment** Corporation (PECO) sued the accounting firm of **Arthur Andersen** for a faulty audit, which PECO relied on to purchase another company, Maloney Pipeline Systems. The audit favorably reported Maloney's financial condition when, in fact, the company was suffering substantial losses. Fourteen months after the sale, Maloney filed for bankruptcy. PECO sued for violations of the Deceptive Trade Practice Act, fraud, negligence, negligent misrepresentation, gross negligence, and breach of implied warranty. Based on the

jury's verdict, the trial court rendered judgment for PECO. The court of appeals affirmed. 898 S.W.2d 914.

We address three issues presented by Arthur Anderson's application for writ of error. First, Arthur Andersen challenges PECO's consumer status because Maloney, rather than PECO, actually paid for the audit. Second, Arthur Andersen claims that the trial court failed to instruct the jury on the correct measure of damages. Third, Arthur Andersen contests the attorney's fees award, arguing that the percentage of recovery method is not a proper measure of attorney's fees under the DTPA, and that even if such fees were recoverable, no evidence supports the award. For the reasons discussed below, we reverse the judgment of the court of appeals and remand this case to the trial court for further proceedings.

## I

When PECO, a successful manufacturer of oil filters used in compressors for gas pipelines, decided to expand its business into the gas metering field, it looked into acquiring Maloney Pipeline Systems, one of three United States companies in the liquid metering market. In the mid–1980s, PECO began negotiating with Maloney's owner, Ramteck II. As a condition of the sale, PECO required an audit of Maloney's financial statements. Maloney retained Arthur Andersen to conduct the audit. Maloney eventually provided PECO financial statements audited by Arthur Andersen. The statements showed Maloney to be a profitable business. Relying upon this information, on August 23, 1985, PECO purchased the Maloney stock from Ramteck II, Inc. for $4,088,237.

Soon after the purchase, Maloney began to show signs of serious financial decline. For example, three months after the sale, Maloney ran out of cash and required a $400,000 advance from PECO to continue operating. PECO also attempted other emergency financial measures, but to no avail. Fourteen months after the sale, Maloney filed bankruptcy. PECO presented uncontradicted evidence at trial that the purchase price for Maloney was a total loss from which PECO realized no return and which PECO wrote off.

PECO's experts testified that Arthur Andersen's audit contained serious errors and otherwise failed to follow acceptable auditing procedures. One of the most significant errors, the evidence showed, was the failure to verify that contracts Maloney reported as complete were in fact complete or that Maloney's estimates of costs and percentage of completion for ongoing contracts were accurate. Maloney later incurred substantial losses on these contracts. One expert testified that the audit was one of the worst he had ever seen. Another expert, an auditing professor, stated that if a student submitted the work, he would have given the student a failing grade.

The jury found Arthur Andersen 51 percent at fault and PECO 49 percent at fault. The jury also found that Arthur Andersen had committed fraud, DTPA violations, and breach of warranty, but that it was not liable for negligent misrepresentation or gross negligence. The jury assessed damages of $5,449,468, including the $4,088,237 PECO paid for Maloney and $1,361,231 for other expenses incurred by PECO in its attempt to salvage the company. PECO elected to recover under the DTPA. The trial court credited Arthur Andersen with the two million dollars that Ramteck II had already paid PECO in settlement, and then awarded PECO a total of $9,297,601.20, including damages, prejudgment interest, DTPA additional damages, attorney's fees, and costs.

## *815 II

[1]    [2]    Arthur Andersen first contends that PECO is not a "consumer," a prerequisite to recovery under the DTPA. The DTPA defines a consumer as one "who seeks or acquires by purchase or lease, any goods or services." TEX. BUS. & COM.CODE § 17.45(4). In determining whether a plaintiff is a consumer, our focus is on the plaintiff's relationship to the transaction. *Amstadt v. United States Brass Corp.,* 919 S.W.2d 644, 650 (Tex.1996). As a condition of sale, PECO insisted that Maloney provide audited financial statements. Maloney hired Arthur Andersen for this specific purpose. PECO then relied on those statements in reaching its decision to purchase Maloney. Under these circumstances, we hold that PECO sought and acquired Arthur Andersen's services.

The next question is whether PECO sought and acquired these services *by purchase or lease,* inasmuch as it did not pay for the audit. Our decision in *Kennedy v. Sale,* 689 S.W.2d 890 (Tex.1985), controls this issue. There, we held that the DTPA does not require the consumer to be an actual purchaser or lessor of the goods or services, as long as the consumer is the beneficiary of those goods or services. *Id.*

The Texas Society of Certified Public Accountants, as amicus curiae, argues that a stock purchaser should not be considered a consumer simply because the corporation paid for an audit

for the purchaser's benefit because virtually every external audit benefits third parties. Thus, any stock purchaser who reviews audited financial statements could bring a DTPA claim against the auditor. [1] Our holding is not so broad. In this case, the audit was rendered in connection with the sale of Maloney and was specifically required by PECO and intended to benefit PECO. **Arthur Andersen** was aware that PECO had required the audit and would rely on its accuracy and knew the specific purpose for which it was conducted. We accordingly hold that PECO is a consumer under the DTPA.

**Arthur Andersen** also urges us to reject PECO's consumer status based on the decision in *Hand v. Dean Witter Reynolds Inc.*, 889 **S.W.2d** 483 (Tex.App.—Houston [14th Dist.] 1994, writ denied). In *Hand*, the plaintiff alleged that her stock broker failed to purchase certain commodity option contracts after she requested that he do so. *Id.* at 487–88. After deciding that a commodity option contract is a right, not a "good," under the DTPA, *id.* at 498, the court next considered whether the plaintiff was a consumer by virtue of her purchase of "services." The DTPA defines services as including "services furnished in connection with the sale or repair of goods." TEX. BUS. & COM.CODE § 17.45(2). The court reasoned that the omission of any reference in the definition to services in connection with the sale of something other than a good indicated that services furnished in connection with the sale of intangibles did not fall within the definition of services under the DTPA. *Hand*, 889 **S.W.2d** at 498. The court then concluded: "The key to the [consumer status] determination is whether the purchased goods or services are an objective of the transaction or merely incidental to it." *Id.* at 500.

We believe that *Hand* confirms, rather than defeats, PECO's consumer status. **Arthur Andersen's** audit was not merely incidental to the sale of Maloney to PECO; it was required by PECO and was central to PECO's decision to consummate the purchase. Determining Maloney's financial condition was PECO's primary objective in acquiring **Arthur Andersen's** services. We therefore reject **Arthur Andersen's** contention that *Hand* defeats PECO's status as a consumer under the DTPA.

### III

**Arthur Andersen** next complains that the jury charge allowed the jury to award PECO the entire purchase price of Maloney, without instructing the jury to subtract the value of Maloney stock at the time of the sale. [2] **Arthur**

**\*816** **Andersen** also contends that even if the court had properly instructed the jury, PECO failed to introduce any evidence that the stock was valueless at the time of sale, and thus failed to establish that it was entitled to the entire purchase price under either the "benefit-of-the-bargain" or the "out-of-pocket" measure of damages. PECO responds that in addition to direct damages, consequential damages are also recoverable under the DTPA. PECO thus argues that it is entitled to recover the purchase price as consequential damages.

[3]    Under the version of the DTPA in effect at the time PECO brought this action, a consumer could recover "the amount of actual damages" caused by the defendant's false, misleading, or deceptive conduct. TEX. BUS. & COM.CODE § 17.50(b)(1). [3] The amount of actual damages recoverable is "the total loss sustained as a result of the deceptive trade practice." *Kish v. Van Note*, 692 **S.W.2d** 463, 466 (Tex.1985)(citing *Smith v. Baldwin*, 611 **S.W.2d** 611, 617 (Tex.1980)).

[4]    [5]    [6]    Actual damages are those damages recoverable under common law. *Brown v. American Transfer & Storage Co.*, 601 **S.W.2d** 931, 939 (Tex.), *cert. denied*, 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980). At common law, actual damages are either "direct" or "consequential." *Henry S. Miller Co. v. Bynum*, 836 **S.W.2d** 160, 163 (Tex.1992) (Phillips, C.J., concurring); see RESTATEMENT (SECOND) OF TORTS § 549 (1977) (outlining measure of damages for fraudulent misrepresentation). Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. *See Southwind Aviation, Inc. v. Avendano*, 776 **S.W.2d** 734, 736 (Tex.App.—Corpus Christi 1989, writ denied); *Anderson Dev. Corp. v. Coastal States Crude Gathering Co.*, 543 **S.W.2d** 402, 405 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.). Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act. *See Bynum*, 836 **S.W.2d** at 163 (Phillips, C.J., concurring); *Coastal States*, 543 **S.W.2d** at 405; Anderson, *Incidental and Consequential Damages*, 7 J.L. & COM. 327, 328 (1987).

[7]    [8]    [9]    Consequential damages, on the other hand, result naturally, but not necessarily, from the defendant's wrongful acts. *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 **S.W.2d** 179, 182 (Tex.1995); *Moore v. Anderson*, 30 Tex. 224, 230 (1867). Under the common law, consequential damages need not be the usual result of the wrong, but must

be foreseeable, *see Mead v. Johnson Group, Inc.,* 615 **S.W.2d** 685, 687 (Tex.1981), and must be directly traceable to the wrongful act and result from it. *Airborne Freight Corp., Inc. v. C.R. Lee Enters., Inc.,* 847 **S.W.2d** 289, 295 (Tex.App. —El Paso 1992, writ denied); *El Paso Dev. Co. v. Ravel,* 339 **S.W.2d** 360, 363 (Tex.Civ.App.—El Paso 1960, writ ref'd n.r.e.). Of course, foreseeability is not an element of producing cause under the DTPA. *See Haynes & Boone,* 896 **S.W.2d** at 182; *Prudential Ins. v. Jefferson Assocs.,* 896 **S.W.2d** 156, 161 (Tex.1995). Still, if damages are too remote, too uncertain, or purely conjectural, they cannot be recovered. *See White v. Southwestern Bell Tel. Co., Inc.,* 651 **S.W.2d** 260, 262 (Tex.1983); *see also Bynum,* 836 **S.W.2d** at 164 (Phillips, C.J., concurring).

**\*817** [10]    [11]    [12]    Under Texas common law, direct damages for misrepresentation are measured in two ways. *W.O. Bankston Nissan, Inc. v. Walters,* 754 **S.W.2d** 127, 128 (Tex.1988); *Leyendecker & Assocs., Inc. v. Wechter,* 683 **S.W.2d** 369, 373 (Tex.1984). Out-of-pocket damages measure the difference between the value the buyer has paid and the value of what he has received; benefit-of-the-bargain damages measure the difference between the value as represented and the value received. *Leyendecker,* 683 **S.W.2d** at 373. Under the DTPA, a plaintiff may recover under the damage theory that provides the greater recovery. *Id.* Both measures of damages are determined at the time of sale. *See id.* at 373 (out-of-pocket damages are measured at the time of sale); *see also* Bullion, *An Understanding of Damages Recoverable Under the DTPA,* 20 ST. MARY'S L.J. 667, 670–72 (1989).

[13]    In this case, the jury was not asked to find direct damages at the time of the sale as well as consequential damages attributable to **Arthur** Anderson's misrepresentations. Rather, the jury was simply asked to consider the purchase price as part of the overall damages. PECO did present evidence that the purchase price was eventually a total loss. There was also evidence that Maloney was losing money at the time of the sale and continued to do so until it declared bankruptcy. What PECO did not establish, however, was how much of its loss occurred at the time of the sale and how much was attributable to subsequent events for which **Arthur** Anderson should bear legal responsibility. If subsequent losses were caused by **Arthur Andersen's** wrongful conduct and were not simply part of the risk a buyer of the business would have assumed, they may be part of PECO's consequential damages.

[14]    [15]    Subsequent losses, however, are recoverable only if the misrepresentation is a producing cause of the loss. *See Haynes & Boone,* 896 **S.W.2d** at 182. Without this limitation, an investor could shift the entire risk of an investment to a defendant who made a misrepresentation, even if the loss were unrelated to the misrepresentation. The basis of a misrepresentation claim is that the defendant's false statement induced the plaintiff to assume a risk he would not have taken had the truth been known. But to allow the plaintiff to transfer the entire risk of loss associated with his investment, even risks that the plaintiff accepted knowingly or losses that occurred through no fault of the defendant, would unfairly transform the defendant into an insurer of the plaintiff's entire investment.

Because the charge failed to instruct the jury on the proper measure of direct damages, the submission was reversible error. But, because we find some evidence that **Arthur Andersen's** misrepresentation was a producing cause of PECO's loss, we remand this case for a new trial. *See Spencer v. Eagle Star Ins. Co.,* 876 **S.W.2d** 154, 157 (Tex.1994) (holding that remand is proper when defective liability question is submitted); *Jackson v. Fontaine's Clinics, Inc.,* 499 **S.W.2d** 87, 90 (Tex.1973) (remanding for new trial when defective damages question submitted); *Moulton v. Alamo Ambulance Serv., Inc.,* 414 **S.W.2d** 444, 449–50 (Tex.1967) (affirming remand for new trial when defective damages question submitted).

[16]    We emphasize that a plaintiff's recovery of damages is limited not only by his own evidence, but also by the defendant's evidence of the plaintiff's failure to reasonably mitigate losses or evidence of intervening causes. *See Dubow v. Dragon,* 746 **S.W.2d** 857, 860 (Tex.App.—Dallas 1988, no writ); EDGAR & SALES, TEXAS TORTS & REMEDIES § 43.04[1][b]; Tschoepe et al., *Aspects of Defending A Texas Deceptive Trade Practices–Consumer Protection Act Claim,* 20 ST. MARY'S L.J. 527, 561 (1989). If a plaintiff's losses are attributable to his own mistakes or factors outside either of the parties' control, the defendant may be entitled to an appropriate limiting instruction to the jury.

### IV

Because we are remanding this case for a new trial, we turn now to **Arthur Andersen's** complaint that the trial court improperly awarded PECO attorney's fees calculated as a percentage of recovery.[4]

*818 [17] Attorney contingency fee contracts serve two main purposes. First, they allow plaintiffs who cannot afford to pay a lawyer up-front to pay the lawyer out of any recovery. *See* See, *An Alternative to the Contingent Fee,* 1984 UTAH L.REV. 485, 490 n. 14. Second, such contracts, because they offer the potential of a greater fee than might be earned under an hourly billing method, compensate the attorney for the risk that the attorney will receive no fee whatsoever if the case is lost. *Id.* The lawyer in effect lends the value of his services, which is secured by a share in the client's potential recovery. POSNER, ECONOMIC ANALYSIS OF LAW § 21.9 (4th ed.1992). Under some contingency fee contracts, the attorney also agrees to advance the out-of-pocket costs of the litigation. In such cases, the attorney not only risks loss of the fee, but also risks loss of actual expenditures.

Arthur Andersen complains that an award of contingency fees under a fee-shifting statute like the DTPA forces defendants to pay fees unrelated to the amount of work performed. While this is not always true, shifting these fees to the defendant presents two problems.

First, a contingent fee award based solely on evidence of a percentage fee agreement between a lawyer and client may be determined without regard to many of the factors that should be considered when determining reasonableness. The DTPA allows recovery of "reasonable and necessary attorneys' fees." TEX. BUS. & COM.CODE § 17.50(d). Factors that a factfinder should consider when determining the reasonableness of a fee include:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

TEX. DISCIPLINARY R. PROF. CONDUCT 1.04, *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G app. (STATE BAR RULES, art. X, § 9); *see also Ragsdale v. Progressive Voters League,* 801 **S.W.2d** 880, 881 (Tex.1990); *cf. General Motors Corp. v. Bloyed,* 916 **S.W.2d** 949, 960–961 (Tex.1996) (discussing the relative strengths and weaknesses of the contingent fee and lodestar methods of awarding attorneys fees in the context of a court-approved class action settlement). While we do not doubt that many plaintiffs must contract for a contingent fee to secure the services of a lawyer, we do not believe that the DTPA authorizes the shifting of the plaintiff's entire contingent fee to the defendant without consideration of the factors required by the Rules of Professional Conduct. A contingent fee may indeed be a reasonable fee from the standpoint of the parties to the contract. But, we cannot agree that the mere fact that a party and a lawyer have agreed to a contingent fee means that the fee arrangement is in and of itself reasonable for purposes of shifting that fee to the defendant.

[18] A party's contingent fee agreement should be considered by the factfinder, see TEX. DISCIPLINARY R. PROF. CONDUCT 1.04(b)(8), and is therefore admissible in evidence, but that agreement cannot alone support an award of attorney's fees under Texas Business and Commerce Code section 17.50(d). *See* Brister, *Proof of Attorney's Fees in Texas,* 24 ST. MARY'S L.J. 313, 324 (1993). In other words, the plaintiff cannot simply ask the jury to award a percentage of *819 the recovery as a fee because without evidence of the factors identified in Disciplinary Rule 1.04, the jury has no meaningful way to determine if the fees were in fact reasonable and necessary.

Second, because the jury is not informed what the total amount of the judgment will be, the jury can only speculate about whether a percentage of that unknown recovery will represent a reasonable and necessary fee in that particular case. Rather than leave this question to speculation, the jury must decide the question of attorney's fees specifically in light of the work performed in the very case for which the fee is sought.

[19] In light of these concerns, we hold that to recover attorney's fees under the DTPA, the plaintiff must prove that the amount of fees was both reasonably incurred and necessary to the prosecution of the case at bar, and must ask the jury to award the fees in a specific dollar amount, not as a percentage of the judgment.

For the foregoing reasons, we reverse the judgment of the court of appeals and remand this cause to the trial court for further proceedings consistent with this opinion.

**All Citations**

945 S.W.2d 812, 40 Tex. Sup. Ct. J. 591

Footnotes

1    After PECO brought this action, the Legislature amended the DTPA to preclude consumers from suing under the DTPA for professional negligence or for claims arising from transactions involving consideration of more than $500,000. TEX. BUS. & COM.CODE § 17.49(c) & (g).

2    The charge asked the jury:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate PECO for its losses which resulted from such conduct?
>
> Do not increase or reduce the amount in one answer because of your answer to any other question about damages.
>
> ....
>
> ....
>
> Consider the elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element. Do not include interest on any amount of damages you find.
>
> ....
>
> a. Purchase price of MPSI [Maloney] _____
>
> b. Costs and expenses incurred by PECO as a result of its purchase and ownership of MPSI [listing 13 categories of costs and expenses]

3    In 1995, the Legislature amended § 17.50(b)(1) to permit recovery of "economic damages" and, if the defendant acted knowingly, "damages for mental anguish," instead of "actual damages." Act of May 17, 1995, 74th Leg., R.S., ch. 414, 1995 Tex.Gen. Laws 2992.

4    The jury charge requested the jury to calculate attorney's fees three ways: in dollars and cents, as a percentage of PECO's recovery, and as a combination of dollars and cents and percentage of recovery.

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

## 292 S.W.3d 179
### Court of Appeals of Texas, Tyler.

### In the ESTATE OF J.W. TYNER, Deceased.

No. 12–08–00232–CV. | June 10, 2009. | Supplemental Opinion on Rehearing July 31, 2009.

**Synopsis**
**Background:** Testator's granddaughter, who was biological child of testator's late adopted son, filed declaratory judgment action, seeking to have testator's will construed to determine that she was a descendant as term was used in will and entitled to take under will. Testator's children filed motion for summary judgment, arguing that will excluded granddaughter. Granddaughter filed motion for summary judgment. The County Court at Law No. 3, Smith County, Floyd T. Getz, J., granted summary judgment to children and ordered granddaughter to pay attorney fees. Granddaughter appealed.

**Holdings:** The Court of Appeals, Brian Hoyle, J., held that:

[1] testator's granddaughter was not a "descendant" under will, and, thus, she was not a beneficiary of will, and

[2] attorney fees were properly awarded to children following summary judgment ruling in their favor.

Affirmed as modified.

West Headnotes (19)

[1] **Declaratory Judgment**
⟸ Object and purpose
The purpose of a declaratory judgment is to obtain a clarification of one's rights.

Cases that cite this headnote

[2] **Declaratory Judgment**
⟸ Scope and extent of review in general

Appellate court reviews a declaratory judgment under the same standards as other judgments and decrees. V.T.C.A., Civil Practice & Remedies Code § 37.010.

3 Cases that cite this headnote

[3] **Appeal and Error**
⟸ Cases Triable in Appellate Court
Appellate court reviews the trial court's summary judgment de novo.

Cases that cite this headnote

[4] **Wills**
⟸ Intention of Testator
Court's primary inquiry in interpreting a will is to determine the intent of the testator.

Cases that cite this headnote

[5] **Wills**
⟸ Construction as a Whole
When construing a will, the language of a single clause will not govern, but must be read in the context of the entire instrument.

Cases that cite this headnote

[6] **Wills**
⟸ Construction as a Whole
Every clause and paragraph of a will should be given a construction that makes it consistent with the document as a whole.

Cases that cite this headnote

[7] **Wills**
⟸ Four corners of will
Court, in construing a will, determines the testator's intent from the language used within the four corners of the instrument.

Cases that cite this headnote

[8] **Wills**
⟸ Ascertainment from words of will

If a will is unambiguous, courts should not go beyond its specific terms in search of the testator's intent.

Cases that cite this headnote

**[9]    Wills**
⟜ Parol or extrinsic evidence in general

In the absence of ambiguity in a will, extrinsic evidence may not be introduced to show that the testator intended something outside of the words used.

1 Cases that cite this headnote

**[10]    Wills**
⟜ Issue, descendants, or offspring

Testator's granddaughter, who was biological child of testator's late adopted son, was not a "descendant" under will, and, thus, she was not a beneficiary under will; first article of will identified testator's children as his two biological children, and did not include testator's adopted son, who had predeceased him, such that term "descendents" could not refer to adopted son's descendants, and other article further addressing meaning of term "descendents" indicated that explanation of term "descendant" was a continuation of explanation provided in first article, such that term "descendant" in other article meant first, descendants of the ancestor designated, that is, the ancestor specifically named in first article, and second, adopted children of adopting parents, i.e., those potential adopting parents that had been specifically named in first article.

Cases that cite this headnote

**[11]    Appeal and Error**
⟜ Power to modify judgment or order

Appellate court has the authority to modify incorrect judgments when the necessary information is available for it to do so. Rules App.Proc., Rule 43.2(b).

3 Cases that cite this headnote

**[12]    Costs**
⟜ Evidence as to items

**Judgment**
⟜ Evidence and Affidavits in Particular Cases

When a movant includes a prayer for attorney fees in the summary judgment motion, an affidavit constituting expert opinion testimony can sufficiently establish reasonable attorney fees.

8 Cases that cite this headnote

**[13]    Costs**
⟜ Duties and proceedings of taxing officer

**Judgment**
⟜ Evidence and Affidavits in Particular Cases

To create fact issue, which would preclude summary judgment on attorney fees, nonmovant's attorney must file affidavit contesting reasonableness of movant's attorney fee affidavit.

7 Cases that cite this headnote

**[14]    Judgment**
⟜ Affidavits, Form, Requisites and Execution of

**Judgment**
⟜ Personal knowledge or belief of affiant

**Judgment**
⟜ Sufficiency of affidavit

To constitute proper summary judgment evidence, an affidavit must be made on personal knowledge, set forth facts which would be admissible in evidence, and show the affiant's competence; the allegations must be direct, unequivocal, and such that perjury is assignable. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(f).

Cases that cite this headnote

**[15]    Judgment**
⟜ Evidence and Affidavits in Particular Cases

A summary judgment affidavit filed by the movant's attorney that sets forth his

qualifications, his opinion regarding reasonable attorney fees, and the basis for his opinion will be sufficient to support summary judgment, if uncontroverted. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(f).

8 Cases that cite this headnote

[16] **Wills**

⟡ Fees and Costs

Attorney fees were properly awarded to testator's children following summary judgment ruling in their favor in declaratory judgment action brought by testator's granddaughter seeking to have testator's will construed, as attorney for children filed affidavit that established reasonable attorney fees, and while granddaughter objected to attorney fees requested by children, she did not produce evidence regarding the reasonableness of those requested fees.

1 Cases that cite this headnote

[17] **Declaratory Judgment**

⟡ Determination and disposition of cause

Motions relating to requests for discovery filed by testator's granddaughter in connection with her declaratory judgment action seeking to have testator's will construed were rendered moot by appellate affirmance of summary judgment in favor of testator's children.

Cases that cite this headnote

[18] **Pleading**

⟡ Time to plead and waiver

Plaintiff's failure to obtain ruling on her special exceptions prior to trial court ruling on motion for summary judgment that was subject of special exceptions resulted in waiver of special exceptions.

4 Cases that cite this headnote

[19] **Pleading**

⟡ Time to plead and waiver

Special exceptions that are not called to the trial court's attention and on which the record does not show that the trial court acted are waived.

4 Cases that cite this headnote

**Attorneys and Law Firms**

*181 Robert A. Ray, Tyler, TX, for appellant.

M. Keith Dollahite, Tyler, TX, for appellee.

Panel consisted of WORTHEN, C.J., HOYLE, J., BASS, Retired Justice, Twelfth Court of Appeals, Tyler, sitting by assignment.

## *OPINION*

BRIAN HOYLE, Justice.

Lacey Westbrook appeals from an adverse summary judgment rendered in the declaratory judgment action she initiated to have J.W. **Tyner's** will construed. Westbrook contends the trial court erroneously determined that she is not a beneficiary under the will, set the wrong postjudgment interest rate, erred in awarding attorney's fees without trial, and failed to hold hearings or rule on several of her motions. We modify the judgment to reflect the correct postjudgment interest rate and to delete the award of attorney's fees for postjudgment collection and affirm as modified.

## *BACKGROUND*

Westbrook is the biological daughter of J.W. **Tyner's** adopted son, Gordon. Gordon died on November 13, 2002. Less than two weeks later, on November 25, 2002, J.W. executed his will, leaving the bulk of his estate to his wife, Hallye. J.W. died March 27, 2006, and his will was admitted to probate.

Westbrook filed a petition for declaratory judgment asking the court to construe J.W.'s will and determine that she is a descendant as the term is used in the will and entitled to take under the will. Appellees Hallye **Tyner**, Zoe Anna **Tyner**, and Mitzi **Tyner** Parks filed a motion for summary judgment arguing that the unambiguous will excludes Westbrook or, if the will is ambiguous, extraneous evidence establishes

that the will excludes Westbrook. Alternatively, they argued, Westbrook released this claim in a compromise settlement agreement signed in 2005.

Westbrook also moved for summary judgment, asserting the right to judgment as a matter of law because the will, she argues, unambiguously includes her as a descendant entitled to take under the will. The trial court determined that the will is not ambiguous and that it limits J.W.'s children to Zoe Anna Tyner and Mitzi Tyner Parks; limits J.W.'s descendants to the descendants of Zoe Anna Tyner and Mitzi Tyner Parks; and excludes Westbrook from being a descendant and beneficiary under the will. The court awarded Appellees their attorney's fees and ordered Westbrook to pay postjudgment interest at the rate of 7.25%.

### STANDARD OF REVIEW

[1]  [2]  [3]  The purpose of a declaratory judgment is to obtain a clarification of *182 one's rights. *J.E.M. v. Fidelity & Cas. Co. of New York,* 928 S.W.2d 668, 671 (Tex.App.-Houston [1st Dist.] 1996, no writ). We review a declaratory judgment under the same standards as other judgments and decrees. TEX. CIV. PRAC. & REM.CODE ANN. § 37.010 (Vernon 2008). We review the trial court's summary judgment de novo. *Tittizer v. Union Gas Corp.,* 171 S.W.3d 857, 860 (Tex.2005). To prevail on a traditional summary judgment motion, the movant must show that no genuine issue of material fact exists and that she is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c). Once the movant has established a right to summary judgment, the nonmovant has the burden to respond to the motion for summary judgment and present to the trial court any issues that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678–79 (Tex.1979).

### CONSTRUING THE WILL

In her first issue, Westbrook asserts that the two sections of the will defining "descendants," when construed together, unambiguously indicate J.W.'s intention that she inherit under the will. She argues that J.W. described some descendants in Article I and then described additional descendants, that is, descendants of adopted children, including herself, in Article XI. She also asserts that J.W. is the "ancestor designated" and the "adopting parent" referenced in Article XI, paragraph

C. She further argues that she, the daughter of Gordon, the adopted son, is the "lineal blood descendant" of J.W. and therefore eligible to inherit under the will. Because Westbrook's interpretation is inconsistent with the context, we disagree.

### Applicable Law

[4]  [5]  [6]  [7]  [8]  [9]  Our primary inquiry in interpreting a will is to determine the intent of the testator. *Gee v. Read,* 606 S.W.2d 677, 680 (Tex.1980). In doing so, the language of a single clause will not govern, but must be read in the context of the entire instrument. *Eldridge v. Marshall Nat'l Bank,* 527 S.W.2d 222, 226 (Tex.Civ.App.-Houston [14th Dist.] 1975, writ ref'd n.r.e.). Every clause and paragraph should be given a construction that makes it consistent with the document as a whole. *Bloodworth v. Bloodworth,* 467 S.W.2d 218, 220 (Tex.Civ.App.-Eastland 1971, writ ref'd n.r.e.). Further, we determine the testator's intent from the language used within the four corners of the instrument. *San Antonio Area Found. v. Lang,* 35 S.W.3d 636, 639 (Tex.2000). If the will is unambiguous, courts should not go beyond its specific terms in search of the testator's intent. *Id.* Accordingly, in the absence of ambiguity, extrinsic evidence may not be introduced to show that the testator intended something outside of the words used. *Id.*

### Discussion

[10]  In Article I, paragraph B, J.W. identified his children.

> *Children.* I have two children, ZOE ANNA TYNER and MITZI TYNER PARKS. All references in this Will to "my children" are to ZOE ANNA TYNER and MITZI TYNER PARKS. All references to "my descendants" shall be to my children (as defined above) and their descendants.

In Article XI, paragraph C, J.W. further addressed the meaning of the term "descendant."

> *Descendants.* References to "descendant" or "descendants" mean, in addition to any definition set forth in Article I, lineal blood descendants of the first, second or any other degree of the ancestor designated; provided, however, such references shall include, with respect to *183 any provision of this Will, descendants who have been conceived at any specific point in time relevant to such provision and who thereafter survive birth; and provided, further, an adopted child and such adopted child's lineal descendants by blood or adoption shall be considered under my Will as lineal blood descendants of the adopting

parent or parents and of anyone who is by blood or adoption a lineal ancestor of the adopting parent or of either of the adopting parents.

Article I of the will specifically identifies J.W.'s children and does not include Gordon, who had predeceased J.W. Therefore, the term "descendants," as used in Article I, cannot refer to Gordon's descendants. Article XI begins by stating that references to "descendants" mean lineal blood descendants of the "ancestor designated." Throughout the will, J.W. spoke in the first person, referring to himself as "I." It is unlikely that he would suddenly refer to himself as the "ancestor designated." In Article XI, paragraph C, he uses the phrases "my Will" and "adopting parent" in the same sentence. Again, it is illogical to interpret this to mean that J.W. is referring to himself as the "adopting parent."

Further, Article XI refers specifically to Article I, indicating that the explanation of the term "descendant" is a continuation of the explanation that began in Article I. Construing the two paragraphs together, the term "descendant" in Article XI means first, descendants of the ancestor designated, that is, the ancestor specifically named in Article I, and second, adopted children of the adopting parents, those potential adopting parents having been specifically named in Article I.

Considering the four corners of the will, we conclude that J.W. intended to limit the term "descendants" to mean only children and adopted children of Zoe Anna Tyner and Mitzi Tyner Parks. The will cannot properly be interpreted in a manner including Westbrook as a descendant. *See Bloodworth,* 467 S.W.2d at 220. Accordingly, the trial court correctly determined that Westbrook is not a descendant and beneficiary under J.W.'s will. We overrule Westbrook's first issue.

## INTEREST RATE

In her second issue, Westbrook asserts that the trial court incorrectly set the postjudgment interest rate at 7.5% when the correct postjudgment interest rate at the time was 6.00%. Appellees concede that the correct interest rate is 6.00%.

[11] Section 304.003(c) of the Texas Finance Code provides that the postjudgment interest rate is "the prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation." Tex. Fin.Code Ann. § 304.003(c) (Vernon 2006). The Federal Reserve Board

prime rate on March 12, 2008, the date of the judgment in this case, was 6.00%. See http://www.federalreserve.go v/releases/h15/data/Business_day/H15_PRIME_NA.txt. We have the authority to modify incorrect judgments when the necessary information is available for us to do so. *See* Tex.R.App. P. 43.2(b); *Mullins v. Mullins,* 202 S.W.3d 869, 878 (Tex.App.-Dallas 2006, pet. denied). We therefore modify the judgment to reflect the correct percentage. *See Dees v. State,* 822 S.W.2d 703, 707 (Tex.App.-Dallas 1991), *aff'd,* 865 S.W.2d 461 (Tex.Crim.App.1993). We sustain Westbrook's second issue.

## ATTORNEY'S FEES

In her **third** issue, Westbrook contends the trial court erred by awarding attorney's fees to Appellees without first having a hearing on the issue. She argues that, *184 in light of her objection to Appellees' evidence of attorney's fees and her demand for a jury trial, the amount of attorney's fees was a fact question for the jury. She further contends that Appellees' affidavit for attorney's fees was "factually insufficient" because the affidavit did not list any facts on which the court could base an award of $5,000.00 for postjudgment collection. Finally, she asserts that the award for collection is moot because she posted cash to supersede the judgment.

In their motion for summary judgment, Appellees asked the court to order Westbrook to pay their attorney's fees but offered no evidence on fees at the time. The court signed an order granting Appellees' motion but specifically stated in the order that it is interlocutory "because it does not determine the amount of attorney's fees that should be awarded to [Appellees.]" The following month, Appellees filed a motion for attorney's fees supported by an affidavit of their attorney in which he asserted that the reasonable, necessary, and customary fees for legal services in this action total $53,795.00.

Thereafter, Westbrook filed a motion for attorney's fees "pursuant to the Summary Judgment that the Court should have granted." The motion was supported by her attorney's affidavit, setting out the amount of fees she requested. In the same motion, Westbrook objected to the fees requested by Appellees and the affidavit filed on their behalf. The trial court's final judgment granted both Appellees' motion for summary judgment and their motion for attorney's fees. The

court ordered Westbrook to pay Appellees up to $53,795.00, depending on the extent of postjudgment appellate activity.

[12] [13] [14] [15] When a movant includes prayer for attorney's fees in the summary judgment motion, an affidavit constituting expert opinion testimony can sufficiently establish reasonable attorney's fees. *Owen Elec. Supply, Inc. v. Brite Day Constr., Inc.,* 821 **S.W.**2d 283, 288 (Tex.App.Houston [1st Dist.] 1991, writ denied). To create a fact issue, the nonmovant's attorney must file an affidavit contesting the reasonableness of the movant's attorney's fee affidavit. *Id.* To constitute proper summary judgment evidence, an affidavit must be made on personal knowledge, set forth facts which would be admissible in evidence, and show the affiant's competence. TEX.R. CIV. P. 166a(f). The allegations must be direct, unequivocal, and such that perjury is assignable. *AU Pharmaceutical, Inc. v. Boston,* 986 **S.W.**2d 331, 338 (Tex.App.-Texarkana 1999, no pet.). Thus, an affidavit filed by the movant's attorney that sets forth his qualifications, his opinion regarding reasonable attorney's fees, and the basis for his opinion will be sufficient to support summary judgment, if uncontroverted. *Basin Credit Consultants, Inc. v. Obregon,* 2 **S.W.**3d 372, 373 (Tex.App.-San Antonio 1999, pet. denied).

[16] Appellees' attorney swore under oath that he is a licensed attorney, he is familiar with the reasonable and necessary attorney's fees charged for appeals in civil actions such as this case, he has personal knowledge of the services rendered to Appellees in this matter, and those services were reasonable, necessary, and customary. Thus, Appellees' attorney's affidavit sufficiently established reasonable attorney's fees and is legally sufficient to support the trial court's award of attorney's fees. *See Columbia Rio Grande Reg'l Hosp. v. Stover,* 17 **S.W.**3d 387, 397 (Tex.App.-Corpus Christi 2000, no pet.); *Querner Truck Lines, Inc. v. Alta Verde Indus., Inc.,* 747 **S.W.**2d 464, 468–69 (Tex.App.-San Antonio 1988, no writ).

The burden then shifted to Westbrook to provide controverting evidence raising *185 an issue of fact as to the amount of attorney's fees she should have to pay. *Owen Elec. Supply, Inc.,* 821 **S.W.**2d at 288. Westbrook's evidence addressed only her own request for attorney's fees. While Westbrook objected to Appellees' requested attorney's fees and their evidence, she did not produce evidence regarding the reasonableness of those requested fees. Accordingly, Westbrook did not raise a fact question triggering the need for an evidentiary hearing before a fact finder.

Westbrook, however, raises an error regarding a specific award. She asserts that the award of $5,000.00 for postjudgment collection is moot because she posted cash to supersede the judgment. Appellees agree, contending that this is not a proper subject for this court's adjudication. The record includes an agreed motion to fix the amount of security for supersedeas, but no order. However, since the parties agree that Appellees are not entitled to an award for postjudgment collection, we will accept this fact as true. *See* TEX.R.APP. P. 38.1(f). Accordingly, because the trial court did not err in failing to hold a hearing on the issue of attorney's fees, we overrule Westbrook's **third** issue to the extent of that complaint. We modify the trial court's judgment to reflect that Appellees are not entitled to an award for postjudgment collection.

## MOTIONS

[17] In her fourth issue, Westbrook asserts the trial court erred in failing to hold hearings or rule on her motion to compel discovery, motion to strike evidence, motion for continuance, supplemental motion for continuance, and special exceptions to Appellees' motion for summary judgment. The four motions all relate to Westbrook's requests for discovery. Because the summary judgment was properly decided, any controversy regarding these motions ceased to exist. Therefore, the issue is moot as to these motions. *See Williams v. Lara,* 52 **S.W.**3d 171, 184 (Tex.2001).

[18] Westbrook filed special exceptions to Appellees' motion for summary judgment asserting that the motion does not clearly state the grounds on which summary judgment is sought. She also excepted to certain paragraphs because they refer to extrinsic evidence, controverted evidence, hearsay, and factual and legal conclusions. She did not specifically identify the evidence or conclusions to which she referred. She did not, in that document, ask the court to set a hearing on her special exceptions. On the same day that she filed her special exceptions, she filed a motion for continuance asking the court to reset the submission date so that she had adequate notice and time to complete discovery.

[19] Three months later, the trial court signed an interlocutory summary judgment in favor of Appellees without addressing the special exceptions. The trial court did not sign an order specifically addressing Westbrook's special exceptions. However, the final judgment includes

the statement that all relief not expressly granted is denied. Special exceptions that are not called to the trial court's attention and on which the record does not show that the trial court acted are waived. *R.I.O. Sys., Inc. v. Union Carbide Corp.*, 780 S.W.2d 489, 491 (Tex.App.-Corpus Christi 1989, writ denied). Westbrook had the burden to obtain a hearing to present her special exceptions to the trial court and obtain a ruling on them before it ruled on the summary judgment that was the subject of the special exceptions. Her failure to do so resulted in waiver of her complaint. Furthermore, due to a lack of specificity, her special exceptions fall short of the standard mandated by Texas Rule of Civil Procedure 91. That rule requires **\*186** the party filing a special exception to point out the particular pleading excepted to and to point out intelligibly and with particularity the defect or insufficiency in the allegations in the pleading excepted to. TEX.R. CIV. P. 91; *Castano v. San Felipe Agric., Mfg., & Irrigation Co.*, 147 S.W.3d 444, 453 (Tex.App.-San Antonio 2004, no pet.). We overrule Westbrook's fourth issue.

### CONCLUSION

In his unambiguous will, J.W. Tyner limited the term "descendants" in a manner that excludes Westbrook. Therefore, the trial court correctly determined that Westbrook is not a descendant and beneficiary under J.W. Tyner's will. We *modify* the judgment to reflect that Westbrook is to pay postjudgment interest at the rate of 6.00% and to delete the $5,000.00 award of attorney's fees for enforcing and collecting the judgment.

As *modified*, we *affirm* the trial court's judgment.

### SUPPLEMENTAL OPINION ON REHEARING

Lacey Westbrook filed a motion for rehearing, asserting that this court erred in determining that she was not entitled to a jury trial on attorney's fees and that she is not a beneficiary under the will of J.W. Tyner. She also asks for clarification of the amount of attorney's fees she is required to pay. Appellees Hallye Tyner, Zoe Anna Tyner, and Mitzi Tyner Parks

also filed a motion for rehearing seeking clarification of the amount of attorney's fees Westbrook is obligated to pay. We grant Appellees' motion, overrule Westbrook's motion, and issue this supplemental opinion on rehearing to address the amount of attorney's fees Westbrook is required to pay.

The trial court judgment states that Westbrook is to pay $15,000.00 in attorney's fees "[f]or responding to a brief and for oral argument in the Court of Appeals, if Plaintiff appeals and Defendants prevail in the appeal." In our original opinion, we determined that the trial court judgment ordered Westbrook to pay a higher postjudgment interest rate than she was legally required to pay and improperly ordered her to pay $5,000.00 in attorney's fees for enforcing and collecting the judgment. On rehearing, Westbrook argues that this court ruled in her favor on these issues, she prevailed in the appeal, and therefore, she is not required to pay the $15,000.00 attorney's fee award. Appellees respond by arguing that they prevailed in the appeal because they won on the main issue of the construction of the will. We agree with Appellees.

In general, the prevailing party is the party that either successfully prosecutes the action or defends against it, prevailing on the main issue, even though not to the extent of its original contention. *FDIC v. Graham*, 882 S.W.2d 890, 900 (Tex.App.-Houston [14th Dist.] 1994, no writ). The prevailing party is the party vindicated by the judgment rendered. *Dear v. City of Irving*, 902 S.W.2d 731, 739 (Tex.App.-Austin 1995, writ denied).

The main issue in this appeal, the question of whether Westbrook is a beneficiary under J.W. Tyner's will, has been decided against her. Accordingly, Appellees prevailed on the main issue in this appeal. The $15,000.00 award for attorney's fees Westbrook is to pay for appealing to this court is included in the portion of the trial court's judgment that we affirmed.

We *grant* Appellees' motion for rehearing and *overrule* Westbrook's motion for rehearing.

### All Citations

292 S.W.3d 179

KeyCite Yellow Flag - Negative Treatment

**Declined to Follow by**   Walden v. Affiliated Computer Services, Inc., Tex.App.-Hous. (14 Dist.),   January 16, 2003

21 S.W.3d 732
Court of Appeals of Texas,
Houston (14th Dist.).

**ACADEMY CORP.**, Appellant,

v.

**INTERIOR BUILDOUT &**
**TURNKEY** CONSTRUCTION, INC.
and Thomas Stuckey, Appellees.

No. 14–98–00885–CV.   |   June 15,
2000.   |   Rehearing Overruled July 13, 2000.

Remodeling company filed action against store owner, asserting claims for breach of contract, quantum meruit, and verified account, and store owner brought counterclaims against remodeling company, and its owner as **third**-party defendant, for breach of contract, fraud, conspiracy to commit fraud, and unjust enrichment. After a jury trial, the 127th District Court, Harris County, Sharolyn Wood, J., entered judgment awarding damages and attorney fees to remodeling company. Store owner appealed. The Court of Appeals, Maurice E. Amidei, J., held that: (1) automatic stay in bankruptcy proceeding did not prevent state court from proceeding with case after remand by bankruptcy court; (2) evidence of kickback scheme involving other contractors and former store employee was not relevant; (3) contracts expressly provided for remodeling company to pay taxes related remodeling work at stores, which thus precluded unjust enrichment claims based on alleged failure to pay such taxes; (4) evidence was legally sufficient to support award of $150,000 in attorney fees to remodeling company; (5) sum due and payable on underlying contracts was ascertainable from contracts, which thus triggered award of prejudgment interest at lower statutory rate.

Affirmed in part, and reversed and remanded in part.

West Headnotes (30)

[1]    **Bankruptcy**
    Remand to state court

Although bankruptcy court acquired jurisdiction over case upon its removal from state court to that court, state court was revested with jurisdiction over the case once the bankruptcy court ordered the case remanded and mailed a certified copy of the remand order to the state court.

1 Cases that cite this headnote

[2]    **Bankruptcy**
    Remand to state court

**Bankruptcy**
    Determination and relief; conditions

Relief from automatic stay was granted by bankruptcy court's order remanding case to state court, and thus, automatic stay did not prevent state court from proceeding with case after remand. Bankr.Code, 11 U.S.C.A. § 362; Fed.Rules Civ.Proc.Rule 62, 28 U.S.C.A.; Fed.Rules Bankr.Proc.Rule 7062, 11 U.S.C.A.

1 Cases that cite this headnote

[3]    **Bankruptcy**
    Effect of Transfer

Any appeal from order of bankruptcy court remanding case to state court would not prevent state court from proceeding with case under federal bankruptcy rule providing 10-day period in which to file notice of appeal after entry of order, absent any stay of state court proceedings issued by federal district court or federal court of appeals. Fed.Rules Bankr.Proc.Rule 8002(a), 11 U.S.C.A.

1 Cases that cite this headnote

[4]    **Contracts**
    Questions for Jury

Issue of whether store owner could retain contract payments owed to remodeling company until remodeling company paid sales and employment taxes could be tried by court as issue of law, rather than submitted to jury, in view of remodeling company's position at trial that it did not want judgment for unpaid taxes but

rather wanted to retain contract payments until remodeling company paid taxes.

Cases that cite this headnote

**[5]     Trial**
  ⬦ Admission of evidence in general

Admission or exclusion of evidence rests within the sound discretion of the trial court.

Cases that cite this headnote

**[6]     Appeal and Error**
  ⬦ Evidence in General

**Appeal and Error**
  ⬦ Prejudicial Effect

To obtain reversal of a judgment based upon error in the admission or exclusion of evidence, the appellant must show: (1) that the trial court did in fact commit error, and (2) that the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment; therefore, the appellant must show the judgment turns on the particular excluded or admitted evidence. Rules App.Proc., Rule 44.1.

1 Cases that cite this headnote

**[7]     Appeal and Error**
  ⬦ Failure or refusal to find on part of issues

Store owner was not harmed by trial court's refusal to make findings of fact and conclusions of law on issue of whether store owner could retain contract payments owed to remodeling company until remodeling company paid sales and employment taxes, where trial court informed owner that its position was untenable; there was not more than one basis on which trial court could have ruled and owner was not left to guess basis for ruling.

Cases that cite this headnote

**[8]     Trial**
  ⬦ Duty to Make in General

If findings of fact and conclusions of law are properly requested, the trial court has a mandatory duty to file findings and conclusions.

2 Cases that cite this headnote

**[9]     Appeal and Error**
  ⬦ Presumption as to Effect of Error

**Appeal and Error**
  ⬦ Failure or refusal to find on part of issues

Failure of trial court to file requested findings and conclusions is presumed harmful, unless the record affirmatively shows that the complaining party suffered no injury; appellant is harmed if there are two or more possible grounds on which the trial court could have ruled, and the appellant is left to guess the basis for the trial court's ruling.

1 Cases that cite this headnote

**[10]    Appeal and Error**
  ⬦ When authorized or required in general

If harm is shown by the trial court's failure to issue findings of fact and conclusions of law, the appropriate remedy is to abate the appeal and direct the trial court to correct its error, rather than reversal and remand for new trial. Rules App.Proc., Rule 44.1.

4 Cases that cite this headnote

**[11]    Evidence**
  ⬦ Showing Intent or Malice or Motive

Any evidence that witness and former store employee intended to, and prepared to, engage in kickback scheme with various contractors or projects other than remodeling project at two particular stores was not admissible as other wrongs evidence in breach of contract action concerning remodeling project to show intent, preparation and plan to collect kickbacks, where such evidence did not explain or detail any involvement of remodeling company in alleged scheme and did not conclusively establish any wrongdoing on part of remodeling company. Rules of Evid., Rule 404(b).

Cases that cite this headnote

**[12]** **Contracts**
&#8477; Admissibility

Contractor's testimony regarding his own payments to former employee of store in alleged kickback scheme was not relevant to show that remodeling company and its owner were involved with former employee in any kickback scheme as asserted by store owner in breach of contract action against remodeling company defendants. Rules of Evid., Rule 401.

Cases that cite this headnote

**[13]** **Contracts**
&#8477; Admissibility

Contractor's testimony regarding another contractor's initial refusal and subsequent agreement to pay kickbacks to former store employee, how bids were to be rigged, and employee's receipt of cash at party attended by many of store's contractors was not relevant in breach of contract action between remodeling company and store owner, given that testimony did not establish any involvement by remodeling company or its owner in alleged kickback scheme. Rules of Evid., Rules 401, 402.

Cases that cite this headnote

**[14]** **Witnesses**
&#8477; Competency of contradictory evidence

Contractor's testimony regarding kickbacks he paid to former store employee and employee's demands for kickbacks was not relevant in breach of contract action between store owner and remodeling company to impeach employee's denial of involvement in kickback scheme to defraud store owner, given that testimony did not establish any involvement by remodeling company or its owner in alleged kickback scheme. Rules of Evid., Rules 401, 402, 613.

Cases that cite this headnote

**[15]** **Contracts**

&#8477; Admissibility

Evidence of store owner's damages from alleged kickback scheme involving former store employee and various contractors was not relevant to breach of contract action between store owner and remodeling company, absent any evidence that remodeling company and its owner were part of alleged kickback conspiracy.

Cases that cite this headnote

**[16]** **Implied and Constructive Contracts**
&#8477; Contract for Services

Contracts between store owner and remodeling company expressly provided for remodeling company to pay federal and state taxes related to remodeling work at stores, which thus precluded store owner's unjust enrichment claims based on remodeling company's alleged failed to pay such taxes.

Cases that cite this headnote

**[17]** **Implied and Constructive Contracts**
&#8477; Unjust enrichment

Party may recover under the theory of unjust enrichment when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.

2 Cases that cite this headnote

**[18]** **Implied and Constructive Contracts**
&#8477; Unjust enrichment

Unjust enrichment is not a proper remedy merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant, or because the benefits to the person sought to be charged amount to a windfall.

4 Cases that cite this headnote

**[19]** **Implied and Constructive Contracts**
&#8477; Effect of Express Contract

Plaintiff cannot recover under unjust enrichment if the same subject is covered by an express contract.

3 Cases that cite this headnote

**[20]**    **Appeal and Error**
   ⬥⟿ Total failure of proof

When reviewing a challenge to the legal sufficiency of the evidence, i.e., a "no evidence" issue, the reviewing court may consider only the evidence and inferences that support the challenged finding and should disregard all evidence and inferences to the contrary.

1 Cases that cite this headnote

**[]**    **Appeal and Error**
   ⬥⟿ Total failure of proof

No evidence point will be sustained if there is no more than a scintilla of evidence to support the finding.

Cases that cite this headnote

**[22]**    **Costs**
   ⬥⟿ Items and amount; hours; rate

Factors for determining the reasonableness and necessity of attorney fees are: (1) time and labor involved, novelty and difficulty of questions involved, and skill required to perform legal services properly; (2) likelihood acceptance of particular employment will preclude other employment by lawyer; (3) fee customarily charged in locality for similar legal services; (4) amount involved and results obtained; (5) time limitations imposed by client or circumstances; (6) nature and length of professional relationship with client; (7) experience, reputation, and ability of lawyer or lawyers performing the services; and (8) whether fee is fixed or contingent on results obtained or uncertainty of collection before legal services have been rendered.

24 Cases that cite this headnote

**[23]**    **Costs**

   ⬥⟿ Evidence as to items
**Costs**
   ⬥⟿ Taxation of costs on appeal or error

Evidence was legally sufficient to support award of $150,000 in attorney fees to remodeling company for prosecution of breach of contract and other claims against store owner through trial, $20,000 for appeal to court of appeals, $5,000 if review is sought in Supreme Court, and $5,000 if review is granted, where attorney testified to his experience, that his firm spent 1200 hours on case, to types of work performed, that work was reasonable and necessary, and that rates of $150 per hour for his time and $100 for that of his associates was reasonable for type of work performed.

1 Cases that cite this headnote

**[24]**    **Appeal and Error**
   ⬥⟿ Necessity of timely objection

**Appeal and Error**
   ⬥⟿ Instructions

**Appeal and Error**
   ⬥⟿ Necessity of Ruling on Objection or Motion

To preserve error in the jury charge, a party must make the trial court aware of the complaint, timely and plainly, and obtain a ruling.

Cases that cite this headnote

**[25]**    **Appeal and Error**
   ⬥⟿ Necessity of timely objection

By not objecting to failure of trial court to instruct jury on all factors for determining reasonableness and necessity of attorney fees prior to charge being submitted to jury, store owner waived any error with regard to complaint about instructions.

3 Cases that cite this headnote

**[26]**    **Appeal and Error**
   ⬥⟿ Questions and Objections in General

Store owner waived complaint that certain issues in breach of contract action could have been resolved by stipulation rather than by

summary judgment, absent anything in record indicating store owner attempted to introduce, or objected to the exclusion of, that evidence. Rules App.Proc., Rule 33.1.

1 Cases that cite this headnote

**[27]    Costs**

American rule; necessity of contractual or statutory authorization or grounds in equity

**Costs**

Particular Actions or Proceedings

Attorney fees are recoverable only by statute or by contract, and thus are not recoverable on tort claims.

4 Cases that cite this headnote

**[28]    Costs**

Prevailing party

To be entitled to recovery of statutory award of attorney fees, the party must: (1) prevail on a cause of action for which attorney fees are recoverable, and (2) recover damages. V.T.C.A., Civil Practice & Remedies Code § 38.001.

4 Cases that cite this headnote

**[29]    Interest**

Computation of rate in general

Sum due and payable to remodeling company on underlying contracts with store owner was ascertainable from contracts, which thus triggered award of prejudgment interest at lower statutory rate to be computed from date 30 days after amount became due and payable. V.T.C.A., Finance Code § 302.002.

2 Cases that cite this headnote

**[30]    Interest**

Computation of rate in general

Contract is one "ascertaining the sum payable" so as to support application of statute authorizing award of prejudgment interest at lower rate if the contract provides the conditions upon which liability depends and fixes a measure by which the sum payable can be ascertained with reasonable certainty, in light of the attending circumstances. V.T.C.A., Finance Code § 302.002.

4 Cases that cite this headnote

**Attorneys and Law Firms**

*736 Charles Herring, Jr., Tim N. Sims, Austin, for appellants.

Brian D. Womac, Richard N. Countiss, Houston, for appellees.

Panel consists of Justices MAURICE E. AMIDEI, EDELMAN, and WITTIG.

## OPINION

MAURICE E. AMIDEI, Justice.

Academy Corp. ("Academy"), appeals the judgment entered in favor of Interior Buildout and Turnkey Construction, Inc. ("Turnkey") on its claim for breach of contract. Academy also appeals the trial court's judgment that it take nothing on its claims against Turnkey and Thomas Stuckey ("Stuckey"). We affirm, in part, and reverse and remand, in part.

### I. Background

Academy owns a chain of retail sporting goods stores. Turnkey is a construction company, which remodels interiors. Academy and Turnkey entered into two contracts for the remodeling of two of Academy's stores located in San Antonio and League City (the "San Antonio and League City contracts"). Asserting claims for breach of contract, quantum meruit, and verified account, Turnkey sued Academy for withholding payments totaling $235,811.11 under the San Antonio and League City contracts. In response, Academy brought counterclaims against Turnkey, and joined Stuckey, the owner of Turnkey, as a third-party defendant, for breach of contract, fraud, conspiracy to commit fraud, and unjust enrichment.

The case was tried to a jury, which found against **Academy** on: (1) its breach of contract, fraud, and conspiracy claims, and (2) its defense that its withholding of the $235,811.11 was excused. The jury further awarded **Turnkey** $150,000 in attorney's fees for services rendered for trial; $20,000 in the event of appeal to the court of appeals; $5,000 if review is sought in the Texas Supreme Court; and $5,000 if review is granted. Based on the jury's verdict, the trial court entered judgment awarding **Turnkey** $235,811.11 on its breach of contract claim and attorney's fees in accordance with the amount awarded by the jury. The trial court further ordered that **Academy** take nothing on its counterclaims against **Turnkey** and its **third**-party action against Stuckey.

## II. Subject Matter Jurisdiction

In its first issue, **Academy** asserts that the trial court lacked subject matter jurisdiction over this case at the time of trial. **Academy** joined Ronnie Bartee, a former **Academy** employee, as a **third**-party defendant. Bartee, however, filed for bankruptcy *737 and **Academy** removed the case to the United States Bankruptcy Court, Southern District of Texas. On May 1, 1998, the bankruptcy court ordered **Academy's** claims against Bartee severed, and remanded the remaining claims to state court. On May 4, 1998, the trial court called the case to trial.

The Federal Rules of Bankruptcy Procedure provide a ten-day period after the entry of a judgment or order in which to file a notice of appeal. *See* FED. R. BANKR. P. 8002(a). **Academy** claims the trial court lacked subject matter jurisdiction to try the case on May 4, because that was still within the ten-day period in which to appeal the bankruptcy court's remand order; therefore, the bankruptcy court retained exclusive jurisdiction. We note that in its brief to this court, **Academy** states that it "chose not to appeal" the bankruptcy court's remand order.

[1]    The bankruptcy court acquired jurisdiction over this case upon removal to that court. *See Stewart Title Co. v. Street,* 731 **S.W.**2d 737, 739 (Tex.App.-Fort Worth 1987, no writ); *Henke Grain Co. v. Keenan,* 658 **S.W.**2d 343, 346 (Tex.App.-Corpus Christi 1983, no writ). However, once the bankruptcy court ordered the case remanded and mailed a certified copy of the remand order to the state district court, that court was revested with jurisdiction over this case. *See Dallas Bank & Trust Co. v. Frigiking, Inc.,* 692 **S.W.**2d 163, 165 (Tex.App.-Dallas 1985, writ ref'd n.r.e.) (finding the termination of

the bankruptcy court's jurisdiction was complete when it mailed a certified copy of the remand order to the district clerk of Dallas County); *see also Quaestor Inv., Inc. v. State of Chiapas,* 997 **S.W.**2d 226, 227 (Tex.1999) (per curiam) (holding that the state court is revested with jurisdiction when a federal district court executes the remand order and mails a certified copy of the order to the state court).

[2]    **Academy** alternatively contends that this case was stayed under an automatic stay provision set forth in the Rules of Bankruptcy Procecure. *See* F ED. R. BANKR. P. 7062. Rule 7062 states that the ten-day stay of the enforcement of judgments provided by Federal Rule of Civil Procedure 62 applies in adversary proceedings. *See id.* Rule 7062, however, further provides that when relief is granted from 11 U.SC. § 362, which is the relief that was granted in the bankruptcy court's order in this case, there is no automatic stay provided by Rule 62. *See id.* Therefore, **Academy** may not rely on Rule 7062.

[3]    Moreover, even if **Academy** had appealed the remand order, it would have had to obtain a stay of the state court proceedings from the federal district court or the federal court of appeals. Without a stay, the state court is free to proceed. *See Fosdick v. Dunwoody,* 420 F.2d 1140, 1141 (1 st Cir.1970) (observing that "absent a supersedeas, an appeal does not vacate orders of the district court, further state proceedings are not avoidable"); *Citizens Bank & Trust Co. v. Carr,* 583 So.2d 864, 866 n. 2 (La.App. 1 st Cir.), *writ denied,* 588 So.2d 109 (La.1991) (determining that the state court has jurisdiction while an appeal of a remand order is pending and further state court proceedings are appropriate unless a stay of the state court proceedings has been obtained); *Drew v. Unauthorized Practice of Law Comm.,* 970 **S.W.**2d 152, 156 (Tex.App.-Austin 1998, pet. denied) (finding that state trial court did not err in continuing its proceedings after remand from federal district court while appeal of remand order was pending, in light of the appellant's failure to obtain stay of the state court proceedings from either the federal district court or court of appeals). In any event, **Academy** did not seek or obtain a stay of the state trial court proceedings. We find that the trial court had subject matter jurisdiction over this case and, accordingly, overrule **Academy's** first issue.

## III. Sales and Employment Taxes

### A. Exclusion of Evidence

[4] [5] [6] In its second issue, **Academy** claims that the trial court erred in excluding *738 evidence from the jury concerning **Turnkey's** failure to withhold and pay sales and employment taxes, which formed one basis for **Academy's** breach of contract claim. The admission or exclusion of evidence rests within the sound discretion of the trial court. *See City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). To obtain reversal of a judgment based upon error in the admission or exclusion of evidence, the appellant must show: (1) that the trial court did in fact commit error, and (2) that the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1; *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989). Therefore, the appellant must show the judgment turns on the particular excluded or admitted evidence. *See Alvarado,* 897 S.W.2d at 753–54.

**Academy** offered the testimony of Gary Winkler, **Academy's** comptroller, to show that from 1991 to 1996, **Turnkey** failed to pay sales taxes to the State in connection with goods and services **Turnkey** provided to **Academy**, and employment taxes on its employees. According to **Academy**, such evidence established: (1) **Turnkey's** breach of the San Antonio and League City contracts, (2) **Academy's** defense to **Turnkey's** breach of contract claim, and (3) **Academy's** claims against **Turnkey**. The trial court "admit[ed] all of the testimony regarding the sales tax audits before the Court to determine whether or not there are any fact issues to go to the jury on this issue or whether it's a matter of law." After hearing the testimony, the trial court determined there were no fact issues concerning the tax matters, but instead, such matters were questions of law for the court.

**Academy** claims that under the San Antonio and League City contracts, it was entitled to withhold all sums due on those contracts until **Turnkey** had paid all taxes related to the work it performed under the contracts:

> 10. Taxes. The Contract Amount includes all federal, state and local taxes and duties. All taxes levied or assessed against Owner or Contractor arising out of the furnishing or installation by Contractor or materials, equipment or any other kind of personal property in the improvement of the Property shall be paid by Contractor, and all such taxes are included in the Contract Amount. If the applicable taxing authority does not require Contractor to pay all or part [of] such taxes, or Contractor obtains a refund in whole or in part of any such tax which was included in the Contract Amount, then in either even the Contract Amount shall be correspondingly decreased. *Contractor's failure to pay any federal, state or local taxes or duties shall entitle Owner to withhold any sum due to Contractor under this Contract, and if such taxes are not paid within forty-eight (48) hours after notice from Owner to Contractor of such unpaid taxes, Owner may forthwith terminate this Contract without further liability to Contractor and/or pay such taxes directly and deduct the amount thereof from the Contract Amount.*

(Emphasis added).

Pursuant to Paragraph 10, if **Turnkey** failed to pay taxes that had been levied or assessed under the contract, **Academy** could temporarily withhold any sums due to **Turnkey** under the contract. **Academy** was then required to give notice to **Turnkey** of the amount of unpaid taxes due, and if **Turnkey** did not pay the taxes "within forty-eight (48) hours after notice," **Academy** could pay the taxes owed, deduct the payment from the amount owed under the contract, and terminate the contract. **Academy** did not pursue any of the contractual remedies available to it. At trial, **Academy** did not want to have a judgment entered in its favor for the unpaid taxes. Instead, **Academy** wanted to retain in its bank account the $235,811.11 it withheld from **Turnkey** until **Turnkey** had paid those taxes. In view of **Academy's** position *739 at trial, it was not an abuse of discretion for the trial court to exclude from the jury testimony regarding unpaid taxes. **Academy's** second issue is overruled.

## B. Findings of Fact and Conclusions of Law

[7] In its third issue, **Academy** asserts that the trial court erred in refusing to make findings of fact and conclusions of law on its claims and defenses arising from **Turnkey's** failure to pay sales and employment taxes pursuant to the **Academy** contracts. As previously observed, rather than submit the tax issues to the jury, the trial court decided that those issues were to be tried to the court.

[8] [9] If findings of fact and conclusions of law are properly requested, the trial court has a mandatory duty to file findings and conclusions. *See Cherne Indus., Inc. v. Magallanes,* 763 S.W.2d 768, 772 (Tex.1989). Such failure is presumed harmful, unless the record affirmatively shows that the complaining party suffered no injury. *See id.* An appellant is harmed if there are two or more possible grounds on which the trial court could have ruled, and the appellant is left to guess the basis for the trial court's ruling. *See Zieba v. Martin,* 928 S.W.2d 782, 786 (Tex.App.-Houston [14 th Dist.] 1996, no writ); *Goggins v. Leo,* 849 S.W.2d 373, 379 (Tex.App.-Houston [14 th Dist.] 1993, no writ).

[10] The trial court informed Academy that there were no disputed facts regarding the tax issues and further informed Academy that Academy's position in not wanting a judgment on the unpaid taxes, but instead, wanting to withhold the unpaid amounts due to Turnkey until the taxes were paid was untenable. Therefore, there was not more than one basis on which the trial court could have ruled and Academy was not left to "guess" the basis for the trial court's ruling. [1] Academy's third issue is overruled.

### IV. Exclusion of Evidence Concerning the "Kickback" Scheme

In its fourth issue, Academy asserts that the trial court erred in excluding evidence establishing its claim that Bartee and Turnkey were involved in a kickback scheme in which Turnkey paid Bartee in exchange for Turnkey being awarded the San Antonio and League City contracts. Academy contends that the alleged kickback scheme breached the provision in the contracts, which prohibited Academy and Turnkey from entering into any other agreements with third parties concerning the remodeling of the San Antonio and League City stores.

Most of the excluded evidence consists of the testimony of Tim Baker ("Baker"), the owner of Baker Lighting & Signs Maintenance, regarding money he paid to Bartee in return for obtaining contracts with Academy. Although Academy lists many incidents which occurred allegedly in furtherance of the kickback scheme, most of those incidents concern Baker's involvement with Bartee, and do not concern Turnkey or Stuckey. [2]

*\*740 A. Rule of Evidence 404(b)*

[11] Academy claims that Baker's testimony showed Bartee's intent, preparation, and plan to engaged in a concerted scheme to collect kickbacks from Academy's contractors, including Turnkey. Academy argues such evidence is admissible under Texas Rule of Evidence 404(b), which provides that while evidence of other wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith, it may be admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See* TEX. R. EVID. 404(b).

Any evidence that Baker and Bartee intended to, and prepared to, engage in a kickback scheme with other contractors or on projects other than the San Antonio and League City projects is not evidence as to Turnkey's alleged involvement. The evidence does not detail or explain Turnkey's or Stuckey's involvement in the Bartee/Baker scheme. Nor does this evidence conclusively establish any wrongdoing on the part of Turnkey or Stuckey regarding the Academy projects. *See First S.W. Lloyds Ins. Co. v. MacDowell,* 769 S.W.2d 954, 957 (Tex.App.-Texarkana 1989, writ denied). Baker's testimony was not admissible under Rule 404(b).

### B. Rule of Evidence 801(e)(2)(E)

[12] Academy also asserts its excluded evidence was admissible as an exception to the hearsay rule under Rule 801(e)(2)(E). A statement is not hearsay if it is offered against a party and is by a co-conspirator of a party made during the course, and in furtherance, of the conspiracy. *See* TEX. R. EVID. 801(e)(2)(E). Academy argues that even if Stuckey and Turnkey were not aware of all the details of the conspiracy's activities, the excluded evidence regarding Bartee's involvement with other contractors was admissible. Evidence is relevant if it has a tendency to make the existence of a fact more or less probable than it would be without the evidence. *See* TEX. R. EVID. 401. Evidence which is not relevant is not admissible. *See* TEX. R. EVID. 402. Baker's testimony regarding his own payments to Bartee is not relevant to show that Turnkey and Stuckey were involved with Bartee in a kickback scheme. Therefore, Baker's testimony was not admissible under Rule 801(e)(2)(E).

### C. Rule of Evidence 803(24)

[13] Academy further claims that Bartee's statements to Baker regarding another contractor's initial refusal and subsequent agreement to pay kickbacks, how bids were to be rigged, and Bartee's receipt of $3,000 at Baker's birthday party attended by many of Academy's contractors, were admissible as statements against Bartee's interest because such statements subjected Bartee to potential criminal and civil liability. *See* TEX. R. EVID. 803(24). None of these statements establish any involvement by Turnkey or Stuckey, only Bartee's involvement with Baker and possibly other undisclosed contractors. Such evidence is not relevant and, therefore, was not admissible under Rule 803(24). *See* Tex.R. Evid. 401, 402.

### D. Rule of Evidence 613

[14] Academy claims the trial court erred in excluding testimony by Baker of kickbacks he paid to Bartee and Bartee's demands for kickbacks because such evidence was relevant to impeach Bartee's denial that he was involved in any kickback conspiracy to defraud Academy. *See* TEX. R. EVID. 613. Again, this evidence does not connect Turnkey or Stuckey to Bartee's kickback scheme. Because it is not relevant, it was not admissible under Rule 613. *See* TEX. R. EVID. 401, 402. In sum, we find that the trial court did not abuse its discretion in excluding Baker's testimony regarding his own involvement with Bartee. Academy's fourth issue is overruled.

### *741 V. Exclusion of Evidence Concerning Academy's Damages

[15] In its fifth issue, Academy contends that the trial court's exclusion of Baker's testimony prejudiced its affirmative claim for damages because that testimony would have shown Academy's damages of at least $500,000 arising from the kickback scheme. Baker would have testified that he paid between 10% and 15% of his revenues from Academy as kickbacks to Bartee. Turnkey received more than $3,500,000 in revenues from Academy. Therefore, applying the "kickback formula," Academy's damages from Turnkey's and Stuckey's alleged kickback payments to Bartee were at least $350,000. Furthermore, as alleged co-conspirators, Academy claims that Turnkey and Stuckey are each liable for any wrongful actions committed by the other co-conspirators and, therefore, Stuckey and Turnkey are liable for the $150,000 in kickbacks that Baker admitted paying to Bartee. Without any evidence that Turnkey and

Stuckey were part of a conspiracy with Bartee and Baker, the trial court did not abuse its discretion in excluding this testimony, and Academy's fifth issue is overruled.

### VI. Exclusion of Evidence of Unjust Enrichment

[16] [17] [18] [19] In its sixth issue, Academy claims that the trial court erred in excluding evidence on its claim for unjust enrichment for Turnkey's failure to pay federal and state taxes related to work Turnkey performed for Academy, as required in the contracts. A party may recover under the theory of unjust enrichment when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage. *See Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex.1992). Unjust enrichment, however, is not a proper remedy merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant, or because the benefits to the person sought to be charged amount to a windfall. *See id.* at 42. Moreover, a plaintiff cannot recover under unjust enrichment " 'if the same subject is covered by an express contract.' " *TransAmerican Natural Gas Corp. v. Finkelstein*, 933 S.W.2d 591, 600 (Tex.App.-San Antonio 1996, writ denied) (quoting *Lone Star Steel Co. v. Scott*, 759 S.W.2d 144, 154 (Tex.App.-Texarkana 1988, writ denied)); *see also Zapata Corp. v. Zapata Gulf Marine Corp.*, 986 S.W.2d 785, 788 (Tex.App.-Houston [1 st Dist.] 1999, no pet.); *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex.App.-El Paso 1997, no writ).

Because the San Antonio and League City contracts expressly provide for the payment of taxes, Academy cannot recover for unjust enrichment. Therefore, it was not an abuse of discretion for the trial court to exclude Academy's evidence purportedly establishing its entitlement to recover for unjust enrichment. Academy's sixth issue is overruled.

### VII. Turnkey's Attorney's Fees

[20] [][21][] [22] In its seventh issue, challenging the legal sufficiency of the evidence supporting Turnkey's award of attorneys fees, Academy claims the trial court erred in not granting its motion for instructed verdict, motion for judgment n.o.v., and motion for new trial on Turnkey's award for attorney's fees because Turnkey failed to present evidence on three of the eight factors set forth by the Texas Supreme Court for determining the reasonableness and

necessity of attorney's fees.[3] Those *742 eight factors are: (1) the time and labor involved, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *See Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 818 (Tex.1997).

Academy claims Turnkey did not present evidence of the second, fifth, and sixth factors; therefore, the evidence is legally insufficient to support an award of attorney's fees. There is nothing in *Perry Equip. Corp.* to suggest that the eight factors are elements of proof, rather than guidelines which the factfinder "should consider when determining the reasonableness of a fee." *See id.; see also* TEX. DISCIPLINARy R. ProfL CONDUCT 1.04, *reprinted in* T EX. GOV'T CODE ANNN., tit. 2, subtit. G app. A (Vernon 1998) (TEX. STATE BAR R. art. X, § 9) (listing "factors that may be considered in determining the reasonableness of a fee include, but not to the exclusion of other relevant factors").

[23]     Turnkey's counsel, Brian Womac ("Womac"), testified as to attorney's fees. Womac, who is board certified in commercial real estate law, stated that he had been practicing law for thirteen years, had experience with commercial contracts, and had represented property owners in retail establishments and contractors. Womac's firm had expended 1200 hours of attorney's time on this case. Womac believed that all the services his firm had rendered were reasonable and necessary to prosecute Turnkey's claims. He testified that it was necessary to prepare demand letters, propound written discovery, respond to Academy's discovery, and take depositions. Womac also stated additional work was performed because of Academy's counterclaims and Academy's joining Stuckey as a third-party defendant. Additionally, the parties could not agree on the issues and Turnkey filed a motion for summary judgment.

Womac's billing rate was $150 per hour and his associates' billing rate was $100 per hour. Based on his experience and familiarity with fees other attorneys charge for this type

of work on similar cases, Womac believes their fees are reasonable and that $150,000 is the amount reasonable and necessary to the prosecution of Turnkey's claims through trial, $20,000 for appeal to the court of appeals, $5,000 in the event that review is sought in the Texas Supreme Court, and $5,000 if review is granted. Under the factors set forth in *Perry Equip. Corp.,* we find this to be more than a scintilla of evidence in support of the judgment awarding Turnkey attorney's fees.

[24]     [25]     Academy further complains that the jury was not instructed on the eight factors or that Turnkey needed to establish all eight factors to recover attorney's fees. A review of the record reflects that while Academy objected to the charge on the basis of legal insufficiency of the evidence, it did not object to the charge for failing to instruct the jury on the *Perry Equip. Corp.* factors, but instead, waited to object on this basis in its motion for judgment n.o.v. and motion for new trial. To preserve error in the jury charge, a party must make the trial court aware of the complaint, timely and plainly, and obtain a ruling. *See State Dep't of Highways & Public Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992). Objections must be made before the charge is read to the jury. *See Missouri Pac. R.R. Co. v. Cross,* 501 S.W.2d 868, 873 (Tex.1973); *Operation Rescue–Nat'l v. Planned Parenthood of Houston & S.E. Tex., Inc.,* 937 S.W.2d 60, 69 (Tex.App.-Houston [14[th] Dist.] 1996), *743 *aff'd as modified on other grounds,* 975 S.W.2d 546 (Tex.1998). By not objecting to the failure to instruct the jury on the *Perry Equip. Corp.* factors prior to the charge being submitted to the jury, Academy has waived any error with regard to this complaint.

Academy also asserts that the trial court erred in excluding expert testimony, which it claims shows that Turnkey's attorney's fees were unreasonable. According to Academy, such evidence established that: (1) Turnkey's objections to Academy's discovery were unreasonable; (2) Turnkey failed to confer with Academy's trial counsel prior to filing discovery motions; and (3) summary judgment issues could have been resolved by stipulation.

With respect to Academy's claims that Turnkey's discovery requests were unreasonable, the trial judge responded that no unnecessary motions were filed in this case, and that she encourages the parties to seek protection from, and present their discovery objections to, the court. She further informed Academy that she did not find that any lawyer's conduct in this case was improper. In any event, a review of the record establishes that Academy was allowed to cross-

examine Womac about Turnkey's unsuccessful objections to Academy's pretrial discovery. A copy of the trial court's order ordering Turnkey to turnover a number of documents and answer certain interrogatories, and ordering the continuation of the depositions of two of Turnkey's witnesses, which had ceased on Turnkey's objections, was admitted into evidence.

[26] With respect to Academy's claim that Turnkey's counsel failed to confer with opposing counsel before filing motions, the trial judge reminded Academy that she does not require a certificate of conference for motions filed in her court and, therefore, there was no violation of that rule. Finally, with respect to Academy's claim that certain issues could have been resolved by stipulation rather than by summary judgment, a review of the record does not show that Academy attempted to introduce, or objected to the exclusion of, that evidence. Academy has waived this complaint. *See* TEX. R. APP. P. 33.1.

In sum, the trial court refused to permit testimony regarding discovery practices which were not found to be abusive or in violation of any rules. Such matters are properly within the trial court's authority to control its docket. Therefore, we find that the trial court did not abuse its discretion in excluding the above evidence. Academy's seventh issue is overruled.

### VIII. Academy's Attorney's Fees

In its eighth and ninth issues, Academy claims that the jury's refusal to award it attorney's fees was based, in part, on the trial court's having erroneously excluded Academy's expert witness testimony regarding the actions its own attorney's had to take in response to Turnkey's "improper efforts to stymie Academy's discovery" and "excessive and unnecessary motions for summary judgment." Academy further challenges the jury's failure to award it any attorney's fees as legally insufficient or, in the alternative, against the great weight and preponderance of the evidence.

[27] [28] In Texas, attorney's fees are recoverable only by statute or by contract. *See Jackson v. Biotectronics, Inc.,* 937 S.W.2d 38, 44 (Tex.App.-Houston [14 th Dist.] 1996, no writ). Because attorney's fees are not recoverable on tort claims, the only basis upon which Academy could have recovered attorney's fees was on its breach of contract claim pursuant to T EX. CIV. PRAC. & REM.CODE ANNN. § 38.001(8) (Vernon 1997). *See Metropolitan Life Ins. Co. v. Haney,* 987 S.W.2d 236, 243–44 (Tex.App.-Houston [14

th Dist.] 1999, pet. denied) (stating that attorney's fees are not recoverable on tort claims); *Villasenor v. Villasenor,* 911 S.W.2d 411, 420 (Tex.App.-San Antonio 1995, no writ) (same). To recover attorney's fees under § 38.001, the party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages. *See Green Int'l, *744 Inc. v. Solis,* 951 S.W.2d 384, 390 (Tex.1997); *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 437 (Tex.1995).

Here, Academy did not recover on any of its claims and was not awarded any damages and, therefore, is not entitled to recover attorney's fees. Because of our disposition of Academy's other issues and of this case, we need not address Academy's challenge to the exclusion of its expert testimony. Academy's eighth and ninth points of error are overruled.

### IX. Prejudgment Interest

[29] In its tenth issue, Academy contends the trial court erred in calculating prejudgment interest. The judgment provides that the prejudgment interest began to accrue on August 23, 1996, at a rate of 10% per annum.

[30] Neither the San Antonio contract nor the League City contract specifies the rate of interest at which prejudgment interest on damages is to be calculated. When the underlying contract does not specify the rate of interest, the rate of prejudgment interest is calculated at a rate of 6% if the amount payable can be ascertained. *See* TEX. FIN. CODE ANN. § 302.002 (Vernon Supp.2000). A contract is one "ascertaining the sum payable" when it provides the conditions upon which liability depends and fixes a measure by which the sum payable can be ascertained with reasonable certainty, in light of the attending circumstances. *See Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1,* 950 S.W.2d 371, 372–73 (Tex.1997). On the other hand, if the amount payable cannot be ascertained from the contract, prejudgment interest accrues at a rate of 10%. *See* TEX. FIN. CODE ANN. § 304.003 (Vernon Supp.2000).

We conclude that the sum due and payable to Turnkey is ascertainable from the contracts.[4] Therefore, the 6% interest rate set forth in § 302.002 is the correct rate, and the trial court erroneously calculated prejudgment interest at a rate of 10%. Section 302.002 further provides that prejudgment interest begins to accrue thirty days after the date the amount becomes due and payable. The amount owed to Turnkey

was due and payable as of July 24, 1996; therefore, August 23, 1996, is the correct date from which to begin calculating interest. **Academy's** tenth issue is sustained.

accordance with this opinion at a rate of 6% interest, starting from August 23, 1996, and affirm the remainder of the judgment. Accordingly, the judgment of the trial court is affirmed, in part, and reversed and remanded, in part.

### X. Conclusion

We remand the prejudgment interest portion of this case to the trial court to recalculate the prejudgment interest in

### All Citations

21 S.W.3d 732

### Footnotes

1     **Academy** argues the proper remedy for the trial court's failure to make findings of fact and conclusions of law is reversal and remand for a new trial. Contrary to **Academy's** contention, if harm is shown by the court's failure to issue findings of fact and conclusions of law, the appropriate remedy is to abate the appeal and direct the trial court to correct its error pursuant to TEX. R. APP. P. 44.4. *See Cherne Indus., Inc.,* 763 **S.W.**2d at 773; *Zieba,* 928 **S.W.**2d at 786.

2     One of the listed incidents includes Red Stuckey, the brother of Stuckey and a Turneky employee. Baker testified that Bartee asked Baker to pay for eyeglasses, which Red Stuckey broke when he got into a fight with an employee of Four Star Air Conditioning at **Academy's** store in Humble. The Four Star employee picked up a piece of extra electrical equipment that Baker had saved aside and was going to sell, splitting the proceeds of the sale with Bartee. Red Stuckey hit the Four Star employee. Baker testified that he paid for the glasses in an effort to cover up the theft scheme. Bartee warned Baker that if Mr. Gochman, the president of **Academy**, found out about the incident, then their scheme would be in jeopardy.

3     When reviewing a challenge to the legal sufficiency of the evidence, i.e., a "no evidence" issue, the reviewing court may consider only the evidence and inferences that support the challenged finding and should disregard all evidence and inferences to the contrary. *See Southwestern Bell Mobile Sys. v. Franco,* 971 **S.W.**2d 52, 54 (Tex.1998) (per curiam). A no evidence point will be sustained if there is no more than a scintilla of evidence to support the finding. *See General Motors Corp. v. Sanchez,* 997 **S.W.**2d 584, 588 (Tex.1999).

4     **Turnkey** conceded in its brief to this court that the amount was ascertainable from the contracts in accordance with TEX. FIN. CODE ANN. § 302.002.

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Clear Lake City Water Authority v. Friendswood Development Co., Ltd., Tex.App.-Hous. (14 Dist.), June 2, 2011

986 S.W.2d 331
Court of Appeals of Texas,
Texarkana.

AU PHARMACEUTICAL, INC., Appellant,

v.

Betty BOSTON, et al., Appellees.

No. 06–98–00032–CV. | Argued
Dec. 8, 1998. | Decided Jan. 29, 1999.

Plaintiffs filed action on a sworn account and for breach of contract, negligence, gross negligence, misrepresentation and fraud, alleging that **pharmaceutical** company and its president breached settlement contract. The 4th Judicial District Court, Rusk County, J. Clay Gossett, J., entered summary judgment in favor of plaintiffs. Appeal was taken. The Court of Appeals, Ross, J., held that: (1) provision of settlement contract expressly agreeing to interest at rate of zero percent precluded award of prejudgment or postjudgment interest at statutory rates; (2) plaintiffs were required to segregate attorney fees incurred on breach of contract claim on which they ultimately recovered from other claims; (3) genuine issue of material fact existed, precluding summary judgment, regarding reasonableness of requested attorney fees; and (4) challenge to capacity of legal representative of estate named as one of plaintiffs was waived by failure to assert it by verified denial.

Affirmed in part, reformed in part, reversed in part, and remanded in part.

West Headnotes (26)

[1] **Interest**
 Construction and Operation
 Provision of settlement agreement expressly stating parties' agreement to interest rate of zero percent precluded application of statute establishing prejudgment interest rate when no specified rate is agreed upon by parties. V.T.C.A., Finance Code § 302.002.

2 Cases that cite this headnote

[2] **Statutes**
 Plain Language; Plain, Ordinary, or Common Meaning
 In interpreting a statute, courts are required to give words their ordinary and plain meaning.

Cases that cite this headnote

[3] **Interest**
 Construction and Operation
 Provision of settlement contract expressly stating parties' agreement to interest rate of zero percent applied to period between breach of settlement contract and judgment, absent anything in settlement contract indicating that parties intended zero interest rate agreed upon to apply only prior to maturity which then would allow statutory prejudgment rate to apply after maturity until judgment. V.T.C.A., Finance Code § 302.002.

3 Cases that cite this headnote

[4] **Contracts**
 Language of contract
 In construing contracts, the primary concern of courts is to ascertain and to give effect to the intentions of the parties as expressed in the instrument.

Cases that cite this headnote

[5] **Contracts**
 Application to Contracts in General
 If the contractual provision in question is unambiguous, courts must determine the rights and liabilities of the parties by giving legal effect to the contract as written.

Cases that cite this headnote

[6] **Interest**
 Construction and Operation

Equitable interest doctrine allowing award of interest when no specified interest is agreed upon by parties did not apply to situation where parties had expressly agreed in settlement agreement to interest rate of zero percent.

1 Cases that cite this headnote

**[7] Interest**

⊛ Judgments founded on contract fixing rate

Statute declaring that postjudgment interest for judgment on contract providing for specific interest rate be imposed at lesser of rate specified in contract or 18% precluded any award of postjudgment interest on judgment enforcing parties' settlement agreement which expressly provided for interest at rate of zero percent. V.T.C.A., Finance Code § 304.002.

1 Cases that cite this headnote

**[8] Costs**

⊛ American rule; necessity of contractual or statutory authorization or grounds in equity

Attorney's fees must be authorized by statute or contract; the common law does not provide a right to attorney's fees.

3 Cases that cite this headnote

**[9] Costs**

⊛ American rule; necessity of contractual or statutory authorization or grounds in equity

If a case involves more than one claim, attorney fees may be recovered only for those claims falling within the statute or contract authorizing award of attorney fees.

2 Cases that cite this headnote

**[10] Costs**

⊛ Evidence as to items

Party seeking recovery of attorney fees always has the burden of proof to show that the fees were incurred against the particular defendant sought to be charged.

1 Cases that cite this headnote

**[11] Costs**

⊛ Form and requisites of application in general

Where a plaintiff seeks to charge multiple defendants and one or more of those defendants have settled, the plaintiff must segregate the requested attorney fees so that the remaining defendants are not charged fees for which they are not responsible.

2 Cases that cite this headnote

**[12] Costs**

⊛ Items and amount; hours; rate

When the causes of action involved in a suit are dependent upon the same set of facts or circumstances and thus are intertwined to the point of being inseparable, the party suing for attorney fees may recover the entire amount covering all claims.

Cases that cite this headnote

**[13] Appeal and Error**

⊛ Attorney fees

Standard of review for an award of attorney's fees on the basis of breach of contract is abuse of discretion.

8 Cases that cite this headnote

**[14] Appeal and Error**

⊛ Ordering new trial of certain issues only

If an award of attorney's fees is erroneously based upon evidence of unsegregated fees, the case must be remanded for more evidence on the issue.

Cases that cite this headnote

**[15] Costs**

⊛ Particular Actions or Proceedings

Attorney fees are not recoverable in tort actions.

1 Cases that cite this headnote

**[16]    Costs**
    ◌→ Form and requisites of application in general

Plaintiffs was required to segregate attorney fees incurred on breach of contract claim on which they ultimately recovered from tort claims which were dismissed or nonsuited, under circumstances that tort causes of action entailed proof of facts unnecessary for proof of contract claim.

3 Cases that cite this headnote

**[17]    Judgment**
    ◌→ Attorneys, cases involving

Genuine issue of material fact existed, precluding summary judgment, regarding reasonableness of requested attorney fees for prosecuting case for breach of settlement agreement through to summary judgment.

Cases that cite this headnote

**[18]    Judgment**
    ◌→ Personal knowledge or belief of affiant

Summary judgment affidavit of attorney constituted proper summary judgment evidence on issue of reasonableness of opposing party's requested attorney fees, where affidavit stated that it was based on affiant's personal knowledge, that he was competent to swear affidavit, that he practiced law in area and was familiar with legal services necessary to handle claims of type involved, and that he was of opinion that requested fees were not reasonable.

2 Cases that cite this headnote

**[19]    Judgment**
    ◌→ Personal knowledge or belief of affiant

To constitute proper summary judgment evidence, an affidavit must be made on personal knowledge, set forth facts which would be admissible in evidence, and show the affiant's competence. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(f).

1 Cases that cite this headnote

**[20]    Judgment**
    ◌→ Sufficiency of affidavit

Allegations in summary judgment affidavit must be direct, unequivocal, and such that perjury is assignable.

2 Cases that cite this headnote

**[21]    Costs**
    ◌→ Effect of fee agreement with attorney
    **Costs**
    ◌→ Evidence as to items

Contingent fee agreement should be considered by the fact finder, but cannot alone support an award of attorney fees, because the fact finder has no meaningful way to determine if the fees were reasonable and necessary without evidence of other applicable factors. State Bar Rules, V.T.C.A., Government Code Title 2, Subtitle G App., Art. 10, § 9, Rules of Prof.Conduct, Rule 1.04.

2 Cases that cite this headnote

**[22]    Costs**
    ◌→ Evidence as to items

Trial court may take judicial notice of usual and customary attorney fees, and it is presumed by statute that such fees are reasonable, but this presumption may be rebutted by competent evidence. V.T.C.A., Civil Practice & Remedies Code § 38.003.

2 Cases that cite this headnote

**[23]    Parties**
    ◌→ Want of capacity or interest

Purported challenge to legal standing of representative to pursue lawsuit on behalf of estate constituted challenge to legal capacity rather than to standing and thus was waived

by failure to raise challenge by verified denial. Vernon's Ann.Texas Rules Civ.Proc., Rule 93.

1 Cases that cite this headnote

**[24]    Action**
     ⊶ Persons entitled to sue
**Parties**
     ⊶ Capacity and interest in general

"Capacity" is a party's legal authority to go into court and prosecute or defend a suit, whereas "standing" is a party's justiciable interest in the suit and is a component of subject matter jurisdiction.

6 Cases that cite this headnote

**[25]    Parties**
     ⊶ Necessity and mode of objection, and effect of failure to object in general

Verified plea must be filed to raise a challenge to capacity anytime that the record does not affirmatively demonstrate the plaintiff's or defendant's right to bring suit or be sued in whatever capacity he is suing; application of rule is not limited to cases of representative capacity only. Vernon's Ann.Texas Rules Civ.Proc., Rule 93, subd. 2.

Cases that cite this headnote

**[26]    Parties**
     ⊶ Necessity and mode of objection, and effect of failure to object in general

Assertions that the cause of action brought by the plaintiff is owned by another party must be raised by a verified denial.

Cases that cite this headnote

**Attorneys and Law Firms**

*333 Ronald D. Gray, Geary Porter & Donovan PC, Addison, for appellant.

Russell Clay Brown, Wellborn, Houston, Adkison, Mann, Henderson, Ray L. Cox, Houston, for appellees.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Justice ROSS.

**AU Pharmaceutical**, Inc. (AU) appeals from the granting of summary judgment in favor of Betty **Boston**, Floyd **Boston**, Helen Fowler, L.E. Fowler, Gary Hawley, Barbara Jones, Wayland Jones "as representative of the Estate of H. Weimar Jones," Edith Keller, Helen McGehee, Slayton McGehee, Amelie Moffett, Milam Roberts, and Doris Snow (collectively referred to herein as **Boston**) for breach of a written settlement agreement between the parties. The trial court ultimately awarded damages of $140,000.00, prejudgment interest of $5,615.34 (at a rate of six percent), postjudgment interest at a rate of ten percent per annum until paid, and attorneys' fees of $14,000.00. In five points of error, **AU** contends that the trial court erred in awarding prejudgment and postjudgment interest, in awarding attorneys' fees, and in awarding judgment in favor of the estate of H. Weimar Jones, appearing through its purported representative Wayland Jones.

### BACKGROUND

On March 4, 1996, **Boston** entered into a comprehensive settlement agreement and release of claims (contract) with **AU**. The contract provided that **AU** would pay **Boston** $140,000.00 on or before February 25, 1997, and stated:

> Plaintiffs [**Boston**] agree and understand that the Settlement Proceeds shall not appreciate with interest or by any other means, the parties specifically agreeing that any interest to be charged on the Settlement Proceeds to equal zero (0) percent.

On March 12, 1997, **Boston** sued **AU** and, individually, Jeffery Ivy, the president of **AU**, on a sworn account and for breach of contract, negligence, gross negligence, misrepresentation and fraud, alleging that the defendants

breached the contract of March 4, 1996. On September 22, 1997, **Boston** filed a motion for summary judgment based solely on the contract claims, and the trial court rendered summary judgment against **AU** on October 27, 1997. It awarded actual damages of $140,000.00, prejudgment interest of $8,553.42 (at a rate of ten percent), postjudgment interest at a rate of ten percent per annum until paid, and attorneys' fees of $14,000.00. Also on October 27, the court granted **Boston's** motion to nonsuit all claims against **AU**, except for the breach of contract claim, and all claims against Ivy. **AU** later filed a motion for new trial which was overruled by operation of law. On January 23, 1998, the trial court entered a *nunc pro tunc* order, changing its award of prejudgment interest to $5,615.34 (a rate of six percent).

## *334 *PREJUDGMENT INTEREST*

[1]   **AU** contends that the trial court erred in awarding six percent prejudgment interest pursuant to TEX. FIN.CODE ANN. § 302.002 (Vernon 1998),[1] effective September 1, 1997, which reads as follows:

> When no specified rate of interest is agreed on by the parties, interest at the rate of six percent per year is allowed on all accounts and contracts ascertaining the amount payable, beginning on the 30th day after the date on which the amount is due and payable.

**AU** argues that the parties agreed in the contract upon a rate of zero percent interest in the contract and that when a contract provides for a specific rate of interest, that is the only rate that may be awarded as prejudgment interest. **Boston** contends that the parties' agreement on zero percent interest applies only during the stated time for performance of the contract and that they had no agreement as to prejudgment interest, i.e., compensation for the use, forbearance, or detention of money from the date of breach of the contract (maturity date) until the date of judgment. They argue that the terms of the agreement must be read as a whole and that, reading them as a whole, it is obvious the parties made no agreement as to interest after the maturity date.

Our first task is to determine if Section 302.002 applies in a case, as here, where the parties have agreed to an interest rate of zero percent. The critical language in the statute is, "When no specified rate of interest is agreed on by the parties...." Does this language refer to the lack of an agreement as to interest, or does it refer to an agreement to pay no interest?

We have found no Texas cases applying this statute to a contract where the parties agreed upon an interest rate of zero percent. However, a Missouri court of appeals has recently considered a claim that the trial court erred in awarding statutory prejudgment interest on defaulted promissory notes where the parties had agreed to the payment of zero interest. The Missouri statute authorizing prejudgment interest "when no rate of interest is agreed upon" is similar to Section 302.002. In sustaining this claim, we find the reasoning of the Missouri court to be persuasive:

> Here, there is no dispute that the parties agreed to interest on the notes at the rate of zero percent.... The fact that the rate agreed upon was zero percent does not change the fact that there was an agreement between them as to what interest rate would be paid. This is not a case where an interest rate was never discussed and decided upon. The "no" found in the phrase in the statute, "when no other rate is agreed upon," obviously refers to the lack of an agreement as to interest, not to an agreement to pay no or zero interest. Giving the phrase, "when no other rate is agreed upon," in [the statute] its plain and ordinary meaning, we interpret it to mean that where the parties to a note have agreed upon interest at any rate, including a rate of zero, they are bound by their agreement and an award of interest at the statutory rate is not implicated.

*Manfield v. Auditorium Bar & Grill, Inc.*, 965 **S.W.2d** 262, 269–70 (Mo.Ct.App.1998) (citations omitted).

[2]   In interpreting a statute, Texas courts are also required to give words their ordinary and plain meaning. *Geters v. Eagle Ins. Co.*, 834 **S.W.2d** 49, 50 (Tex.1992). Applying this rule of construction to Section 302.002, we interpret the phrase, "When no specified rate of interest is agreed on by the parties ...." to refer to the lack of an agreement as to interest, and not to an agreement to pay no interest. **AU** and **Boston** had an agreement as to interest, and that agreement was, "that any interest to be charged on the *335 Settlement Proceeds to equal zero (0) percent." That agreement took the matter out of Section 302.002, and it was error for the trial court to award **Boston** the statutory six percent prejudgment interest.

[3]   Turning our attention to **Boston's** argument that the agreement on zero percent interest applied only during the stated time for performance of the contract and that the parties made no agreement as to interest after the maturity date, we first note that the Texas Supreme Court has held that when a note specifies a rate of interest before maturity, but

is silent about any rate after maturity, TEX.REV.CIV. STAT. ANN.. art. 5069–1.03 [2] does not apply and the prematurity rate is implied as the postmaturity rate. *Petroscience Corp. v. Diamond Geophysical, Inc.*, 684 **S.W.2d** 668, 668–69 (Tex.1984); *see also Bailey, Vaught, Robertson and Co. v. Remington Invs., Inc.*, 888 **S.W.2d** 860, 866 (Tex.App.-Dallas 1994, no writ). The promise to pay a note is a contract no different from the promise to pay the settlement proceeds here. Since **AU** and **Boston** specified a rate of interest of zero percent in their contract, that same rate of interest is implied as the postmaturity rate.

This same issue was also addressed in the *Manfield* case. On the question of whether the statutory rate, or the zero rate provided for in the notes, applied after maturity, the Missouri court wrote:

> There is nothing in this language [of the statute] to suggest that [it] is to apply where parties agree in a note to an interest rate to be paid, but do not specify whether it is to apply before and/or after its maturity or default. If the legislature had intended for the statutory interest rate to apply where, as here, there is an agreement as to the rate of interest to be charged, but no separate and specific agreement as to whether the same rate is to be charged after maturity or default, it could have simply said so. It did not. The clear implication of the statutory language used is that if the parties to a note have agreed upon an interest rate without specifying whether it is to apply before and/or after maturity, the statutory interest rate of [the statute] cannot be charged.

*Manfield*, 965 **S.W.2d** at 270.

That court further pointed out that the statute under consideration clearly authorizes the parties to a note to contract on different rates of interest to be charged before and after maturity. The same is true of Section 302.002. However, there is nothing in the contract between **AU** and **Boston**-as there was nothing in the notes in issue in *Manfield*-to indicate that the parties intended that the zero percent interest rate agreed upon was to apply only prior to maturity. These parties made other agreements which anticipated breach of their contract, as evidenced by the following language:

> Should it become necessary to enforce this Agreement, or any portion of it, or to declare the effect of any provision of this Agreement, the Party prevailing in a judgment concerning such enforcement or declaration shall be entitled to recover costs, including reasonable attorneys' fees, incurred in obtaining or defending against such judgment.

We find it significant that the recovery of interest was not included in this provision. If the parties had intended for their specified rate of zero percent interest not to apply "[s]hould it become necessary to enforce this Agreement," it is reasonable to assume they would have expressed it in this provision. They did not, and we cannot consider **Boston's** interpretation that zero percent applied only until maturity.

[4] [5] In construing contracts, the primary concern of courts is to ascertain and to give effect to the intentions of the parties as expressed in the instrument. *Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 **S.W.2d** 951, 953 (Tex.1983). If the provision in question is unambiguous, courts must determine the rights and liabilities of the parties by giving legal effect to the contract as written. *Id.* The intent of **AU** and **Boston** that "the Settlement Proceeds shall not appreciate with interest or by any other means" is unambiguous, and they did not condition or *336 restrict that agreement to apply only until maturity.

[6] **Boston** argues that their recovery of prejudgment interest at the statutory rate is also justified on equitable grounds, citing *Phillips Petroleum Co. v. Stahl Petroleum Co.*, 569 **S.W.2d** 480 (Tex.1978). However, it is clear from *Phillips* that equitable interest applies when no specified interest is agreed upon by the parties. Other cases hold that interest in equity may be appropriate if the sum payable is not ascertainable from the contract. *Wheat v. American Title Ins. Co.*, 751 **S.W.2d** 943, 945 (Tex.App.-Houston [1st Dist.] 1988, no writ); *Acco Constructors, Inc. v. National Steel Prods. Co.*, 733 **S.W.2d** 368, 370 (Tex.App.-Houston [14th Dist.] 1987, no writ). Here, **AU** and **Boston** agreed on the specified interest of zero percent, and the settlement proceeds were clearly ascertainable from the contract. We find that the equitable interest doctrine does not apply in this case. **AU's** first point of error is sustained.

## POSTJUDGMENT INTEREST

[7]  TEX. FIN.CODE ANN. § 304.002 (Vernon 1998),[3] effective September 1, 1997, reads:

A judgment of a court of this state on a contract that provides for a specific interest rate earns interest at a rate equal to the lesser of:

> (1) the rate specified in the contract; or

> (2) 18 percent a year.

Because the contract provides for a specific interest rate of zero percent, Section 304.002 applies to provide a postjudgment interest rate of zero percent. In awarding postjudgment interest at the rate of ten percent, the trial court apparently applied TEX. FIN.CODE ANN. § 304.003 (Vernon 1998). However, that statute provides that the rate of interest to be determined under Section 304.003 applies to a judgment to which Section 304.002 does not apply. We hold that the trial court erred in awarding postjudgment interest, and AU's second point of error is sustained.

## SEGREGATION OF FEES

AU contends that the trial court improperly awarded attorneys' fees because Boston did not produce evidence that they segregated the work done pursuing the nonsuited claims against AU (sworn account, negligence, gross negligence, misrepresentation, and fraud) and against Ivy. AU argues that Boston's only summary judgment evidence as to attorneys' fees was the affidavit of their attorney, Ray Cox, who merely stated that he had been retained by Boston on a ten percent contingency basis to pursue claims on a sworn account and for breach of contract, negligence, gross negligence, misrepresentation, and fraud.

[8]  [9]  [10]  [11]  Attorney's fees must be authorized by statute or contract; the common law does not provide a right to attorney's fees. *Hill v. Heritage Resources, Inc.,* 964 S.W.2d 89, 143 (Tex.App.-El Paso 1997, pet. denied). If a case involves more than one claim, fees may be recovered only for those claims falling within the statute or contract. *Id.* Further, the party seeking recovery of attorney's fees always has the burden of proof to show that the fees were incurred

against the particular defendant sought to be charged. *Koch Oil Co. v. Wilber,* 895 S.W.2d 854, 867 (Tex.App.-Beaumont 1995, writ denied). Where a plaintiff seeks to charge multiple defendants and one or more of those defendants have settled, the plaintiff must segregate the fees so that the remaining defendants are not charged fees for which they are not responsible. *Stewart Title Guaranty Co. v. Sterling,* 822 S.W.2d 1, 10–11 (Tex.1991); *Koch,* 895 S.W.2d at 867.

[12]  Courts recognize an exception to this general duty to segregate fees in cases in which "the attorney's fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their 'prosecution or defense entails proof or denial of essentially the same facts.' " *Stewart,* 822 S.W.2d at 11; *see* *337 *Koch,* 895 S.W.2d at 867. "[W]hen the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are 'interwined [sic] to the point of being inseparable,' the party suing for attorney's fees may recover the entire amount covering all claims." *Stewart,* 822 S.W.2d at 11.

[13]  [14]  The standard of review for an award of attorney's fees on the basis of breach of contract is abuse of discretion. *Pyles v. United Servs. Auto. Ass'n,* 804 S.W.2d 163, 164 (Tex.App.-Houston [14th Dist.] 1991, writ denied); *cf. City of Austin v. Janowski,* 825 S.W.2d 786, 788 (Tex.App.-Austin 1992, no writ). The test for abuse of discretion is whether the trial court's decision was arbitrary or unreasonable. *Pyles,* 804 S.W.2d at 164. A trial court's actions are unreasonable only if the court acted without reference to any guiding rules and principles. *Janowski,* 825 S.W.2d at 788. If an award of attorney's fees is erroneously based upon evidence of unsegregated fees, the case must be remanded for more evidence on the issue. *Aetna Cas. and Surety v. Wild,* 944 S.W.2d 37, 41 (Tex.App.-Amarillo 1997, writ denied).

Boston contends that they did not have to segregate attorneys' fees because they fall within the exception to the general duty to segregate. They argue that their use of multiple causes of action and parties was for the sole purpose of collecting the total amount of the settlement proceeds, $140,000.00, and that because their claims arose out of the same facts and the prosecution entailed proof of the same facts, segregation was impossible.

AU argues that Boston produced no evidence at the summary judgment hearing to show that the claims are not severable or that the claims are so intertwined as to render segregation impossible. Further, it argues that the proof required to prove

the tort claims is distinctly different from that required to prove the contract claims, requiring separate discovery and trial strategies, and the fees are thus subject to segregation.

We agree that **Boston** did not produce evidence that the various legal claims they asserted were so intertwined that they were inseparable. The extent of **Boston's** proof of attorneys' fees was the affidavit of Cox, which did not purport to segregate fees by claim or defendant.

[15]    [16]    **Boston** was entitled to recover their attorneys' fees under the contract and pursuant to TEX. CIV. PRAC. & REM.CODE ANN. § 38.001 (Vernon 1997).[4] However, attorney's fees are not recoverable in tort actions. *Huddleston v. Pace*, 790 **S.W.2d** 47, 49 (Tex.App.-San Antonio 1990, writ denied). Because **Boston** ultimately recovered only on their breach of contract claim against **AU** and dismissed their tort claims, and because **Boston's** tort causes of action entailed proof of facts unnecessary for proof of their contract claim, and considering the percentage basis of the award without any evidence that the fees attributable to the breach of contract claim had been segregated, we find the trial court's award of attorneys' fees was an abuse of discretion and must be reversed and remanded. *See Hill*, 964 **S.W.2d** at 142–43. Because **Boston** nonsuited their tort claims against Ivy, the fees corresponding with work on those claims should also be segregated on remand. Work performed on the breach of contract claim against Ivy would appear to entail proof of essentially the same facts as the breach of contract claim against **AU** and may not need to be segregated. **AU's** third point of error is sustained.

## REASONABLE AND NECESSARY ATTORNEYS' FEES

[17]    First, citing *General Elec. Supply Co. v. Gulf Electroquip, Inc.*, 857 **S.W.2d** 591, 601 (Tex.App.-Houston [1st Dist.] 1993, writ denied), **AU** contends that a summary judgment award of attorneys' fees is improper where the nonmovant produces a contravening affidavit regarding fees. It argues that because it introduced the affidavit of Theodore Riney in response to **Boston's** motion for summary judgment, it created an issue of *338 fact regarding the reasonableness of the fees that precluded the granting of summary judgment under TEX.R. CIV. P. 166a(c).[5]

[18]    In response to **AU's** contention that summary judgment was not proper pursuant to the *General Electric* case because it filed a controverting affidavit, **Boston** attacks the

sufficiency of Riney's affidavit by arguing that it is nothing more than his opinions with no controverting evidence to support it. Citing *Law v. Law*, 792 **S.W.2d** 150, 151 (Tex.App.-Houston [1st Dist.] 1990, writ denied), they argue that an affidavit which states no facts does not constitute summary judgment evidence. Because Riney's affidavit is no evidence, they argue that there was no controverting evidence to the affidavit of Cox and that the trial court properly granted summary judgment under Rule 166a(c). **AU** replies that **Boston** did not object at the summary judgment proceeding to the adequacy of Riney's affidavit and, therefore, waived any error.

[19]    [20]    The *General Electric* case holds that a summary judgment award of attorney's fees is improper where the nonmovant produces a controverting affidavit regarding fees. **Boston's** attempt to impeach Riney's affidavit with the *Law* case is not on point. In the *Law* case, the affidavit attached to a response to a motion for summary judgment merely referenced the summary judgment response, stated that all the allegations in the response were true, and did not state any facts itself. The court held that because sworn pleadings do not constitute summary judgment evidence, the response did not present any fact issues to the trial court or preserve any for review. *Law*, 792 **S.W.2d** at 151. To constitute proper summary judgment evidence under Rule 166a(f), an affidavit must be made on personal knowledge, set forth facts which would be admissible in evidence, and show the affiant's competence. *Fisher v. Yates*, 953 **S.W.2d** 370, 383 (Tex.App.-Texarkana 1997), *writ denied per curiam*, 41 Tex. Sup.Ct. J. 1404, 1998 WL 652543 (Sept. 24, 1998). The allegations must be direct, unequivocal, and such that perjury is assignable. *Id.*

Here, Riney stated in his affidavit that it was based on his personal knowledge and that he was competent to swear an affidavit. He also stated that he practices in the Dallas area and is familiar with the legal services necessary to handle claims of the type involved in this case, and that applying his knowledge of the time and labor involved, difficulty of the issues presented, the skills requisite to properly conduct the case, customary charges of the Bar, and awards in similar cases, he is of the opinion that $14,000.00 is not a reasonable attorneys' fee for prosecuting this case to summary judgment. Because **Boston** has not directed us to any place in the record where they objected to the adequacy of Riney's affidavit, and because Riney's affidavit otherwise appears to be proper summary judgment evidence under TEX.R. CIV. P. 166a(f), we hold that a genuine issue of material fact was created as to

the reasonableness of the attorneys' fees which precluded the entry of summary judgment on this issue. We sustain AU's first contention under this point of error and reverse the trial court's award of attorneys' fees and remand for a trial on the issue of reasonable and necessary attorneys' fees.

Second, citing *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 818 (Tex.1997), AU contends that the mere existence of a contingency fee arrangement is not sufficient to prove the reasonableness of the fees in a breach of contract action as required by Section 38.001 because it does not establish the various factors that should be considered when determining the reasonableness of a fee.

Boston argues that the *Andersen* case is distinguishable from the instant case because it was an action brought under the Texas Deceptive Trade Practices Act and should be limited to its facts. It also argues that the underlying reason for the holding in the *Andersen* *339 case, that a contingency fee arrangement by itself is insufficient to prove the reasonableness of attorney's fees, is that a jury, without knowing what the total amount of the judgment would be, could only speculate as to whether a percentage of that unknown recovery would present a reasonable and necessary fee in that case. This is not the case here, they argue, because the amount of damages was known to be $140,000.00 and ten percent of this is $14,000.00, a known amount.

[21] The *Andersen* case did arise under the Texas Deceptive Trade Practices Act. However, its holding has been extended to other contexts. *See Lubbock County v. Strube,* 953 S.W.2d 847, 857–58 (Tex.App.-Austin 1997, pet. denied) (extending it to Whistleblower Act); *Purina Mills, Inc. v. Odell,* 948 S.W.2d 927, 940 (Tex.App.-Texarkana 1997, writ denied) (extending it to products liability/negligence/breach of warranty/DTPA). In accord with the *Andersen* case, we hold that a contingent fee agreement should be considered by the fact finder, but cannot alone support an award of attorney's fees, because without evidence of the factors identified in TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon 1998),[6] the fact finder has no meaningful way to determine if the fees were reasonable and necessary. *Andersen,* 945 S.W.2d at 818–19.

AU also complains that Boston did not produce the contingency fee contract in support of their summary judgment. Boston argues that this failure is not fatal because, pursuant to TEX. CIV. PRAC. & REM.CODE ANN. §

38.004 (Vernon 1997), the trial court is allowed to take judicial notice of the usual and customary attorney's fees and of the contents of the case file without receiving further evidence.

[22] A trial court may take judicial notice of usual and customary attorney's fees, and it is presumed, under TEX. CIV. PRAC. & REM.CODE ANN. § 38.003 (Vernon 1997), that such fees are reasonable. *Richards v. Mena,* 907 S.W.2d 566, 573 (Tex.App.-Corpus Christi 1995, writ dism'd by agr.). However, this presumption may be rebutted by competent evidence. *Id.* Here, even if the presumption of reasonable attorney's fees arose, it was rebutted by the competent testimony of Riney's affidavit.

## REPRESENTATIVE CAPACITY

[23] AU contends that even though H. Weimar Jones was a party to the contract, Boston has produced no evidence that Wayland Jones, listed in Boston's petition on sworn account as "representative of the Estate of H. Weimar Jones," has legal standing to represent the estate of H. Weimar Jones or to pursue a lawsuit on behalf of the estate of H. Weimar Jones, assuming such estate in fact exists. It argues that no letters testamentary or order appointing an executor was ever appended to the petition or entered into the summary judgment record. Further, it argues that there has been no showing that H. Weimar Jones is deceased. AU maintains that it challenged this defect both in its response to plaintiffs' motion for summary judgment and in its motion for new trial.

Boston responds that AU's complaint deals with the legal *capacity* of Wayland Jones to prosecute a claim for the estate of H. Weimar Jones and not with his *standing.* They argue that TEX.R. CIV. P. 93(1) and (2) require that an attack on the legal capacity of a plaintiff to sue or that the plaintiff is not *340 entitled to recover in the capacity in which he sues must be made in the form of a verified denial and that the failure to file a verified denial waives any complaint regarding a judgment rendered in the capacity in which the party was sued.

[24] [25] [26] The distinction between "capacity" and "standing" is dispositive of this issue. "Capacity" is a party's legal authority to go into court and prosecute or defend a suit, whereas "standing" is a party's justiciable interest in the suit and is a component of subject matter jurisdiction. *See Nootsie, Ltd. v. Williamson County Appraisal Dist.,* 925

S.W.2d 659, 661 (Tex.1996). TEX.R. CIV. P. 93 reads (in relevant part):

A pleading setting up any of the following matters, unless the truth of such matters appear of record, shall be verified by affidavit.

1. That the plaintiff has not legal capacity to sue or that the defendant has not legal capacity to be sued.

2. That the plaintiff is not entitled to recover in the capacity in which he sues, or that the defendant is not liable in the capacity in which he is sued.

If a plea under Rule 93(1) or (2) is not raised in a verified pleading, the issue is waived and not properly preserved for appeal. *Estate of Crawford v. Town of Flower Mound,* 933 S.W.2d 727, 731 (Tex.App.-Fort Worth 1996, writ denied). As stated in *Pledger v. Schoellkopf,* 762 S.W.2d 145, 146 (Tex.1988): "When capacity is contested, Rule 93(2) requires that a verified plea be filed anytime the record does not affirmatively demonstrate the plaintiff's or defendant's right to bring suit or be sued in *whatever* capacity he is suing. Its application is not limited to cases of representative capacity only. The rule means just what it says." (Citation omitted.). Further, "The 'capacity' addressed in rule 93(c)[7] ... is the standing of a party to assert or defend the action before the court. Capacity, or standing, as used in the rule, relates to instances such as an administrator's right to prosecute a decedent's cause of action,...." *Conrad v. Artha Garza Co.,* 615 S.W.2d 238, 240 (Tex.Civ.App.-Dallas 1981, no writ). Further, assertions that the cause of action brought by the plaintiff is owned by another party must be raised by a verified denial. *Matthiessen v. Schaefer,* 900 S.W.2d 792, 795 (Tex.App.-San Antonio 1995, writ denied).

One of AU's complaints is that the record does not affirmatively demonstrate Wayland Jones' right to bring suit

in the capacity as "representative of the Estate of H. Weimar Jones." They also assert that the cause of action is actually owned by someone else until proven otherwise. AU therefore challenges legal capacity, and not standing, which must be made by verified denial. Having made no verified denial, AU has waived the issue and there is nothing for appeal. AU's fifth point of error is overruled.

## DAMAGES FOR DELAY

Boston contends that AU's conduct has been to delay payment of the $140,000.00 owed them as opposed to challenging such payment. Therefore, Boston asks for further damages under TEX.R.APP. P. 84 (Vernon 1997) (now TEX.R.APP. P. 45[8] ). Boston has not directed us to evidence in the record to support their contention. In the absence of such evidence, we must deny this relief.

## SUMMARY

For the reasons stated above, we reverse that portion of the court's summary judgment awarding attorneys' fees. We sever Boston's claims for such fees and remand them for trial, consistent with this opinion. We sustain AU's objections to the trial court's awards of prejudgment and postjudgment interest, and we reform the trial court's judgment, striking all such recovery and ordering prejudgment and postjudgment *341 interest at the rate of zero percent. The remainder of the trial court's summary judgment, as reformed, is affirmed.

**All Citations**

986 S.W.2d 331

Footnotes

1    Some cases cited in this opinion refer to TEX.REV.CIV. STAT. ANN. . art. 5069–1.03. This statute was repealed in 1997 and recodified at TEX. FIN.CODE ANN. § 302.002 (Vernon 1998). Article 5069–1.03 read: "When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all written contracts ascertaining the sum payable, from and after the time when the sum is due and payable; and on all open accounts, from the first day of January after the same are made." *See Phillips Petroleum Co. v. Stahl Petroleum Co.,* 569 S.W.2d 480, 483 (Tex.1978).

2    Predecessor statute to TEX. FIN.CODE ANN. § 302.002.

3    TEX. FIN.CODE ANN. § 304.002 (Vernon 1998) was preceded by TEX.REV.CIV. STAT. ANN.. art. 5069–1.05, § 1.

4    TEX. CIV. PRAC. & REM.CODE ANN. § 38.001 (Vernon 1997) reads (in relevant part):

A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for:

....

(8) an oral or written contract.

TEX.R. CIV. P. 166a(c) reads (in relevant part):

The judgment sought shall be rendered forthwith if ... there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.... A summary judgment may be based on uncontroverted testimonial evidence of an interested witness ... if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted.

These factors include:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

TEX.R. CIV. P. 93(c) is now found at TEX.R. CIV. P. 93(2).

TEX. R. APP. P. 45 reads:

If the court of appeals determines that an appeal is frivolous, it may-on motion of any party or on its own initiative, after notice and a reasonable opportunity for response-award each prevailing party just damages. In determining whether to award damages, the court must not consider any matter that does not appear in the record, briefs, or other papers filed in the court of appeals.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2 S.W.3d 372
Court of Appeals of Texas,
San Antonio.

**BASIN CREDIT CONSULTANTS,**
INC. and Patrick O'Brien, Appellants,
v.
Lydia **OBREGON**, Appellee.

No. 04–98–01058–CV. | May 26,
1999. | Rehearing Overruled July 2, 1999.

Debtor brought action for violations of the Federal Fair Debt Collection Practices Act and the Texas Fair Debt Collection Practices Act. The 81st Judicial District Court, Atascosa County, Olin Strauss, J., entered summary judgment for debtor, and debt collectors appealed, challenging award of attorney fees. The Court of Appeals, Hardberger, C.J., held that debt collectors failed to create genuine issue of material fact regarding reasonableness of attorney fees.

Affirmed.

West Headnotes (7)

[1] **Judgment**
⟜ Attorneys
An affidavit filed by the movant's attorney that sets forth his qualifications, his opinion regarding reasonable attorney fees, and the basis for his opinion will be sufficient to support summary judgment on attorney fees claim, if uncontroverted.

14 Cases that cite this headnote

[] **Judgment**
⟜ Attorneys
An affidavit filed by non-movant's counsel that simply criticizes the attorney fees sought by the movant as unreasonable without setting forth the affiant's qualifications or the basis for his opinion will not be sufficient to defeat summary judgment on attorney fees claim.

11 Cases that cite this headnote

[3] **Judgment**
⟜ Matters of Fact or Conclusions
Affidavit that simply criticized amount of attorney fees sought by debtor as excessive, without setting forth affiant's qualifications or basis for his opinion, was conclusory and could not raise genuine issue of material fact regarding reasonableness sufficient to preclude summary judgment on attorney fees claim, in suit challenging debt collection practices.

14 Cases that cite this headnote

[4] **Judgment**
⟜ Hearing and Determination
A trial court may consider only the summary judgment evidence on file at the time of the summary judgment hearing or filed thereafter and before judgment with permission of the court.

2 Cases that cite this headnote

[5] **Judgment**
⟜ Hearing and Determination
On motion for summary judgment, late filed evidence is a nullity unless the record affirmatively shows the trial court's acceptance of the late filing.

2 Cases that cite this headnote

[6] **Appeal and Error**
⟜ Facts or Evidence Not Shown by Record
Where no affirmative showing is contained in the record, appellate court presumes that the trial court did not consider late-filed evidence in granting motion for summary judgment.

6 Cases that cite this headnote

[7] **New Trial**
⟜ Affidavits and Extrinsic Evidence in General

When a motion for new trial is filed after summary judgment is granted, the trial court may only consider the record as it existed prior to granting the summary judgment.

1 Cases that cite this headnote

**Attorneys and Law Firms**

*373 Jeffrey Gelb, Houston, for appellant.

Michael J. O'Connor, Raba-O'Connor, L.L.P., San Antonio, for appellee.

Sitting: PHIL HARDBERGER, Chief Justice ALMA L. LÓPEZ, Justice PAUL W. GREEN, Justice.

**Opinion**

Opinion by: PHIL HARDBERGER, Chief Justice.

Appellants, **Basin Credit Consultants**, Inc. ("Basin") and Patrick O'Brien ("O'Brien"), appeal a summary judgment in favor of appellee, Lydia **Obregon** ("Obregon"). The summary judgment finds **Basin** and O'Brien liable for violations of the Federal Fair Debt Collection Practices Act and the Texas Fair Debt Collection Practices Act. In their sole point of error, **Basin** and O'Brien assert that they were entitled to have a jury determine the amount of attorney's fees to be awarded. In the alternative, **Basin** and O'Brien contend that the amount of attorney's fees awarded by the trial court was not reasonable and necessary in relation to the damages awarded to **Obregon**. **Obregon** responds that the reasonableness of the attorney's fees award was established as a matter of law because **Basin** and O'Brien failed to file any competent summary judgment evidence to controvert her attorney's affidavit. We agree with **Obregon** and affirm the trial court's judgment.

**DISCUSSION**

[1] [][2][] An attorney's affidavit can sufficiently establish the reasonableness of attorney's fees for purposes of summary judgment. *See Querner Truck Lines, Inc. v. Alta Verde Industries, Inc.*, 747 S.W.2d 464, 468 (Tex.App.—San Antonio 1988, no writ). An affidavit filed by the movant's attorney that sets forth his qualifications, his opinion regarding reasonable attorney's fees, and the basis for his

opinion will be sufficient to support summary judgment, if uncontroverted. *Enell Corp. v. Longoria*, 834 S.W.2d 132, 135 (Tex.App.—San Antonio 1992, writ denied). An affidavit filed by non-movant's counsel that simply criticizes the fees sought by the movant as unreasonable without setting forth the affiant's qualifications or the basis for his opinion will not be sufficient to defeat summary judgment. *See Querner Truck Lines, Inc.*, 747 S.W.2d at 469 (summary judgment not defeated where controverting affidavit did not show affiant was competent to give opinion testimony about attorney's fees); *see generally* TIMOTHY PATTON, SUMMARY JUDGMENTS IN TEXAS § 9.07[3] (1996) (conclusory affidavit by non-movant's counsel criticizing amount of fees as unreasonable does not raise fact issue).

**Obregon** attached her attorney's affidavit to her motion for summary judgment. *374 Her attorney's affidavit sets forth his experience and the basis for his opinion regarding the reasonableness of the attorney's fees **Obregon** sought. [1] This evidence was sufficient to support summary judgment as to attorney's fees, if uncontroverted. *See Enell Corp.*, 834 S.W.2d at 135; *Querner Truck Lines, Inc.*, 747 S.W.2d at 468.

[3] **Basin** and O'Brien filed three affidavits in an effort to controvert **Obregon's** summary judgment proof. The first affidavit, which was timely filed, simply criticizes the amount of fees sought by **Obregon** as excessive. The affidavit does not set forth the affiant's qualifications or the basis for his opinion as to what a reasonable fee would be. [2] The affidavit is conclusory and does not raise a fact issue regarding the reasonableness of the attorney's fees sought by **Obregon**. *See Querner Truck Lines, Inc.*, 747 S.W.2d at 469; TIMOTHY PATTON, SUMMARY JUDGMENTS IN TEXAS § 9.07[3] (1996).

[4] [5] [6] [7] The second and third affidavits filed by **Basin** and O'Brien were filed after the summary judgment hearing. A trial court may consider only the summary judgment evidence on file at the time of the summary judgment hearing or filed thereafter and before judgment with permission of the court. *Hussong v. Schwan's Sales Enterprises, Inc.*, 896 S.W.2d 320, 323 (Tex.App.—Houston [1st Dist.] 1995, no writ). Late filed evidence is a nullity unless the record affirmatively shows the trial court's acceptance of the late filing. *Benchmark Bank v. Crowder*, 919 S.W.2d 657, 663 (Tex.1996); *Peek v. Equipment Services, Inc.*, 906 S.W.2d 529, 531 (Tex.App.—San Antonio 1995, no writ). Where no affirmative showing is contained in the record, we presume that the trial court did not consider

the evidence. *Benchmark Bank,* 919 S.W.2d at 663; *Peek,* 906 S.W.2d at 531. When a motion for new trial is filed after summary judgment is granted, the trial court may only consider the record as it existed prior to granting the summary judgment. *Leinen v. Buffington's Bayou City Service Co.,* 824 S.W.2d 682, 685 (Tex.App.—Houston [14th Dist.] 1992, no writ).

The second affidavit was filed after the summary judgment hearing, but before summary judgment was granted. There is no affirmative showing in our record that the trial court accepted the late filing of the second affidavit, so we presume the trial court did not consider it as evidence. The third affidavit was attached to the motion for new trial filed by **Basin** and O'Brien. Since it was not filed prior to the rendition of the summary judgment, it cannot be considered.

## CONCLUSION

The affidavit filed by **Obregon's** attorney was sufficient to support summary judgment on the issue of attorney's fees. Because **Basin** and O'Brien failed to controvert the affidavit with timely, competent summary judgment evidence, the trial court properly granted summary judgment. **\*375** The judgment of the trial court is affirmed.

## All Citations

2 S.W.3d 372

## Footnotes

1     The attorney's affidavit states: "I have practiced law in Bexar, Comal and Atascosa Counties beginning in 1985. I am familiar with rates charged for civil trial lawyers in Atascosa County, and the hourly rate of $175 per hour is a reasonable rate for the area and for the services I have provided. I am a 1985 graduate of St. Mary's Law School and have been board certified in Civil Trial Law by the Texas Board of Legal Specialization since 1990. These charges are usual and customary for this area for the same or similar services for an attorney with my experience, reputation, and ability, considering the type of controversy, time limitations imposed and the results obtained."

2     The affidavit states: "The attorney's fees alleged by Plaintiff's Motion for Summary Judgment are not reasonable and necessary for the sum sued upon. Attorney fees for Plaintiff should be less than $4,000.00. The hourly rate of $175.00 per hour is excessive by Plaintiff's attorney and should be $125.00 per hour. The number of hours to complete Plaintiff's attorneys services should be less than 30 hours."

End of Document      © 2015 Thomson Reuters. No claim to original U.S. Government Works.